IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, ET AL.,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
JUSTICE, ET AL.

      Defendants.

Civil Action No. 19-cv-00290-SK

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)      I am currently the Assistant Section Chief ("ASC") of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Winchester, Virginia and, in the absence of RIDS Section Chief, David M. Hardy, I serve as Acting Section Chief for RIDS.  I have held this position since June 26, 2016.  I joined the FBI in September 2011, and prior to my current position, I was the Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("PA") litigation cases nationwide.  Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIA/PA matters and served as agency counsel representing the DEA in FOIA/PA suits nationwide.  I also served as a

U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIA/PA litigation for the U.S. Army.  I am an attorney registered in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Acting Section Chief of RIDS, I supervise approximately 275 FBI employees, supported by approximately 74 contractors, who staff a total of twelve (12) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's request for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am aware of the FBI's handling of Plaintiffs' FOIA request for records related to social media surveillance.

(4)     Prior to Plaintiffs' initiation of this instant action, the FBI originally responded to Plaintiffs' FOIA request stating it could neither confirm nor deny the existence of records sought by Plaintiffs pursuant to FOIA Exemption 7E, 5 U.S.C. §§ 552 (b)(7)(E).  Upon additional review of the subject matter sought, the FBI determined its original position (neither confirming

2

nor denying the existence of records) can only be maintained for portions of Plaintiffs' request.

Additionally, the FBI has determined facets of Plaintiffs' request do not constitute proper FOIA

requests as they are not described in a manner that would allow the FBI to conduct searches with

a reasonable amount of effort.  For the remaining portions of Plaintiffs' request, the FBI is

currently searching for and processing responsive records for potential release.  This declaration

is submitted in support of Defendants' Partial Motion for Summary Judgment, only to defend the

FBI's determination it can neither confirm nor deny the existence of records responsive to certain

portions of Plaintiffs' request, pursuant to Exemption 7E.  This declaration also provides the

Court and Plaintiff the administrative history of Plaintiff's request.

## ADMINISTRATIVE HISTORY OF PLAINTIFFS' REQUESTS

(5)      By letter dated May 24, 2018, Plaintiffs submitted a FOIA request to the

FBI seeking:

    a.   All policies, guidance, procedures, directives, advisories, memoranda, and/or legal opinions pertaining to the agency's search, analysis, filtering, monitoring, or collection of content on any social media network [hereafter "item 1"];

    b.   All records created since January 1, 2015 concerning the purchase of, acquisition of, subscription to, payment for, or agreement to use any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network, including but not limited to:

       i.   Records concerning any product or service capable of using social media content in assessing applications for immigration benefits or admission to the United States [hereafter "item 2.a."];

      ii.   Records concerning any product or service capable of using social media content for immigration enforcement purposes [hereafter "item 2.b."];

     iii.   Records concerning any product or service capable of using social media content for border or transportation screening purposes [hereafter "item 2.c."];

3

     iv.   Records concerning any product or service capable of using social media content in the investigation of potential criminal conduct [hereafter "item 2.d."];

c.  All communications to or from any private business and/or its employees since January 1, 2015 concerning any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network [hereafter "item 3"];

d.  All communications to or from employees or representatives of any social media network (*e.g.,* Twitter, Facebook, YouTube, LinkedIn, WhatsApp) since January 1, 2015 concerning the search, analysis, filtering, monitoring, or collection of social media content [hereafter "item 4"]; and

e.  All records concerning the use or incorporation of social media content into systems or programs that make use of targeting algorithms, machine learning processes, and/or data analytics for the purpose of (a) assessing risk, (b) predicting illegal activity or criminality, and/or (c) identifying possible subjects of investigation or immigration enforcement actions [hereafter "item 5"].

Additionally, Plaintiffs requested expedited processing pursuant to 5 U.S.C. 552(a)(6)(E) and a waiver of all fees pursuant to 5 U.S.C. 552(a)(4)(A)(ii)(II). *See* **Exhibit A.**

(6)     By letter dated June 8, 2018, the FBI acknowledged receipt of Plaintiffs' request, and informed Plaintiffs it was assigned FOIPA Request No. 1407258-000. Additionally the FBI informed Plaintiffs it could neither confirm nor deny the existence of records responsive to their request pursuant to FOIA Exemption 7(E), because the mere acknowledgement of whether or not the FBI had any records in and of itself would disclose techniques, procedures, and/or guidelines that could reasonably be expected to risk circumvention of the law. Additionally, the FBI informed Plaintiffs they could appeal the FBI's response to DOJ, Office of Information Policy ("OIP"), within ninety (90) days of its letter, seek dispute resolution services through the Office of Government Information Services ("OGIS"), or contact the FBI's FOIA Public Liaison. *See* **Exhibit B.**

(7)     By letter dated July 18, 2018, Plaintiffs appealed the FBI's June 8, 2018 response

to OIP.  Plaintiffs averred the FBI's "Glomar"[1] response should be reversed.  Additionally,

Plaintiffs argued their requests for expedited processing and a fee waiver should be granted.  *See*

**Exhibit C.**

(8)     By letter dated July 23, 2019, OIP acknowledged receipt of Plaintiffs' appeal, and

assigned it appeal number DOJ-AP-2018-006841.  Additionally, OIP denied Plaintiff's request

for expedited processing of their appeal.  First, Plaintiffs did not demonstrate a time-sensitive,

urgent need for the records; and second, Plaintiffs had not demonstrated they were primarily

engaged in disseminating information.  OIP informed Plaintiffs if they were dissatisfied with

OIP's response, they could file a lawsuit in accordance with 5 U.S.C. § 552(a)(6)(E)(iii); and/or

seek mediation services through OGIS.  OIP also informed Plaintiffs seeking OGIS mediations

services would not affect their right to pursue litigation.  *See* **Exhibit D.**

(9)     On January 17, 2019, Plaintiffs filed their complaint in this instant action.  *See*

ECF No. 1.

(10)     By letter dated January 31, 2019, OIP advised Plaintiffs it was sending their

appeal back to the FBI so the FBI could search for responsive records with regard to certain

portions of the request.  *See* **Exhibit E.**

(11)     By letter dated May 31, 2019, the FBI advised Plaintiffs it was modifying its

earlier response.  The FBI explained that in regards to items 2)a-c, the FBI could neither confirm

nor deny the existence of any responsive records pursuant to FOIA Exemption (b)(7)((E).  In

---

[1] The term "Glomar" refers to an agency's response stating confirming or denying records would present a harm under a FOIA Exemption.  In *Phillipi v. CIA*, 655 F 2d. 1325, 1327 (D.C. Cir. 1981), a FOIA requester sought information concerning a ship named the "Hughes Glomar Explorer" and the CIA refused to confirm or deny its relationship with the "Glomar" vessel because to do so would compromise the national security or divulge intelligence sources and methods.

regard to items 3 and 4 of the request, the FBI advised that these items did not constitute proper

FOIA requests since it would not allow the agency to locate records with a reasonable amount of

effort pursuant to 28 C.F.R. § 16.3(b).  Finally, the FBI advised that is was currently conducting

searches for records responsive to the remaining portions of Plaintiffs' request.  *See* **Exhibit F**.

### THE FBI'S LIMITED GLOMAR RESPONSE

(12)     The FBI employs a Glomar response in instances where acknowledging the

existence or nonexistence of records would itself trigger harm to interests protected by one or

more FOIA exemptions.   To effectively implement the doctrine to protect identified interests,

the FBI must consistently provide a Glomar response in all similar cases regardless of whether

responsive records actually exist or do not exist.  If the FBI were to invoke a Glomar response

only when it actually possessed responsive records, it would render the Glomar response

meaningless as Glomar response would be a tacit admission that records exist.

(13)     Upon re-review of the FBI's original Glomar response, the FBI has determined it

can maintain a Glomar pursuant per FOIA Exemption 7E in response to items 2.a. through 2.c. of

Plaintiffs' request.[2]  These items seek records about tools for analyzing social media data in

conjunction with a specific type of enforcement action: *immigration enforcement* (emphasis

added).  The use of such tools for immigration enforcement would imply that the FBI is

analyzing social media data in conjunction with immigration records or similar data.

Immigration enforcement is not part of the FBI's primary law enforcement and intelligence

gathering missions.  Accordingly, if the FBI were to employ tools for analysis of social media

data, in conjunction with immigration enforcement data, it would do so in furtherance of other

---

[2] Thus, the FBI is searching for records responsive to item 2d of Plaintiff's request which seeks
such records in connection with investigation of potential criminal conduct.

criminal law enforcement, national security, or intelligence purposes. Additionally, item 2.c. also seeks the FBI's use of social media surveillance in conjunction with transportation screening. Revealing the FBI uses or does not use social media analysis to determine whether or not individuals pose a threat to the United States transportation infrastructure and other travelers would also allow for law enforcement circumvention. While the FBI has acknowledged generally it monitors social media as a law enforcement technique, it has not acknowledged whether it uses tools specifically to analyze social media data in conjunction with immigration records or enforcement procedures, or in the transportation security context. Confirming or denying the existence of records showing the FBI applies such techniques specific to immigration enforcement or transportation would itself reveal FBI capabilities, or the lack thereof. This non-public information about law enforcement techniques would allow criminals, terrorists, or intelligence targets to modify their behavior to evade FBI investigative efforts.

## FOIA EXEMPTION (b)(7)(E)

### *Exemption (b)(7) Threshold*

(14)    Before an agency can invoke any of the harms enumerated in Exemption 7, 5 U.S.C. §552 (b)(7), it must first demonstrate the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(15)    Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to investigate all violations of federal law not exclusively assigned to another

agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of the United States.

(16)    Immigration enforcement involves enforcing laws associated with immigration into the United States.  Additionally, transportation screening involves preventing crimes or acts of violence targeting the Unites States' transportation infrastructure and those traversing the United States.  Thus, records concerning these subjects are inherently related to law enforcement. Also, as described *supra*, if the FBI were to deploy tools in the specific setting of analyzing social media data in conjunction with immigration enforcement data, it would be doing so in furtherance of its law enforcement, national security, or intelligence gathering missions. Furthermore, if the FBI were to use social media data in the context of transportation screening, it would be doing so in furtherance of its mission to prevent federal crimes.  Therefore, the very fact that records sought by Plaintiff in items 2.a. through 2.c. exist or do not exist, would reveal records created for, or connected to the interests of, a law enforcement purpose.  As such, whether such law enforcement records exist or not readily crosses the Exemption 7 threshold.

### *Exemption 7E – Immigration Enforcement*

(17)    FOIA Exemption 7E protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552 (b)(7)(E).  This exemption protects techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not known to the public as well as non-public details about the use of known techniques and

procedures.

(18)    While the FBI has acknowledged it reviews social media information when generally pursuing its law enforcement duties, it has not confirmed use of the generally known technique in the specific setting sought by Plaintiffs herein, namely—the deployment of tools to analyze this information in conjunction with immigration enforcement data; and in the context of transportation screening.  Revealing the FBI has, or does not have, records responsive to Plaintiff's items 2.a. through 2.c. would itself reveal the fact that the FBI has the capability, or lacks the capability, to employ tools to analyze data located on social media platforms, in conjunction with immigration enforcement data, in furtherance of criminal or national security investigations; and the fact that the FBI has the capability, or lacks the capability, to employ tools to analyze data located on social media platforms in transportation screening.

(19)    It is my understanding that this Circuit has held that Exemption 7(E) does not require a showing that disclosure of particular techniques would risk circumvention of the law. I have nonetheless considered the likely consequences of disclosure, and have determined that providing a non-Glomar response under these circumstances would provide criminals or terrorists with a key piece of investigative information to either predict the use of investigative tools/intelligence analysis to alter or plan their activity if such records exist, or exploit enforcement blind spots if any such records do not exist.  In either instance, disclosure risks circumvention of the law.

(20)    When considering the FBI's Glomar determination, it's important to consider the types of crimes the FBI typically investigates, and thus would likely deploy such tools to investigate.  For example, one of the FBI's most important missions is to protect the United States from international terrorists who aim to commit violence upon American citizens in

furtherance of their political aims.  Informing international terrorists the FBI monitors social media information in conjunction with immigration data, would inform them the FBI is closely monitoring their behavior on social media platforms in association with any efforts to immigrate into the United States.  Terrorists often rely on social media to spread their message and recruit individuals to their causes – it is an important tool they use to pursue their violent objectives.[3] To the extent the FBI has records, to confirm this and thus reveal the FBI monitors their social media activity in conjunction with immigration enforcement data would inform them on how they should modify their behavior, should they attempt to enter the United States through immigration to commit violence within the United States or somehow further terrorist plots. Potential terrorists would be warned they should limit their social media presence during the timeframe of their immigration and/or change their presence to mislead investigators, to avoid additional scrutiny by FBI investigators.  Confirming the FBI has no responsive records would allow them to continue their social media campaigns focused on spreading their violent messages, without fear of further investigative scrutiny while attempting to enter the United States.

(21)    Another FBI core mission is to prevent foreign adversaries from committing espionage and subverting the national security of the United States.  Recently, there has been public confirmation foreign intelligence agencies have used social media to subvert the national security of the United States.[4]  Informing the United States' foreign adversaries and spies the FBI

---

[3] "Social Media has allowed both international and domestic terrorists to gain unprecedented, virtual access to people living in the U.S. in an effort to enable homeland attacks."

"What We Investigate: Terrorism." www.FBI.gov. Accessed July 16, 2019.

[4] *See generally* Special Counsel Robert S. Mueller, III. *Report On The Investigation Into Russian Interference In The 2016 Presidential Election.* Volume I, "II. Russian 'Active

monitors social media information in conjunction with immigration data, would inform them the

FBI is closely monitoring their behavior on social media platforms relevant to their efforts to

enter the United States.  This would allow them to predict such monitoring and take extra steps

to conceal their identities within their online presences, and/or modify their behavior to mislead

FBI investigators in order to allow for their successful entry into the Unites States.  This would

enable these criminals to enter the United States and pursue their nefarious missions in a manner

that avoids investigative scrutiny by the FBI.  Confirming the FBI has no responsive records

would allow them to continue their efforts on social media aimed at subverting the national

security of the United States, without fear of further investigative scrutiny from the FBI when

attempting to enter the United States.

(22)    As a final example, consider the FBI's efforts to investigate and prevent

international crime – specifically, the criminal activities of transnational, criminal gangs.  Some

of these criminal gangs have been known to use social media as a means of spreading fear and

intimidation, and finding new recruits. [5]  Revealing to these criminals the FBI is monitoring their

social media activities in conjunction with immigration records, would inform them they likely

need to mask their association with a transnational gang in their social media presence when

seeking to immigrate to the United States.  Doing so may allow them to avoid investigative

scrutiny by the FBI, and allow them to successfully enter the United States and pursue their

---

Measures' Social Media Campaign." United States Department of Justice, Office of the Special
Counsel. March, 2019. Pages 14-35.

[5] "Transnational criminal organizations are taking advantage of new communications
technologies and social media to facilitate criminal activity, recruit new members, and intimidate
or harass their rivals."

Harris, K.  *Gangs Beyond Borders: California and the Fight Against Transnational Organized
Crime.*  Office of the Attorney General, California Department of Justice. March 2014. Page iii.

criminal activities within the United States, undeterred. Confirming the FBI has no responsive records would allow them to continue their efforts on social media spread fear, intimidate rivals and find new recruits, without fear of further investigative scrutiny from the FBI when attempting to enter the United States.

### *Exemption 7(E) – Transportation Screening*

(23)    Plaintiff's item 2.c. seeks records relating to products or services allowing the FBI to use social media surveillance in conjunction with transportation screening.  Revealing whether or not the FBI uses tools to evaluate social media data to determine whether or not individuals pose a threat to the United States transportation infrastructure and other travelers would allow for law enforcement circumvention.  Informing criminals wishing to target United States transportation that the FBI is scrutinizing social media data for threats to transportation security would allow them to preemptively mask their travel plans and/or their violent intentions to avoid detection and disruption by the FBI.  As described above, different types of criminals use social media in furtherance of their criminal activities.  Thus, revealing the FBI *does not* possess tools to monitor social media for transportation screening purposes would also enable law enforcement circumvention – it would enable criminals planning attacks targeting United States transportation to further their criminal activities on social media unabated, without fear of the FBI discovering their plots to target United States transportation infrastructure or travelers.

### CONCLUSION

(24)    As described above, if the FBI were required to search for responsive records with regard to Plaintiffs items 2a.-c. and thus reveal whether or not such records exist, it would potentially inform criminals as to the investigative tools associated with immigration and social media and transportation screening available to FBI personnel.  Publically confirming the

existence of records related to these tools would enable criminals to modify their behavior in a manner that thwarts FBI investigative efforts and the investigative viability of such tools. Conversely, denying the FBI possesses responsive records related to these tools would show a possible gap in the FBI's intelligence gathering capabilities, and allow criminals to pursue their current immigration plans/plans to target United States transportation and pursue their criminal behavior on social media platforms, unabated. As such, in order to preserve the investigative viability of these tools, should they be available to the FBI, the FBI must neither confirm nor deny it possesses records responsive to Plaintiff's items 2.a. through 2.c., in accordance with Exemption 7E.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through F attached hereto are true and correct copies.

Executed this _6th_ day of September, 2019.

MICHAEL G. SEIDEL
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, ET AL<br><br>    Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF<br>    JUSTICE, ET AL<br><br>    Defendants. | Civil Action No. 19-cv-00290-SK |

# **<u>Exhibit A</u>**



AMERICAN CIVIL LIBERTIES UNION

May 24, 2018

FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, D.C. 20530-0001

Federal Bureau of Investigation
Attn: FOI/PA Request
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

Chief Privacy Officer/Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane SW, STOP-0655
Washington, D.C. 20528-0655

FOIA Officer
U.S. Customs & Border Protection
90 K Street NW,
9th Floor, Mail Stop 1181
Washington, D.C. 20229

National Records Center, FOIA/PA Office
U.S. Citizenship & Immigration Services
P. O. Box 648010
Lee's Summit, MO 64064-8010

FOIA Office
U.S. Immigration & Customs Enforcement
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

U. S. Department of State
Office of Information Programs and Services
A/GIS/IPS/RL
SA-2, Suite 8100
Washington, D.C. 20522-0208

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT

National Office
125 Broad Street,
18 Floor
New York, NY 10004
Tel. (212) 549-2611
Fax (212) 549-2611
aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA

39 Drumm Street
San Francisco, CA 94111
Tel. (415) 621-2493
Fax (415) 255-1478
aclunc.org

JUN 06 2018

**Re:     Request Under Freedom of Information Act (Expedited Processing & Fee Waiver/Limitation Requested)**

To Whom It May Concern:

The American Civil Liberties Union Foundation and the American Civil Liberties Union Foundation of Northern California (together, the "ACLU"),[1] submit this Freedom of Information Act ("FOIA") request (the "Request") for records pertaining to social media surveillance, including the monitoring and retention of immigrants' and visa applicants' social media information for the purpose of conducting "extreme vetting."

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## I. Background

Multiple federal agencies are increasingly relying on social media surveillance to monitor the speech, activities, and associations of U.S. citizens and noncitizens alike.

The Department of Homeland Security ("DHS") has used social media surveillance for "situational awareness," intelligence, and "other operations."[2] According to documents that the ACLU obtained through FOIA, as of 2015 the DHS Office of Intelligence and Analysis was collecting, analyzing, retaining, and disseminating social media information related to "Homeland Security Standing Information Needs"—subjects on which DHS continuously gathers information.[3] A February 2017 report by the DHS Inspector General also confirmed DHS's use of manual and automated social media screening of immigration and visa applications, the establishment within DHS of a "Shared Social Media Screening Service," and the planned "department-wide use of

---

[1] The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, educates the public about civil rights and civil liberties issues across the country, directly lobbies legislators, and mobilizes the American Civil Liberties Union's members to lobby their legislators. The American Civil Liberties Union is a separate non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.

[2] Dep't of Homeland Security, Privacy Impact Assessment of the Office of Operations Coordination and Planning, *Publicly Available Social Media Monitoring and Situational Awareness Initiative* 3 (June 22, 2010), available at https://goo.gl/R1LVxM.

[3] Dep't of Homeland Security, Office of Intelligence and Analysis, Policy Instruction IA-900, *Official Usage of Publicly Available Information* 2 (Jan. 13, 2015), available at https://goo.gl/6gnmzn.

social media for screening."[4] The same report concluded, however, that DHS lacked the means to evaluate and measure the effectiveness of such programs.[5] Similarly, internal reviews obtained through FOIA from U.S. Citizenship and Immigration Services show that its social-media screening efforts lacked protections against discrimination and profiling and yielded few actionable results.[6]

Nonetheless, DHS is expanding its social media surveillance efforts as part of the Trump administration's "extreme vetting" initiatives. The department issued a public notice in September 2017 indicating that the records it retains in immigrants' files include "social media handles, aliases, associated identifiable information, and search results."[7] U.S. Immigration and Customs Enforcement ("ICE") also solicited proposals from contractors to utilize "social media exploitation" to vet visa applicants and monitor them while they are in the United States.[8] According to contract documents, ICE plans to spend $100 million on a program that will employ approximately 180 people to monitor visitors' social media posts.[9]

The State Department plays a significant role in the collection of social media information for vetting purposes. In May 2017, the department submitted an emergency request to the Office of Management and Budget to expand the information sought from approximately 65,000 visa applicants each year to include, *inter alia*, social media identifiers.[10] On March 30, 2018,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[4] Office of Inspector General, OIG-17-40, *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success* 1 n.2, 4 (Feb. 27, 2017), available at https://goo.gl/WDb5iJ.

[5] *Id.* at 2.

[6] *See* Aliya Sternstein, "Obama Team Did Some 'Extreme Vetting' of Muslims Before Trump, New Documents Show," Daily Beast, Jan. 2, 2018, available at https://goo.gl/azKwLm.

[7] Dep't of Homeland Security, Privacy Act of 1974; System of Records, 82 Fed. Reg. 43,557 (Sept. 18, 2017), available at https://goo.gl/GcLYoQ.

[8] Dep't of Homeland Security, Immigration & Customs Enforcement, *Extreme Vetting Initiative: Statement of Objectives* §§ 3.1-3.2 (June 12, 2017), available at https://goo.gl/ZTHzBS.

[9] Dep't of Homeland Security, Acquisition Forecast No. F2018040916 (Apr. 11, 2018), available at https://goo.gl/Zd7p1p; *see also* Drew Harwell & Nick Miroff, "ICE Just Abandoned Its Dream of 'Extreme Vetting' Software That Could Predict Whether a Foreign Visitor Would Become a Terrorist," Wash. Post, May 17, 2018, available at https://goo.gl/UxiF5P.

[10] Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 20,956 (May 4, 2017), available at https://goo.gl/2hsRNi. On August 3, 2017, the State Department notified the public that it would extend the collection of social media information beyond the emergency period. *See* Sixty-Day Notice of Proposed Information Collection: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 36,180 (Aug. 3, 2017), available at https://goo.gl/JXTFfi.

the department signaled a dramatic expansion of its collection of social media information, publishing two notices of new rules which, if adopted, would require nearly all of the 14.7 million people who annually apply for work or tourist visas to submit social media identifiers they have used in the past five years on up to 20 online platforms in order to travel or immigrate to the United States.[11] The notices do not indicate how such information may be shared across government agencies or what consequences its collection may have for individuals living in America, including U.S. citizens.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The Federal Bureau of Investigation ("FBI") also engages in extensive social media surveillance. In 2012, the FBI sought information from contractors on a planned "social media application" that would enable the FBI to "instantly search and monitor" publicly available information on social media platforms.[12] The FBI revealed in November 2016 that it would acquire social media monitoring software designed by Dataminr that would enable it to "search the complete Twitter firehose, in near real-time, using customizable filters" that are "specifically tailored to operational needs."[13] News reports indicate that the FBI is now also establishing a social media surveillance task force, the purpose and scope of which remain unclear.[14]

The FBI uses social media surveillance not only "to obtain information about relevant breaking news and events in real-time," but also to identify subjects for investigation.[15] For instance, it acquired the Dataminr software so that it could identify content that "track[s] FBI investigative priorities."[16] Similarly, the FBI appears to be using social media as a basis for deciding who to interview, investigate, or target with informants or undercover agents.[17]

---

[11] 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13,806 (Mar. 30, 2018), available at https://goo.gl/Rakt1v; 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 13,807 (Mar. 30, 2018), available at https://goo.gl/SxJVBk.

[12] Federal Bureau of Investigation, Strategic Information and Operations Center, Request for Information – Social Media Application (Jan. 19, 2012), available at https://goo.gl/kRPLZt.

[13] Federal Bureau of Investigation, Requisition Number DJF-17-1300-PR00000555, Limited Source Justification, 1 (Nov. 8, 2016), available at https://goo.gl/Ty9WFZ.

[14] Chip Gibbons, "The FBI Is Setting Up a Task Force to Monitor Social Media," The Nation, Feb. 1, 2018, available at https://goo.gl/Ud6mVD.

[15] See FBI, Limited Source Justification, supra note 13 at 1.

[16] See id.

[17] See, e.g., Center on National Security at Fordham Law, Case by Case: ISIS Prosecutions in the United States 19 (July 2016), available at https://goo.gl/eCE8hh (concluding that a significant percentage of individuals prosecuted for certain national security-related crimes came to the attention of the FBI through social media use).

Technology plays a critical role in enabling government agencies to surveil and analyze social media content. The migration of speech and associational activity onto the social media web, and the concentration of that activity on a relatively small number of social media platforms, has made it possible for government agencies to monitor speech and association to an unprecedented degree. At the same time, advances in data mining, network analysis, and machine learning techniques enable the government to search, scrape, and aggregate content on a vast scale quickly and continuously, or to focus and filter such content according to specific investigative priorities.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Government surveillance of social media raises serious constitutional and privacy concerns. Most online speech reflects no wrongdoing whatsoever and is fully protected by the First Amendment. Protected speech and beliefs—particularly expression or association of a political, cultural, or religious nature—should not serve as the sole or predominant basis for surveillance, investigation, or watchlisting. When government agencies collect or share individuals' online speech without any connection to investigation of actual criminal conduct, they foster suspicion about individuals and make it more likely that innocent people will be investigated, surveilled, or watchlisted. Additionally, the knowledge that the government systematically monitors online speech has a deeply chilling effect on the expression of disfavored beliefs and opinions—all of which the First Amendment protects. People are likely to stop expressing such beliefs and opinions in order to avoid becoming the subject of law enforcement surveillance. Basic due process and fairness is also undermined when significant decisions affecting peoples' lives—such as decisions about immigration status or whether an investigator targets a person for additional scrutiny—are influenced by proprietary systems running secret algorithms, analyzing data without necessary context or rules to prevent abuse. Finally, suspicionless social media surveillance can facilitate government targeting of specific racial and religious communities for investigation and promotes a climate of fear and self-censorship within those communities.

Despite the significant resources federal agencies are expending on social media surveillance and the constitutional concerns it raises, little information is available to the public on the tools and methods agencies use for surveillance, or the policies and guidelines that govern their use. The public similarly lacks information on whether surveillance of social media contributes meaningfully to public safety or simply floods agencies with information on innocent individuals and innocuous conduct. Because government social media surveillance could impact free expression and individual privacy on a broad scale, it has generated widespread and sustained public and media interest.[18]

---

[18] *See, e.g.*, Harwell & Miroff, *supra* note 9; Michelle Fabio, "Department of Homeland Security Compiling Database of Journalists and 'Media Influencers,'" Forbes, Apr. 6, 2018, available at https://goo.gl/THDSLZ; Brendan Bordelon, "New Visa Rules Suggest

To provide the public with information on the federal government's use of social media surveillance, the ACLU submits this FOIA Request.

## II. Requested Records

1) All policies, guidance, procedures, directives, advisories, memoranda, and/or legal opinions pertaining to the agency's search, analysis, filtering, monitoring, or collection of content available on any social media network;

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

2) All records created since January 1, 2015 concerning the purchase of, acquisition of, subscription to, payment for, or agreement to use any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network, including but not limited to:

   a. Records concerning any product or service capable of using social media content in assessing applications for immigration benefits or admission to the United States;

   b. Records concerning any product or service capable of using social media content for immigration enforcement purposes;

---

Expanded Plans for 'Extreme Vetting' Via Algorithm," Nat'l Journal, Apr. 5, 2018, available at https://goo.gl/9Ux2mX; Arwa Mahdawi, "Hand Over My Social Media Account to Get a U.S. Visa? No Thank You," Guardian, Mar. 31, 2018, available at https://goo.gl/tpU6Ba; Sewell Chan, "14 Million Visitors to U.S. Face Social Media Screening," N.Y. Times, Mar. 30, 2018, available at https://goo.gl/RDUvKm; Brendan O'Brien, "U.S. Visa Applicants to be Asked for Social Media History: State Department," Reuters, Mar. 30, 2018, available at https://goo.gl/3PRMef; Stephen Dinan, "Extreme Vetting: State Department to Demand Tourists' Social Media History," Wash. Times, Mar. 29, 2018, available at https://goo.gl/YwazXd; "U.S. Plans 'Enhanced Vetting' of Every Visa Applicant With Orders to Hand Over Their Social Media History, Old Email Addresses and Phone Numbers," Daily Mail, Mar. 29, 2018, available at https://goo.gl/yY1g6m; Gibbons, *supra* note 14; Sternstein, *supra* note 6; Lily Hay Newman, "Feds Monitoring Social Media Does More Harm Than Good," Wired, Sept. 28, 2017, available at https://goo.gl/4obGFi; Tal Kopan, "Vetting of Social Media, Phones Possible as Part of Travel Ban Review," CNN.com, Sept. 12, 2017, available at https://goo.gl/BXf4k3; Aaron Cantú & George Joseph, "Trump's Border Security May Search Your Social Media by 'Tone,'" The Nation, Aug. 23, 2017, available at https://goo.gl/MuTmVN; Conor Finnegan, "Trump Administration Begins Vetting Social Media Profiles for Visa Applicants," ABC News, June 5, 2017, available at https://goo.gl/cJbnjg; Russell Brandom, "Can Facebook and Twitter Stop Social Media Surveillance?", Verge, Oct. 12, 2016, available at https://goo.gl/hzA2fY; Ron Nixon, "U.S. to Further Scour Social Media Use of Visa and Asylum Seekers," N.Y. Times, Feb. 23, 2016, available at https://goo.gl/y5C7Ba.

c.  Records concerning any product or service capable of using social media content for border or transportation screening purposes;

d.  Records concerning any product or service capable of using social media content in the investigation of potential criminal conduct;

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

3)  All communications to or from any private business and/or its employees since January 1, 2015 concerning any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network;

4)  All communications to or from employees or representatives of any social media network (*e.g.*, Twitter, Facebook, YouTube, LinkedIn, WhatsApp) since January 1, 2015 concerning the search, analysis, filtering, monitoring, or collection of social media content; and

5)  All records concerning the use or incorporation of social media content into systems or programs that make use of targeting algorithms, machine learning processes, and/or data analytics for the purpose of (a) assessing risk, (b) predicting illegal activity or criminality, and/or (c) identifying possible subjects of investigation or immigration enforcement actions.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the ACLU requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, the ACLU requests that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

### III. Application for Expedited Processing

The ACLU requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).[19] There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

---

[19] *See also* 6 C.F.R. § 5.5(e); 28 C.F.R. § 16.5(e); 22 C.F.R. § 171.11(f).

*A.*     *The ACLU is an organization primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II).[20] Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").[21]

The ACLU regularly publishes *STAND*, a print magazine that reports on and analyzes civil liberties-related current events. The magazine is disseminated to over 980,000 people. The ACLU also publishes regular updates and alerts via email to over 3.1 million subscribers (both ACLU members and non-members). These updates are additionally broadcast to over 3.8 million social media followers. The magazine as well as the email and social-media alerts often include descriptions and analysis of information obtained through FOIA requests.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news,[22] and ACLU attorneys are interviewed frequently for news stories about

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[20] *See also* 6 C.F.R. § 5.5(e)(1)(ii); 28 C.F.R. § 16.5(e)(1)(ii); 22 C.F.R. § 171.11(f)(2).

[21] Courts have found that the ACLU as well as other organizations with similar missions that engage in information-dissemination activities similar to the ACLU are "primarily engaged in disseminating information." *See, e.g., Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003).

[22] *See, e.g.*, Press Release, American Civil Liberties Union, U.S. Releases Drone Strike 'Playbook' in Response to ACLU Lawsuit (Aug. 6, 2016), https://www.aclu.org/news/us-releases-drone-strike-playbook-response-aclu-lawsuit; Press Release, American Civil Liberties Union, Secret Documents Describe Graphic Abuse and Admit Mistakes (June 14, 2016), https://www.aclu.org/news/cia-releases-dozens-torture-documents-response-aclu-lawsuit; Press Release, American Civil Liberties Union, U.S. Releases Targeted Killing Memo in Response to Long-Running ACLU Lawsuit (June 23, 2014), https://www.aclu.org/national-security/us-releases-targeted-killing-memo-response-long-running-aclu-lawsuit; Press Release, American Civil Liberties Union, Justice Department White Paper Details Rationale for Targeted Killing of Americans (Feb. 4, 2013), https://www.aclu.org/national-security/justice-department-white-paper-details-rationale-targeted-killing-americans; Press Release, American Civil Liberties Union, Documents Show FBI Monitored Bay Area Occupy Movement (Sept. 14, 2012), https://www.aclu.org/news/documents-show-fbi-monitored-bay-area-occupy-movement-insidebayareacom.

documents released through ACLU FOIA requests.[23]

Similarly, the ACLU publishes reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA requests. This material is broadly circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee. ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[24] The ACLU also regularly publishes books, "know your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties.

The ACLU publishes a widely read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily. *See* https://www.aclu.org/blog. The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. *See* https://www.aclu.org/multimedia. The ACLU also

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[23] *See, e.g.,* Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavioral Screen Program,* Intercept, Feb. 8, 2017, https://theintercept.com/2017/02/08/tsas-own-files-show-doubtful-science-behind-its-behavior-screening-program/ (quoting ACLU staff attorney Hugh Handeyside); Karen DeYoung, *Newly Declassified Document Sheds Light on How President Approves Drone Strikes,* Wash. Post, Aug. 6, 2016, http://wapo.st/2jy62cW (quoting former ACLU deputy legal director Jameel Jaffer); Catherine Thorbecke, *What Newly Released CIA Documents Reveal About 'Torture' in Its Former Detention Program,* ABC, June 15, 2016, http://abcn.ws/2jy40d3 (quoting ACLU staff attorney Dror Ladin); Nicky Woolf, *US Marshals Spent $10M on Equipment for Warrantless Stingray Device,* Guardian, Mar. 17, 2016, https://www.theguardian.com/world/2016/mar/17/us-marshals-stingray-surveillance-airborne (quoting ACLU staff attorney Nathan Freed Wessler); David Welna, *Government Suspected of Wanting CIA Torture Report to Remain Secret,* NPR, Dec. 9, 2015, http://n.pr/2jy2p71 (quoting ACLU project director Hina Shamsi).

[24] *See, e.g.,* Hugh Handeyside, *New Documents Show This TSA Program Blamed for Profiling Is Unscientific and Unreliable — But Still It Continues* (Feb. 8, 2017, 11:45 AM), https://www.aclu.org/blog/speak-freely/new-documents-show-tsa-program-blamed-profiling-unscientific-and-unreliable-still; Carl Takei, *ACLU-Obtained Emails Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site* (Nov. 22, 2016, 3:15 PM), https://www.aclu.org/blog/speak-freely/aclu-obtained-emails-prove-federal-bureau-prisons-covered-its-visit-cias-torture; Brett Max Kaufman, *Details Abound in Drone 'Playbook' – Except for the Ones That Really Matter Most* (Aug. 8, 2016, 5:30 PM), https://www.aclu.org/blog/speak-freely/details-abound-drone-playbook-except-ones-really-matter-most; Nathan Freed Wessler, *ACLU Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida* (Feb. 22, 2015, 5:30 PM), https://www.aclu.org/blog/free-future/aclu-obtained-documents-reveal-breadth-secretive-stingray-use-florida; Ashley Gorski, *New NSA Documents Shine More Light into Black Box of Executive Order 12333* (Oct. 30, 2014, 3:29 PM), https://www.aclu.org/blog/new-nsa-documents-shine-more-light-black-box-executive-order-12333; ACLU, *ACLU Eye on the FBI: Documents Reveal Lack of Privacy Safeguards and Guidance in Government's "Suspicious Activity Report" Systems* (Oct. 29, 2013), https://www.aclu.org/sites/default/files/assets/eye_on_fbi_-_sars.pdf.

publishes, analyzes, and disseminates information through its heavily visited
website, www.aclu.org. The website addresses civil rights and civil liberties
issues in depth, provides features on civil rights and civil liberties issues in the
news, and contains many thousands of documents relating to the issues on
which the ACLU is focused. The ACLU's website also serves as a
clearinghouse for news about ACLU cases, as well as analysis about case
developments, and an archive of case-related documents. Through these
pages, and with respect to each specific civil liberties issue, the ACLU
provides the public with educational material, recent news, analyses of
relevant Congressional or executive branch action, government documents
obtained through FOIA requests, and further in-depth analytic and educational
multi-media features.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

  The ACLU website includes many features on information obtained
through the FOIA.[25] For example, the ACLU's "Predator Drones FOIA"
webpage, https://www.aclu.org/national-security/predator-drones-foia,
contains commentary about the ACLU's FOIA request, press releases,
analysis of the FOIA documents, numerous blog posts on the issue,
documents related to litigation over the FOIA request, frequently asked
questions about targeted killing, and links to the documents themselves.
Similarly, the ACLU maintains an online "Torture Database," a compilation
of over 100,000 pages of FOIA and other documents that allows researchers
and the public to conduct sophisticated searches of FOIA documents relating
to government policies on rendition, detention, and interrogation.[26]

---

[25] *See, e.g.,* Nathan Freed Wessler & Dyan Cortez, *FBI Releases Details of 'Zero-Day'
Exploit Decisionmaking Process* (June 26, 2015, 11:00 AM), https://www.aclu.org/blog/free-
future/fbi-releases-details-zero-day-exploit-decisionmaking-process; Nathan Freed Wessler,
*FBI Documents Reveal New Information on Baltimore Surveillance Flights* (Oct. 30, 2015,
8:00 AM), https://www.aclu.org/blog/free-future/fbi-documents-reveal-new-information-
baltimore-surveillance-flights; *ACLU v. DOJ – FOIA Case for Records Relating to the Killing
of Three U.S. Citizens,* ACLU Case Page, https://www.aclu.org/national-security/anwar-al-
awlaki-foia-request; *ACLU v. Department of Defense,* ACLU Case Page,
https://www.aclu.org/cases/aclu-v-department-defense; *Mapping the FBI: Uncovering
Abusive Surveillance and Racial Profiling,* ACLU Case Page,
https://www.aclu.org/mappingthefbi; *Bagram FOIA,* ACLU Case Page
https://www.aclu.org/cases/bagram-foia; *CSRT FOIA,* ACLU Case Page,
https://www.aclu.org/national-security/csrt-foia; *ACLU v. DOJ – Lawsuit to Enforce NSA
Warrantless Surveillance FOIA Request,* ACLU Case Page, https://www.aclu.org/aclu-v-doj-
lawsuit-enforce-nsa-warrantless-surveillance-foia-request; *Patriot FOIA,* ACLU Case Page,
https://www.aclu.org/patriot-foia; *NSL Documents Released by DOD,* ACLU Case Page,
https://www.aclu.org/nsl-documents-released-dod?redirect=cpredirect/32088.

[26] *The Torture Database,* ACLU, https://www.thetorturedatabase.org; *see also
Countering Violent Extremism FOIA Database,* ACLU, https://www.aclu.org/foia-
collection/cve-foia-documents; *TSA Behavior Detection FOIA Database,* ACLU,
https://www.aclu.org/foia-collection/tsa-behavior-detection-foia-database; *Targeted Killing
FOIA Database,* ACLU, https://www.aclu.org/foia-collection/targeted-killing-foia-database.

The ACLU has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through the FOIA. For example, through compilation and analysis of information gathered from various sources—including information obtained from the government through FOIA requests—the ACLU created an original chart that provides the public and news media with a comprehensive summary index of Bush-era Office of Legal Counsel memos relating to interrogation, detention, rendition, and surveillance.[27] Similarly, the ACLU produced an analysis of documents released in response to a FOIA request about the TSA's behavior detection program[28]; a summary of documents released in response to a FOIA request related to the FISA Amendments Act[29]; a chart of original statistics about the Defense Department's use of National Security Letters based on its own analysis of records obtained through FOIA requests[30]; and an analysis of documents obtained through FOIA requests about FBI surveillance flights over Baltimore.[31]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.

B.   *The records sought are urgently needed to inform the public about actual or alleged government activity.*

These records are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records relate to the federal government's use of social media surveillance and its interactions with the private sector for the purpose of obtaining social media surveillance technology. As discussed in Part I, *supra*, federal agencies are expanding their use of social media surveillance—which implicates the online speech of millions of social media users—but little information is available to the public regarding the nature, extent, and consequences of that surveillance.

---

[27] *Index of Bush-Era OLC Memoranda Relating to Interrogation, Detention, Rendition and/or Surveillance*, ACLU (Mar. 5, 2009), https://www.aclu.org/sites/default/files/pdfs/safefree/olcmemos_2009_0305.pdf.

[28] *Bad Trip: Debunking the TSA's 'Behavior Detection' Program*, ACLU (2017), https://www.aclu.org/sites/default/files/field_document/dem17-tsa_detection_report-v02.pdf.

[29] *Summary of FISA Amendments Act FOIA Documents Released on November 29, 2010*, ACLU, https://www.aclu.org/files/pdfs/natsec/faafoia20101129/20101129Summary.pdf.

[30] *Statistics on NSLs Produced by Department of Defense*, ACLU (2014), https://www.aclu.org/ other/statistics-nsls-produced-dod.

[31] Nathan Freed Wessler, *FBI Documents Reveal New Information on Baltimore Surveillance Flights* (Oct. 30, 2015, 8:00 AM), https://www.aclu.org/blog/free-future/fbi-documents-reveal-new-information-baltimore-surveillance-flights.

11

Given the foregoing, the ACLU has satisfied the requirements for expedited processing of this Request.

### IV. Application for Waiver or Limitation of Fees

The ACLU requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii).[32] The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).

A. *The Request is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU.*

As discussed above, credible media and other investigative accounts underscore the substantial public interest in the records sought through this Request. Given the ongoing and widespread media attention to this issue, the records sought will significantly contribute to public understanding of an issue of profound public importance. Because little specific information about government surveillance and monitoring of social media is publicly available, the records sought are certain to contribute significantly to the public's understanding of whether and under what circumstances the government monitors social media content, and how such monitoring affects individual privacy and liberty.

The ACLU is not filing this Request to further its commercial interest. As described above, any information disclosed by the ACLU as a result of this FOIA Request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted)).

B. *The ACLU is a representative of the news media and the records are not sought for commercial use.*

The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[32] *See also* 6 C.F.R. § 5.11(k); 28 C.F.R. § 16.10(k); 22 C.F.R. § 171.16.

12

are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).[33] The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. DOJ*, No. C09-0642RSL, 2011 WL 887731, at \*10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is therefore a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information."

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media" as well. *See, e.g., Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[34]

On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU as a "representative of the news media."[35] As was true in those instances, the ACLU meets the requirements for a fee waiver here.

---

[33] *See also* 6 C.F.R. § 5.11(d)(1); 28 C.F.R. § 16.10(b)(6); 22 C.F.R. § 171.14(b).

[34] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information / public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54.

[35] In August 2017, CBP granted a fee-waiver request regarding a FOIA request for records relating to a muster sent by CBP in April 2017. In May 2017, CBP granted a fee-

*       *       *

Pursuant to applicable statutes and regulations, the ACLU expects a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii).

If the Request is denied in whole or in part, the ACLU asks that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish the applicable records to:

Hugh Handeyside
American Civil Liberties Union
125 Broad Street—18th Floor
New York, New York 10004
hhandeyside@aclu.org

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

waiver request regarding a FOIA request for documents related to electronic device searches at the border. In April 2017, the CIA and the Department of State granted fee-waiver requests in relation to a FOIA request for records related to the legal authority for the use of military force in Syria. In March 2017, the Department of Defense Office of Inspector General, the CIA, and the Department of State granted fee-waiver requests regarding a FOIA request for documents related to the January 29, 2017 raid in al Ghayil, Yemen. In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the DOJ for documents related to Countering Violent Extremism Programs. In April 2013, the National Security Division of the DOJ granted a fee-waiver request with respect to a request for documents relating to the FISA Amendments Act. Also in April 2013, the DOJ granted a fee-waiver request regarding a FOIA request for documents related to "national security letters" issued under the Electronic Communications Privacy Act. In August 2013, the FBI granted the fee-waiver request related to the same FOIA request issued to the DOJ. In June 2011, the DOJ National Security Division granted a fee waiver to the ACLU with a request for documents relating to the interpretation and implementation of a section of the PATRIOT Act. In March 2009, the State Department granted a fee waiver to the ACLU with regard to a FOIA request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists.

14



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; July 2013; All rights reserved.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, ET AL<br><br>     Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, ET AL<br><br>     Defendants. | Civil Action No. 19-cv-00290-SK |

# **<u>Exhibit B</u>**



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

June 8, 2018

MR. HUGH HANDEYSIDE
AMERICAN CIVIL LIBERTIES UNION
18TH FLOOR
125 BROAD STREET
NEW YORK, NY 10004

                                                   FOIPA Request No.: 1407258-000
                                                   Subject: Records Pertaining to Social Media
                                                   Surveillance (Monitoring and Retention of
                                                   Immigrants' and Visa Applicants' Social
                                                   Media Information for the Purpose of
                                                   Conducting Extreme Vetting)

Dear Mr. Handeyside:

      This is in response to your Freedom of Information Act (FOIA) request: "Records pertaining to social media surveillance, including the monitoring and retention of immigrants' and visa applicants' social media information for the purpose of conducting extreme vetting."

      Please be advised that upon reviewing the substantive nature of your request, we can neither confirm nor deny the existence of records responsive to your request pursuant to FOIA exemption (b) (7) (E) [5 U.S.C. §522 (b)(7)(E)]. The mere acknowledgement of whether or not the FBI has any records in and of itself would disclose techniques, procedures, and/or guidelines that could reasonably be expected to risk circumvention of the law. Thus, the FBI neither confirms nor denies the existence of any records.

      For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA).   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

      For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.

      You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

      You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet and Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Information Management Division

Enclosure



# FBI FACT SHEET

- **The primary functions of the FBI are national security and law enforcement.**

- **The FBI does not keep a file on every citizen of the United States.**

- **The FBI was not established until 1908 and we have very few records prior to the 1920s.**

- **FBI files generally contain reports** of FBI investigations of a wide range of matters, including counterterrorism, counter-intelligence, cyber-crime, public corruption, civil rights, organized crime, white collar crime, major thefts, violent crime, and applicants.

- **The FBI does not issue clearances or deny clearances for anyone other than its own personnel or persons having access to FBI facilities.**   Background investigations for security clearances are conducted by many different Government agencies.   Persons who received a clearance while in the military or employed with some other government agency should contact that entity.   Most government agencies have websites which are accessible on the internet which have their contact information.

- **An identity history summary check or "rap sheet" is NOT the same as an "FBI file."** It is a listing of information taken from fingerprint cards and related documents submitted to the FBI in connection with arrests, federal employment, naturalization or military service.   The subject of a "rap sheet" may obtain a copy by submitting a written request to FBI CJIS Division – Summary Request, 1000 Custer Hollow Road, Clarksburg, WV 26306.   Along with a specific written request, the individual must submit a new full set of his/her fingerprints in order to locate the record, establish positive identification, and ensure that an individual's records are not disseminated to an unauthorized person.   The fingerprint submission must include the subject's name, date and place of birth.   There is a required fee of $18 for this service, which must be submitted by money order or certified check made payable to the Treasury of the United States.   A credit card payment option is also available.   Forms for this option and additional directions may be obtained by accessing the FBI Web site at www.fbi.gov/about-us/cjis/identity-history-summary-checks.

- **The National Name Check Program (NNCP)** conducts a search of the FBI's Universal Index (UNI) to identify any information contained in FBI records that may be associated with an individual and provides the results of that search to a requesting federal, state or local agency.   Names are searched in a multitude of combinations and phonetic spellings to ensure all records are located.   The NNCP also searches for both "main" and "cross reference" files.   A main file is an entry that carries the name corresponding to the subject of a file, while a cross reference is merely a mention of an individual contained in a file.   A search of this magnitude can result in several "hits" on an individual.   In each instance where UNI has identified a name variation or reference, information must be reviewed to determine if it is applicable to the individual in question.

- **The Record/Information Dissemination Section (RIDS)** searches for records and provides copies of FBI documents responsive to Freedom of Information or Privacy Act (FOIPA) requests for information.   RIDS provides responsive documents to requesters seeking "reasonably described information."   For a FOIPA search, the subject's name, event, activity, or business is searched to determine whether there is an associated investigative file.   This is called a **main file search** and differs from the **NNCP** search.

**FOR GENERAL INFORMATION ABOUT THE FBI, VISIT OUR WEBSITE AT**
**www.fbi.gov**

09/21/17

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute(A)   requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal  privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal   privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control,   or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, ET AL

    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
    JUSTICE, ET AL

    Defendants.

Civil Action No. 19-cv-00290-SK

# **<u>Exhibit C</u>**

*type 2    FOIA-A
FISI*



**AMERICAN CIVIL LIBERTIES UNION**

July 18, 2018

⌐ RECEIVED

JUL 1 9 2018

Office of Information Policy

Director, Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue NW
Washington, D.C. 20530-0001

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT**

National Office
125 Broad Street,
18ᵗʰ Floor
New York, NY 10004
Tel: (212) 549-2611
Fax: (212) 549-2611
aclu.org

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA**

39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-1478
aclunc.org

**Re:    Freedom of Information Act Appeal: Request No. 1407258-000**

To Whom It May Concern:

The American Civil Liberties Union Foundation and the American
Civil Liberties Union Foundation of Northern California (together, the
"ACLU") appeal the response by the Federal Bureau of Investigation ("FBI")
to Freedom of Information Act ("FOIA") request 1407258-000 (the
"Request," attached as Exhibit A) for records pertaining to social media
surveillance.

In a letter dated June 8, 2018 and received by the ACLU on June 14,
2018 ("Response," attached as Exhibit B), David M. Hardy, Section Chief of
the Record/Information Dissemination Section of the Records Management
Division within the FBI, issued a so-called "Glomar" response refusing to
confirm or deny the existence or nonexistence of responsive records, citing
FOIA Exemption 7(E), 5 U.S.C. § 552(b)(7)(E). The Response further stated
that "[t]he mere acknowledgement of whether or not the FBI has any records
in and of itself would disclose techniques, procedures, and/or guidelines that
could reasonably be expected to risk circumvention of the law. Thus, the FBI
neither confirms nor denies the existence of any records." Ex. B at 1.

**I.     The FBI's Glomar response should be reversed.**

The FBI's Glomar response is unjustifiable and should be reversed.
FOIA "imposes a duty upon agencies to disclose their records." *Yeager v.
Drug Enf't Admin.*, 678 F.2d 315, 320 (D.C. Cir. 1982). The Supreme Court
has noted FOIA's "'goal of broad disclosure' and insisted that [its]
exemptions be 'given a narrow compass.'" *Milner v. Dep't of Navy*, 562 U.S.
562, 571 (2011) (quoting *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151
(1989)). A Glomar response is permitted "only when confirming or denying
the existence of records would itself cause harm cognizable under an FOIA
exception." *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (internal
citation and quotation marks omitted). The Response falls far short of meeting
these requirements.

First, the Response fails to provide adequate justification for the Glomar response. Agencies must substantiate any Glomar response with "reasonably specific detail." *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007). The FOIA and relevant case law, moreover, require agencies responding to FOIA requests to provide reasons for their determinations. *See* 5 U.S.C. § 552(a)(6)(A)(i) (responding agency "shall immediately notify the person making such request of such determination *and the reasons therefor*") (emphasis added); *Pollack v. Dep't of Justice*, 49 F.3d 115, 118 (4th Cir. 1995) (agency must notify the requester of its decisions and provide reasons for those decisions). Similarly, where an agency has failed to offer a "reasoned basis" for its action, such action cannot be upheld. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The FBI provided no justification for the Glomar response, let alone one supported with "reasonably specific detail." *See Morley*, 508 F.3d at 1126. Stating in conclusory fashion that "[t]he mere acknowledgement of whether or not the FBI has any records . . . could reasonably be expected to risk circumvention of the law," *see* Ex. B at 1, is not sufficient to establish— as the agency must—that providing a non-Glomar response would cause harm under Exemption 7(E). The Response also fails to differentiate among the various categories of requested information; it is inadequate because it provides no explanation as to why merely confirming or denying the existence or nonexistence of the requested records—or even any particular category of requested records—would itself meet the requirements for Exemption 7(E). The Glomar response is far too sweeping and categorical to comply with FOIA.

Second, the FBI's Glomar response is not justified because it is neither logical nor plausible that merely confirming the existence or nonexistence of responsive records is protected from disclosure. For a Glomar response to be justified, it must be "logical or plausible" that the purported harm would result from revealing the existence or nonexistence of the requested records. *See ACLU v. CIA*, 710 F.3d at 429. Because the FBI invoked Exemption 7(E), it bears the burden of showing that acknowledging the existence or nonexistence of responsive records "could reasonably be expected to risk circumvention of the law." *See* 5 U.S.C. § 552(b)(7)(E); *see also Mayer Brown LLP v. I.R.S.*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) ("Exemption 7(E) shields information if 'disclosure could reasonably be expected to risk circumvention of the law.'").

The FBI's Response plainly fails to sustain this burden. It is neither logical nor plausible that providing a non-Glomar response regarding records related to social media surveillance would risk circumvention of the law. Online speech, of course, is almost always protected by the First Amendment to the Constitution and rarely constitutes a violation of the law of itself. To the extent that the FBI argues that acknowledgement of its use of social media

2

surveillance would prompt individuals to stop posting material via social media merely serves as recognition that such surveillance is likely to chill speech and dampen freedom of expression. Any such reluctance to make statements publicly on social media, however, would not "increase the risks that a law will be violated . . . encourage decisions to violate the law or evade punishment." *See Mayer Brown LLP*, 562 F.3d at 1193. Speech foregone, in other words, cannot reasonably be equated with circumvention of the law.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The Request, moreover, differs fundamentally from other rare contexts in which courts have approved the FBI's use of a Glomar response under Exemption 7(E). In those cases, courts concluded that disclosing the identity of the subject of a particular law enforcement technique would reveal the circumstances under which that technique had been used. *See Catledge v. Mueller*, No. 08-3550, 2009 WL 1025980, at *3 (7th Cir. Apr. 17, 2009) (per curiam) (affirming refusal to confirm or deny existence of any National Security Letters pertaining to requester); *El Badrawi v. DHS*, 596 F. Supp. 2d 389, 396 (D. Conn. 2009) (concluding that "confirming or denying that [an individual] is a subject of interest . . . would cause the very harm FOIA Exemption[] . . . 7(E) [is] designed to prevent"). Here, acknowledging that the FBI uses social media surveillance would not identify any individuals as subjects of interest, nor would it reveal the specific circumstances under which social media surveillance is used.

Third, the FBI has waived its right to assert a Glomar response vis-à-vis the requested records. The government's voluntary disclosure of information waives its right to claim an exemption with respect to that information, including through a Glomar response. *N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 114 (2d Cir. 2014). "[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). In determining whether a Glomar response is proper, courts may consider outside evidence, including other public documents, which fall short of an official acknowledgment. *Florez v. CIA*, 829 F.3d 178, 187 (2d Cir. 2016).

As set forth in the Request, Ex. A at 4, the FBI has repeatedly acknowledged, officially and publicly, that it engages in surveillance of social media content. In 2012, the FBI sought information from contractors on a planned "social media application" that would enable the FBI to "instantly search and monitor" publicly available information on social media platforms.[1] An FBI contract solicitation dated September 15, 2015 stated that "[i]t is the FBI's intent to procure the Geofeedia social media monitoring

---

[1] Federal Bureau of Investigation, Strategic Information and Operations Center, Request for Information – Social Media Application (Jan. 19, 2012), available at https://goo.gl/kRPLZt.

3

platform."[2] And in November 2016, the FBI completed detailed contract documentation explaining why "Dataminr is the only company in the market that is able to provide the mission critical social media monitoring needed by the FBI."[3] The same documentation stated that the FBI needed to be able to "search the complete Twitter firehose, in near real-time, using customizable filters" that are "specifically tailored to operational needs" and would identify content that "track[s] FBI investigative priorities."[4] The FBI stated explicitly that "a one-year contract will be awarded to Dataminr" for its social media monitoring software.[5] Additionally, an FBI spokesperson acknowledged that the FBI has established a social media surveillance task force.[6]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Given these publicly known facts, it "beggars belief that [the FBI] does not also have documents relating to the subject." *See ACLU v. CIA*, 710 F.3d at 431. The FBI's repeated and unequivocal acknowledgements of its use of social media surveillance leave no doubt that the FBI has records responsive to the Request. It therefore "strains credulity" to suggest that confirming the existence of those records would cause any harm cognizable under Exemption 7(E). *Id* at 430. The FBI's Glomar response is improper.

## II.   Application for Expedited Processing and Fee Waiver

The ACLU requests expedited processing of this appeal pursuant to 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(e). As discussed in detail in the Request, expedited processing is warranted in this FOIA request. There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II). *See* Ex. A at 7-12. The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. *See id.* at 8. The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost. These records are urgently needed to inform the public about actual or alleged government activity. As discussed in Part I of the Request, the use of social media surveillance by the FBI and other federal agencies is the subject of strong and sustained public concern and

---

[2] Social Media Monitoring Platform, Solicitation No. DJF-15-3150-PR-0028925 (Sept. 15, 2015), https://goo.gl/zEuG4W.

[3] Federal Bureau of Investigation, Requisition Number DJF-17-1300-PR00000555, Limited Source Justification, 1, 4 (Nov. 8, 2016), available at https://goo.gl/Ty9WFZ.

[4] *Id.* at 1.

[5] *Id.* at 3.

[6] Chip Gibbons, "The FBI Is Setting Up a Task Force to Monitor Social Media," The Nation, Feb. 1, 2018, available at https://goo.gl/Ud6mVD.

4

media attention. Given the foregoing, the ACLU has satisfied the requirements for expedited processing of this Request.

Furthermore, the ACLU reasserts its request that fees be waived, on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 28 C.F.R. § 16.10(k)(2). The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The grounds for a fee waiver are discussed in detail in the Request. *See* Ex. A at 12-14.

*       *       *

For the foregoing reasons, the FBI's Response was in error and should be reversed on appeal. We respectfully request that you reconsider the decision to neither confirm nor deny the existence or nonexistence of any records responsive to the Request and that you release records responsive to the Request on an expedited basis. Thank you for your prompt attention to this matter. Please furnish all further correspondence to:

Hugh Handeyside
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
hhandeyside@aclu.org

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

Respectfully,

Hugh Handeyside
American Civil Liberties Union
    Foundation
125 Broad Street—18th Floor
New York, New York 10004
212.549.2500
hhandeyside@aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Matt Cagle
American Civil Liberties Union
    Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
415.621.2493
mcagle@aclunc.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

# Exhibit A



**AMERICAN CIVIL LIBERTIES UNION**

May 24, 2018

FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, D.C. 20530-0001

Federal Bureau of Investigation
Attn: FOI/PA Request
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

Chief Privacy Officer/Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane SW, STOP-0655
Washington, D.C. 20528-0655

FOIA Officer
U.S. Customs & Border Protection
90 K Street NW,
9th Floor, Mail Stop 1181
Washington, D.C. 20229

National Records Center, FOIA/PA Office
U.S. Citizenship & Immigration Services
P. O. Box 648010
Lee's Summit, MO 64064-8010

FOIA Office
U.S. Immigration & Customs Enforcement
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

U. S. Department of State
Office of Information Programs and Services
A/GIS/IPS/RL
SA-2, Suite 8100
Washington, D.C. 20522-0208

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
LEGAL DEPARTMENT

National Office
125 Broad Street,
18th Floor
New York, NY 10004
Tel: (212) 549-2644
Fax: (212) 549-2644
aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA

39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-1478
aclunc.org

**Re:   Request Under Freedom of Information Act (Expedited Processing & Fee Waiver/Limitation Requested)**

To Whom It May Concern:

The American Civil Liberties Union Foundation and the American Civil Liberties Union Foundation of Northern California (together, the "ACLU"),[1] submit this Freedom of Information Act ("FOIA") request (the "Request") for records pertaining to social media surveillance, including the monitoring and retention of immigrants' and visa applicants' social media information for the purpose of conducting "extreme vetting."

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## I. Background

Multiple federal agencies are increasingly relying on social media surveillance to monitor the speech, activities, and associations of U.S. citizens and noncitizens alike.

The Department of Homeland Security ("DHS") has used social media surveillance for "situational awareness," intelligence, and "other operations."[2] According to documents that the ACLU obtained through FOIA, as of 2015 the DHS Office of Intelligence and Analysis was collecting, analyzing, retaining, and disseminating social media information related to "Homeland Security Standing Information Needs"—subjects on which DHS continuously gathers information.[3] A February 2017 report by the DHS Inspector General also confirmed DHS's use of manual and automated social media screening of immigration and visa applications, the establishment within DHS of a "Shared Social Media Screening Service," and the planned "department-wide use of

---

[1] The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, educates the public about civil rights and civil liberties issues across the country, directly lobbies legislators, and mobilizes the American Civil Liberties Union's members to lobby their legislators. The American Civil Liberties Union is a separate non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.

[2] Dep't of Homeland Security, Privacy Impact Assessment of the Office of Operations Coordination and Planning, *Publicly Available Social Media Monitoring and Situational Awareness Initiative* 3 (June 22, 2010), available at https://goo.gl/R1LVxM.

[3] Dep't of Homeland Security, Office of Intelligence and Analysis, Policy Instruction IA-900, *Official Usage of Publicly Available Information* 2 (Jan. 13, 2015), available at https://goo.gl/6gnmzn.

2

social media for screening."[4] The same report concluded, however, that DHS lacked the means to evaluate and measure the effectiveness of such programs.[5] Similarly, internal reviews obtained through FOIA from U.S. Citizenship and Immigration Services show that its social-media screening efforts lacked protections against discrimination and profiling and yielded few actionable results.[6]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Nonetheless, DHS is expanding its social media surveillance efforts as part of the Trump administration's "extreme vetting" initiatives. The department issued a public notice in September 2017 indicating that the records it retains in immigrants' files include "social media handles, aliases, associated identifiable information, and search results."[7] U.S. Immigration and Customs Enforcement ("ICE") also solicited proposals from contractors to utilize "social media exploitation" to vet visa applicants and monitor them while they are in the United States.[8] According to contract documents, ICE plans to spend $100 million on a program that will employ approximately 180 people to monitor visitors' social media posts.[9]

The State Department plays a significant role in the collection of social media information for vetting purposes. In May 2017, the department submitted an emergency request to the Office of Management and Budget to expand the information sought from approximately 65,000 visa applicants each year to include, *inter alia*, social media identifiers.[10] On March 30, 2018,

---

[4] Office of Inspector General, OIG-17-40, *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success* 1 n.2, 4 (Feb. 27, 2017), available at https://goo.gl/WDb5iJ.

[5] *Id.* at 2.

[6] *See* Aliya Sternstein, "Obama Team Did Some 'Extreme Vetting' of Muslims Before Trump, New Documents Show," Daily Beast, Jan. 2, 2018, available at https://goo.gl/azKwLm.

[7] Dep't of Homeland Security, Privacy Act of 1974; System of Records, 82 Fed. Reg. 43,557 (Sept. 18, 2017), available at https://goo.gl/GcLYoQ.

[8] Dep't of Homeland Security, Immigration & Customs Enforcement, *Extreme Vetting Initiative: Statement of Objectives* §§ 3.1-3.2 (June 12, 2017), available at https://goo.gl/ZTHzBS.

[9] Dep't of Homeland Security, Acquisition Forecast No. F2018040916 (Apr. 11, 2018), available at https://goo.gl/Zd7p1p; *see also* Drew Harwell & Nick Miroff, "ICE Just Abandoned Its Dream of 'Extreme Vetting' Software That Could Predict Whether a Foreign Visitor Would Become a Terrorist," Wash. Post, May 17, 2018, available at https://goo.gl/UxiF5P.

[10] Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 20,956 (May 4, 2017), available at https://goo.gl/2hsRNi. On August 3, 2017, the State Department notified the public that it would extend the collection of social media information beyond the emergency period. *See* Sixty-Day Notice of Proposed Information Collection: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 36,180 (Aug. 3, 2017), available at https://goo.gl/JXTFfi.

the department signaled a dramatic expansion of its collection of social media information, publishing two notices of new rules which, if adopted, would require nearly all of the 14.7 million people who annually apply for work or tourist visas to submit social media identifiers they have used in the past five years on up to 20 online platforms in order to travel or immigrate to the United States.[11] The notices do not indicate how such information may be shared across government agencies or what consequences its collection may have for individuals living in America, including U.S. citizens.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The Federal Bureau of Investigation ("FBI") also engages in extensive social media surveillance. In 2012, the FBI sought information from contractors on a planned "social media application" that would enable the FBI to "instantly search and monitor" publicly available information on social media platforms.[12] The FBI revealed in November 2016 that it would acquire social media monitoring software designed by Dataminr that would enable it to "search the complete Twitter firehose, in near real-time, using customizable filters" that are "specifically tailored to operational needs."[13] News reports indicate that the FBI is now also establishing a social media surveillance task force, the purpose and scope of which remain unclear.[14]

The FBI uses social media surveillance not only "to obtain information about relevant breaking news and events in real-time," but also to identify subjects for investigation.[15] For instance, it acquired the Dataminr software so that it could identify content that "track[s] FBI investigative priorities."[16] Similarly, the FBI appears to be using social media as a basis for deciding who to interview, investigate, or target with informants or undercover agents.[17]

---

[11] 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13,806 (Mar. 30, 2018), available at https://goo.gl/Rakt1v; 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 13,807 (Mar. 30, 2018), available at https://goo.gl/SxJVBk.

[12] Federal Bureau of Investigation, Strategic Information and Operations Center, Request for Information – Social Media Application (Jan. 19, 2012), available at https://goo.gl/kRPLZt.

[13] Federal Bureau of Investigation, Requisition Number DJF-17-1300-PR00000555, Limited Source Justification, 1 (Nov. 8, 2016), available at https://goo.gl/Ty9WFZ.

[14] Chip Gibbons, "The FBI Is Setting Up a Task Force to Monitor Social Media," The Nation, Feb. 1, 2018, available at https://goo.gl/Ud6mVD.

[15] See FBI, Limited Source Justification, *supra* note 13 at 1.

[16] See id.

[17] See, e.g., Center on National Security at Fordham Law, *Case by Case: ISIS Prosecutions in the United States* 19 (July 2016), available at https://goo.gl/eCE8hh (concluding that a significant percentage of individuals prosecuted for certain national security-related crimes came to the attention of the FBI through social media use).

4

Technology plays a critical role in enabling government agencies to surveil and analyze social media content. The migration of speech and associational activity onto the social media web, and the concentration of that activity on a relatively small number of social media platforms, has made it possible for government agencies to monitor speech and association to an unprecedented degree. At the same time, advances in data mining, network analysis, and machine learning techniques enable the government to search, scrape, and aggregate content on a vast scale quickly and continuously, or to focus and filter such content according to specific investigative priorities.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Government surveillance of social media raises serious constitutional and privacy concerns. Most online speech reflects no wrongdoing whatsoever and is fully protected by the First Amendment. Protected speech and beliefs—particularly expression or association of a political, cultural, or religious nature—should not serve as the sole or predominant basis for surveillance, investigation, or watchlisting. When government agencies collect or share individuals' online speech without any connection to investigation of actual criminal conduct, they foster suspicion about individuals and make it more likely that innocent people will be investigated, surveilled, or watchlisted. Additionally, the knowledge that the government systematically monitors online speech has a deeply chilling effect on the expression of disfavored beliefs and opinions—all of which the First Amendment protects. People are likely to stop expressing such beliefs and opinions in order to avoid becoming the subject of law enforcement surveillance. Basic due process and fairness is also undermined when significant decisions affecting peoples' lives—such as decisions about immigration status or whether an investigator targets a person for additional scrutiny—are influenced by proprietary systems running secret algorithms, analyzing data without necessary context or rules to prevent abuse. Finally, suspicionless social media surveillance can facilitate government targeting of specific racial and religious communities for investigation and promotes a climate of fear and self-censorship within those communities.

Despite the significant resources federal agencies are expending on social media surveillance and the constitutional concerns it raises, little information is available to the public on the tools and methods agencies use for surveillance, or the policies and guidelines that govern their use. The public similarly lacks information on whether surveillance of social media contributes meaningfully to public safety or simply floods agencies with information on innocent individuals and innocuous conduct. Because government social media surveillance could impact free expression and individual privacy on a broad scale, it has generated widespread and sustained public and media interest.[18]

---

[18] *See, e.g.,* Harwell & Miroff, *supra* note 9; Michelle Fabio, "Department of Homeland Security Compiling Database of Journalists and 'Media Influencers,'" Forbes, Apr. 6, 2018, available at https://goo.gl/THDSLZ; Brendan Bordelon, "New Visa Rules Suggest

To provide the public with information on the federal government's
use of social media surveillance, the ACLU submits this FOIA Request.

## II. Requested Records

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

1)   All policies, guidance, procedures, directives, advisories,
     memoranda, and/or legal opinions pertaining to the agency's
     search, analysis, filtering, monitoring, or collection of content
     available on any social media network;

2)   All records created since January 1, 2015 concerning the
     purchase of, acquisition of, subscription to, payment for, or
     agreement to use any product or service that searches,
     analyzes, filters, monitors, or collects content available on any
     social media network, including but not limited to:

     a.   Records concerning any product or service capable of
          using social media content in assessing applications for
          immigration benefits or admission to the United States;

     b.   Records concerning any product or service capable of
          using social media content for immigration enforcement
          purposes;

---

Expanded Plans for 'Extreme Vetting' Via Algorithm," Nat'l Journal, Apr. 5, 2018, available
at https://goo.gl/9Ux2mX; Arwa Mahdawi, "Hand Over My Social Media Account to Get a
U.S. Visa? No Thank You," Guardian, Mar. 31, 2018, available at https://goo.gl/tpU6Ba;
Sewell Chan, "14 Million Visitors to U.S. Face Social Media Screening," N.Y. Times, Mar.
30, 2018, available at https://goo.gl/RDUvKm; Brendan O'Brien, "U.S. Visa Applicants to be
Asked for Social Media History: State Department," Reuters, Mar. 30, 2018, available at
https://goo.gl/3PRMef; Stephen Dinan, "Extreme Vetting: State Department to Demand
Tourists' Social Media History," Wash. Times, Mar. 29, 2018, available at
https://goo.gl/YwazXd; "U.S. Plans 'Enhanced Vetting' of Every Visa Applicant With Orders
to Hand Over Their Social Media History, Old Email Addresses and Phone Numbers," Daily
Mail, Mar. 29, 2018, available at https://goo.gl/yY1g6m; Gibbons, *supra* note 14; Sternstein,
*supra* note 6; Lily Hay Newman, "Feds Monitoring Social Media Does More Harm Than
Good," Wired, Sept. 28, 2017, available at https://goo.gl/4obGFi; Tal Kopan, "Vetting of
Social Media, Phones Possible as Part of Travel Ban Review," CNN.com, Sept. 12, 2017,
available at https://goo.gl/BXf4k3; Aaron Cantú & George Joseph, "Trump's Border Security
May Search Your Social Media by 'Tone,'" The Nation, Aug. 23, 2017, available at
https://goo.gl/MuTmVN; Conor Finnegan, "Trump Administration Begins Vetting Social
Media Profiles for Visa Applicants," ABC News, June 5, 2017, available at
https://goo.gl/cJbnjg; Russell Brandom, "Can Facebook and Twitter Stop Social Media
Surveillance?", Verge, Oct. 12, 2016, available at https://goo.gl/hzA2fY; Ron Nixon, "U.S. to
Further Scour Social Media Use of Visa and Asylum Seekers," N.Y. Times, Feb. 23, 2016,
available at https://goo.gl/y5C7Ba.

c.     Records concerning any product or service capable of using social media content for border or transportation screening purposes;

d.     Records concerning any product or service capable of using social media content in the investigation of potential criminal conduct;

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

3)     All communications to or from any private business and/or its employees since January 1, 2015 concerning any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network;

4)     All communications to or from employees or representatives of any social media network (*e.g.*, Twitter, Facebook, YouTube, LinkedIn, WhatsApp) since January 1, 2015 concerning the search, analysis, filtering, monitoring, or collection of social media content; and

5)     All records concerning the use or incorporation of social media content into systems or programs that make use of targeting algorithms, machine learning processes, and/or data analytics for the purpose of (a) assessing risk, (b) predicting illegal activity or criminality, and/or (c) identifying possible subjects of investigation or immigration enforcement actions.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the ACLU requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, the ACLU requests that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

### III. Application for Expedited Processing

The ACLU requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).[19] There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

---

[19] *See also* 6 C.F.R. § 5.5(e); 28 C.F.R. § 16.5(e); 22 C.F.R. § 171.11(f).

7

A.   *The ACLU is an organization primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II).[20] Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").[21]

The ACLU regularly publishes *STAND*, a print magazine that reports on and analyzes civil liberties-related current events. The magazine is disseminated to over 980,000 people. The ACLU also publishes regular updates and alerts via email to over 3.1 million subscribers (both ACLU members and non-members). These updates are additionally broadcast to over 3.8 million social media followers. The magazine as well as the email and social-media alerts often include descriptions and analysis of information obtained through FOIA requests.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news,[22] and ACLU attorneys are interviewed frequently for news stories about

---

[20] *See also* 6 C.F.R. § 5.5(e)(1)(ii); 28 C.F.R. § 16.5(e)(1)(ii); 22 C.F.R. § 171.11(f)(2).

[21] Courts have found that the ACLU as well as other organizations with similar missions that engage in information-dissemination activities similar to the ACLU are "primarily engaged in disseminating information." *See, e.g., Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *ACLU*, 321 F. Supp. 2d at 29 n.5; *Elec. Privacy Info. Ctr. v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003).

[22] *See, e.g.,* Press Release, American Civil Liberties Union, U.S. Releases Drone Strike 'Playbook' in Response to ACLU Lawsuit (Aug. 6, 2016), https://www.aclu.org/news/us-releases-drone-strike-playbook-response-aclu-lawsuit; Press Release, American Civil Liberties Union, Secret Documents Describe Graphic Abuse and Admit Mistakes (June 14, 2016), https://www.aclu.org/news/cia-releases-dozens-torture-documents-response-aclu-lawsuit; Press Release, American Civil Liberties Union, U.S. Releases Targeted Killing Memo in Response to Long-Running ACLU Lawsuit (June 23, 2014), https://www.aclu.org/national-security/us-releases-targeted-killing-memo-response-long-running-aclu-lawsuit; Press Release, American Civil Liberties Union, Justice Department White Paper Details Rationale for Targeted Killing of Americans (Feb. 4, 2013), https://www.aclu.org/national-security/justice-department-white-paper-details-rationale-targeted-killing-americans; Press Release, American Civil Liberties Union, Documents Show FBI Monitored Bay Area Occupy Movement (Sept. 14, 2012), https://www.aclu.org/news/documents-show-fbi-monitored-bay-area-occupy-movement-insidebayareacom.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

8

documents released through ACLU FOIA requests.[23]

Similarly, the ACLU publishes reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA requests. This material is broadly circulated to the public and widely available to everyone for no cost or, sometimes, for a small fee. ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests.[24] The ACLU also regularly publishes books, "know your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties.

The ACLU publishes a widely read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily. *See* https://www.aclu.org/blog. The ACLU creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. *See* https://www.aclu.org/multimedia. The ACLU also

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[23] *See, e.g.*, Cora Currier, *TSA's Own Files Show Doubtful Science Behind Its Behavioral Screen Program*, Intercept, Feb. 8, 2017, https://theintercept.com/2017/02/08/tsas-own-files-show-doubtful-science-behind-its-behavior-screening-program/ (quoting ACLU staff attorney Hugh Handeyside); Karen DeYoung, *Newly Declassified Document Sheds Light on How President Approves Drone Strikes*, Wash. Post, Aug. 6, 2016, http://wapo.st/2jy62cW (quoting former ACLU deputy legal director Jameel Jaffer); Catherine Thorbecke, *What Newly Released CIA Documents Reveal About 'Torture' in Its Former Detention Program*, ABC, June 15, 2016, http://abcn.ws/2jy40d3 (quoting ACLU staff attorney Dror Ladin); Nicky Woolf, *US Marshals Spent $10M on Equipment for Warrantless Stingray Device*, Guardian, Mar. 17, 2016, https://www.theguardian.com/world/2016/mar/17/us-marshals-stingray-surveillance-airborne (quoting ACLU staff attorney Nathan Freed Wessler); David Welna, *Government Suspected of Wanting CIA Torture Report to Remain Secret*, NPR, Dec. 9, 2015, http://n.pr/2jy2p71 (quoting ACLU project director Hina Shamsi).

[24] *See, e.g.*, Hugh Handeyside, *New Documents Show This TSA Program Blamed for Profiling Is Unscientific and Unreliable — But Still It Continues* (Feb. 8, 2017, 11:45 AM), https://www.aclu.org/blog/speak-freely/new-documents-show-tsa-program-blamed-profiling-unscientific-and-unreliable-still; Carl Takei, *ACLU-Obtained Emails Prove that the Federal Bureau of Prisons Covered Up Its Visit to the CIA's Torture Site* (Nov. 22, 2016, 3:15 PM), https://www.aclu.org/blog/speak-freely/aclu-obtained-emails-prove-federal-bureau-prisons-covered-its-visit-cias-torture; Brett Max Kaufman, *Details Abound in Drone 'Playbook' – Except for the Ones That Really Matter Most* (Aug. 8, 2016, 5:30 PM), https://www.aclu.org/blog/speak-freely/details-abound-drone-playbook-except-ones-really-matter-most; Nathan Freed Wessler, *ACLU Obtained Documents Reveal Breadth of Secretive Stingray Use in Florida* (Feb. 22, 2015, 5:30 PM), https://www.aclu.org/blog/free-future/aclu-obtained-documents-reveal-breadth-secretive-stingray-use-florida; Ashley Gorski, *New NSA Documents Shine More Light into Black Box of Executive Order 12333* (Oct. 30, 2014, 3:29 PM), https://www.aclu.org/blog/new-nsa-documents-shine-more-light-black-box-executive-order-12333; ACLU, *ACLU Eye on the FBI: Documents Reveal Lack of Privacy Safeguards and Guidance in Government's "Suspicious Activity Report" Systems* (Oct. 29, 2013), https://www.aclu.org/sites/default/files/assets/eye_on_fbi_-_sars.pdf.

publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU's website also serves as a clearinghouse for news about ACLU cases, as well as analysis about case developments, and an archive of case-related documents. Through these pages, and with respect to each specific civil liberties issue, the ACLU provides the public with educational material, recent news, analyses of relevant Congressional or executive branch action, government documents obtained through FOIA requests, and further in-depth analytic and educational multi-media features.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU website includes many features on information obtained through the FOIA.[25] For example, the ACLU's "Predator Drones FOIA" webpage, https://www.aclu.org/national-security/predator-drones-foia, contains commentary about the ACLU's FOIA request, press releases, analysis of the FOIA documents, numerous blog posts on the issue, documents related to litigation over the FOIA request, frequently asked questions about targeted killing, and links to the documents themselves. Similarly, the ACLU maintains an online "Torture Database," a compilation of over 100,000 pages of FOIA and other documents that allows researchers and the public to conduct sophisticated searches of FOIA documents relating to government policies on rendition, detention, and interrogation.[26]

---

[25] *See, e.g.*, Nathan Freed Wessler & Dyan Cortez, *FBI Releases Details of 'Zero-Day' Exploit Decisionmaking Process* (June 26, 2015, 11:00 AM), https://www.aclu.org/blog/free-future/fbi-releases-details-zero-day-exploit-decisionmaking-process; Nathan Freed Wessler, *FBI Documents Reveal New Information on Baltimore Surveillance Flights* (Oct. 30, 2015, 8:00 AM), https://www.aclu.org/blog/free-future/fbi-documents-reveal-new-information-baltimore-surveillance-flights; *ACLU v. DOJ – FOIA Case for Records Relating to the Killing of Three U.S. Citizens*, ACLU Case Page, https://www.aclu.org/national-security/anwar-al-awlaki-foia-request; *ACLU v. Department of Defense*, ACLU Case Page, https://www.aclu.org/cases/aclu-v-department-defense; *Mapping the FBI: Uncovering Abusive Surveillance and Racial Profiling*, ACLU Case Page, https://www.aclu.org/mappingthefbi; *Bagram FOIA*, ACLU Case Page https://www.aclu.org/cases/bagram-foia; *CSRT FOIA*, ACLU Case Page, https://www.aclu.org/national-security/csrt-foia; *ACLU v. DOJ – Lawsuit to Enforce NSA Warrantless Surveillance FOIA Request*, ACLU Case Page, https://www.aclu.org/aclu-v-doj-lawsuit-enforce-nsa-warrantless-surveillance-foia-request; *Patriot FOIA*, ACLU Case Page, https://www.aclu.org/patriot-foia; *NSL Documents Released by DOD*, ACLU Case Page, https://www.aclu.org/nsl-documents-released-dod?redirect=cpredirect/32088.

[26] *The Torture Database*, ACLU, https://www.thetorturedatabase.org; *see also Countering Violent Extremism FOIA Database*, ACLU, https://www.aclu.org/foia-collection/cve-foia-documents; *TSA Behavior Detection FOIA Database*, ACLU, https://www.aclu.org/foia-collection/tsa-behavior-detection-foia-database; *Targeted Killing FOIA Database*, ACLU, https://www.aclu.org/foia-collection/targeted-killing-foia-database.

The ACLU has also published a number of charts and explanatory materials that collect, summarize, and analyze information it has obtained through the FOIA. For example, through compilation and analysis of information gathered from various sources—including information obtained from the government through FOIA requests—the ACLU created an original chart that provides the public and news media with a comprehensive summary index of Bush-era Office of Legal Counsel memos relating to interrogation, detention, rendition, and surveillance.[27] Similarly, the ACLU produced an analysis of documents released in response to a FOIA request about the TSA's behavior detection program[28]; a summary of documents released in response to a FOIA request related to the FISA Amendments Act[29]; a chart of original statistics about the Defense Department's use of National Security Letters based on its own analysis of records obtained through FOIA requests[30]; and an analysis of documents obtained through FOIA requests about FBI surveillance flights over Baltimore.[31]

The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.

B.     *The records sought are urgently needed to inform the public about actual or alleged government activity.*

These records are urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested records relate to the federal government's use of social media surveillance and its interactions with the private sector for the purpose of obtaining social media surveillance technology. As discussed in Part I, *supra*, federal agencies are expanding their use of social media surveillance—which implicates the online speech of millions of social media users—but little information is available to the public regarding the nature, extent, and consequences of that surveillance.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[27] *Index of Bush-Era OLC Memoranda Relating to Interrogation, Detention, Rendition and/or Surveillance*, ACLU (Mar. 5, 2009), https://www.aclu.org/sites/default/files/pdfs/safefree/olcmemos_2009_0305.pdf.

[28] *Bad Trip: Debunking the TSA's 'Behavior Detection' Program*, ACLU (2017), https://www.aclu.org/sites/default/files/field_document/dem17-tsa_detection_report-v02.pdf.

[29] *Summary of FISA Amendments Act FOIA Documents Released on November 29, 2010*, ACLU, https://www.aclu.org/files/pdfs/natsec/faafoia20101129/20101129Summary.pdf.

[30] *Statistics on NSLs Produced by Department of Defense*, ACLU (2014), https://www.aclu.org/ other/statistics-nsls-produced-dod.

[31] Nathan Freed Wessler, *FBI Documents Reveal New Information on Baltimore Surveillance Flights* (Oct. 30, 2015, 8:00 AM), https://www.aclu.org/blog/free-future/fbi-documents-reveal-new-information-baltimore-surveillance-flights.

Given the foregoing, the ACLU has satisfied the requirements for expedited processing of this Request.

### IV. Application for Waiver or Limitation of Fees

The ACLU requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii).[32]  The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).

A.   *The Request is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU.*

As discussed above, credible media and other investigative accounts underscore the substantial public interest in the records sought through this Request. Given the ongoing and widespread media attention to this issue, the records sought will significantly contribute to public understanding of an issue of profound public importance. Because little specific information about government surveillance and monitoring of social media is publicly available, the records sought are certain to contribute significantly to the public's understanding of whether and under what circumstances the government monitors social media content, and how such monitoring affects individual privacy and liberty.

The ACLU is not filing this Request to further its commercial interest. As described above, any information disclosed by the ACLU as a result of this FOIA Request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted)).

B.   *The ACLU is a representative of the news media and the records are not sought for commercial use.*

The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[32] *See also* 6 C.F.R. § 5.11(k); 28 C.F.R. § 16.10(k); 22 C.F.R. § 171.16.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II).[33] The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *See* 5 U.S.C. § 552(a)(4)(A)(ii)(III); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. DOJ*, No. C09-0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 30 n.5 (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is therefore a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information."

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media" as well. *See, e.g., Cause of Action v. IRS*, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[34]

On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU as a "representative of the news media."[35] As was true in those instances, the ACLU meets the requirements for a fee waiver here.

---

[33] *See also* 6 C.F.R. § 5.11(d)(1); 28 C.F.R. § 16.10(b)(6); 22 C.F.R. § 171.14(b).

[34] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information / public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54.

[35] In August 2017, CBP granted a fee-waiver request regarding a FOIA request for records relating to a muster sent by CBP in April 2017. In May 2017, CBP granted a fee-

                              *        *        *

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

    Pursuant to applicable statutes and regulations, the ACLU expects a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii).

    If the Request is denied in whole or in part, the ACLU asks that you justify all deletions by reference to specific exemptions to FOIA. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or deny a waiver of fees.

    Thank you for your prompt attention to this matter. Please furnish the applicable records to:

      Hugh Handeyside
      American Civil Liberties Union
      125 Broad Street—18th Floor
      New York, New York 10004
      hhandeyside@aclu.org

    I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

---

waiver request regarding a FOIA request for documents related to electronic device searches at the border. In April 2017, the CIA and the Department of State granted fee-waiver requests in relation to a FOIA request for records related to the legal authority for the use of military force in Syria. In March 2017, the Department of Defense Office of Inspector General, the CIA, and the Department of State granted fee-waiver requests regarding a FOIA request for documents related to the January 29, 2017 raid in al Ghayil, Yemen. In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the DOJ for documents related to Countering Violent Extremism Programs. In April 2013, the National Security Division of the DOJ granted a fee-waiver request with respect to a request for documents relating to the FISA Amendments Act. Also in April 2013, the DOJ granted a fee-waiver request regarding a FOIA request for documents related to "national security letters" issued under the Electronic Communications Privacy Act. In August 2013, the FBI granted the fee-waiver request related to the same FOIA request issued to the DOJ. In June 2011, the DOJ National Security Division granted a fee waiver to the ACLU with respect to a request for documents relating to the interpretation and implementation of a section of the PATRIOT Act. In March 2009, the State Department granted a fee waiver to the ACLU with regard to a FOIA request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists.

Respectfully,

Hugh Handeyside
American Civil Liberties Union
   Foundation
125 Broad Street—18th Floor
New York, New York 10004
212.549.2500
hhandeyside@aclu.org


Matt Cagle
American Civil Liberties Union
   Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
415.621.2493
mcagle@aclunc.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

15

# Exhibit B



U.S. Department of Justice

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

June 8, 2018

MR. HUGH HANDEYSIDE
AMERICAN CIVIL LIBERTIES UNION
18TH FLOOR
125 BROAD STREET
NEW YORK, NY 10004

FOIPA Request No.: 1407258-000
Subject: Records Pertaining to Social Media
Surveillance (Monitoring and Retention of
Immigrants' and Visa Applicants' Social
Media Information for the Purpose of
Conducting Extreme Vetting)

Dear Mr. Handeyside:

This is in response to your Freedom of Information Act (FOIA) request: "Records pertaining to social media surveillance, including the monitoring and retention of immigrants' and visa applicants' social media information for the purpose of conducting extreme vetting."

Please be advised that upon reviewing the substantive nature of your request, we can neither confirm nor deny the existence of records responsive to your request pursuant to FOIA exemption (b) (7) (E) [5 U.S.C. §522 (b)(7)(E)]. The mere acknowledgement of whether or not the FBI has any records in and of itself would disclose techniques, procedures, and/or guidelines that could reasonably be expected to risk circumvention of the law. Thus, the FBI neither confirms nor denies the existence of any records.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA). See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIA online portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home. Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov. Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@fbi.gov. If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet and Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Information Management Division

Enclosure

7/18/2018                                                                UPS CampusShip

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed label at the solid line below.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   **Customers without a Daily Pickup**
   Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
   Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
   Hand the package to any UPS driver in your area.

UPS Access Point™               UPS Access Point™               UPS Access Point™
THE UPS STORE                   THE UPS STORE                   THE UPS STORE
71 BROADWAY                     64 BEAVER ST                    82 NASSAU ST
NEW YORK ,NY 10006              NEW YORK ,NY 10004              NEW YORK ,NY 10038

**FOLD HERE**



0.0 LBS    LTR                                    1 OF 1

HUGH HANDEYSIDE
2125492500 2530
ACLU
125 BROAD ST 18THFLOOR
NEW YORK NY 100042400

SHIP TO:
DIRECTOR, OFFICE OF INFO. POLICY
DEPARTMENT OF JUSTICE
SUITE 11050
1425 NEW YORK AVENUE NW
WASHINGTON DC 20005-2106

MD 201 9-83

UPS NEXT DAY AIR SAVER    1P

TRACKING #: 1Z 149 0E0 NW 9037 9080

BILLING: P/P
ATTENTION UPS DRIVER: SHIPPER RELEASE

Department: National Security
Case/Accounting Code: 00000

FREEDOM OF INFORMATION ACT
APPEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, ET AL

     Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
     JUSTICE, ET AL

     Defendants.

Civil Action No. 19-cv-00290-SK

# **<u>Exhibit D</u>**



**U.S. Department of Justice**

Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

Hugh Handeyside, Esq.
American Civil Liberties Union
18th Floor
125 Broad Street
New York, NY  10004
hhandeyside@aclu.org

Re: Appeal No. DOJ-AP-2018-006841
   Request No. 1407258-000
   SRO:RCS

**VIA:  FOIAonline**

Dear Mr. Handeyside:

   This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation was received in this Office on July 18, 2018.  Your appeal has been assigned number DOJ-AP-2018-006841.  Please mention this number in any future correspondence with this Office regarding this appeal.

   You assert that your appeal is entitled to expedited treatment pursuant to the second standard enumerated in the Department of Justice's regulations.  Expedited treatment pursuant to the second standard will be granted where the requester shows that there is "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 28 C.F.R. § 16.5(e)(1)(ii) (2017).

   In deciding whether you have demonstrated that there is an "urgency to inform the public" under 28 C.F.R. § 16.5(e)(1)(ii) (2017), I considered three factors: "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." Al-Fayed v. CIA, 254 F.3d 300, 310 (D.C. Cir. 2001).  Although your request concerns a federal government activity, you have not established that the requested records are a matter of current exigency to the American public, nor that delaying a response would compromise a significant recognized interest.  Instead, you only state that your appeal should be expedited because the requested records are "are urgently needed to inform the public about actual or alleged government activity" since "the use of social media surveillance by the FBI and other federal agencies is the subject of strong and sustained public concern and media attention."  While this issue may be of some public interest, you have not demonstrated a time-sensitive, urgent need for these records.

   Furthermore, although you may well engage in the dissemination of information, you have not demonstrated that you are "primarily engaged" in disseminating information.  See

- 2 -

<u>Landmark Legal Found. v. EPA</u>, 910 F. Supp. 2d 270 (D.D.C. 2012) (noting that plaintiff must be "primarily, and not just incidentally, engaged in information dissemination"); <u>ACLU of N. Cal. v. DOJ</u>, No. 04-4447, 2005 WL 588354, at *14 (N.D. Cal. Mar. 11, 2005) (holding that information dissemination must be "*the* main activity" rather than merely "*a* main activity" of plaintiff to satisfy expedition standard).  Without such a showing, expedited processing pursuant to the second standard is not warranted.

As a result of the denial, your appeal will be placed into chronological order with the other pending appeals and will be addressed in turn.

Please be advised that this Office's decision was made only after a full review of this matter.  Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your request for expedited processing.

If you are dissatisfied with my action on your request for expedited treatment of your appeal, you may file a lawsuit in accordance with 5 U.S.C. § 552(a)(6)(E)(iii).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  Using OGIS services does not affect your right to pursue litigation.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.  If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you may speak with the undersigned agency official by calling (202) 514-3642.

Sincerely,

7/23/2018

X _Sean O'Neill_

Sean R. O'Neill
Chief, Administrative Appeals Staff
Signed by: OIP

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, ET AL<br><br>     Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, ET AL<br><br>     Defendants. | Civil Action No. 19-cv-00290-SK |

# **<u>Exhibit E</u>**



**U.S. Department of Justice**
Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

Hugh Handeyside, Esq.
American Civil Liberties Union
18th Floor
125 Broad Street                        Re:      Appeal No. DOJ-AP-2018-006841
New York, NY  10004                              Request No. 1407258
hhandeyside@aclu.org                             CDT:RNB

**VIA:  FOIAonline**

Dear Mr. Handeyside:

        You appealed on behalf of your clients, the ACLU Foundation and the ACLU Foundation
of Northern California, from the action of the Federal Bureau of Investigation on their Freedom
of Information Act request for access to records concerning social media surveillance, including
the monitoring and retention of immigrants' and visa applicants' social media information for the
purpose of conducting "extreme vetting."  I note that your appeal concerns the FBI's refusal to
confirm or deny the existence of records.  Please note that this Office was closed due to a lapse
in funding appropriations between December 22, 2018 and January 25, 2019, which resulted in
a delay in responding to your appeal.

        After carefully considering your appeal, and as a result of discussions between the FBI
personnel and this Office, I am sending your clients' request back to the FBI for a search for
responsive records.  If the FBI locates releasable records, it will send them to you directly,
subject to any applicable fees.  You may appeal any future adverse determination made by the
FBI.  If you would like to inquire about the status of this remanded request or to receive an
estimated date of completion, please contact the FBI directly at 540-868-1535.

        If you have any questions regarding the action this Office has taken on your appeal, you
may contact this Office's FOIA Public Liaison for your appeal.  Specifically, you may speak with
the undersigned agency official by calling (202) 514-3642.

- 2 -

If your clients are dissatisfied with my action on your appeal, the FOIA permits them to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

1/31/2019

X _____

Sean R. O'Neill
Chief, Administrative Appeals Staff
Signed by: SEAN O'NEILL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, ET AL

     Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
     JUSTICE, ET AL

     Defendants.

Civil Action No. 19-cv-00290-SK

# **<u>Exhibit F</u>**



**Federal Bureau of Investigation**
*Washington, D.C. 20535*

May 31, 2019

Mr. Hugh Handeyside
American Civil Liberties Union
18th Floor
125 Broad Street
New York, NY 10004

FOIPA Request No.: 1407258-000
Subject: Records Pertaining to Social Media Surveillance
*American Civil Liberties Union, et al. v. Department of Justice, et al.*
Civil Action No.: 19-cv-290 (Northern District of California)

Dear Mr. Handeyside,

This letter is in regard to your Freedom of Information Act (FOIA) request dated May 24, 2018. The FBI re-reviewed its initial response to your Freedom of Information Act (FOIA) request and is modifying its response.

In regards to items 2) – a., b., and c. of your request, the FBI can neither confirm nor deny the existence of any responsive records. To do so would disclose the existence or non-existence of non-public law enforcement techniques, procedures, and/or guidelines. The acknowledgment that any such records exist or do not exist could reasonably be expected to risk circumvention of the law. Thus, pursuant to FOIA Exemption (b)(7)(E) [5 U.S.C.§552 (b)(7)(E)], the FBI neither confirms nor denies the existence of records responsive to these particular portions of your request.

In regards to items 3) and 4) of your request, FOIA provides for access to Government records where the records sought are "reasonably described" [Title 5, United States Code, Section 552(a)(3)(A)]. Furthermore, 28 CFR § 16.3(b) requires FOIA requests be framed in a manner that allows agencies to locate records "with a reasonable amount of effort." To fulfill these items of your request, the FBI would need to conduct unduly burdensome, agency-wide searches of its records. Therefore, the FBI determined these portions do not constitute proper FOIA requests.

The FBI is currently conducting searches for records responsive to all other portions of your request.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. The **"Standard Responses to Requests"** section of the Addendum applies to all requests. If the subject of your request is a person, the **"Standard Responses to Requests for Individuals"** section also applies. The **"General Information"** section includes useful information about FBI records. Also enclosed is our Explanation of Exemptions.

For questions regarding our determination, please correspond with the Department of Justice attorney representing the FBI in this matter.

Sincerely,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Information Management Division

Enclosure(s)

**FBI FOIPA Addendum**

As referenced in our letter, the FBI FOIPA Addendum includes information applicable to your request.   Part 1 of the Addendum includes standard responses that apply to all requests.   If you submitted a request regarding yourself or another person, Part 2 includes additional standard responses that apply to requests for individuals.   If you have questions regarding the standard responses in Parts 1 or 2, visit the www.fbi.gov/foia website under "Contact Us."   Previously mentioned appeal and dispute resolution services are also available.   Part 3 includes general information about FBI records that you may find useful.

**Part 1: Standard Responses to All Requests:   See Below for all Requests**

(i)     **5 U.S.C. § 552(c).**   Congress excluded three categories of law enforcement and national security records from the requirements of the Freedom of Information Act (FOIA). *See* 5 U.S. C. § 552(c) (2006 & Supp. IV (2010). FBI responses are limited to those records subject to the requirements of the FOIA. Additional information about the FBI and the FOIPA can be found on the fbi.gov website.

(ii)     **National Security/Intelligence Records.**   The FBI can neither confirm nor deny the existence of national security and foreign intelligence records pursuant to FOIA exemptions (b)(1) and (b)(3) and PA exemption (j)(2) as applicable to requests for records about individuals [5 U.S.C. §§ 552/552a (b)(1), (b3), and (j)(2); 50 U.S.C § 3024(i)(1)].   The mere acknowledgement of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3); 50 USC § 3024(i)(1).   This is a standard response and should not be read to indicate that national security or foreign intelligence records do or do not exist.

**Part 2: Standard Responses to Requests for Individuals:   See Below for all Requests for Individuals**

(i)     **Requests for Records about any Individual—Watch Lists.**   The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2].   This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)     **Requests for Records for Incarcerated Individuals.**   The FBI can neither confirm nor deny the existence of records which could reasonably be expected to endanger the life or physical safety of any incarcerated individual pursuant to FOIA exemptions (b)(7)(E) and (b)(7)(F) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (b)(7)(F), and (j)(2)].   This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i)     **Record Searches.**   The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching those systems or locations where responsive records would reasonably be found. Most requests are satisfied by searching the Central Record System (CRS), an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its dual law enforcement and intelligence mission as well as the performance of agency administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide. A CRS search includes Electronic Surveillance (ELSUR) records.

(ii)     **FBI Records**
Founded in 1908, the FBI carries out a dual law enforcement and national security mission.   As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)     **Requests for Criminal History Records or "Rap Sheets."**   The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks –often referred to as a criminal history record or "rap sheets." These criminal history records are not the same as material in an investigative "FBI file."   An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service.   For a fee, individuals can request a copy of their Identity History Summary Check.   Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks.   Additionally, requests can be submitted electronically at www.edo.cjis.gov.   For additional information, please contact CJIS directly at (304) 625-5590.

(iv)     **The National Name Check Program (NNCP).**   The mission of NNCP is to analyze and report information in response to name check requests received from federal agencies, for the purpose of protecting the United States from foreign and domestic threats to national security.   Please be advised that this is a service provided to other federal agencies. Private citizens cannot request a name check.

**EXPLANATION OF EXEMPTIONS**

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552**

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ