# Exhibit O





U.S. Department of Justice (DOJ)
Office of the Inspector General (OIG)
Evaluation and Inspections Division

U.S. Department of Homeland Security (DHS)
Office of Inspector General (OIG)
Special Reviews and Evaluations

# A Joint Review of Law Enforcement Cooperation on the Southwest Border between the Federal Bureau of Investigation and Homeland Security Investigations



Evaluation and Inspections Division 19-03
Special Reviews and Evaluations OIG 19-57

July 2019



# Executive Summary

*A Joint Review of Law Enforcement Cooperation on the Southwest Border between the Federal Bureau of Investigation and Homeland Security Investigations*



## Introduction

The U.S. Southwest border with Mexico spans nearly 2,000 miles. The region presents unique challenges to law enforcement, and, because multiple law enforcement agencies engage in investigative activity along the Southwest border, effective cooperation among such agencies is important to ensure that all agencies perform their work without jeopardizing the safety of law enforcement and the public.

The U.S. Department of Justice's (DOJ) Federal Bureau of Investigation (FBI) and the U.S. Department of Homeland Security (DHS) Immigration and Customs Enforcement's (ICE) Homeland Security Investigations (HSI) are among the largest U.S. federal investigative law enforcement agencies. Both agencies have a significant presence along the Southwest border. Combined, the FBI and HSI had nearly 3,000 federal agents assigned to Southwest border locations in 2017. The FBI and HSI share many of the same statutory authorities to investigate certain crimes, underscoring the need for agents to share information and manage investigative overlap effectively.

For this review, the DOJ Office of the Inspector General (DOJ OIG) and the DHS Office of Inspector General (DHS OIG) jointly evaluated cooperation between the FBI and HSI on Southwest border criminal investigations. We defined cooperation as deconflicting investigative targets to avoid duplicative investigations, deconflicting law enforcement operations to promote officer safety, and sharing relevant investigative information. We conducted this joint review following a February 2016 request from the then Chairmen of the U.S. Senate Committee on the Judiciary and the U.S. House of Representatives Committee on Oversight and Government Reform.

As part of our review, we deployed an anonymous online survey to all 2,948 agents (1,245 FBI and 1,703 HSI) assigned to Southwest border locations in 2017. We received 980 survey responses (291 FBI and 689 HSI), a 33 percent aggregate response rate. We conducted interviews with 246 DOJ and DHS personnel, primarily from the FBI, HSI, and U.S. Attorney's Offices, in Southwest border locations across Arizona, California, New Mexico, and Texas. We also traveled to 10 Southwest border cities in Texas.

## Results in Brief

While 63 percent of survey respondents did not report any cooperation failures, 37 percent of survey respondents and many interviewees reported cooperation failures that resulted in negative impacts on investigations and operations. We identified several factors that may have contributed to the reported cooperation failures: unclear agency policies governing deconfliction and overlapping investigative areas; agents' negative perceptions, mistrust, and lack of understanding of the other agency's mission and authorities; and lack of a national-level memorandum of understanding (MOU) regarding cooperation. The agencies should take action to address the unclear policies, negative perceptions, and lack of understanding that appear to have inhibited cooperation.

### The Majority of Survey Respondents Did Not Encounter Interagency Cooperation Failures, and Agents Reported that Task Forces Generally Improve Cooperation between the FBI and HSI

Based on our survey of FBI and HSI agents in Southwest border locations, 63 percent did not report any cooperation failures despite many agents reporting that they shared similar targets and operations. Nearly all survey respondents reported that they took action to resolve any overlapping aspects of their investigations, although many interviewees stated that there is little joint investigative interaction outside of task forces.

We also found that task forces have generally improved cooperation between the FBI and HSI along the Southwest border. Agents reported increased cooperation in each of the elements we measured, and they also stated that task forces increased members' awareness of the other agency's missions and investigative resources. This has allowed agents to increase investigative collaboration and utilize each agency's authorities to enable more effective investigations.

### Over One-third of Survey Respondents Reported at Least One Cooperation Failure, and Respondents Identified Deconfliction and Information Sharing Issues That Require Attention

Over one-third of FBI and HSI survey respondents (363 of 980) reported cooperation failures that resulted in a range of negative impacts. Of those, 316 (87 percent of those that reported failures) reported that they had experienced at least 1 negative impact, including lost trust in the other agency or its personnel, unnecessary use of resources, unnecessarily



# Executive Summary

*A Joint Review of Law Enforcement Cooperation on the Southwest Border between the Federal Bureau of Investigation and Homeland Security Investigations*



prolonged investigations, and a failure to gather evidence or intelligence or apprehend a target.

### Inconsistent Deconfliction Practices and a Lack of FBI and HSI Deconfliction Policy May Have Contributed to Cooperation Failures

We found that inconsistent deconfliction practices on the part of both FBI and HSI agents compromised the other agency's ability to access relevant investigative information. For example, when deconflicting targets, agents did not consistently use the systems required by both DOJ and DHS deconfliction policies. Agents reported that they used the required systems when deconflicting events, but we found that inconsistent practices have reduced the systems' effectiveness.

We identified several policy-based reasons that likely contributed to these inconsistent deconfliction practices. First, at the time of our fieldwork, neither agency had its own deconfliction policy tailored to meet its operational needs; instead, both agencies relied on broad, department-wide policies. However, since then, on February 15, 2019, ICE issued deconfliction policy applicable to HSI that may alleviate some of the problems we identified. Additionally, neither agency has established protocols for proper deconfliction procedures. Second, during the time of our fieldwork neither the FBI nor HSI had a policy for sharing appropriate target information, which limited agents' ability to avoid investigative overlap or pursue common targets jointly. ICE's February 15, 2019 deconfliction policy included some information sharing provisions, which may result in improvements for HSI. Finally, many agents were unaware of their agency's deconfliction policy, which we believe hindered effective deconfliction practices.

### Agents Lack Understanding of the Other Agency's Mission and Authorities, and Many Agents Do Not Trust the Other Agency or Its Personnel

We found that many FBI and HSI personnel lacked understanding of the other agency's mission, jurisdiction, and authorities. Many agents wrongly believed that the other agency conducted investigations in the Southwest border region that were outside of its

jurisdiction or that it expanded its mission without proper authority. FBI agents particularly did not understand HSI's mission and believed that HSI had engaged in "mission creep." HSI personnel acknowledged this perception and told us that it was likely due to several reorganizations and a prioritization of its investigative focus beyond crimes occurring at the border.

Trust issues between FBI and HSI agents have likely contributed to the reported cooperation failures and their resulting impacts. Many agents cited lack of trust as both a cause of failing to resolve conflicts and an effect of negative interactions with the other agency. Only half of survey respondents reported being comfortable deconflicting and sharing information with the other agency.

### Jurisdictional Conflicts and Unclear Policies in Specific Investigative Areas May Have Contributed to Interagency Disagreements, and an Interagency Memorandum of Understanding Could Improve Cooperation

We also believe that specific jurisdictional conflicts and unclear policies, in areas where both the FBI and HSI have investigative authority, have contributed to interagency disagreements. Specifically, we found disagreements over investigations involving public corruption, assault on federal officers, ports of entry, and FBI requests for assistance from DHS entities other than HSI. Conflicts in these areas are likely to persist unless the FBI and HSI update or clarify their policies.

## Recommendations

In this report, we make five recommendations to improve cooperation between the FBI and HSI along the Southwest border. These recommendations include developing written, agency-specific deconfliction guidelines; increasing awareness among FBI and HSI agents of each agency's mission, statutory authorities, and criminal investigative priorities; instituting an interagency MOU for investigative interactions; and resolving unclear jurisdictional areas highlighted in the Results of the Review.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

    Background ................................................................................................ 1

    FBI and HSI Responsibilities ...................................................................... 2

    Scope and Methodology of the Joint OIG Review ....................................... 7

SURVEY HIGHLIGHTS ....................................................................................... 8

RESULTS OF THE REVIEW ............................................................................... 10

    The Majority of Survey Respondents Did Not Encounter Interagency
    Cooperation Failures, and Agents Reported that Task Forces Generally
    Improve Cooperation between the FBI and HSI ....................................... 10

    Over One-third of Survey Respondents Reported at Least One Cooperation
    Failure, and Respondents Identified Deconfliction and Information Sharing
    Issues That Require Attention ................................................................. 13

    Inconsistent Deconfliction Practices and a Lack of FBI and HSI
    Deconfliction Policy May Have Contributed to Cooperation Failures ............ 16

    Agents Lack Understanding of the Other Agency's Mission and Authorities,
    and Many Agents Do Not Trust the Other Agency or Its Personnel ............ 20

    Jurisdictional Conflicts and Unclear Policies in Specific Investigative Areas
    May Have Contributed to Interagency Disagreements, and an Interagency
    Memorandum of Understanding Could Improve Cooperation .................... 23

CONCLUSION AND RECOMMENDATIONS ......................................................... 29

    Conclusion ............................................................................................. 29

    Recommendations ................................................................................... 30

APPENDIX 1:   SCOPE AND METHODOLOGY OF THE JOINT REVIEW ................... 31

    Standards ............................................................................................... 31

    Scope ..................................................................................................... 31

    Methodology ........................................................................................... 32

    Prior Work Related to FBI and HSI Southwest Border Cooperation ............ 38

APPENDIX 2:   THE OIG SURVEY INSTRUMENT WITH FBI AND HSI RESPONSES ... 39

    Survey Introduction ................................................................................ 39

Survey Questions.............................................................................. 39

Survey Conclusion........................................................................... 56

APPENDIX 3:   SURVEY RESPONDENTS' RECOMMENDATIONS FOR
IMPROVEMENT ....................................................................... 57

APPENDIX 4:   THE FBI'S RESPONSE TO THE DRAFT REPORT ........................... 59

APPENDIX 5:   DOJ OIG ANALYSIS OF THE FBI'S RESPONSE ............................. 62

APPENDIX 6:   ICE'S RESPONSE TO THE DRAFT REPORT ................................. 65

APPENDIX 7:   DHS OIG MANAGEMENT COMMENTS AND ANALYSIS OF ICE'S
RESPONSE.............................................................................. 68

# INTRODUCTION

## Background

The U.S. Southwest land border with Mexico spans nearly 2,000 miles across California, Arizona, New Mexico, and Texas.  The region presents unique challenges to law enforcement.  For example, because multiple federal agencies conduct investigative activity along the Southwest border, effective cooperation among them is important to ensure that agencies perform their law enforcement work without jeopardizing the safety of law enforcement and the public.

The Federal Bureau of Investigation (FBI), within the U.S. Department of Justice (DOJ), and Homeland Security Investigations (HSI), within the U.S. Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE), are among the largest federal investigative law enforcement agencies in the United States.  Both have a significant presence along the Southwest border.  Specifically, combined, nearly 3,000 FBI and HSI agents were assigned to Southwest border locations in 2017.  Though the FBI and HSI have separate missions, they share many of the same statutory authorities to investigate certain crimes, underscoring the importance of their agents sharing information and managing overlap in investigations.

For this review of FBI and HSI cooperation along the Southwest border, the DOJ Office of the Inspector General (DOJ OIG) and DHS Office of Inspector General (DHS OIG) jointly evaluated cooperation between the FBI and HSI on Southwest border criminal investigations.  We defined cooperation as deconflicting investigative targets to avoid duplicative investigations, deconflicting law enforcement operations to promote officer safety, and sharing relevant investigative information.  (We further define these terms in the text box.)  The law enforcement community generally defines deconfliction as the sharing of limited investigative information between federal, state, local, and tribal law enforcement entities to identify a common investigative interest or activity.  Failures between

---

### Cooperation Definitions for the Joint Review

- Deconflicting targets (or subjects):  (1) the FBI and HSI identifying investigations with the same targets by taking steps such as entering an investigative target's telephone number into a deconfliction database and (2) the FBI and HSI taking action to resolve any investigative overlap, such as coordinating with each other to avoid compromising either investigation.  A target, or subject, is any individual whose conduct is the subject of investigation.

- Deconflicting operations (or events):  (1) the FBI and HSI using a regional system to notify each other of significant investigative occurrences, such as an upcoming search warrant execution, and (2) the FBI and HSI coordinating that event with each other to promote officer safety.

- Sharing information:  the FBI and HSI exchanging information related to active criminal investigations, beyond initial target and operational deconfliction, such as FBI or HSI case agents sharing intelligence that has a nexus to the other agency's case.

Source:  DOJ OIG and DHS OIG

the FBI and HSI to deconflict properly, share relevant investigative information, or resolve jurisdictional conflicts can jeopardize officer safety, public safety, and the ability of both agencies to execute their critical missions.

The DOJ OIG and DHS OIG conducted this joint review following a 2016 request from congressional oversight committees, which asked us to examine how effectively DOJ and DHS law enforcement components are cooperating along the Southwest border.[1]  We focused this review on the FBI and HSI because of the agencies' overlapping statutory authorities, large size, and significant presence along the Southwest border.  We also focused on the FBI and HSI because we identified a lack of prior oversight work on the coordination between these two agencies.

## FBI and HSI Responsibilities

Notwithstanding the FBI's and HSI's separate missions (described below), the agencies share many of the same broad and overlapping statutory authorities to investigate criminal activities.  The text box below displays some of the criminal activities that both agencies have the authority to investigate.

---

[1]  Charles E. Grassley, Chairman, Senate Committee on the Judiciary, and Jason Chaffetz, Chairman, House Committee on Oversight and Government Reform, letter to the Honorable John Roth, Inspector General, DHS, and the Honorable Michael E. Horowitz, Inspector General, DOJ, February 22, 2016.

The former Chairmen's letter referred to the DOJ OIG report, *A Review of the Department of Justice's and ATF's Implementation of Recommendations Contained in the OIG's Report on Operations Fast and Furious and Wide Receiver*, Oversight and Review Division Report 16-01 (February 2016), www.oig.justice.gov/reports/2016/o1601.pdf (accessed July 29, 2019).  The letter also cited a whistleblower allegation that HSI agents had failed to coordinate with DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) per a 2009 Memorandum of Understanding.  DHS OIG's Office of Investigations reviewed the whistleblower allegation separately.  We do not address that matter in this report.  Because of that report's findings and a whistleblower allegation related to an agency not sharing investigative information as required, the former Chairmen expressed concern that coordination issues continue between DOJ and DHS law enforcement components.

Examples of the FBI's and HSI's Overlapping Investigative Authorities

- Child exploitation
- Commercial fraud
- Counter-proliferation
- Cyber crimes
- Gangs
- Human rights violations
- Human smuggling
- Human trafficking
- Intellectual property theft
- International art, antiquity theft
- Money laundering, bulk cash smuggling
- Narcotics
- Smuggling of narcotics, weapons
- Transnational financial crimes

Notes:  HSI claims lead agency responsibility for human smuggling and human trafficking.  HSI defines human *smuggling* as the importation of people into the United States involving deliberate evasion of immigration laws.  HSI defines human *trafficking* as (1) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion or (2) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion.

Source:  OIG analysis of FBI and HSI documentation and public source information

Both agencies also lead, support, and assign agents to various multiagency task forces, including Transnational Organized Crime and Violent Crime Task Forces; FBI-led Joint Terrorism Task Forces, Safe Streets Task Forces, and Gang Task Forces; and HSI-led Border Enforcement Security Task Forces.

## FBI Organization and Responsibilities

The FBI is a DOJ component created in 1908 with a mission to protect the American people and uphold the Constitution of the United States.  As a dual law enforcement/intelligence agency, the FBI's responsibilities include criminal investigations, as well as intelligence analysis and planning.  The FBI has investigative authority to exercise lead agency responsibility in investigating all crimes for which the FBI has primary or concurrent jurisdiction, as well as those that involve terrorist-related activities.[2]  The FBI holds broad legal authority to enforce numerous federal statutes, primarily under Titles 18 and 21 of the *U.S. Code.*  In fiscal year (FY) 2018, the FBI employed 38,360 personnel, including 14,120 agents, of which the FBI assigned 9 percent (1,245) to Southwest border

---

[2]  The FBI's primary investigative authority is derived from the Attorney General's authority under 28 U.S.C. §§ 509, 510, 533, and 534.  In 28 C.F.R. § 0.85, the Attorney General delegated a number of statutory authorities and granted other authorities to the FBI Director, including the authority to "investigate violations of the laws, including the criminal drug laws, of the United States and collect evidence in cases in which the United States is or may be a party in interest, except in cases in which such responsibility is by statue or otherwise exclusively assigned to another agency" and "exercise Lead Agency responsibility in investigating all crimes for which it has primary or concurrent jurisdiction and which involve terrorist activities or acts in preparation of terrorist activities within the statutory jurisdiction of the United States."

locations.[3]  The FBI has six field offices (or divisions) on the Southwest border: San Diego, California; Phoenix, Arizona; Albuquerque, New Mexico; El Paso, Texas; San Antonio, Texas; and Houston, Texas.  A Special Agent in Charge (SAC) leads each office and oversees resident agencies located within each field office's jurisdiction.  The FBI's 6 Southwest border field offices oversee 26 resident agencies.

*HSI Organization and Responsibilities*

HSI is one of two primary operational directorates of DHS's ICE.[4]  ICE enforces federal laws governing border control, customs, trade, and immigration. Congress created ICE in 2003 with the Homeland Security Act, which merged the investigative and enforcement elements of the former U.S. Customs Service (Customs) and the former Immigration and Naturalization Service (INS), which were established in 1789 and 1933, respectively.[5]  In 2010, ICE formed HSI from elements of its former Offices of Investigations, Intelligence, and International Affairs.

HSI's mission is to investigate, disrupt, and dismantle terrorist, transnational, and other criminal organizations that threaten or seek to exploit U.S. customs and immigration laws.  HSI agents investigate violations of U.S. customs and immigration laws pertaining to border security, homeland security, and public safety. They also investigate other crimes linked to the U.S. border, such as drugs, weapons, and money laundering violations with an international nexus.  HSI is authorized to conduct warrantless border searches and can cross-designate other law enforcement officers to investigate and enforce customs laws.[6]  HSI holds broad legal authority to enforce over 400 federal statutes, including investigating the crimes shown above in the text box.

---

[3]  At the end of FY 2018, the FBI employed 42,496 personnel, including 16,562 agents, of which the FBI assigned 9 percent (1,482) to Southwest border locations.

[4]  ICE's other primary operational directorate is Enforcement and Removal Operations (ERO). The ERO enforces U.S. immigration laws by apprehending and removing illegal aliens from the United States.  The ERO transports removable aliens, manages those in custody, and provides them access to legal resources.

[5]  The Homeland Security Act placed other former elements of Customs and the INS in two other DHS agencies, U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services.  Specifically, the Act merged the former elements of Customs and the INS that enforce anti-terrorism, immigration, anti-smuggling, trade compliance, and agriculture protection at the U.S. ports of entry (POE) to create the CBP's Office of Field Operations.  A POE is any place where people may be permitted to enter the country and goods may be cleared through customs.  The Act also placed the U.S. Border Patrol (Border Patrol) in the CBP.  Border Patrol enforces immigration laws and detects, interdicts, and apprehends those who attempt to illegally enter or smuggle people or contraband across U.S. borders between POEs.  Additionally, the former element of the INS that provided immigration benefits now resides in DHS's Citizenship and Immigration Services; that agency adjudicates applications for immigrant visas and naturalization and administers refugee and asylum programs.

[6]  Under 19 U.S.C. §§ 482 and 1401, HSI may conduct, and cross-designate other law enforcement officials to conduct, reasonable border searches without a warrant or probable cause.

In FY 2018, HSI employed 8,974 personnel, including 6,074 agents, of which 28 percent (1,703) were assigned to Southwest border locations. HSI has five principal field offices on the Southwest border: San Diego, California; Phoenix, Arizona; El Paso, Texas; San Antonio, Texas; and Houston, Texas. Each office is headed by a SAC and oversees suboffices within its jurisdiction. Together, these 5 field offices oversee 31 border suboffices.

*FBI and HSI Deconfliction Policies*

The FBI and HSI are subject to nearly identical—but separate—departmental policies on mandatory use of investigative deconfliction systems.[7] In establishing their departmental deconfliction policies, DOJ and DHS emphasized the same goals: ensure officer safety, preserve the integrity of ongoing investigations, and facilitate greater law enforcement collaboration and information sharing. In mandating the use of specific deconfliction systems, both policies also recognized that each agency has its own deconfliction policies, procedures, and practices that the agencies may continue to observe. The DOJ and DHS deconfliction policies apply to all the law enforcement components under each respective department but do not apply to law enforcement agencies outside the departments.

The Deputy Attorney General implemented DOJ's mandatory deconfliction policy in May 2014, following a DOJ Deconfliction Working Group that identified ways to improve intra-departmental deconfliction.[8] The policy requires that all DOJ law enforcement components deconflict investigative data, targets, and events using specific systems "when a viable deconfliction item is identified by the agent/deputy/officer and throughout the course of an active investigation."[9] The policy requires using the Drug Enforcement Administration's (DEA) Deconfliction and Information Coordination Endeavor (DICE) and various pointer databases to deconflict investigative data and targets, as well as appropriate regional

---

[7] James M. Cole, Deputy Attorney General, DOJ, memorandum for Heads of Department Law Enforcement Components, Department Policy for Mandatory Use of Investigative Deconfliction Systems, May 1, 2014; Alejandro N. Mayorkas, Deputy Secretary, DHS, memorandum for Department Component Heads, Department Policy Regarding Investigative Data and Event Deconfliction, Policy Directive 045-04, October 18, 2016.

[8] The DOJ OIG identified significant deconfliction issues in its 2012 report, *A Review of ATF's Operation Fast and Furious and Related Matters*, Oversight and Review Report (September 2012), www.oig.justice.gov/reports/2012/s1209.htm (accessed July 29, 2019). These deconfliction issues included one between the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) (a DOJ law enforcement component) and ICE (a DHS law enforcement component) concerning gun trafficking along the Southwest border. The DOJ OIG recommended the creation of a Deconfliction Working Group, which resulted in DOJ's deconfliction policy. The DOJ OIG's 2016 follow-up report noted that the DOJ OIG had closed this recommendation. See *A Review of the Department of Justice's and ATF's Implementation of Recommendations Contained in the OIG's Report on Operations Fast and Furious and Wide Receiver*, Oversight and Review Division Report 16-01 (February 2016), www.oig.justice.gov/reports/2016/o1601.pdf (accessed July 29, 2019).

[9] Cole, memorandum for Heads of Department Law Enforcement Components, 3.

deconfliction systems such as Regional Information Sharing Systems (RISS) to deconflict events (see the text box).

<div style="background-color:#e8f0f8; padding:1em;">

**FBI and HSI Deconfliction Systems Required by Policy**

*Target Deconfliction*

- DICE (DOJ and DHS):  the DEA's Internet-based, DOJ-run application that provides participating agencies the ability to identify and deconflict investigative information overlaps, such as phone numbers, email addresses, bank accounts, and license plates. The system notifies users if an overlap occurs and provides the record owner's contact information so users can share information.  DICE does not provide access to the matched data itself.

- Export Enforcement Coordination Center (DHS only):  DHS law enforcement components conducting export enforcement activities and investigations, including counter-proliferation, deconflict targets through the Export Enforcement Coordination Center.

*Event Deconfliction*

- RISSAFE, SAFETNET, Case Explorer (DOJ and DHS):  The three primary regional event deconfliction systems enable law enforcement personnel to identify potential operational conflicts in the field.  The Internet-based systems notify users of significant or anticipated occurrences, such as search and arrest warrants, surveillances, buy-busts, and enforcement operations.  When elements such as time, date, or location are matched between two or more upcoming operations, the systems notify affected agencies of the conflict.

Sources:  DOJ and DHS deconfliction policies

</div>

In October 2016, the DHS Deputy Secretary issued DHS's mandatory deconfliction policy, which is nearly identical to DOJ's.  The policy outlined a similar recognition that DHS "can benefit from a more unified policy governing investigative deconfliction activities."[10]  Like DOJ's, the DHS policy requires that all DHS law enforcement components use DICE to deconflict investigative data and targets.  For deconflicting targets of export enforcement activities and investigations, including counter-proliferation, the DHS policy requires using the Export Enforcement Coordination Center (see the text box above).  For event deconfliction, the DHS policy mirrors DOJ's requirement to use appropriate regional systems such as RISSAFE.

In July 2019, in its formal response to a working draft of this report, ICE notified us of a deconfliction directive it issued in February 2019 to all ICE law enforcement officers, including HSI.[11]  The directive establishes ICE policy regarding requirements for deconfliction of investigative data and enforcement events and reaffirms the use of the target and event deconfliction systems described above.  The directive assigns responsibility to the HSI Executive Associate Director to ensure compliance with the directive and issue further implementing guidance, as necessary, including establishing criteria for deconflicting investigative data and events.  Among the responsibilities the directive

---

[10]  Mayorkas, memorandum for Department Component Heads, 3.

[11]  ICE Directive 10090.1:  Investigative Data and Event Deconfliction, February 15, 2019.

assigns to HSI SACs are identifying and using the appropriate event deconfliction systems and notifying other law enforcement agencies in the jurisdictions where certain enforcement actions will occur. In this report, we discuss the policies in place at the time of our fieldwork, which occurred prior to the February 2019 ICE directive.

## Scope and Methodology of the Joint OIG Review

To understand the nature of cooperation between the FBI and HSI fully, we used a two-part methodology. First, in November 2017 we deployed an anonymous online survey to all 2,948 FBI and HSI agents assigned to Southwest border locations to gather their experiences and perceptions of cooperation. We received 980 complete responses, a 33 percent response rate. The FBI's response rate was 23 percent (291 of 1,245), and HSI's was 40 percent (689 of 1,703). Second, we conducted interviews with 246 DOJ and DHS personnel, primarily from the FBI, HSI, and U.S. Attorney's Offices (USAO). We traveled to 10 Southwest border locations to interview agents, Intelligence Analysts, and Assistant U.S. Attorneys who prosecute FBI and HSI cases to gain a better understanding of the reported problems. We conducted telephone interviews with personnel from the remaining Southwest border locations. We conducted our fieldwork from September 2017 through July 2018. Appendix 1 provides a detailed description of our review methodology; Appendix 2 provides the survey instrument and responses; and Appendix 3 provides respondents' recommendations for improvement in Southwest border coordination.

We used the survey results to assess agents' perceptions of interagency cooperation and the personal experiences they reported. When we interviewed agents, we sought to understand the nuances and circumstances surrounding the perceptions and experiences revealed in the survey responses. Throughout our review, we learned that perceptions of FBI/HSI cooperation on the Southwest border varied by agency, specific location, and other factors. In this report, we present agents' perceptions—based on the roughly 1,000 agent responses to our survey and our interviews of nearly 250 officials—to provide unique insight of overall cooperation between the FBI and HSI along the Southwest border.

# SURVEY HIGHLIGHTS

The 980 FBI and HSI Southwest border agents who responded to our survey answered questions about their experiences and perceptions of interagency cooperation as defined by:  (1) target deconfliction, (2) event deconfliction, and (3) information sharing.  Below, we present agents' survey responses to our questions regarding cooperation failures, negative impacts, perceptions of interagency relationships, and recommendations for improvement.

*Cooperation Failures and Impacts*

We first analyzed responses within each cooperation category individually:

### Percentage of Survey Respondents' Reported Cooperation Failures

|  | The Other Agency Failed to: Deconflict Targets | The Other Agency Failed to: Deconflict Events | The Other Agency Failed to: Share Information |
|---|---|---|---|
| Total | 28% (275 of 979) | 20% (197 of 975) | 22% (218 of 972) |
| FBI | 37% (108 of 290) | 29% (82 of 286) | 27% (75 of 283) |
| HSI | 24% (167 of 689) | 17% (115 of 689) | 21% (143 of 689) |

Note:  The number of agents responding to these three questions varied from 972 to 979 because not all agents answered each survey question.  The percentages do not total 100 for this reason.

Source:  OIG analysis of agent responses to Survey Questions 10, 14, and 18 (see Appendix 2)

We then determined how many individual respondents reported any failure in *at least one* category, counting each individual respondent only once.  Of all 980 respondents, 363 (37 percent) reported *at least one* cooperation failure; 63 percent did not report any failures.  We also asked respondents to identify the impacts from an identified cooperation failure on their investigations, agency operations, and working relationship with the other agency:

### Cooperation Failures and Top Negative Impacts Reported

| | Agents Reporting at Least One Failure | Agents Reporting No Failures |
|---|---|---|
| Total | 37% (363 of 980) | 63% (617 of 980) |
| FBI | 46% (133 of 291) | 54% (158 of 291) |
| HSI | 33% (230 of 689) | 67% (459 of 689) |

Source:  OIG analysis of 980 responses (291 FBI and 689 HSI) to Survey Questions 10, 14, and 18 (see Appendix 2)

| Impact Identified by Agents | Number of Agents Reporting |
|---|---|
| Loss of Trust of HSI/FBI as an Agency | 207 |
| Loss of Trust of HSI/FBI Personnel | 165 |
| Unnecessary Use of Resources | 164 |
| Lowered Morale | 158 |
| Failure to Gather Evidence/Intelligence | 140 |
| Unnecessarily Prolonged Investigation | 129 |

Source:  OIG analysis of 363 agent responses (133 FBI and 230 HSI) to Survey Questions 8b, 10b, and 14b (see Appendix 2)

*Overall Perceptions and Recommendations for Improvement*

### FBI and HSI Responses to Our Survey Question

"How much do you agree or disagree with the following statement: Overall, my agency has a good relationship with [FBI/HSI] on the Southwest Border?"

|  | Strongly Agree or Agree | Strongly Disagree or Disagree | Neither Agree nor Disagree | Don't Know |
|---|---|---|---|---|
| Combined Average | 35% (343 of 968) | 21% (203 of 968) | 37% (359 of 968) | 7% (63 of 968) |
| FBI | 30% (83 of 279) | 27% (75 of 279) | 35% (98 of 279) | 8% (23 of 279) |
| HSI | 38% (260 of 689) | 19% (128 of 689) | 38% (261 of 689) | 6% (40 of 689) |

Source:  OIG analysis of 968 responses (279 FBI and 689 HSI) to Survey Question 26 (see Appendix 2)

### Percentage of Agents Who Reported that They Were Comfortable Deconflicting Targets, Deconflicting Operations, or Sharing Information with the Other Agency

|  | Strongly Agree or Agree | Strongly Disagree or Disagree | Neither Agree nor Disagree |
|---|---|---|---|
| Target Deconfliction | 50% (482 of 969) | 22% (219 of 969) | 28% (268 of 969) |
| Operational Deconfliction | 53% (511 of 969) | 19% (189 of 969) | 28% (269 of 969) |
| Information Sharing | 43% (416 of 969) | 28% (267 of 969) | 29% (286 of 969) |

Source:  969 responses (280 FBI and 689 HSI) to OIG Survey Questions 22a, 22b, and 22c (see Appendix 2)

### Agents' Top Recommendations for Improvement

| Recommendation | FBI | HSI |
|---|---|---|
| 1. "Develop clear agency policy or procedures for deconflicting and sharing information." | 42% | 45% |
| 2. "Improve FBI and HSI information sharing systems (IT)." | 25% | 49% |
| 3. "Establish a Memorandum of Understanding or Agreement (MOU/MOA) between FBI and HSI." | 37% | 40% |
| 4. "Ensure compliance with existing deconfliction and information sharing protocols." | 32% | 37% |
| 5. "Align FBI and HSI investigative procedures." | 30% | 34% |
| 6. "Improve awareness and understanding of FBI/HSI jurisdiction." | 44% | 25% |

Source:  Responses to OIG Survey Question 27 (see Appendix 3)

# RESULTS OF THE REVIEW

## The Majority of Survey Respondents Did Not Encounter Interagency Cooperation Failures, and Agents Reported that Task Forces Generally Improve Cooperation between the FBI and HSI

FBI and HSI agents in Southwest border locations investigate many of the same types of crimes, and many reported encountering the same investigative targets and operations. Due to the agencies' overlapping jurisdictions, deconflicting and sharing information is important for FBI and HSI to accomplish their respective missions and address Southwest border criminal threats. The majority— 63 percent—of survey respondents reported that they did not encounter cooperation failures, and nearly all respondents who encountered the same targets and operations reported that they took action to resolve the overlap.

FBI and HSI personnel assigned to task forces also reported better deconfliction and information sharing than those not assigned to task forces. These Southwest border task force settings specifically included Organized Crime Drug Enforcement Task Forces (OCDETF), the FBI's Joint Terrorism Task Forces (JTTF), and a multiagency counterterrorism/counter-proliferation working group.[12] Agents working on task forces cited benefits such as improved deconfliction and information sharing, a shared mission, the ability to leverage investigative resources, and the cultivation of interpersonal relationships. Additionally, many agents we surveyed and interviewed recommended increasing task force opportunities to improve interagency cooperation.

### Many Survey Respondents Reported Encountering the Same Targets and Operations, and Nearly All Reported Taking Action to Resolve the Overlap

Nearly half of survey respondents reported having had the same target as the other agency (44 percent), and nearly a third reported having had a law enforcement operation overlap (29 percent), as Table 1 below illustrates. Interviewees emphasized that the Southwest border region is a "target rich environment" that contains a broad range of criminal activities with targets that both the FBI and HSI investigate. This frequency of investigative overlap illustrates the importance of effective deconfliction for agent safety and efficiency, even though the FBI and HSI do not often perform joint investigative work outside of task forces. Nearly all survey respondents (97 percent) who said they encountered the same targets and operations reported that they took action to resolve the overlap by coordinating with the other agency.

---

[12] DOJ established the OCDETF Program in 1982 to disrupt and dismantle the major drug-centric transnational criminal networks affecting the United States. Seven federal law enforcement agencies, state and local law enforcement, DOJ's Criminal Division, and USAOs collaborate to execute long-term, prosecutor-led, intelligence-driven, multi-jurisdictional investigations and prosecutions. There are 12 OCDETF Strike Forces nationwide, where member agencies work exclusively on OCDETF cases.

Table 1

Percentage of Survey Respondents Who Experienced Investigative Overlap

| | Overlapping Target | Overlapping Operation |
|---|---|---|
| Combined Average | 44%  (433 of 980) | 29%  (284 of 975) |
| FBI | 46% (135 of 291) | 33% (94 of 286) |
| HSI | 43% (298 of 689) | 28% (190 of 689) |

Source:  980 responses (291 FBI and 689 HSI) to Survey Question 9 and 975 responses (286 FBI and 689 HSI) to Survey Question 13 (see Appendix 2)

*Most Survey Respondents Did Not Report Experiencing Cooperation Failures During the Previous 3 Years*

Of the 980 survey respondents, 63 percent did not report any cooperation failures (see the text box for our definition).  Further, a significant number of FBI and HSI interviewees and survey respondents indicated that the two agencies have a good working relationship.  Specifically, of the FBI and HSI personnel we interviewed across the Southwest border, nearly half (47 percent) described the overall working relationship positively.  Even in locations where FBI and HSI personnel reported interagency problems or disagreements, interviewees described the overall working relationship positively.  Among all survey respondents, only 21 percent (203 of 968 agents) disagreed or strongly disagreed that the FBI and HSI have a good relationship on the Southwest border.

Defining Cooperation Failure

As noted above, we consider a "cooperation failure" between the FBI and HSI to have occurred if a survey respondent answered "yes" to the following questions:

- *Target Deconfliction:*  To your knowledge, has [FBI/HSI] ever begun an investigation on a target you were already investigating, but did not deconflict with you?

- *Event Deconfliction:*  To your knowledge, has [FBI/HSI] ever failed to deconflict a significant investigative event that overlapped with one of your operations?

- *Information Sharing*:  Have you ever been aware that [FBI/HSI] had information relevant to your investigation but failed to share it with you in a timely manner (for example, known locations of potential witnesses in your case)?

Source:  OIG Survey

Although the majority of respondents did not report any cooperation failures, we identified an additional factor that we believe provides context for this positive result.  Many FBI and HSI interviewees stated that they have little joint investigative interaction outside task forces, despite agents investigating the same criminal activity in various Southwest border locations.  FBI and HSI agents, as well as Assistant U.S. Attorneys (AUSA), attributed this to the volume of criminal activity on the Southwest border and differences in local agency investigative priorities, which have resulted in limited joint investigative interaction.

*Agents Assigned to Task Forces Reported Improved Cooperation*

Survey respondents assigned to task forces reported better overall cooperation in each of the three elements we measured.[13]  Agents assigned to task forces also had a better perception of the FBI/HSI working relationship along the Southwest border.  These agents reported greater comfort in deconflicting targets, deconflicting operations, and sharing information than their counterparts who were not assigned to task forces.  Additionally, many survey respondents and interviewees recommended increasing task force opportunities to improve interagency cooperation.

Agents reported good cooperation in task force settings.  We found that co-located task forces seem to increase these cooperation benefits but such benefits were not always dependent on co-location (see the text box below). Agents we interviewed attributed this to having a shared mission and daily interagency communication to establish personal relationships across the agencies, which helped to improve perceptions and leverage each agency's unique investigative resources.  Agents expressed that task forces improve deconfliction, allow each agency to use the other's exclusive jurisdictions to further investigations, increase the availability of investigative resources, and serve as a "force multiplier."  Agents also expressed that task forces help to break down agency stereotypes and the associated distrust that harms interagency cooperation. Personnel assigned to co-located task forces emphasized that low turnover and dedicated funding sources have contributed to these successes.  In the text box below, we describe one example of a successful interagency working group whose members cited some of these same benefits.

The FBI and HSI contribute to multiple task forces to further investigations through increased interagency cooperation, and agents we interviewed gave several examples of the benefits of task force environments.  For example, agents assigned to Houston's OCDETF Strike Force reported successful joint casework and increased opportunities to leverage interagency strengths, such as HSI assisting the FBI with immigration-related issues.  HSI agents at this location reported improved deconfliction and information sharing.  In another example, AUSAs stationed in Southwest border districts also agreed that OCDETFs have resulted in improved collaboration between the FBI and HSI.  OCDETF officials emphasized that dedicated funding, AUSAs, and support personnel also incentivize interagency collaboration.  Finally, agents assigned to the FBI's Southwest border JTTFs emphasized the increased benefits of leveraging HSI's border search authority for apprehending suspects; sharing investigative information; and coordinating investigations among multiple federal, state, and local agencies.

---

[13]  As discussed in the Introduction, for the purposes of this review we defined cooperation as (1) deconflicting investigative targets to avoid duplicative investigations, (2) deconflicting law enforcement operations to promote officer safety, and (3) sharing relevant investigative information.

**Example of a Strong Interagency Working Group**

The FBI and HSI have been working together on a counterterrorism/counter-proliferation working group in San Antonio, Texas. According to FBI and HSI agents we interviewed, the working group is an AUSA-led effort involving agents from the FBI, HSI, and the Departments of Commerce and Defense. The FBI and HSI agents we interviewed described multiple past arrests on substantial cases and an ongoing complex joint investigation expected to result in the takedown of a significant criminal organization.

The AUSA leading the working group has designated the FBI as the intelligence agency and HSI as the lead investigative agency, though the agents consider their investigative work to generate joint cases. The FBI's counterterrorism focus, which requires lengthy intelligence gathering, and HSI's counter-proliferation focus, which targets criminal investigative tools, integrate well without creating competing interests for the agencies. Agents explained that they have successfully leveraged each other's unique law enforcement authorities, such as HSI's border search authority and FBI's access to certain information under the Foreign Intelligence Surveillance Act of 2008.

Agents assigned to the working group attributed its success to a number of factors. First, all agents exchange performance goals so everyone understands each agency member's responsibilities and rating process. The agents also said that frequent communication and open information sharing among all members and the AUSA were crucial, as the members are not co-located. Agents also credited strong support from FBI and HSI field office leadership. Finally, the AUSA's clear division of tasks between the FBI and HSI has helped the agencies work well together.

Source:  FBI and HSI working group members

FBI and HSI agents work together on several task forces. For example, HSI is the second largest contributor of federal task force agents to the FBI's JTTFs, with over 300 agents assigned to more than 100 JTTFs nationwide, according to HSI. Additionally, both agencies also cooperate in child exploitation task forces and multiple agents we interviewed stated that these efforts have been successful and have fostered good cooperation.[14]

Additionally, 19 percent of survey respondents (187 agents) and an additional 34 agents we interviewed recommended increasing task force opportunities to improve interagency cooperation. Because of this, along with the improved cooperation between the FBI and HSI that survey respondents assigned to task forces reported, we believe that expansion of these arrangements could yield greater investigative successes and further improve cooperation between the FBI and HSI.

## Over One-third of Survey Respondents Reported at Least One Cooperation Failure, and Respondents Identified Deconfliction and Information Sharing Issues That Require Attention

We found that 37 percent of survey respondents reported experiencing a failure to deconflict a target, deconflict an operation, or share information within the previous 3 years. Survey respondents reported that these instances resulted in

---

[14]  We did not examine agency-wide participation in, or the overall effectiveness of, Southwest border task forces.

negative impacts on their investigations, agency operations, and interagency working relationships.

***Thirty-seven Percent of Survey Respondents Reported Cooperation Failures Resulting in Negative Impacts to Investigations and Interagency Relationships***

Of the 980 FBI and HSI agents who responded to our survey, 363 (37 percent) reported having experienced one or more failures by the other agency to deconflict a target, deconflict an event, or share information during the previous 3 years.  This is the proportion of agents who reported *any* failure in target deconfliction, event deconfliction, and/or information sharing.  Of the 363 respondents who reported having experienced one or more cooperation failures, 214 reported having experienced failures in at least 2 cooperation categories.  Respondents reported that most of these failures resulted in negative impacts to their investigations and interagency relationships.

Of the 37 percent—or 363 FBI and HSI survey respondents—who reported experiencing at least 1 cooperation failure, 316 (87 percent) reported that they had experienced at least 1 negative impact.  Figure 1 below displays the negative impacts reported by respondents who experienced one or more cooperation failures, and the text box shows the corresponding survey questions.

---

**Negative Impacts Resulting from Cooperation Failures**

To identify the nature and number of negative impacts resulting from FBI/HSI cooperation failures, we asked agents who responded "yes" to any of the questions related to cooperation failures to answer the following, selecting all that applied from a list of 12 impacts and writing in any additional impacts.

- *Target Deconfliction:*  Were there any negative impacts on your investigation as a result of [FBI/HSI's] failure to deconflict targets?

- *Event Deconfliction:*  Were there any negative impacts on your investigation as a result of [FBI's/HSI's] overlapping operation?

- *Information Sharing:*  Did [FBI's/HSI's] failure to share the information result in any of the following?

Source:  OIG Survey

---



Figure 1

Negative Impacts Resulting from Cooperation Failures Reported by
363 Survey Respondents Who Reported at Least 1 Failure



| | |
|---|---|
| 207 | Loss of trust of HSI/FBI as an agency |
| 165 | Loss of trust of HSI/FBI personnel |
| 164 | Unnecessary use of resources |
| 158 | Lowered morale |
| 140 | Failure to gather evidence/intelligence |
| 129 | Unnecessarily prolonged investigation |
| 70 | Target not apprehended |
| 55 | Confidential source compromised |
| 45 | Agent safety compromised |
| 36 | Charges reduced or dropped |
| 29 | Blue-on-blue incident(s) |
| 18 | Compromised Title III or consensual wiretap |

Notes:  This figure represents only those respondents who indicated that they had experienced a cooperation failure and reported impacts resulting from *any* reported failure in target deconfliction, event deconfliction, and/or information sharing.  The numbers to the left of each impact represent the total number of FBI and HSI respondents who indicated that they had experienced the negative impact.  This was a multiple choice survey question, and respondents could "check all that apply" from the responses provided, including "other" (not shown in the figure).  Overall, 47 agents who reported cooperation failures either did not report a negative impact or did not recall the specific negative impacts of their reported cooperation failures.

Source:  OIG analysis of 363 agent responses (133 FBI and 230 HSI) to Survey Questions 8b, 10b, and 14b (see Appendix 2)

As Figure 1 shows, agents who reported experiencing at least one cooperation failure most frequently reported that they lost trust in the other agency (207 agents) or its personnel (165 agents).  Nearly half of survey respondents who reported experiencing at least one cooperation failure reported that the failure resulted in an unnecessary use of resources (164 agents).  Further, 129 agents reported unnecessarily prolonged investigations, 140 agents reported a failure to gather evidence or intelligence, and 70 agents reported a failure to apprehend a target.  Finally, 45 agents reported compromised agent safety and 29 agents

reported "blue-on-blue" incidents.[15]   Table 2 provides some examples of agents' concerns and the cooperation failures they cited.

Table 2

Cooperation Failure Examples Reported by Survey Respondents

| FBI | HSI |
|---|---|
| FBI entered a "silent hit" on a target, which indicates to Customs and Border Protection (CBP) officers at the port of entry (POE) to notify the FBI case agent without alerting the target of law enforcement's interest.  The FBI case agent did not receive notification.  Rather, the CBP officer stopped the target and contacted HSI, which then conducted an interrogation.  The target got scared and stopped coming to the United States. | The FBI classifies (e.g., Secret or Top Secret) its investigations when it is completely unnecessary, which inhibits normal, interagency cooperation. |
| HSI claimed the target of a task force investigation as HSI's target after receiving the task force report.  HSI claimed the target despite having no sources and minimal information outside of the task force report. | The FBI seized evidence from one of the targets of HSI's investigation.  HSI deconflicted the target through the Drug Enforcement Administration's Deconfliction and Information Coordination Endeavor, but the FBI did not contact the HSI agent and conducted the operation.  As a result, the FBI seized evidence without HSI's knowledge and HSI closed its case due to lack of evidence. |
| HSI agents allowed the subject of an FBI arrest warrant at a POE to return valuable investigative evidence to an acquaintance before the FBI arrived at the scene.  HSI did not notify the FBI that HSI had taken these actions.  The FBI discovered this only after taking custody of the subject. | The FBI attempted to take over an entire case due to a public corruption angle in part of the case.  HSI agent had to obtain assistance from the U.S. Attorney's Office to resolve the dispute. |

Source:  OIG Survey (free text responses)

Agents who experienced cooperation failures cited incidents involving a variety of themes, including improper deconfliction, case coordination, and withholding relevant investigative information.  We found through our analysis of survey results and interviews with FBI and HSI personnel that, where investigative overlap occurred, agents often attempted to coordinate but could not resolve disagreements due to a variety of factors, including inconsistent deconfliction practices and policy issues, which we discuss in the next section.  Many agents also expressed mistrust and a lack of understanding of the other agency's mission, jurisdiction, and authorities.  Finally, later in the report we identify specific investigative areas that have been problematic for FBI and HSI.

Inconsistent Deconfliction Practices and a Lack of FBI and HSI Deconfliction Policy May Have Contributed to Cooperation Failures

While the majority of FBI and HSI survey respondents and interviewees reported that they deconflict their investigative targets and operations in some way

---

[15]   Blue-on-blue incidents are those in which a failure to deconflict resulted in agents being misidentified as criminals.

using a variety of methods, deconfliction practices were inconsistent and did not always ensure that the other agency could access relevant investigative information.  For example, when deconflicting targets, agents did not always use the Drug Enforcement Administration's (DEA) Deconfliction and Information Coordination Endeavor (DICE), the system required by both DOJ and DHS deconfliction policies.  When deconflicting events, agents reported that they use one of the regional systems required by departmental policies; but the FBI and HSI sometimes input and retain information differently, which has resulted in agents being unaware of overlapping operations.  We identified several reasons why deconfliction practices have been inconsistent, including:  neither the FBI nor HSI had its own deconfliction policy, the agencies had no interagency agreement, and many agents were unaware of the DOJ and DHS department-wide policies.[16]

*Agents Deconflicted and Shared Information Using a Variety of Methods*

FBI and HSI survey respondents and interviewees reported that they used a variety of methods to deconflict targets and operations and share information with each other.  Those methods ranged from using an electronic deconfliction system (such as DICE and Regional Information Sharing Systems (RISS)) or fusion/intelligence centers (such as the DEA's Special Operations Division (SOD)) to contacting the case agent; calling a personal contact; or sharing information during a meeting.[17]  Of those methods, survey respondents most frequently reported using an electronic deconfliction system and fusion/intelligence center when deconflicting targets and operations.  Below we identify some discrepancies in how agents deconflicted, which we believe may have contributed to some of the reported cooperation failures.

*Agents Did Not Always Deconflict Targets as Departmental Policies Mandate*

Through interviews and survey responses, we found that FBI and HSI agents did not always use DICE, the mandatory target deconfliction system required by both DOJ and DHS deconfliction policies.  We believe that the FBI's and HSI's inconsistent use of DICE may explain why 28 percent of survey respondents (275 of 979 agents) reported that without deconflicting the other agency had begun an investigation on a target that they were already investigating.  We also heard complaints from both FBI and HSI Southwest border agents that the other agency did not use DICE.  Overall, 143 survey respondents (84 FBI and 59 HSI) reported that they did not deconflict targets via DICE or any electronic deconfliction system.  Additionally, at least 15 agents we interviewed were unaware of the requirement to

---

[16]  In this review, we evaluated DOJ and DHS policies in place during the time of our fieldwork, which concluded prior to a deconfliction directive that ICE issued in February 2019.

[17]  SOD is a DEA-led multiagency operational coordination center whose mission is to establish seamless law enforcement strategies and to dismantle national and international trafficking organizations.  SOD facilitates secure coordination, deconfliction, and communication among over 20 participating agencies, including the FBI and HSI:  identification of overlapping investigations; and assistance in ensuring that intelligence is shared between the DEA and SOD's participating agencies.  SOD methods allow agencies to deconflict classified and sensitive information.

use DICE to deconflict investigative data such as telephone numbers, email addresses, and license plates.

We found several other explanations for the inconsistent use of DICE.  First, both FBI and HSI agents told us that some investigative information was too sensitive for general dissemination and should not be entered into electronic deconfliction systems.  For example, FBI agents told us that they typically do not deconflict public corruption cases in nationwide systems because of the risk of jeopardizing the investigation.  Agents sometimes deconflicted these cases through discreet methods, such as SOD.  Public corruption investigations often encompass multiple subjects that are part of a larger investigation, and the subjects could be law enforcement officials with access to deconfliction systems.

Both DOJ and DHS deconfliction policies acknowledge that some sensitive or classified case information might not be appropriate to enter into the required systems.  The DHS policy specifically cited national security investigations and sensitive investigations of corrupt law enforcement officers as requiring special handling, though the policy stated that such circumstances should be an exception and must receive supervisory review and approval.

*FBI and HSI Have Not Aligned Local Protocols to Ensure Effective Event Deconfliction*

We found in at least one jurisdiction that the FBI and HSI have not aligned their local event deconfliction protocols.  As a result, agents may not have consistently entered and retained information in the event deconfliction systems to ensure that the information about the planned operation is sufficient to assess whether a conflict exists.

Although the process differs by Southwest border region, agents reported that they conduct the necessary event deconfliction using one of the required regional systems (RISSAFE, SAFETNET, and Case Explorer).  In some areas, agents called a local phone number and provided their event information to a local deconfliction or watch center, which searched a centralized database or similar system for any overlapping law enforcement events in the area.  If there were no conflicting events, agents received a deconfliction number indicating no conflicts. Agents we interviewed were not always certain which database or system their local deconfliction center searched.  However, FBI and HSI agents told us that, prior to conducting an investigative event, they obtained a deconfliction number and recorded it on their operations plans, which supervisors reviewed.  This helped to ensure agent safety and minimized the potential for a blue-on-blue incident.

In one case, an event deconfliction failure occurred despite both agencies' use of the required systems.  In this example, the local deconfliction system had options to store information for 24 hours, 6 months, or 5 years.  The FBI and HSI each used different options, which created the failure (see the text box below).  In another example, we identified an instance in which the FBI did not deconflict an event related to a kidnapping case, which resulted in FBI agents mistaking HSI agents on the scene as suspects and drawing their weapons before recognizing the

HSI agents.  The FBI agents cited the reactive, dynamic nature of the kidnapping case as the reason for not deconflicting the event.  We recognize that FBI and HSI agents cannot deconflict every event due to fast-changing circumstances of law enforcement operations.  However, we encourage FBI and HSI leadership to review and align deconfliction protocols and practices in each location to better ensure agent safety.

### FBI and HSI Lacked Adequate Policy to Facilitate Consistent, Effective Deconfliction

Although DHS and DOJ have deconfliction policies at the department level, at the time of our fieldwork the FBI and HSI did not have their own, agency-specific deconfliction policies to take into account their respective missions.[18]  Further, the agencies did not have and still do not have an interagency agreement to facilitate access to the other's relevant investigative information.  The DOJ and DHS deconfliction policies applied to all law enforcement components under each department and therefore did not provide specific guidance to either the FBI or HSI.  We also found that nearly half of the Southwest border agents we interviewed lacked awareness of the departmental policies, and many agents we surveyed indicated confusion over the existence of an interagency agreement.

DOJ and DHS deconfliction policies require the use of specific systems for identifying common investigative targets and events, but they do not provide guidance specific to the mission needs of the FBI and HSI.  For example, the policies do not stipulate:  (1) the specific scenarios under which each agency should use alternatives to DICE to deconflict targets; (2) parameters for the use of each deconfliction system, such as how long they should retain operational information in that system; or (3) the types of information on overlapping targets that agents should share with each other and at the point in their investigations at which they should share it.

> #### Example of an Event Deconfliction Failure Involving Use of Different Deconfliction Options
>
> FBI agents in one Southwest border office described an incident during which they raided the same home that HSI had previously raided during a child pornography investigation.  FBI agents learned of the HSI raid when residents of the home informed them of the prior raid and showed them the HSI agents' business cards.  When the FBI contacted HSI to determine the cause of the cooperation failure, HSI stated that it does not deconflict an event until the day prior to the operation and stores information for only 24 hours in the local deconfliction system, Rocky Mountain Information Network.  FBI agents told us that if HSI had followed the FBI's local policy of storing information in the Rocky Mountain Information Network for at least 6 months, the FBI would have learned of HSI's operation and would not have executed the search warrant on the same home.  The FBI reimbursed the property owner approximately $3,000 for damages to the home.  The HSI agents involved agreed to change their local deconfliction practices to provide longer notification of investigative events, according to the FBI agents.
>
> Source:  OIG Interviews

---

[18]  This analysis is based on activities and events prior to the conclusion of our fieldwork.  It does not address or analyze ICE Directive 10090.1:  Investigative Data and Event Deconfliction, promulgated on February 15, 2019, after our fieldwork.

Separate FBI and HSI deconfliction policies addressing these issues would help promote successful target deconfliction.[19]  For example, one of the reasons that the FBI and HSI do not always use DICE is that certain cases are classified or are too sensitive for inclusion in the system.  The departmental policies allow for these exceptions, but neither agency has provided detailed guidance on how to handle such exceptions, which would likely include the alternative methods that each agency should then use to deconflict targets.  Documenting the procedures for handling sensitive case exceptions in an agency policy would provide clarity to agents to ensure they deconflict through the proper channels, which may also reduce the target deconfliction failures that have occurred between the FBI and HSI.

Similarly, we believe that FBI and HSI deconfliction policies addressing exactly how each agency should use the required regional event deconfliction systems would help ensure that agents know of relevant operations in a timely manner so they may safely execute their operations and avoid blue-on-blue incidents.  For example, if each agency documented its local policies for entering and retaining information into RISSAFE, SAFETNET, and Case Explorer, the other agency would have greater confidence in the reliability of the information in these systems.  Moreover, agency-specific policies should ensure alignment between the FBI and HSI's practices for entering and retaining information in these systems.

The FBI and HSI should also issue deconfliction policies that address information sharing on overlapping targets to help clarify agency and agent expectations and encourage more proactive information sharing between agencies.  While a policy is not a substitute for the professional judgment of an agent and cannot always account for specific case variables, a policy providing guidance on what and when to share information would help create certainty in this area and reduce negative impacts from the failure to share information between the agencies.

Finally, the issuance of new, agency-specific deconfliction policies would improve agent awareness about guidance in this important area.  Almost half of the FBI and HSI agents we interviewed were not aware of any written deconfliction policies, including the department-wide policies currently in place.

Agents Lack Understanding of the Other Agency's Mission and Authorities, and Many Agents Do Not Trust the Other Agency or Its Personnel

Through survey responses and interviews, we found that FBI and HSI personnel lacked detailed understanding of the other agency's mission, jurisdiction, and authorities.  Additionally, agents commonly expressed mistrust of the other agency or its personnel, which may have contributed to lasting negative perceptions of the other agency and discomfort deconflicting or sharing information.  Overall, only half of survey respondents reported that they are comfortable

---

[19]  HSI provided us a copy of the February 2019 ICE deconfliction policy after it had reviewed a draft of this report in July 2019.  We address the policy's provisions in our OIG Analysis of HSI's Response, in Appendix 7 of this report.

deconflicting or sharing information with the other agency and less than 40 percent reported that their duty station deconflicts or shares information well with the other agency.  We believe that these factors have likely contributed to the information sharing and deconfliction challenges that agents reported.

*Agents Lack Understanding of the Other Agency's Mission and Authorities*

Agents we interviewed commonly expressed that they did not understand the other agency's mission and authorities or that they incorrectly believed that the other agency had expanded investigations into areas outside its jurisdiction.  For example, some FBI and HSI interviewees incorrectly believed that the other agency did not have the authority to investigate international money laundering, child exploitation, or gangs.  We found greater confusion among FBI personnel about HSI's mission, authorities, and investigative priorities.  We believe that these misunderstandings between the FBI and HSI have contributed to agents' inability to resolve disagreements.  Many survey respondents (297, or 31 percent) recommended improving awareness of the other agency's jurisdiction and aligning investigative priorities to improve cooperation (see [Appendix 3](#)).

Many of the FBI personnel we interviewed and surveyed across the Southwest border expressed a lack of understanding of HSI's mission and authorities.  At least 54 percent of FBI interviewees reported misunderstanding or confusion over HSI's mission.  Additionally, 44 percent of FBI survey respondents answered that improving their understanding of HSI's jurisdiction would improve cooperation (see [Appendix 3](#)).  Many of the FBI personnel told us they also did not understand HSI's local investigative priorities, which made it difficult for them to know how to best support their HSI counterparts.  Many FBI agents mistakenly believed that HSI could investigate only border and immigration related crimes.[20] AUSAs that we interviewed explained that HSI had recently shifted its investigative priorities beyond arrests and investigations at the border, which likely contributed to FBI agents' misunderstanding of HSI authorities.

HSI officials acknowledged that other law enforcement agencies have expressed confusion over its mission.  They attributed the other agencies' confusion to a number of factors, including the fact that HSI, an investigative agency, and Enforcement and Removal Operations (ERO), a non-investigative agency, are both organized under ICE.[21]  HSI officials also attributed this confusion to the combined

---

[20]  The FBI's perceptions of HSI mission creep have been longstanding and may expand beyond Southwest border field offices.  In 2014, FBI leadership issued an internal report based on an internal survey that highlighted perceived HSI mission creep in 30 field offices.  These offices reported conflicts between the agencies in human trafficking, violence against children, drugs, shootings, gangs, and robbery investigations.  FBI, *Violent Criminal Threat Section:  Jurisdiction Encroachment* (August 2014), 1–13.

[21]  In June 2018, during our fieldwork for this review, multiple media outlets reported that 19 HSI SACs—including 4 of the 5 Southwest border SACs—wrote an open letter to DHS Secretary Kirstjen Nielsen requesting that HSI and the ERO become separate agencies under DHS, not under ICE.  The letter stated that this change is needed to improve transparency, efficiency, and

(Cont'd)

authorities HSI inherited following DHS's 2003 creation and HSI's 2010 name change from Office of Investigations to HSI.  Some Southwest border officials acknowledged that HSI has not firmly established its identity as an investigative agency.  These officials attributed confusion over HSI's identity partly to the prioritization, during recent years, of its investigations beyond reactive crimes occurring at the border.

Based on our survey and interviews with FBI and HSI officials, we believe that an increased awareness among FBI and HSI agents of the other agency's mission, jurisdiction, and criminal investigative priorities would encourage greater interagency cooperation.  We believe that the FBI and HSI should jointly develop and implement a plan to increase awareness of each agency's mission, statutory authorities, and criminal investigative priorities.

*Lack of Trust between FBI and HSI May Undermine Cooperation*

As we discussed above, losing trust in the other agency and in the other agency's personnel were the two most frequently reported negative impacts among the 363 survey respondents who experienced an interagency cooperation failure. Lack of trust was also the most common reason survey respondents cited for not sharing information with the other agency.  Further, only half of all survey respondents reported being comfortable with interagency target or operational deconfliction.  Even fewer survey respondents—only 43 percent (416 of 969)—reported being comfortable sharing investigative information with the other agency. Moreover, less than 40 percent of survey respondents reported that their duty station deconflicts and shares information well with the other agency (see Table 3 below).  Finally, about half of all survey respondents who experienced a disagreement pertaining to deconfliction or information sharing (227 of 471) reported that they were unable to resolve the disagreement.  We believe that negative perceptions and lack of trust may inhibit future information sharing and cooperation.

---

effectiveness, and that HSI's and the ERO's organization under ICE has created confusion among the public, the press, other law enforcement agencies, and lawmakers.  We did not independently verify this information with HSI leadership.  Nick Miroff, "Seeking a Split from ICE, Some Agents Say Trump's Immigration Crackdown Hurts Investigations and Morale," *Washington Post,* June 28, 2018, www.washingtonpost.com/world/national-security/seeking-split-from-ice-agents-say-trumps-immigration-crackdown-hurts-investigations-morale/2018/06/28/7bb6995e-7ada-11e8-8df3-007495a78738_story.html?utm_term=.38ed19f40866 (accessed July 29, 2019).  Jason Buch, "ICE Criminal Investigators Ask to Be Distanced from Detentions, Deportations in Letter to Kirstjen Nielsen," *Texas Observer,* June 27, 2018, www.texasobserver.org/ice-hsi-letter-kirstjen-nielsen-criminal-civil-deportation-zero-tolerance (accessed July 29, 2019).

The ERO enforces U.S. immigration laws by apprehending and removing illegal aliens from the United States.  HSI investigates, disrupts, and dismantles terrorist, transnational, and other criminal organizations that threaten or seek to exploit U.S. customs and immigration laws.

Table 3

Percentage of Agents Who Reported that Their Duty Station Deconflicts Targets, Deconflicts Operations, or Shares Information Well with the Other Agency

| | Strongly Agree or Agree | Strongly Disagree or Disagree | Neither Agree nor Disagree |
|---|---|---|---|
| Target Deconfliction | 36% (351 of 969) | 16% (158 of 969) | 47% (460 of 969) |
| Operational Deconfliction | 38% (366 of 969) | 15% (144 of 969) | 47% (459 of 969) |
| Information Sharing | 34% (326 of 969) | 17% (164 of 969) | 49% (479 of 969) |

Source:  969 responses (280 FBI and 689 HSI) to OIG Survey Questions 23a, 23b, and 23c (see Appendix 2)

We believe that trust issues between the FBI and HSI have likely exacerbated interagency cooperation problems and have contributed to many agents expressing discomfort with deconfliction or information sharing.  Many agents we interviewed cited lack of trust as the reason that they do not cooperate or work with the other agency.  Agents we interviewed often attributed negative experiences to what they deemed "personality" conflicts, but we found that many of these agents used those experiences to justify distrust of and reluctance to work with anyone from the other agency.  For example, one supervisor we interviewed stated that he despises working with the other agency and limits his interaction with the agency due to past cooperation failures.  Other agents made similar statements based on their or their colleagues' negative experiences.  Additionally, agents commonly based these judgments on issues that occurred many years prior or in a different location.

Jurisdictional Conflicts and Unclear Policies in Specific Investigative Areas May Have Contributed to Interagency Disagreements, and an Interagency Memorandum of Understanding Could Improve Cooperation

We found agents' lack of understanding of the other agency's mission and authorities to be more apparent in specific investigative areas.  These included assault on federal officer cases, in which distinct jurisdictional conflicts and unclear DOJ and DHS policies have contributed to interagency disagreements.  The FBI and HSI lack a memorandum of understanding (MOU) or similar written agreement to guide their interactions and govern their overlapping jurisdictions.  We believe that such an agreement could help reduce interagency cooperation failures.

*Jurisdictional Conflicts and Unclear Policies in Specific Investigative Areas May Have Contributed to Interagency Disagreements*

Several investigative areas under FBI and HSI jurisdiction are governed by outdated and unclear policies or agreements.  Because of this, agents cited disagreements over FBI and HSI coordination on cases with a public corruption element, cases involving assault on federal officers, and FBI requests for assistance from DHS entities other than HSI.  Below, we describe five examples of such disagreements.

<u>Disagreements Over Interagency Coordination on HSI Cases with a Public
Corruption Element Have Contributed to Conflicts</u>

Agents in one Southwest border field division described conflicts over HSI's
jurisdiction and notification practices in cases with a public corruption element.  FBI
and HSI agents in this field division told us that public corruption investigations on
the Southwest border are pervasive and can involve federal, state, or local officials.
They noted that federal agents had arrested six or seven sheriffs in Laredo and
Brownsville, Texas, over the previous 15 years.  During our interviews, several FBI
agents expressed frustration that HSI was investigating public corruption cases.

Some HSI agents we interviewed told us that they take steps to deconflict
with the FBI if they have a drug case with a public corruption element.  These
agents also stated that they are willing to work these cases jointly with the FBI but
that HSI will not completely turn that type of case over to the FBI simply because it
has a public corruption element.  These HSI agents also told us that they arrest
corrupt officials they encounter during the course of their ongoing drug cases
because the corrupt officials are directly related to HSI's drug investigations.

Due to recurring issues with public corruption cases in this field division, the
FBI and HSI Special Agents in Charge (SAC) and the U.S. Attorney's Office (USAO)
made an informal agreement under which HSI agreed to notify the FBI when HSI
encountered a public corruption element on a case.  The agreement came about
following the FBI SAC voicing concern to his HSI counterpart about the risk to FBI
cases when HSI does not notify the FBI about a potentially corrupt official.  The
failure to disclose HSI's interest in an allegedly corrupt police officer could result in
HSI unknowingly compromising a larger FBI investigation involving that officer.

The HSI SAC understood this concern and agreed to notify the FBI of cases
involving public corruption.  When asked whether the FBI would begin investigating
a public corruption element of HSI's case, the FBI SAC said:  "If [HSI] work[s] a
case for 2 years and finds one dirty cop, FBI should not take the case.  However, I
asked HSI to tell us about that cop and split off for us the 5 percent of the cop
case, while they work the rest of the drug case."  An HSI agent in the same area
stated that he turns public corruption cases over to the Assistant U.S. Attorney
(AUSA) and the AUSA turns the case over to the FBI.  In addition, an FBI agent in
the same area informed us that he was investigating a joint case with HSI, but only
because the AUSA had identified a public corruption nexus and required HSI to
include the FBI in the investigation.

<u>Assault on Federal Officer Cases Need Jurisdictional Clarification</u>

We found that the DOJ policy addressing assault on federal officer cases is
outdated and has been inconsistently interpreted across the Southwest border.
Several FBI agents in two Southwest border field divisions told us about
misunderstandings between the FBI and HSI regarding assault on federal officer
cases involving the Customs and Border Protection's (CBP) Border Patrol agents
and Office of Field Operations (OFO) officers.  Specifically, we learned that there is
confusion in some Southwest border areas over which agency investigates assaults

on CBP agents and officers.  This confusion has led to inconsistent responses to CBP employees assaulted along the Southwest border.

According to FBI officials from one field division, policies between the FBI and HSI have not been updated to reflect the merging of the former Immigration and Naturalization Service (INS) and U.S. Customs (Customs) into DHS as part of the Homeland Security Act of 2002.  Although the FBI has statutory jurisdiction to investigate assaults on federal officers, current DOJ and FBI policy states, "FBI does not, at the request of the Treasury Department, investigate assaults on, kidnapping of, or murders of Treasury Department personnel."[22]  At the time of this policy, Treasury personnel included Customs officers who were stationed at ports of entry (POE).  In addition, the FBI had jurisdiction over Border Patrol agents and immigration officers, who were part of DOJ's INS.  When DHS was created, Immigration and Customs officers' duties were combined into one position, OFO officers, who enforce both immigration and customs laws at POEs.  However, DOJ has not updated its policy to reflect that those legacy Customs officers are now part of the CBP's OFO.  Therefore, in some locations, the FBI leads all assault on federal officer investigations while in other locations the FBI leads only those investigations involving Border Patrol agents, not investigations involving OFO officers.

<ins>Jurisdictional Disagreements at POEs Have Contributed to Interagency Conflicts</ins>

Numerous FBI agents reported instances of friction related to criminal investigations at POEs.  Some FBI agents described instances in which HSI had interfered with FBI investigations involving informants or subjects traveling through POEs.  The FBI agents told us that HSI was interviewing witnesses and subjects in FBI cases without notifying the FBI.  FBI personnel in two Southwest border field offices also told us that HSI has conducted interviews of suspects based on FBI-placed TECS alerts, which has compromised established investigations.[23]

DHS policy states that HSI is the primary investigative agency supporting the CBP OFO.  Accordingly, HSI has the right of first refusal to lead investigations arising from violations at a POE; the policy instructs CBP officers to alert the Office of Investigations, now HSI, of any such violations.[24]  One HSI supervisor told us that he understood the policy to mean that the FBI should clear with HSI any investigative activity at POEs in his field office's jurisdiction.  HSI agents told us

---

[22]  U.S. Attorneys' Manual, Criminal Resource Manual 1563.  See also 18 U.S.C. §§ 111 and 1114, Justice Manual 9-65.600.

[23]  TECS, formerly the Treasury Enforcement Communications System, is the primary system that DHS officers along the border use to screen and make determinations regarding the admissibility of arriving persons.  Other law enforcement agencies may input into TECS information on persons expected to cross the border.  HSI uses a variation of TECS as its case management system.

[24]  Jayson P. Ahern, Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, and Marcy M. Forman, Director, Office of Investigations, U.S. Immigration and Customs Enforcement, memorandum for Directors, Field Operations; Acting Director, Pre-Clearance Operations; Special Agents in Charge; and Attachés, Coordination Efforts Between U.S. Customs and Border Protection, Office of Field Operations and U.S. Immigration and Customs Enforcement, Office of Investigations, December 8, 2005.

that the CBP nonetheless had been willing to perform searches on behalf of or work directly with the FBI at POEs without notifying HSI.[25]   However, FBI supervisory agents in one field office stated that HSI has investigative and law enforcement jurisdiction only to the extent that those investigations relate to searches and seizures of drugs or the apprehension or detention of persons at or between POEs. Because of these incidents, we believe that unclear and inconsistent DHS policy related to investigations of crimes occurring at POEs has increased agents' misunderstandings.

### FBI Protocol for Requesting ERO Assistance at the Houston Texas Anti-Gang Center Needs Clarification

FBI and HSI agents in Houston told us that there are disagreements over the protocol for the FBI contacting the ERO to assist in FBI investigations.  We found that these disagreements occurred at the Houston Texas Anti-Gang (TAG) Center, where the agencies work on gang-related investigations.[26]  FBI personnel told us that they typically call ERO directly when they need to interview an illegal alien that ERO has picked up or when they need ERO to assist at the scene of an operation. However, the HSI Houston TAG Center supervisor requires that all FBI Houston TAG Center personnel contact him personally when they need ERO assistance; there is no ERO officer assigned to the Houston TAG Center.  He told us that HSI is "the face of ICE" at the Houston TAG Center and should be coordinating the FBI's investigative needs, particularly on common investigative gang targets.

HSI Houston managers told us that the FBI should contact HSI when it needs ERO assistance rather than contacting ERO directly so that HSI can ensure that the request is properly coordinated, resourced, and deconflicted with HSI investigations.  HSI managers said that the FBI contacting the ERO without HSI's knowledge risks disrupting HSI's investigations of aliens; ERO officers are not criminal investigators, are not responsible for deconflicting targets and operations, and are not covert in their operations, the HSI managers stated.  When we asked HSI Houston managers whether the requirement for the FBI to coordinate with HSI before contacting the ERO was memorialized in a policy, they cited a 2016 ICE memorandum governing ERO participation on federal task forces.[27]  However, since

---

[25]  Unlike FBI agents, CBP officers and HSI agents are granted border search authority, which allows them to conduct searches without a warrant or probable cause.  See 19 U.S.C. §§ 482, 1467, 1496, 1581, and 1582.

[26]  The Criminal Justice Division of the Texas Governor's Office created the first of six TAG Centers in Houston in 2012 to combat gangs and other criminal organizations affecting the region. Federal, state, and local law enforcement agencies and prosecutors collaborate in a co-located environment on anti-gang intelligence, investigatory, and operational activities.  We limited our analysis of cooperation between the FBI and HSI at the Houston TAG Center to issues we learned of during the review.  We did not visit other TAG Centers or evaluate the overall effectiveness of any of the TAG Centers.

[27]  Daniel Ragsdale, Deputy Director, ICE, memorandum for all ICE Employees, Delegation of General Arrest Authority under Title 19 to Enforcement and Removal Officers and Participation in Investigative Task Forces, April 4, 2016.  The memorandum directs ERO Task Force Officers to "operate in a coordinated manner with oversight by [HSI] as HSI is ICE's primary program office responsible for investigative activities."

there are no ERO officers assigned to the Houston TAG Center, it is unclear to what extent this language applies.

FBI Houston TAG Center personnel told us that going through HSI, particularly one person, to request the ERO assistance creates a "bottleneck" that causes unnecessary delays and has harmed FBI operations.  In one example, an FBI agent stated that HSI told him that he could not contact ERO directly, and would have to inform HSI beforehand, in order to interview someone at a detention facility.  In another example, the FBI arrested a murder suspect and was interviewing an individual who was reluctant to talk to the FBI.  The ERO was on the scene to assist the FBI, but HSI arrived and told the ERO to leave, ending the FBI's opportunity to continue the interview.

<u>Delays and Denials of the FBI's Immigration Requests May Have Harmed Investigations</u>

HSI is the point of contact for the FBI and other law enforcement agencies that want to defer removal of an alien who is not legally authorized to remain in the United States during the pendency of an investigation or trial.  Under U.S. immigration law, DHS has discretion to grant "special public benefit paroles" or "deferred action" based on law enforcement purposes, such as the alien being an important witness in an investigation or prosecution.[28]   According to DHS policy, the FBI must submit these immigration requests to the local HSI SAC or through ICE headquarters, depending on the status of the alien.  FBI agents complained that their deferred action applications have been ignored or delayed significantly.  For example, an FBI agent stated that two recent deferred action applications, as well as all the other requests from that FBI office, had been denied.  FBI agents in two other Southwest border field divisions told us that, as a result of delays or denied applications, their witnesses and victims have been deported, which has had significant impacts on their investigations and trials. An HSI employee we interviewed from one of those field divisions agreed that HSI's delay in issuing these immigration requests contributes to the poor relationship with the FBI.

Overall, interagency disagreements regarding these distinct investigative areas have contributed to conflicts between the FBI and HSI, which will likely persist without updated policies or clear interagency protocols.  In addition, informal agreements do not appear to have sufficiently addressed these issues.  Instead, we believe that the agencies should jointly develop clear, written guidance for these investigative areas.  Written agreements, unlike verbal ones, are also less likely to dissolve when the officials who entered into them leave office.  In addition,

---

[28]  Section 212(d)(5)(A) of the Immigration and Nationality Act, as amended, authorizes the Secretary of DHS "in his discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission into the United States."

Deferred action is "an act of administrative convenience to the government which gives some cases lower priority" and allows ICE to allocate resources in the best possible manner to focus on high priority cases.  See 8 C.F.R. § 274a.12(c)(14) (defining deferred action in the context of authorized employment).

the local USAO should work with the FBI and HSI, as needed, to determine the best policies and practices to resolve these jurisdictional conflicts.

*The FBI and HSI Do Not Have an MOU to Guide Their Interactions and Govern Overlapping Jurisdictions*

Despite having concurrent jurisdiction over many types of criminal activity, the FBI and HSI have no national level MOU or other interagency policy governing interagency deconfliction and information sharing for criminal investigations over which the agencies have concurrent jurisdiction.[29]  We believe that this lack of policy has contributed to the cooperation failures and negative impacts that the agents reported.  Among survey respondents, 39 percent (379 agents) recommended establishing an MOU between the FBI and HSI to improve cooperation; it ranked among the top three recommendations (see Appendix 3).

Many federal law enforcement agencies with missions that require interagency collaboration have developed MOUs to establish mechanisms for coordinating their activities and outlining roles and responsibilities.  The goal of these MOUs is to formalize the partnership between agencies and promote effective, coordinated law enforcement efforts.  The FBI and HSI (through ICE) have several such agreements to govern their respective interactions with other agencies.  For example, ICE and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) have a national MOU governing their interactions for conducting investigations related to coordination on illegal weapons investigations.  Similarly, ICE and the DEA have agreements that outline interagency coordination on drug investigations.  The FBI and HSI also have MOUs governing limited coordination on specific activities, such as investigations of terrorist financing, prosecutions of aliens of national security interest, and information sharing from DHS alien information databases.

A formal, national MOU or similar interagency agreement could improve the FBI's and HSI's working relationships by helping to institutionalize good practices, clarify roles and responsibilities in similar or shared investigative authorities, and clarify the FBI's procedures to access other DHS components in its operations.  We believe that the FBI and HSI should also consider whether the investigative areas that have caused disagreement, which we discussed above, could also be addressed in an MOU.

---

[29]  FBI and HSI agents participating in task forces and other narrow programmatic areas may be subject to local interagency MOUs or informal agreements.  The FBI and ICE also have various MOUs governing coordination on specific cases, such as a 2003 MOU on terrorist financing cases and 2007 MOUs on administrative cases involving aliens of national security interest and information sharing across ICE's Law Enforcement Information Sharing Service and the FBI's Regional Data Exchange system.

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

We found that Southwest border-based FBI and HSI agents we surveyed and interviewed generally characterized the interagency working relationships as positive.  We found that agents assigned to work on interagency task forces reported better cooperation as compared to those not serving on task forces.  Agents assigned to task forces also reported a better perception of the overall FBI/HSI working relationship and increased awareness of the other agency's mission and priorities.

However, over one-third of survey respondents (363 of 980 FBI and HSI respondents) reported experiencing at least one deconfliction or information sharing failure that resulted in a range of negative impacts to agency operations and interagency relationships.  Additionally, only half of survey respondents reported that they are comfortable deconflicting or sharing information with the other agency and less than 40 percent believed that their duty station deconflicts or shares information well.  We believe that these results present challenges to each agency's effectiveness, given the number of FBI and HSI agents working on the Southwest border, the agencies' overlapping jurisdictions, and the volume of criminal activity.

We also found specific areas in which inconsistent practices or policy deficiencies may have constrained effective cooperation between FBI and HSI agents.  For example, across the Southwest border, we found that inconsistent deconfliction practices constrained some agents' ability to access relevant investigative information in a timely manner.  Although DHS and DOJ department-level policies mandated the use of certain deconfliction systems, at the time of our fieldwork these policies did not provide guidance specific to the mission needs of FBI and HSI and neither agency had its own deconfliction policy.  To remedy these issues, we believe that FBI and HSI management should develop agency-level deconfliction policies, ensure that they appropriately train agents on these policies, and share the policies with each other.  The February 2019 ICE deconfliction policy, together with a new FBI deconfliction policy, should help clarify exactly how FBI and HSI agents should use the required regional event deconfliction systems and share information on overlapping targets.

Finally, we also found specific investigative areas in which the FBI and HSI have similar jurisdictions or in which unclear policies have contributed to interagency disagreements.  For example, investigations involving public corruption, jurisdiction over assault on federal officer cases, FBI collaboration with DHS entities, and FBI witness immigration requests have led to disagreements and have harmed agency operations and interagency relationships.  FBI and HSI management should seek to address these areas and implement a memorandum of understanding or broad interagency agreement to guide investigative interactions.

Recommendations

To improve cooperation between FBI and HSI along the Southwest border, we recommend that FBI and HSI:

1. Each develop and implement its own written policy, consistent with existing departmental policies, to address how Southwest border agents should deconflict investigative targets and events and share relevant information with each other.

2. Ensure that each agency has a copy of the other's deconfliction policy and that all agents understand the expectations for interagency deconfliction and information sharing.

3. Provide training to Southwest border Federal Bureau of Investigation and Homeland Security Investigations agents on the existing Department of Justice and Department of Homeland Security deconfliction policies and mandatory systems.

4. Jointly develop and implement a plan to increase awareness among Federal Bureau of Investigation and Homeland Security Investigations agents of each agency's mission, statutory authorities, and criminal investigative priorities.

5. Jointly develop a memorandum of understanding or similar written agreement governing Federal Bureau of Investigation and Homeland Security Investigations operations on overlapping criminal investigative areas.

# SCOPE AND METHODOLOGY OF THE JOINT REVIEW

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Scope

The DOJ OIG and DHS OIG jointly reviewed cooperation between the FBI and HSI on criminal investigations in the five judicial districts along the Southwest border:  Southern District of Texas, Western District of Texas, District of New Mexico, District of Arizona, and Southern District of California.  We defined cooperation as deconflicting investigative targets and operations and sharing relevant information.

The OIGs conducted this review based on a request from the Chairmen of the Senate Committee on the Judiciary and the House Committee on Oversight and Government Reform.[30]  The Chairmen requested that the OIGs jointly examine how effectively DOJ and DHS law enforcement components are cooperating on the Southwest border.  To ensure that we conducted a thorough and balanced review, the OIGs formed a joint team and conducted the work together.  Throughout the review, we shared information and responsibilities within the team, including conducting nearly all interviews jointly.

### Pre-Initiation Period

Based on the broad review scope requested by Congress, we first implemented a pre-initiation period involving 16 DOJ and DHS agencies and components (see Table 4 below).  The goal of this work was to learn about all of the relevant agencies involved in Southwest border cooperation and to determine how to narrow the review scope.  We focused on each agency's role and the relationships between the agencies, including any cooperation issues the agencies identified.  From May through September 2017, we reviewed information submitted by senior officials from those 16 agencies and components; interviewed senior officials and Southwest border program managers from those 16 agencies; and researched relevant prior and ongoing oversight work, including corrective actions taken in response to OIG and other reviews.

---

[30]  Charles E. Grassley, Chairman, Senate Committee on the Judiciary, and Jason Chaffetz, Chairman, House Committee on Oversight and Government Reform, letter to the Honorable John Roth, Inspector General, DHS, and the Honorable Michael E. Horowitz, Inspector General, DOJ, February 22, 2016.

Table 4

Pre-Initiation Review Scope, DOJ and DHS Agencies

| DOJ | DHS |
| --- | --- |
| • Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>• Drug Enforcement Administration<br><br>• Executive Office for U.S. Attorneys<br><br>• Federal Bureau of Investigation<br><br>• Organized Crime Drug Enforcement Task Force Executive Office<br><br>• U.S. Marshals Service<br><br>• U.S. Attorney's Offices | • U.S. Immigration and Customs Enforcement:<br><br>   o   Homeland Security Investigations<br>   o   Enforcement and Removal Operations<br><br>• U.S. Customs and Border Protection:<br><br>   o   U.S. Border Patrol<br>   o   Office of Field Operations<br>   o   Air and Marine Operations<br><br>• U.S. Secret Service<br><br>• U.S. Coast Guard |

Source:  DOJ OIG and DHS OIG

Based on our pre-initiation research, we narrowed our review scope to focus on cooperation between the FBI and HSI, which are among the largest federal investigative law enforcement agencies in the United States.  Despite having separate missions, the two agencies share some of the same statutory authorities.  During our research period, we learned that this investigative overlap had created jurisdictional confusion in some instances.  Compared to other DOJ and DHS agencies, the FBI and HSI were experiencing the greatest number of cooperation problems.  In addition, whereas prior oversight work evaluated DOJ and DHS agencies (e.g., the Bureau of Alcohol, Tobacco, Firearms and Explosives and HSI), we found no prior oversight work focused solely on the FBI and HSI.

Our review did not include an evaluation of the FBI and DHS OIG's Investigations Division cooperation on public corruption investigations of DHS staff because of concerns about conflicts of interest.  We also did not review cooperation between other law enforcement components within DOJ or DHS.  Although we examined cooperation between FBI and HSI agents assigned to task forces, we did not attempt to evaluate the effectiveness of the task forces themselves.

We conducted our fieldwork for the narrowed review scope from September 2017 through July 2018.  When surveying and interviewing personnel for this review, we inquired about experiences during the previous 3 years, from approximately 2014 to 2017.

Methodology

To fully understand FBI and HSI cooperation along the Southwest border, we utilized a two-part methodology.  We first invited all FBI and HSI agents in Southwest border locations to participate in an anonymous online survey.  We then traveled to 10 Southwest border locations in Texas to interview Special Agents, Intelligence Analysts, and Assistant U.S. Attorneys (AUSA) who prosecute FBI and

HSI criminal cases.[31]  We conducted telephone interviews of personnel in the remaining Southwest border locations.

*Survey*

In November 2017, we deployed an anonymous online survey to all FBI and HSI agents in Southwest border locations to gather their experiences and perceptions of cooperation.  In creating the survey instrument, we used a design similar to one that the U.S. Government Accountability Office (GAO) had used in an earlier report evaluating DOJ law enforcement coordination.[32]  To preserve anonymity and security across departments, we created two nearly identical surveys using Novi Survey software.  The DHS OIG team members deployed one survey to HSI agents, and the DOJ OIG team members deployed the other survey to FBI agents.  The DHS OIG survey closed on December 18, 2017, and the DOJ OIG survey closed on January 1, 2018.  Appendix 2 contains the survey instrument and responses.

Our survey asked agents about their personal experiences working with the other agency, as well as their perceptions of the other agency, their own cooperation, and that of their agency.  As with any self-reported measurement, we relied on survey respondents to report their experiences and perceptions truthfully; we did not attempt to validate the specific information and incidents they provided in the survey.  Survey respondents could remain anonymous or voluntarily provide their names for a potential OIG interview.  When we interviewed agents, some of whom were survey respondents (including some volunteers), we sought to understand the nuances and circumstances surrounding their experiences and perceptions.

When we deployed our survey, there were 1,245 FBI and 1,703 HSI agents assigned to Southwest border locations, as reported by the agencies' headquarters. We invited all 2,948 agents to participate in the survey.  We received a total of 980 complete responses, a 33 percent response rate of the total population.  The FBI's response rate was 23 percent (291 of 1,245), and HSI's was 40 percent (689 of 1,703).  Table 5 below shows each agency's response rate by field division.

---

[31]  We visited 10 Texas locations in person:  (1) Brownsville, (2) Corpus Christi, (3) Del Rio, (4) Eagle Pass, (5) Galveston, (6) Houston, (7) Laredo, (8) McAllen, (9) San Antonio, and (10) Texas City.

[32]  GAO, *Law Enforcement Coordination:  DOJ Could Improve Its Process for Identifying Disagreements Among Agents*, GAO-11-314 (April 2011), Appendix II.

Table 5

FBI and HSI Response Rates to the OIG Survey by Field Division

| | Number of Agents Invited to Take the Survey | Number of Survey Respondents | Percent of Total Survey Respondents | Percent of Survey Respondents in Each Field Office |
|---|---|---|---|---|
| FBI | | | | |
| Albuquerque | 117 | 31 | 10.65% | 26.50% |
| El Paso | 119 | 81 | 27.84% | 68.07% |
| Houston | 285 | 26 | 8.93% | 9.12% |
| Phoenix | 252 | 41 | 14.09% | 16.27% |
| San Antonio | 232 | 89 | 30.58% | 38.36% |
| San Diego | 240 | 23 | 7.90% | 9.58% |
| TOTAL | 1,245 | 291 | 100.00% | |
| HSI | | | | |
| Albuquerque | N/A | N/A | N/A | N/A |
| El Paso | 258 | 132 | 19.16% | 51.16% |
| Houston | 243 | 96 | 13.93% | 39.51% |
| Phoenix | 389 | 120 | 17.42% | 30.85% |
| San Antonio | 398 | 188 | 27.29% | 47.24% |
| San Diego | 415 | 153 | 22.21% | 36.87% |
| TOTAL | 1,703 | 689 | 100.00% | |

Note:  HSI does not have an Albuquerque field office.

Source:  OIG Survey data

Compared to the FBI, HSI had more agents assigned to Southwest border locations, a greater overall survey response rate, and a more evenly distributed response rate across the field divisions.  HSI had 31 percent more agents assigned to Southwest border locations than the FBI (1,703 compared to 1,245).  HSI's overall survey response rate also significantly exceeded the FBI's (40 percent compared to 23 percent).  As Table 5 shows, HSI's response rate by field division was more evenly distributed than the FBI's, which ranged from 9 percent to 68 percent across its field divisions.  Two FBI locations had particularly low response rates:  San Diego, at 8 percent, and Houston, at 9 percent.  In analyzing these results, we remained cognizant of the different sample sizes and response rates between the FBI and HSI.  Throughout this report, we typically present survey results both by agency and the average combined population.  We selected the Houston field division for one of our site visits because of the FBI's low response rate there and because it was among the locations that respondents reported the most cooperation issues (explained below).

Survey Analysis

To analyze the full survey results, we combined electronic responses from the FBI and HSI Novi Survey outputs into one spreadsheet.  We first totaled

responses by multiple choice question, calculating each agency's response per question and the average combined response per question. To analyze text responses, we created unique categories and sorted the comments into those categories. Because we organized the survey into the three cooperation types matching our definition (deconflicting targets, deconflicting events, and sharing information), we analyzed results within and across each of these types.

We also examined overall responses and differences by location. To determine agents' cooperation experiences and perceptions by location, we examined responses by category to 13 survey questions (7 questions about agents' experiences and 6 questions about their perceptions of cooperation) and ranked and consolidated the scores by field office. We used this information to determine site visit locations in the areas that reported the most cooperation issues, which were San Antonio and Houston. Survey results showed agent sentiment varied greatly by location. Overall, San Antonio and Houston represented the areas with the worst reported cooperation, whereas El Paso and Phoenix rated best in these areas. Table 6 displays the results of this analysis.

Table 6

Cooperation Experience and Sentiment Ranked by Field Office

| FBI | | | | | |
|---|---|---|---|---|---|
| Field Office | | Rank | | | Overall Score |
| | Target Deconfliction | Operational Deconfliction | Information Sharing | Overall Sentiment | |
| Houston | 22 | 20 | 19 | 4 | 65 |
| San Antonio | 15 | 21 | 20 | 6 | 62 |
| San Diego | 17 | 16 | 11 | 5 | 49 |
| Phoenix | 14 | 9 | 16 | 3 | 42 |
| Albuquerque | 8 | 11 | 10 | 1 | 30 |
| El Paso | 8 | 7 | 8 | 2 | 25 |

| HSI | | | | | |
|---|---|---|---|---|---|
| Field Office | | Rank | | | Overall Score |
| | Target Deconfliction | Operational Deconfliction | Information Sharing | Overall Sentiment | |
| Houston | 19 | 19 | 18 | 3 | 59 |
| San Antonio | 13 | 15 | 15 | 4 | 47 |
| San Diego | 13 | 10 | 13 | 5 | 41 |
| El Paso | 8 | 8 | 7 | 2 | 25 |
| Phoenix | 7 | 8 | 7 | 1 | 23 |

Source:  Consolidated and ranked agent responses (worst to best) to OIG Survey Questions 9, 10, 13, 14, 17, 18, 22a–c, 23a–c, 26 (see Appendix 2)

*Site Visits*

We conducted two site visits to the FBI's and HSI's field divisions and regional offices within the San Antonio, Texas, and Houston, Texas, jurisdictions from January through March 2018. In total, we traveled to 10 cities in Texas: (1) Brownsville, (2) Corpus Christi, (3) Del Rio, (4) Eagle Pass, (5) Houston,

(6) Galveston, (7) Laredo, (8) McAllen, (9) San Antonio, and (10) Texas City.  We selected those locations based on survey respondents' answers by category to 13 questions (7 questions about agents' experiences and 6 questions about their perceptions of cooperation).[33]  We then ranked and consolidated those scores by field division.  San Antonio and Houston were the two field divisions in which all FBI and HSI survey respondents reported the most cooperation issues.

*Interviews*

We conducted a total of 195 interviews of 246 primarily FBI, HSI, and U.S. Attorney's Office (USAO) officials during this review (see Table 7 below).  We jointly conducted every in-person interview, with at least one DOJ OIG and DHS OIG team member present.  At each location, we interviewed FBI and HSI agents at all levels to better understand the reported problems.  We also interviewed FBI and HSI Intelligence Analysts and investigative support personnel in many locations.  We also interviewed AUSAs who prosecute FBI and HSI cases in those jurisdictions to gain their perspectives on the agencies' cooperation.  We conducted a total of 171 in-person interviews, 96 in the San Antonio jurisdiction and 75 in the Houston jurisdiction.  While in Houston, we interviewed FBI and HSI personnel at two multi-agency centers, the Houston Texas Anti-Gang (TAG) Center and the Organized Crime Drug Enforcement Task Force Strike Force, and HSI Houston personnel assigned to the Border Enforcement Security Task Force.

We then conducted telephone interviews with an additional 62 FBI, HSI, and USAO personnel in 6 additional Southwest border locations:  (1) Albuquerque, New Mexico;  (2) Las Cruces, New Mexico;  (3) El Paso, Texas;  (4) Phoenix, Arizona;  (5) Tucson, Arizona;  and (6) San Diego, California.  We also interviewed officials who operate local deconfliction centers and the Administrators of the Houston and El Paso TAG Centers.

---

[33]  OIG Survey Questions 9, 10, 13, 14, 17, 18, 22a–c, 23a–c, 26 (see Appendix 2).

Table 7

Total OIG Interviews Conducted

| State | Location | Agency | No. Interviewees |
|---|---|---|---|
| Arizona | Phoenix | FBI | 9 |
| | | HSI | 12 |
| | | USAO | 2 |
| | Tucson | FBI | 5 |
| California | San Diego | FBI | 12 |
| | | HSI | 3 |
| | | USAO | 1 |
| New Mexico | Albuquerque | FBI | 6 |
| | | USAO | 1 |
| | Las Cruces | USAO | 1 |
| Texas | Brownsville | FBI | 5 |
| | | HSI | 7 |
| | | USAO | 3 |
| | Corpus Christi | FBI | 11 |
| | | HSI | 9 |
| | | USAO | 3 |
| | Del Rio | FBI | 6 |
| | | HSI | 6 |
| | | USAO | 1 |
| | Eagle Pass | HSI | 8 |
| | El Paso | FBI | 3 |
| | | HSI | 9 |
| | | USAO | 1 |
| | | TAG Center | 1 |
| | Galveston | HSI | 4 |
| | Houston | FBI | 22 |
| | | HSI | 21 |
| | | USAO | 4 |
| | | TAG Center | 1 |
| | | HIDTA | 1 |
| | Laredo | HSI | 7 |
| | | USAO | 1 |
| | | FBI | 7 |
| | McAllen | HSI | 10 |
| | | USAO | 2 |
| | | FBI | 9 |
| | San Antonio | HSI | 14 |
| | | USAO | 2 |
| | | FBI | 13 |
| | Texas City | FBI | 3 |
| Grand Total | | | 246 |

Notes:  HIDTA=High Intensity Drug Trafficking Area.  Included in the FBI Corpus Christi interviewees is an FBI Task Force Officer from the Corpus Christi Police Department.

Source:  DOJ OIG and DHS OIG

*Policy and Document Review*

We reviewed DOJ, DHS, and Immigration and Customs Enforcement (ICE) documentation pertaining to the FBI's and HSI's mission areas, criminal

investigative priorities, budgets, and strategic plans, as well as federal laws pertaining to the agencies' statutory authorities and internal investigative policies and guidance.  We reviewed position descriptions and performance plans for FBI and HSI agents and Intelligence Analysts.  We also reviewed memoranda of agreement and local agreements involving DOJ, DHS, ICE, FBI, and HSI.

Prior Work Related to FBI and HSI Southwest Border Cooperation

The DOJ OIG, DHS OIG, and GAO have not conducted any previous reviews specifically focused on FBI and HSI cooperation along the Southwest border.  However, to form our methodological approach to designing our evaluation and survey, we reviewed GAO's 2011 report on DOJ law enforcement coordination and spoke to its authors.  We also reviewed a 2014 Congressional Research Service report on federal law enforcement coordination along the Southwest border.[34]

---

[34]  GAO, *Law Enforcement Coordination;* Congressional Research Service, *Domestic Federal Law Enforcement Coordination:  Through the Lens of the Southwest Border,* Report 7-5700 (June 2014).

APPENDIX 2

# THE OIG SURVEY INSTRUMENT WITH FBI AND HSI RESPONSES

In November 2017, we used Novi software to launch an anonymous survey to a total of 2,948 agents (1,245 FBI and 1,703 HSI) assigned to Southwest border locations.  We received a total of 980 responses (291 from the FBI and 689 from HSI).  We used the survey to gather agents' perceptions and experiences of interagency cooperation.  This appendix provides the full survey instrument, including the introduction, instructions, and all 27 questions and sub-questions.  We have also included responses to all questions and sub-questions, except for free text responses.  Text in brackets indicates variation between the FBI and HSI surveys.

## Survey Introduction

*Welcome to the Office of the Inspector General Survey of [FBI/HSI] Southwest Border Cooperation.*

Thank you for participating in this survey to assess [FBI/HSI] criminal investigators' perceptions of cooperation with [FBI/HSI] on criminal investigations along the Southwest border.  We define "cooperation" as deconflicting targets, deconflicting operations, and sharing information with [FBI/HSI].  Your individual responses are anonymous and will not be shared outside the joint OIG review team.  If you would like the opportunity to share more information with us, you may provide your contact information at the end of this survey.

The survey does not request any specific information about open cases.  Please do not provide any classified information.  The survey should take about 15 minutes.  If you have any questions or concerns, please email us at:  [survey email address].

## Survey Questions

### Demographics

1.   In which field office are you currently working?

| FBI | | HSI | |
|---|---|---|---|
| Albuquerque | 31 (11%) | N/A | N/A |
| El Paso | 81 (28%) | El Paso | 132 (19%) |
| Houston | 26 (9%) | Houston | 96 (14%) |
| Phoenix | 41 (14%) | Phoenix | 120 (17%) |
| San Antonio | 89 (31%) | San Antonio | 188 (27%) |
| San Diego | 23 (8%) | San Diego | 153 (22%) |
| Total | 291 (100%) | Total | 689 (100%) |

a.   For each field office, select your duty station.

| Agency | Area of Responsibility | Duty Station | Survey Respondents |
|---|---|---|---|
| FBI | Albuquerque | Albuquerque | 25 |
| | | Farmington | 1 |
| | | Las Cruces | 4 |
| | | Roswell | 1 |
| | El Paso | El Paso | 79 |
| | | Midland | 2 |
| | Houston | Houston | 19 |
| | | Corpus Christi | 4 |
| | | Texas City | 3 |
| | Phoenix | Sierra Vista | 7 |
| | | Flagstaff | 3 |
| | | Lakeside | 2 |
| | | Yuma | 2 |

| | | Lake Havasu | 1 |
|---|---|---|---|
| | San Antonio | San Antonio | 23 |
| | | McAllen | 32 |
| | | Laredo | 14 |
| | | Austin | 9 |
| | | Brownsville | 5 |
| | | Del Rio | 6 |
| | San Diego | San Diego | 21 |
| | | Imperial | 1 |
| | | North County | 1 |
| Total FBI | | | 291 |
| HSI | El Paso | El Paso | 77 |
| | | Albuquerque | 16 |
| | | Las Cruces | 14 |
| | | Deming | 10 |
| | | Alpine | 7 |
| | | Presidio | 5 |
| | | Midland | 3 |
| | Houston | Houston | 67 |
| | | Corpus Christi | 20 |
| | | Galveston | 6 |
| | | Beaumont | 2 |
| | | Bryan | 1 |
| | Phoenix | Phoenix | 40 |
| | | Tucson | 23 |
| | | Sells | 15 |
| | | Nogales | 9 |
| | | Yuma | 8 |
| | | Casa Grande | 5 |
| | | Flagstaff | 4 |
| | San Antonio | San Antonio | 22 |
| | | Brownsville | 31 |
| | | Harlingen | 33 |
| | | Laredo | 40 |
| | | Eagle Pass | 13 |
| | | Del Rio | 8 |
| | | Falcon Heights | 3 |
| | | McAllen | 32 |
| | | Austin | 6 |
| | San Diego | Calexico | 29 |
| | | San Diego | 71 |
| | | San Ysidro | 53 |
| Total HSI | | | 689 |

2.  What is your current duty title? *If you are in an acting capacity, select your current acting title.*
    Multiple choice:

| Duty Title | FBI | HSI |
|---|---|---|
| Special Agent | 236 (81%) | 542 (79%) |
| Supervisory Special Agent | 42 (14%) | 43 (6%) |
| Resident Agent in Charge | 0 (0%) | 9 (1%) |
| Assistant Special Agent in Charge | 9 (3%) | 28 (4%) |
| Special Agent in Charge | 4 (1%) | 4 (1%) |
| Group Supervisor | 0 (0%) | 47 (7%) |
| Deputy Special Agent in Charge | 0 (0%) | 4 (1%) |
| Program Manager | 0 (0%) | 6 (1%) |
| Task Force Officer | 0 (0%) | 1 (.1%) |

| | | |
|---|---|---|
| Regional Coordinator | 0 (0%) | 1 (.1%) |
| Intelligence Research Specialist | 0 (0%) | 1 (.1%) |
| N/A | 0 (0%) | 1 (.1%) |
| Acting ASAC | 0 (0%) | 1 (.1%) |
| Not in an acting capacity | 0 (0%) | 1 (.1%) |
| Totals | 291 (100%) | 689 (100%) |

3.   How many years have you been assigned to your current field office? *Check one*.

| Number of Years | FBI | HSI |
|---|---|---|
| 0–1 year | 45 (15%) | 82 (12%) |
| 1–2 years | 58 (20%) | 117 (17%) |
| 2–3 years | 37 (13%) | 82 (12%) |
| 3–4 years | 24 (8%) | 18 (3%) |
| 4–5 years | 14 (5%) | 27 (4%) |
| Greater than 5 years | 113 (39%) | 363 (53%) |
| Totals | 291 (100%) | 689 (100%) |

4.   How many years in total have you worked on the Southwest border as an [FBI/HSI or a legacy agency] criminal investigator?

| Number of Years | FBI | HSI |
|---|---|---|
| 0–3 years | 135 (46%) | 200 (29%) |
| 3–5 years | 34 (12%) | 21 (3%) |
| 5–10 years | 60 (21%) | 203 (29%) |
| 10–15 year | 36 (12%) | 120 (17%) |
| 15–20 years | 15 (5%) | 100 (15%) |
| Greater than 20 years | 11 (4%) | 45 (7%) |
| Totals | 291 (100%) | 689 (100%) |

5.   How many years in total have you been a criminal investigator with [FBI/HSI or a legacy agency]?

| Number of Years | FBI | HSI |
|---|---|---|
| 0–3 years | 84 (29%) | 166 (24%) |
| 3–5 years | 16 (5%) | 12 (2%) |
| 5–10 years | 67 (23%) | 184 (27%) |
| 10–15 years | 70 (24%) | 131 (19%) |
| 15–20 years | 27 (9%) | 139 (20%) |
| Greater than 20 years | 27 (9%) | 57 (8%) |
| Totals | 291 (100%) | 689 (100%) |

6.   Are you currently assigned to a Task Force on which both FBI and HSI criminal investigators are members?

| | FBI | HSI |
|---|---|---|
| Yes | 70 (24%) | 80 (12%) |
| No | 221 (76%) | 609 (88%) |
| Totals | 291 (100%) | 689 (100%) |

## *Deconflicting Targets*

*We define deconflicting targets as:  (1) identifying [FBI/HSI] investigations with the same targets (for example, entering an investigative target's telephone number into a deconfliction database) and (2) taking action to resolve any investigative overlap (for example, coordinating with [FBI/HSI] to avoid compromising either investigation).*

*Please respond to the following questions based on your experiences at your <u>current field office</u> over the past <u>3 years</u>.*

7.  Does your office have either a written policy or a defined procedure* for deconflicting targets with [FBI/HSI]?

*  Defined procedures mean guidance or instructions applicable to all office personnel intended to create a consistent practice.  Defined procedures could be in the form of a supervisor's written guidance or verbal instructions.

| | FBI  (N=291)[35] | HSI  (N=689) | Total (N=980) |
|---|---|---|---|
| Yes | 80 (27%) | 286 (41%) | 366 (37%) |
| No | 59 (20%) | 146 (21%) | 205 (21%) |
| Don't know | 152 (52%) | 257 (37%) | 409 (42%) |

   a.  If Yes:  Is the policy or procedure fully effective for deconflicting targets with [FBI/HSI]?

| | FBI  (N=80) | HSI  (N=286) |
|---|---|---|
| Yes | 28 (35%) | 127 (44%) |
| No | 35 (44%) | 69 (24%) |
| Don't know | 17 (21%) | 90 (31%) |

      i.  If No:  Has the ineffectiveness of the policy or procedure on deconflicting targets with [FBI/HSI] negatively affected your investigations?

| | FBI  (N=34) | HSI  (68) |
|---|---|---|
| Yes | 23 (68%) | 35 (51%) |
| No | 8 (24%) | 24 (35%) |
| Don't know | 3 (9%) | 9 (13%) |

   b.  If No/Don't know to Q7:  Has the lack of policy or procedure on deconflicting targets with [FBI/HSI] negatively affected your investigations?

| | FBI  (N=211) | HSI  (N=403) |
|---|---|---|
| Yes | 43 (20%) | 39 (10%) |
| No | 106 (50%) | 242 (60%) |
| Don't know | 62 (29%) | 122 (30%) |

   c.  If Yes to Q7:  Have you received any training or guidance on this policy or procedure on deconflicting targets with [FBI/HSI]?

| | FBI  (N=80) | HSI  (N=286) |
|---|---|---|
| Yes | 43 (54%) | 157 (55%) |
| No | 36 (45%) | 116 (41%) |
| Don't know | 1 (1%) | 13 (5%) |

      i.  If Yes:  Was the training or guidance effective for understanding how to deconflict targets with [FBI/HSI]?

| | FBI  (N=42) | HSI  (N=155) |
|---|---|---|
| Yes | 40 (95%) | 131 (85%) |
| No | 2 (5%) | 11 (7%) |
| Don't know | 0 | 13 (8%) |

      ii.  If No/Don't know:  Has the lack of training or guidance on deconflicting targets with [FBI/HSI] negatively affected your investigations?

| | FBI  (N=37) | HSI  (128) |
|---|---|---|
| Yes | 5 (14%) | 12 (9%) |
| No | 28 (76%) | 96 (75%) |
| Don't know | 4 (11%) | 20 (16%) |

8.  Typically, how frequently do you use the following methods to determine whether the target of your investigation is also the target of an FBI/HSI investigation?

   a.  Enter information into an electronic deconfliction system (e.g., DICE, RISS).

---

[35]  "N" refers to the number of FBI, HSI, and combined survey respondents for each question.

|  | FBI  (N=245) | HSI  (N=619) | Total  (N=864) |
|---|---|---|---|
| Never | 84 (34%) | 59 (9%) | 143 (16%) |
| Sometimes | 58 (24%) | 102 (16%) | 160 (18%) |
| Frequently | 55 (22%) | 187 (30%) | 242 (28%) |
| Always | 48 (20%) | 271 (44%) | 319 (37%) |

b.   Use a fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center).

|  | FBI  (N=245) | HSI  (N=619) | Total  (N=864) |
|---|---|---|---|
| Never | 84 (34%) | 73 (12%) | 143 (18%) |
| Sometimes | 82 (33%) | 202 (33%) | 284 (33%) |
| Frequently | 63 (26%) | 181 (29%) | 244 (28%) |
| Always | 16 (7%) | 163 (26%) | 179 (21%) |

c.   Share information at a joint FBI and HSI meeting.

|  | FBI  (N=245) | HSI  (N=619) | Total  (N=864) |
|---|---|---|---|
| Never | 93 (38%) | 331 (53%) | 424 (49%) |
| Sometimes | 101 (41%) | 206 (33%) | 307 (35%) |
| Frequently | 37 (15%) | 55 (9%) | 92 (11%) |
| Always | 14 (6%) | 27 (4%) | 41 (5%) |

d.   Contact the [FBI/HSI] case agent directly without using a deconfliction system.

|  | FBI  (N=245) | HSI  (N=619) | Total  (N=864) |
|---|---|---|---|
| Never | 85 (35%) | 332 (54%) | 417 (49%) |
| Sometimes | 108 (44%) | 213 (34%) | 321 (37%) |
| Frequently | 37 (15%) | 48 (8%) | 85 (10%) |
| Always | 15 (6%) | 26 (4%) | 41 (5%) |

e.   Call a personal contact at [FBI/HSI].

|  | FBI  (N=245) | HSI  (N=619) | Total  (N=864) |
|---|---|---|---|
| Never | 69 (28%) | 341 (55%) | 410 (47%) |
| Sometimes | 110 (45%) | 189 (31%) | 299 (35%) |
| Frequently | 45 (18%) | 60 (10%) | 105 (12%) |
| Always | 21 (9%) | 29 (5%) | 50 (6%) |

9.   When deconflicting targets, have you ever learned that [FBI/HSI] had the same target?

|  | FBI  (N=291) | HSI  (N=689) | Total (N=980) and Average Percent |
|---|---|---|---|
| Yes | 135 (46%) | 298 (43%) | 433 (44%) |
| No | 92 (32%) | 278 (40%) | 370 (38%) |
| Don't know | 12 (4%) | 42 (6%) | 54 (6%) |
| Not applicable | 52 (18%) | 71 (10%) | 123 (13%) |

a.   If No/Don't know/Not applicable:  SKIP to Q10.
b.   If Yes:  Did you take action to attempt to resolve investigative overlap by coordinating with [FBI/HSI]?

|  | FBI  (N=134)* | HSI  (N=298) | Total (N=432) and Average Percent |
|---|---|---|---|
| Yes in all cases | 114 (85%) | 249 (83.5%) | 363 (84%) |
| Yes in some cases | 18 (13%) | 39 (13%) | 57 (13%) |
| Total "Yes" all or some | 132 (98.5%) | 288 (97%) | 420 (97%) |
| No, I didn't take action in any of the cases. | 0 (0%) | 4 (1%) | 4 (1%) |
| Don't recall | 2 (1%) | 6 (2%) | 8   (2%) |

*  Note:  One person did not answer this sub-question, so the total is 134 instead of 135 from Q8.

i.   If No:  Why didn't you take action? (Responses were limited, not shown.)

10. To your knowledge, has [FBI/HSI] ever begun an investigation on a target you were already investigating, but did not deconflict with you?

|  | FBI (N=290) | HSI (N=689) | Total (N=979) and Average Percent |
|---|---|---|---|
| Yes | 108 (37%) | 167 (24%) | 275 (28%) |
| No | 182 (63%) | 522 (6%) | 704 (72%) |

a. If Yes:  How did you first learn that [FBI/HSI] had the same target?

|  | FBI (N=185) | HSI (N=252) |
|---|---|---|
| Electronic deconfliction system (e.g., DICE, RISS) | 22 (12%) | 46 (18%) |
| Fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center) | 8 (4%) | 29 (12%) |
| Joint FBI and HSI meeting | 23 (12%) | 23 (9%) |
| The [FBI/HSI] case agent contacted me directly without using a deconfliction system. | 22 (12%) | 29 (12%) |
| Personal contact at [FBI/HSI] | 27 (15%) | 28 (11%) |
| [FBI/HSI] warrant, arrest or indictment that I did not know about beforehand | 30 (16%) | 27 (11%) |
| Don't recall | 11 (6%) | 15 (6%) |
| Other, please explain. | 42 (22%) | 55 (22%) |

a. If Yes:  Were there any negative impacts on your investigation as a result of [FBI's/HSI's] failure to deconflict targets?

|  | FBI | Percent of FBI "Yes" (N=108) | HSI | Percent of HSI "Yes" (N=167) | Total Number of Agents "Yes" | Percent of Total "Yes" (N=275) | Percent of Total Respondents (N=979) |
|---|---|---|---|---|---|---|---|
| Confidential source compromised | 15 | 14% | 13 | 8% | 28 | 10% | 3% |
| Agent safety compromised | 15 | 14% | 17 | 10% | 32 | 12% | 3% |
| Target not apprehended | 15 | 14% | 30 | 18% | 45 | 16% | 5% |
| Lowered morale | 37 | 34% | 67 | 40% | 104 | 38% | 11% |
| Loss of trust of [FBI/HSI] | 81 | 75% | 94 | 56% | 175 | 64% | 18% |
| Loss of trust of [FBI/HSI] agent or Task Force Officer | 50 | 46% | 64 | 38% | 114 | 41% | 12% |
| Blue-on-blue incident(s) | 10 | 9% | 8 | 5% | 18 | 7% | 2% |
| Unnecessary use of resources | 51 | 47% | 61 | 37% | 112 | 41% | 11% |
| Compromised Title III or consensual wiretap | 7 | 6% | 8 | 5% | 15 | 5% | 2% |
| Unnecessarily prolonged investigation | 26 | 24% | 53 | 32% | 79 | 29% | 8% |
| Charges reduced or dropped | 7 | 6% | 12 | 7% | 19 | 7% | 2% |
| Failure to gather evidence/intelligence | 39 | 36% | 40 | 24% | 79 | 29% | 8% |
| Don't recall | 6 | 6% | 10 | 6% | 16 | 6% | 2% |
| Other, please explain. | 10 | 9% | 15 | 9% | 25 | 9% | 3% |

## Deconflicting Operations

We define deconflicting operations (or events) as:  (1) using a system such as RISSAFE or informal means like a telephone call to notify [FBI/HSI] of significant investigative events, such as conducting search warrants, surveillance, or buy-busts and (2) coordinating with [FBI/HSI].

Please respond to the following questions based on your experiences at your <u>current field office</u> over the past <u>3 years</u>.

11. Does your office have either a written policy or defined procedure* for deconflicting operations with [FBI/HSI]?

*  Defined procedures mean guidance or instructions applicable to all office personnel intended to create a consistent practice.  Defined procedures could be in the form of a supervisor's written guidance or verbal instructions.

|  | FBI  (N=290) | HSI  (N=689) | Total (N=979) |
|---|---|---|---|
| Yes | 64 (22%) | 236 (34%) | 300 (30%) |
| No | 61 (21%) | 145 (21%) | 206 (21%) |
| Don't know | 165 (57%) | 308 (45%) | 473 (49%) |

a.  If Yes:  Is the policy or procedure fully effective for deconflicting operations with [FBI/HSI]?

|  | FBI  (N=64) | HSI  (N=236) |
|---|---|---|
| Yes | 25 (39%) | 102 (43%) |
| No | 21 (33%) | 39 (17%) |
| Don't know | 18 (28%) | 95 (40%) |

i.  If No:  Has the ineffectiveness of the policy or procedure on deconflicting operations with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=21) | HSI  (N=38) |
|---|---|---|
| Yes | 15 (71%) | 17 (45%) |
| No | 4 (19%) | 11 (29%) |
| Don't know | 2 (10%) | 10 (26%) |

b.  If No/Don't know to Q11:  Has the lack of policy or procedure on deconflicting operations with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=226) | HSI  (N=453) |
|---|---|---|
| Yes | 36 (16%) | 36 (8%) |
| No | 107 (47%) | 262 (58%) |
| Don't know | 83 (37%) | 155 (32%) |

c.  If Yes to Q11:  Have you received any training or guidance on this policy or procedure on deconflicting operations with [FBI/HSI]?

|  | FBI  (N=64) | HSI  (N=236) |
|---|---|---|
| Yes | 36 (56%) | 142 (60%) |
| No | 27 (42%) | 84 (36%) |
| Don't know | 1 (2%) | 10 (4%) |

i.  If Yes: Was the training or guidance effective for understanding how to deconflict operations with [FBI/HSI]?

|  | FBI  (N=36) | HSI  (N=135) |
|---|---|---|
| Yes | 33 (92%) | 123 (91%) |
| No | 1 (3%) | 4 (3%) |
| Don't know | 2 (6%) | 8 (6%) |

ii.  If No/Don't know:  Has the lack of training or guidance on deconflicting operations with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=28) | HSI  (N=92) |
|---|---|---|
| Yes | 6 (21%) | 6 (7%) |
| No | 17 (61%) | 67 (73%) |
| Don't know | 5 (18%) | 19 (21%) |

12. Typically, how frequently do you use the following methods to notify [FBI/HSI] of significant investigative events for deconfliction purposes?

a.  Enter information into an electronic deconfliction system (e.g., RISSAFE).

|  | FBI  (N=224) | HSI  (N=601) | Total (N=825) |
|---|---|---|---|
| Never | 111 (50%) | 244 (41%) | 355 (43%) |
| Sometimes | 33 (15%) | 73 (12%) | 106 (13%) |

| | | | |
|---|---|---|---|
| Frequently | 26 (12%) | 89 (15%) | 115 (14%) |
| Always | 54 (24%) | 195 (32%) | 2490%) |

b.   Use a fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center).

| | FBI  (N=224) | HSI  (N=601) | Total  (N=825) |
|---|---|---|---|
| Never | 91 (40%) | 101 (17%) | 192 (23%) |
| Sometimes | 71 (32%) | 190 (32%) | 261 (32%) |
| Frequently | 46 (21%) | 163 (27%) | 209 (25%) |
| Always | 16 (7%) | 147 (24%) | 1630%) |

c.   Share information at a joint FBI and HSI meeting.

| | FBI  (N=224) | HSI  (N=601) | Total  (N=825) |
|---|---|---|---|
| Never | 83 (37%) | 328 (55%) | 411 (50%) |
| Sometimes | 93 (42%) | 191 (32%) | 284 (35%) |
| Frequently | 32 (14%) | 54 (9%) | 86 (10%) |
| Always | 16 (7%) | 28 (5%) | 44 (6%) |

d.   Contact the [FBI/HSI] case agent directly without using a deconfliction system.

| | FBI  (N=224) | HSI  (N=601) | Total  (N=825) |
|---|---|---|---|
| Never | 90 (40%) | 339 (56%) | 429 (52%) |
| Sometimes | 88 (39%) | 192 (32%) | 280 (34%) |
| Frequently | 33 (15%) | 45 (7%) | 78 (9%) |
| Always | 13 (6%) | 25 (4%) | 38 (5%) |

e.   Call a personal contact at [FBI/HSI].

| | FBI  (N=224) | HSI  (N=601) | Total  (N=825) |
|---|---|---|---|
| Never | 75 (33%) | 332 (55%) | 407 (50%) |
| Sometimes | 89 (40%) | 187 (31%) | 276 (33%) |
| Frequently | 41 (18%) | 57 (9%) | 98 (11%) |
| Always | 19 (8%) | 25 (4%) | 44 (5%) |

13. **When deconflicting operations, have you ever learned that [FBI/HSI] had an overlapping operation?**

| | FBI (N=286) | HSI (N=689) | Total (N=975) and Average Percent |
|---|---|---|---|
| Yes | 94 (33%) | 190 (28%) | 284 (29%) |
| No | 103 (36%) | 360 (52%) | 463 (47%) |
| Don't know | 30 (10%) | 61 (9%) | 91 (9%) |
| Not applicable | 59 (21%) | 78 (11%) | 137 (14%) |

a.   If No/Don't know/Not applicable:  SKIP to Q 14.
b.   If Yes:  Did you take action to resolve investigative overlap by coordinating with [FBI/HSI]?

| | FBI (N=94) | HSI (N=190) | Total (N=284) and Average Percent |
|---|---|---|---|
| Yes in all cases | 75 (77%) | 159 (84%) | 234 (82%) |
| Yes in some cases | 15 (16%) | 27 (14%) | 42 (15%) |
| Total "Yes" all or some | 90 (96%) | 186 (98%) | 276 (97%) |
| No, I didn't take action in any of the cases. | 1 | 2 | 3 (1%) |
| Don't recall | 3 | 2 | 5 (2%) |

i.   If No:  Why didn't you take action? *Choose all that apply.*  (Responses were limited, not shown.)

14. To your knowledge, has [FBI/HSI] ever failed to deconflict a significant investigative event that overlapped with one of your operations?

|  | FBI  (N=286) | HSI  (N=689) | Total (N=975) and Average Percent |
|---|---|---|---|
| Yes | 82 (29%) | 115 (17%) | 197 (20%) |
| No | 204 (71%) | 574 (83%) | 778 (80%) |

a.   If Yes:  How did you first learn that [FBI/HSI] had an overlapping operation?

|  | FBI | HSI |
|---|---|---|
| Electronic deconfliction system (e.g., RISSAFE) | 6 | 21 |
| Fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center) | 7 | 27 |
| Joint FBI and HSI meeting | 19 | 19 |
| The [FBI/HSI] case agent contacted me directly without using a deconfliction system. | 17 | 22 |
| Personal contact at [FBI/HSI] | 26 | 24 |
| [FBI/HSI] warrant, arrest or indictment that I did not know about beforehand | 22 | 24 |
| Don't recall | 11 | 12 |
| Other, please explain. | 27 | 28 |

i.   If Yes:  Were there any negative impacts on your investigation as a result of [FBI's/HSI's] overlapping operation?

|  | FBI | Percent of FBI "Yes" (N=82) | HSI | Percent of HSI "Yes" (N=115) | Total Number of Agents "Yes" | Percent of Total "Yes" (N=197) | Percent of Total Respondents (N=975) |
|---|---|---|---|---|---|---|---|
| Confidential source compromised | 13 | 16% | 11 | 10% | 24 | 12% | 2% |
| Agent safety compromised | 11 | 13% | 13 | 11% | 24 | 12% | 2% |
| Target not apprehended | 13 | 16% | 25 | 22% | 38 | 19% | 4% |
| Lowered morale | 37 | 45% | 59 | 51% | 96 | 49% | 10% |
| Loss of trust of [FBI/HSI] | 65 | 79% | 71 | 62% | 136 | 69% | 14% |
| Loss of trust of [FBI/HSI] agent or Task Force Officer | 47 | 57% | 49 | 43% | 96 | 49% | 9% |
| Blue-on-blue incident(s) | 8 | 10% | 12 | 10% | 20 | 10% | 2% |
| Unnecessary use of resources | 40 | 49% | 54 | 47% | 94 | 48% | 10% |
| Compromised Title III or consensual wiretap | 4 | 5% | 4 | 3% | 8 | 4% | 0.8% |
| Unnecessarily prolonged investigation | 19 | 23% | 48 | 42% | 67 | 34% | 7% |
| Charges reduced or dropped | 8 | 10% | 12 | 10% | 20 | 10% | 2% |
| Failure to gather evidence/intelligence | 33 | 40% | 37 | 32% | 70 | 36% | 7% |
| Don't recall | 0 | 0% | 5 | 4% | 5 | 3% | 0.5% |
| Other, please explain. | 8 | 4% | 4 | 3% | 12 | 6% | 1% |

## Information Sharing

*We define information sharing as FBI and HSI exchanging information related to active criminal investigations, beyond initial target and operational deconfliction.  For example, [FBI/HSI] case agents sharing intelligence that has a nexus to an [FBI/HSI] case.*

*Please respond to the following questions based on your experiences at your <u>current field office</u> over the past <u>3 years</u>.*

15. Does your office have either a written policy or defined procedure* for sharing information with [FBI/HSI]?

*\* Defined procedures mean guidance or instructions applicable to all office personnel intended to create a consistent practice.  Defined procedures could be in the form of a supervisor's written guidance or verbal instructions.*

|  | FBI  (N=290) | HSI (N=689) | Total (N=979) |
|---|---|---|---|
| Yes | 64 (22%) | 236 (34%) | 300 (31%) |
| No | 61 (21%) | 145 (21%) | 206 (21%) |
| Don't know | 165 (57%) | 308 (45%) | 473 (48%) |

    a.   If Yes:  Is the policy or procedure fully effective for sharing information with [FBI/HSI]?

|  | FBI  (N=37) | HSI (N=168) |
|---|---|---|
| Yes | 22 (59%) | 83 (49%) |
| No | 7 (19%) | 29 (17%) |
| Don't know | 8 (22%) | 56 (33%) |

       i.   If No:  Has the ineffectiveness of the policy or procedure on information sharing with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=7) | HSI (N=27) |
|---|---|---|
| Yes | 4 (57%) | 10 (37%) |
| No | 2 (29%) | 9 (33%) |
| Don't know | 1 (14%) | 8 (30%) |

    b.   If No/Don't know to Q15:  Has the lack of policy or procedure on sharing information with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=247) | HSI (N=521) |
|---|---|---|
| Yes | 31 (13%) | 36 (7%) |
| No | 111 (45%) | 272 (52%) |
| Don't know | 105 (43%) | 213 (41%) |

    c.   If Yes to Q15:  Have you received any training or guidance on this policy or procedure for information sharing with [FBI/HSI]?

|  | FBI  (N=37) | HSI (N=68) |
|---|---|---|
| Yes | 19 (51%) | 111 (16%) |
| No | 16 (43%) | 50 (74%) |
| Don't know | 2 (5%) | 7 (10%) |

      ii.   If Yes: Was the training or guidance effective for understanding how to share information with [FBI/HSI]?

|  | FBI  (N=19) | HSI (N=109) |
|---|---|---|
| Yes | 15 (79%) | 94 (86%) |
| No | 2 (11%) | 4 (4%) |
| Don't know | 2 (11%) | 11 (10%) |

      iii.   If No/Don't know:  Has the lack of training or guidance on information sharing with [FBI/HSI] negatively affected your investigations?

|  | FBI  (N=18) | HSI (N=57) |
|---|---|---|
| Yes | 3 (17%) | 3 (5%) |
| No | 12 (67%) | 39 (68%) |
| Don't know | 3 (17%) | 15 (26%) |

48

16. Typically, how do you share information with [FBI/HSI]?

| | FBI (N=284) | HSI (N=689) | Total (N=973) |
|---|---|---|---|
| Enter information into an electronic deconfliction system (e.g., DICE). | 93 (33%) | 418 (61%) | 511 (53%) |
| Enter information into an information sharing database. | 38 (13%) | 124 (18%) | 162 (17%) |
| Use a fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center). | 79 (28%) | 352 (51%) | 431 (44%) |
| Share information at a joint FBI and HSI meeting. | 99 (35%) | 170 (25%) | 269 (28%) |
| Contact the [FBI/HSI] case agent directly without using a deconfliction system. | 117 (42%) | 209 (30%) | 326 (34%) |
| Call a personal contact at [FBI/HSI]. | 139 (49%) | 241 (35%) | 380 (39%) |
| Other, please explain. | 22 (8%) | 38 (6%) | 60 (6%) |

17. Have you ever had information relevant to an [FBI/HSI] investigation and <u>not</u> shared it with [FBI/HSI]?

| | FBI (N=284) | HSI (N=689) | TOTAL (N=973) |
|---|---|---|---|
| Yes | 15 (5%) | 19 (3%) | 34 (3.5%) |
| No | 204 (72%) | 573 (83%) | 777 (80%) |
| Don't know | 30 (11%) | 44 (6%) | 74 (7.5%) |
| Not applicable | 35 (12%) | 53 (8%) | 88 (9%) |

    a.   If Yes:  Why did you not share the information?

| | FBI (N=15) | HSI (N=19) | TOTAL (N=34) |
|---|---|---|---|
| Information was classified (Confidential, Secret, or Top Secret). | 1 | 0 | 1 |
| Information was too sensitive to share. | 6 | 2 | 8 |
| Investigation might have been compromised. | 8 | 11 | 19 |
| Confidential source might have been compromised. | 9 | 10 | 19 |
| Agent safety might have been compromised. | 1 | 1 | 2 |
| I did not have time to share the information. | 0 | 0 | 0 |
| I did not know whom to contact. | 1 | 2 | 3 |
| I did not trust the [FBI/HSI]. | 9 | 14 | 23 |
| I did not trust the [FBI/HSI] agent or Task Force Officer. | 9 | 8 | 17 |
| Would have resulted in negative feedback from management. | 0 | 1 | 1 |
| I was discouraged by agency coworkers. | 3 | 2 | 5 |
| Target might not have been apprehended. | 2 | 2 | 4 |
| Morale might have decreased. | 2 | 4 | 6 |
| Blue-on-blue incident(s) might have resulted. | 1 | 1 | 2 |
| Might have resulted in unnecessary use of resources | 2 | 2 | 4 |
| Might have compromised a Title III or consensual wiretap | 0 | 1 | 1 |
| Might have unnecessarily prolonged investigation | 2 | 6 | 8 |
| Charges might have been reduced or dropped. | 0 | 3 | 3 |
| Might have resulted in failure to gather evidence/intelligence | 4 | 6 | 10 |
| Other, please explain. | 2 | 4 | 6 |

18. Have you ever been aware that [FBI/HSI] had information relevant to your investigation but failed to share it with you in a timely manner (for example, known locations of potential witnesses in your case)?

|  | FBI  (N=283) | HSI  (N=689) | Total (N=972) and Average Percent |
|---|---|---|---|
| Yes | 75 (27%) | 143 (21%) | 218 (22%) |
| No | 208 (73%) | 546 (79%) | 754 (78%) |

    a.　If Yes:  How did you first learn that [FBI/HSI] had information relevant to your investigation?

|  | FBI (N=76) | HSI (N=144) | Total (N=220) |
|---|---|---|---|
| Electronic deconfliction system (e.g., DICE, RISS) | 3 | 35 | 38 |
| Fusion/intelligence center (e.g., EPIC, SOD, OCDETF Fusion Center) | 5 | 28 | 33 |
| Joint FBI and HSI meeting | 22 | 25 | 47 |
| The [FBI/HSI] case agent contacted me directly without using a deconfliction system. | 11 | 26 | 37 |
| Personal contact at [FBI/HSI] | 25 | 40 | 65 |
| [FBI/HSI] warrant, arrest or indictment that I did not know about beforehand | 20 | 24 | 44 |
| Don't recall | 1 | 9 | 10 |
| Other, please explain. | 28 | 39 | 67 |

Note:  The OIGs identified and deleted two duplicate responses from the overall responses in Q18. The totals for 18a reflect responses provided by these individuals, and we consider them to have an immaterial effect on overall agent sentiment.

    a.　If Yes:  Did [FBI/HSI's] failure to share the information result in any of the following?

|  | FBI | Percent of FBI "Yes" (N=75) | HSI | Percent of HSI "Yes" (N=143) | Total Number of Agents "Yes" | Percent of Total "Yes" (N=218) | Percent of Total Respondents (N=972) |
|---|---|---|---|---|---|---|---|
| Confidential source compromised | 7 | 9% | 8 | 6% | 15 | 7% | 2% |
| Agent safety compromised | 9 | 12% | 17 | 12% | 26 | 12% | 3% |
| Target not apprehended | 13 | 17% | 24 | 17% | 37 | 17% | 4% |
| Lowered morale | 34 | 45% | 74 | 52% | 108 | 50% | 11% |
| Loss of trust of [FBI/HSI] | 63 | 84% | 104 | 73% | 167 | 77% | 17% |
| Loss of trust of [FBI/HSI] agent or Task Force Officer | 47 | 63% | 72 | 50% | 119 | 55% | 12% |
| Compromised a Title III or consensual wiretap | 4 | 5% | 6 | 4% | 10 | 5% | 1% |
| Blue-on-blue incident(s) | 7 | 9% | 7 | 5% | 14 | 6% | 1% |
| Unnecessary use of resources | 35 | 47% | 61 | 43% | 96 | 44% | 10% |
| Unnecessarily prolonged investigation | 32 | 43% | 55 | 38% | 87 | 40% | 9% |
| Charges reduced or dropped | 7 | 9% | 16 | 11% | 23 | 11% | 2% |
| Failure to gather evidence/intelligence | 31 | 41% | 56 | 39% | 87 | 40% | 9% |
| Don't recall | 3 |  | 5 |  |  |  |  |
| Other, please explain. | 5 |  | 4 |  |  |  |  |

*Deconfliction and Information Sharing with Other Federal Law Enforcement Agencies*

*Please respond to the following questions based on your experiences at your <u>current field office</u> over the past <u>3 years</u>.*

19. If Yes to Q6 (respondent is currently on a task force with [FBI/HSI]):  How much do you agree or disagree with the following statements?

  a.   My participation on a task force with [FBI/HSI] facilitates deconflicting targets.

|  | FBI  (N=67) | HSI  (N=80) |
|---|---|---|
| Strongly disagree | 3 (4%) | 9 (11%) |
| Disagree | 4 (6%) | 1 (1%) |
| Neither agree nor disagree | 15 (22%) | 18 (23%) |
| Agree | 22 (33%) | 29 (36%) |
| Strongly agree | 23 (34%) | 23 (29%) |

  b.   My participation on a task force with [FBI/HSI] facilitates deconflicting operations.

|  | FBI  (N=67) | HSI  (N=80) |
|---|---|---|
| Strongly disagree | 3 (4%) | 9 (11%) |
| Disagree | 6 (9%) | 1 (1%) |
| Neither agree nor disagree | 10 (15%) | 20 (25%) |
| Agree | 27 (40%) | 28 (35%) |
| Strongly agree | 21 (31%) | 22 (28%) |

  c.   My participation on a task force with [FBI/HSI] facilitates information sharing.

|  | FBI  (N=67) | HSI  (N=80) |
|---|---|---|
| Strongly disagree | 4 (6%) | 10 (12.5%) |
| Disagree | 3 (4%) | 6 (7.5%) |
| Neither agree nor disagree | 15 (22%) | 14 (17.5%) |
| Agree | 23 (34%) | 26 (32.5%) |
| Strongly agree | 22 (33%) | 24 (30%) |

20. Have you experienced problems with any aspect of deconflicting targets, deconflicting operations, or sharing information with any of the following agencies:

|  | FBI  (N=102) | HSI  (N=564) |
|---|---|---|
| Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) | 29 (29%) | 49 (9%) |
| Drug Enforcement Administration (DEA) | 33 (32%) | 222 (39%) |
| U.S. Coast Guard (USCG) | 0 (0%) | 4 (1%) |
| U.S. Customs and Border Protection/ Air and Marine Operations (CBP AMO) | 0 (0%) | 9 (2%) |
| U.S. Customs and Border Protection/Border Patrol (CBP BP) | 7 (7%) | 180 (32%) |
| U.S. Customs and Border Protection/Office of Field Operations (CBP OFO) | 4 (4%) | 89 (16%) |
| U.S. Marshals Service (USMS) | 7 (7%) | 7 (1%) |
| U.S. Secret Service (USSS) | 4 (4%) | 4 (1%) |
| Not answered | 18 (18%) | 0 (0%) |

51

## Overall Perceptions

21. If you have had disagreements with [FBI/HSI] related to deconfliction and information sharing, were you able to resolve them?

|  | FBI  (N=282) | HSI  (N=689) | Total (N=971) Total That Had Disagreements (N=465) |
|---|---|---|---|
| Yes | 80 (28%) | 159 (23%) | 239 (25%) 239 (51%) |
| No | 67 (24%) | 159 (23%) | 226 (23%) 226 (49%) |
| Not applicable | 135 (48%) | 371 (54%) | 506 (52%) |

a. If Yes, at what level were disagreements with [FBI/HSI] related to deconfliction and information sharing most effectively resolved?

|  | FBI (N=80) | FBI Totals | HSI (N=128) | HSI Totals | Combined Totals (N=208) |
|---|---|---|---|---|---|
| Agent | 37 (46%) | same | 80 (63%) | same | 117 (56%) |
| Group Supervisor (HSI only) | N/A | 1st line supervisor 21 (26%) | 31 (24%) | 1st line supervisor 44 (34%) | 1st line supervisor 65 (31%) |
| Supervisory Special Agent | 21 (26%) | | 13 (10%) | | |
| RAC | 3 (4%) | Division leadership 9 (11%) | 3 (2%) | Division leadership 19 (15%) | Division leadership 28 (13%) |
| ASAC | 5 (6%) | | 14 (11%) | | |
| SAC | 1 (1%) | | 2 (2%) | | |
| USAO | 4 (5%) | same | 3 (2%) | same | 7 (3%) |
| FBI/HSI HQ | 0 (0%) | same | 0 (0%) | same | 0 |
| DOJ HQ | 0 (0%) | same | 0 (0%) | same | 0 |
| More than one level was involved in resolving the issue. | 8 (10%) | same | 11 (9%) | same | 19 (9%) |
| Don't recall | 1 (1%) | same | 2 (2%) | same | 3 (1%) |

22. How much do you agree or disagree with the following statements?

a. I am comfortable deconflicting targets with [FBI/HSI].

|  | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 28 (10%) | 68 (24%) | 76 (11%) | 151 (22%) | 219 (23%) |
| Disagree | 40 (14%) | | 75 (11%) | | |
| Neither agree nor disagree | 99 (35%) | same | 169 (25%) | same | 268 (28%) |
| Agree | 90 (32%) | 113 (40%) | 259 (38%) | 369 (54%) | 482 (50%) |
| Strongly agree | 23 (8%) | | 110 (16%) | | |

b.   I am comfortable deconflicting operations with [FBI/HSI].

| | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 29 (10%) | 59 (21%) | 66 (10%) | 130 (19%) | 189 (20%) |
| Disagree | 30 (11%) | | 64 (9%) | | |
| Neither agree nor disagree | 95 (34%) | same | 174 (25%) | same | 269 (28%) |
| Agree | 101 (36%) | 126 (45%) | 263 (38%) | 385 (56%) | 511 (53%) |
| Strongly agree | 25 (9%) | | 122 (18%) | | |

c.   I am comfortable sharing information with [FBI/HSI].

| | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 35 (13%) | 88 (31%) | 97 (14%) | 179 (26%) | 267 (28%) |
| Disagree | 53 (19%) | | 82 (12%) | | |
| Neither agree nor disagree | 89 (32%) | same | 197 (29%) | same | 286 (30%) |
| Agree | 73 (26%) | 103 (37%) | 221 (32%) | 313 (45%) | 416 (43%) |
| Strongly agree | 30 (11%) | | 92 (13%) | | |

23. How much do you agree or disagree with the following statements?

a.   My duty station deconflicts targets with [FBI/HSI] well.

| | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 16 (6%) | 50 (18%) | 43 (6%) | 108 (16%) | 158 (16%) |
| Disagree | 34 (12%) | | 65 (9%) | | |
| Neither agree nor disagree | 149 (53%) | same | 311 (45%) | same | 460 (47%) |
| Agree | 71 (25%) | 81 (29%) | 201 (29%) | 270 (39%) | 351 (36%) |
| Strongly agree | 10 (4%) | | 69 (10%) | | |

b.   My duty station deconflicts operations with [FBI/HSI] well.

| | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 17 (6%) | 48 (17%) | 41 (6%) | 96 (14%) | 144 (15%) |
| Disagree | 31 (11%) | | 55 (8%) | | |
| Neither agree nor disagree | 147 (53%) | same | 312 (45%) | same | 459 (47%) |
| Agree | 74 (26%) | 85 (30%) | 200 (29%) | 281 (41%) | 366 (38%) |
| Strongly agree | 11 (4%) | | 81 (12%) | | |

c.   My duty station shares information with [FBI/HSI] well.

| | FBI (N=280) | FBI Totals | HSI (N=689) | HSI Totals | Combined Totals (N=969) |
|---|---|---|---|---|---|
| Strongly disagree | 17 (6%) | 50 (18%) | 44 (6%) | 114 (17%) | 164 (17%) |
| Disagree | 33 (12%) | | 70 (10%) | | |
| Neither agree nor disagree | 152 (54%) | same | 327 (47%) | same | 479 (49%) |
| Agree | 61 (22%) | 78 (28%) | 184 (27%) | 248 (36%) | 326 (34%) |
| Strongly agree | 17 (6%) | | 64 (9%) | | |

24. How much do you agree or disagree with the following statements?

a.   My colleagues encourage me to cooperate with [FBI/HSI].

| | FBI (N=228) | HSI (N=554) |
|---|---|---|
| Strongly disagree | 19 (8%) | 40 (7%) |
| Disagree | 37 (16%) | 77 (14%) |
| Neither agree nor disagree | 95 (42%) | 227 (41%) |
| Agree | 46 (20%) | 124 (22%) |
| Strongly agree | 16 (7%) | 55 (10%) |
| Not applicable | 15 (7%) | 31 (6%) |

b.   My Group Supervisor encourages me to cooperate with [FBI/HSI].

| | FBI (N=228) | HSI (N=554) |
|---|---|---|
| Strongly disagree | 9 (4%) | 20 (4%) |
| Disagree | 21 (9%) | 37 (7%) |
| Neither agree nor disagree | 98 (43%) | 215 (39%) |
| Agree | 61 (27%) | 164 (30%) |
| Strongly agree | 21 (9%) | 80 (14%) |
| Not applicable | 18 (8%) | 38 (7%) |

c.   My ASAC encourages me to cooperate with [FBI/HSI].

| | FBI (N=228) | HSI (N=554) |
|---|---|---|
| Strongly disagree | 5 (2%) | 20 (4%) |
| Disagree | 15 (7%) | 27 (5%) |
| Neither agree nor disagree | 110 (48%) | 231 (42%) |
| Agree | 49 (21%) | 155 (28%) |
| Strongly agree | 21 (9%) | 76 (14%) |
| Not applicable | 28 (12%) | 45 (8%) |

d.   My RAC encourages me to deconflict with other agencies.

| | FBI (N=228) | HSI (N=554) |
|---|---|---|
| Strongly disagree | 3 (1%) | 13 (2%) |
| Disagree | 9 (4%) | 20 (4%) |
| Neither agree nor disagree | 101 (44%) | 216 (39%) |
| Agree | 19 (8%) | 103 (19%) |
| Strongly agree | 5 (2%) | 44 (8%) |
| Not applicable | 91 (40%) | 158 (29%) |

e.   My SAC encourages me to cooperate with [FBI/HSI].

| | FBI (N=228) | HSI (N=554) |
|---|---|---|
| Strongly disagree | 4 (2%) | 15 (3%) |
| Disagree | 12 (5%) | 21 (4%) |
| Neither agree nor disagree | 112 (49%) | 237 (43%) |
| Agree | 43 (19%) | 146 (26%) |
| Strongly agree | 21 (9%) | 76 (14%) |
| Not applicable | 36 (16%) | 59 (11%) |

25. In your capacity as a supervisor, how much do you agree or disagree with the following statements?

a. I encourage the staff I supervise to cooperate with [FBI/HSI].

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 1 (2%) | 2 (1%) |
| Disagree | 2 (4%) | 4 (3%) |
| Neither agree nor disagree | 9 (18%) | 18 (13%) |
| Agree | 29 (57%) | 67 (50%) |
| Strongly agree | 10 (20%) | 44 (33%) |

b. I encourage the staff I supervise to resolve conflicts with [FBI/HSI] themselves.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 1 (2%) | 2 (1%) |
| Disagree | 3 (6%) | 8 (6%) |
| Neither agree nor disagree | 9 (18%) | 24 (18%) |
| Agree | 28 (55%) | 67 (50%) |
| Strongly agree | 10 (20%) | 34 (25%) |

c. The staff I supervise are comfortable coming to me to help resolve [FBI/HSI] conflicts.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 0 (0%) | 1 (1%) |
| Disagree | 0 (0%) | 1(1%) |
| Neither agree nor disagree | 6 (12%) | 13 (10%) |
| Agree | 32 (63%) | 74 (55%) |
| Strongly agree | 13 (25%) | 46 (34%) |

d. I am comfortable going to my supervisor for help resolving [FBI/HSI] conflicts.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 0 (0%) | 0 (0%) |
| Disagree | 0 (0%) | 2 (1%) |
| Neither agree nor disagree | 10 (20%) | 17 (13%) |
| Agree | 25 (49%) | 66 (49%) |
| Strongly agree | 16 (31%) | 50 (37%) |

e. I document [FBI/HSI] cooperation efforts by staff I supervise.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 4 (8%) | 3 (2%) |
| Disagree | 6 (12%) | 21 (16%) |
| Neither agree nor disagree | 25 (49%) | 59 (44%) |
| Agree | 13 (25%) | 36 (27%) |
| Strongly agree | 3 (6%) | 16 (12%) |

f. My supervisor documents [FBI/HSI] cooperation by my unit/group.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 4 (8%) | 4 (3%) |
| Disagree | 4 (8%) | 16 (12%) |
| Neither agree nor disagree | 30 (59%) | 74 (55%) |
| Agree | 12 (24%) | 31 (23%) |
| Strongly agree | 1 (2%) | 10 (7%) |

g. My supervisor encourages FBI/HSI cooperation and strong FBI/HSI working relationships.

|  | FBI (N=51) | HSI (N=135) |
|---|---|---|
| Strongly disagree | 0 (0%) | 2 (1%) |
| Disagree | 1 (2%) | 7 (5%) |
| Neither agree nor disagree | 17 (33%) | 30 (22%) |
| Agree | 20 (39%) | 63 (47%) |
| Strongly agree | 13 (25%) | 33 (24%) |

26. How much do you agree or disagree with the following statement:  Overall my agency has a good
    working relationship with [FBI/HSI] on the Southwest border.

| | FBI (N=279) | FBI Totals | HSI (N=689) | HSI Totals | Total (N=968) | Combined Totals |
|---|---|---|---|---|---|---|
| Strongly disagree | 26 (9%) | 75 (27%) | 45 (7%) | 128 (19%) | 71 (7%) | 203 (21%) |
| Disagree | 49 (18%) | | 83 (12%) | | 132 (14%) | |
| Neither agree nor disagree | 98 (35%) | same | 261 (38%) | same | 359 (37%) | 359 (37%) |
| Agree | 68 (24%) | 83 (30%) | 213 (31%) | 260 (38%) | 281 (20%) | 343 (35%) |
| Strongly agree | 15 (5%) | | 47 (7%) | | 62 (6%) | |
| Don't know | 23 (8%) | same | 40 (6%) | same | 63 (7%) | 63 (7%) |

27. What actions, if any, should be taken to improve the working relationship with [FBI/HSI] on the
    Southwest Border?  *Check all that apply*.

    For our discussion of the responses to Question 27, see Appendix 3.

28. What additional comments or suggestions would you like to share about FBI/HSI cooperation?
    *Open-ended*.  (Free text responses not shown.)

29. Would you like to provide your contact information to share your experiences to help us
    understand these issues?

    ☑ Yes, I would like to provide my contact information (Enter name and preferred contact
    information below).
    ☑ No, I wish to remain anonymous.

## Survey Conclusion

We appreciate your input to our survey.  Please click the next button to submit your
responses and close your browser.  Thank you very much.

APPENDIX 3

# SURVEY RESPONDENTS' RECOMMENDATIONS FOR IMPROVEMENT

In our survey, we asked FBI and HSI agents what actions they recommend be taken to improve the agencies' working relationship on the Southwest border. Respondents could select all that applied from 16 recommendations provided, as well as an "Other, please explain" option to provide a free text response. Figure 2 shows the top 10 recommendations from those 970 survey respondents.

Figure 2

Top 10 FBI and HSI Responses to Our Survey Question

"What actions, if any, should be taken to improve the working relationship with [FBI/HSI] on the Southwest border?"



Source: 970 responses (280 FBI and 690 HSI) to OIG Survey Question 27 (see Appendix 2)

Both agencies shared similar support for the majority of the top 10 recommendations for improvement. The top three improvements that survey respondents recommended, on average, were:

1. "Develop clear agency policy or procedures for deconflicting and sharing information": 44 percent (426 agents).

2. "Improve FBI and HSI information sharing systems (IT)": 42 percent (405 agents).

3. "Establish a Memorandum of Understanding or Agreement (MOU/MOA) between HSI and FBI":  39 percent (379 agents).

FBI and HSI responses differed on each recommendation, with disparities between the agencies greatest on two recommendations.  The top disparity was that 49 percent of HSI agents, but only 25 percent of FBI agents, supported improving FBI and HSI information sharing systems (IT), commonly defined as information technology.  In our survey, we did not specify whether this option meant improving or updating the IT systems themselves or the processes through which agents deconflict and share investigative information in the systems.  Though nearly half of HSI survey respondents supported this recommendation, those who provided optional text responses did not always indicate exactly which interpretation they envisioned, nor did they name specific IT systems needing improvement.  Though the most common complaint from HSI survey respondents was that the FBI does not share investigative information with HSI and other agencies, it is unclear to what extent IT systems, including HSI agents' access to particular IT systems containing FBI's investigative information, are involved.[36]

The second top disparity between the agencies' responses was that 44 percent of FBI agents and only 25 percent of HSI agents supported improving awareness and understanding of FBI/HSI jurisdictions.  As we discussed in the report, many of the FBI interviewees and survey respondents across the Southwest border expressed a lack of understanding of HSI's mission and authorities.  At least 54 percent of FBI interviewees reported confusion over HSI's mission.  Table 8 shows the remaining recommendations, in order of most to least cited.

Table 8

Survey Respondents' Other Recommendations for Improvement

| Recommendation | FBI | HSI |
|---|---|---|
| 11. "Increase USAO's role in case coordination." | 22% | 16% |
| 12. "Other, please explain." | 21% | 12% |
| 13. "Increase support for cooperation from SSA." | 7% | 15% |
| 14. "Increase support for cooperation from RAC, ASAC, or SAC." | 8% | 16% |
| 15. "Increase support for cooperation from HQ." | 9% | 15% |
| 16. "Align annual statistics reporting to ensure shared credit." | 9% | 15% |
| 17. "Don't know." | 8% | 9% |
| 18. "Include cooperation in performance goals." | 3% | 5% |
| 19.  Not answered | 8% | 0% |

Note:  SSA=Supervisory Special Agent; RAC=Regional Agent in Charge; ASAC=Assistant Special Agent in Charge; SAC=Special Agent in Charge; HQ=headquarters.

Source:  970 responses (280 FBI and 690 HSI) to OIG Survey Question 27 (see Appendix 2)

---

[36] A small number of HSI survey respondents in particular reported dissatisfaction with the FBI's lack of investigative information sharing.  For example, 29 of 85 HSI survey respondents' optional free text comments indicated that the FBI does not share information with HSI.

APPENDIX 4

# THE FBI'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

July 26, 2019

The Honorable Michael E. Horowitz
Inspector General
Office of the Inspector General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Mr. Horowitz:

The Federal Bureau of Investigation (FBI) appreciates the opportunity to review and respond to your office's report entitled, *Review of the Federal Bureau of Investigation's and Homeland Security Investigations' Cooperation on Southwest Border Investigations.*

We are pleased that you found, "...task forces have generally improved cooperation between the FBI and HSI along the Southwest border."

We agree it is important to continue to improve cooperation between FBI and HSI along the Southwest border. In that regard, we concur with your five recommendations for the FBI.

Should you have any questions, feel free to contact me. We greatly appreciate the professionalism of your audit staff throughout this matter.

Sincerely,

Suzanne Turner
Section Chief
External Audit and Compliance Section
Inspection Division

Enclosure

59

Review of the Federal Bureau of Investigation's and
Homeland Security Investigations' Cooperation on
Southwest Border Investigations
**FBI Response to the OIG Recommendations**
**July 26, 2019**

To improve cooperation between FBI and HSI along the Southwest border, we recommend that
FBI and HSI:

**Recommendation 1:** Each develop and implement its own written policy, consistent with
existing departmental policies, to address how southwest border agents should de conflict
investigative targets and events and share relevant information with each other.

**FBI Response to OIG Recommendation 1:** Concur. The FBI will review its existing
deconfliction and information sharing policies and procedures and if needed, develop additional
guidance for field office personnel to deconflict investigative targets and events with HSI. The
FBI will conduct this review and development of policies, procedures, and guidance at the
agency level, as opposed to the regional level, as our investigations frequently span the nation
and the globe, especially along the Southwest Border.

**Recommendation 2:** Ensure that each agency has a copy of the other's de confliction policy and
that all agents understand the expectations for interagency de confliction and information
sharing.

**FBI Response to OIG Recommendation 2:** Concur. The FBI's Criminal Investigative Division
(CID) will share its deconfliction and information sharing policies with HSI for dissemination.
Upon receipt from HSI, the FBI's Criminal Investigative Division will ensure that FBI Field
Office personnel, including those along the Southwest Border, are provided with HSI
deconfliction policies.

**Recommendation 3:** Provide training to Southwest border Federal Bureau of Investigation and
Homeland Security Investigations agents on the existing Department of Justice and Department
of Homeland Security de confliction policies and mandatory systems.

**FBI Response to OIG Recommendation 3:** Concur. The FBI's CID will develop resources and
provide training to FBI agents in the field, including those along the Southwest border, on DOJ
and FBI deconfliction policies and mandatory systems, and disseminate these policies/systems
requirements to Field Office personnel. We will also provide any materials, resources, and
trainings that are provided by DHS/HSI to the FBI on their policies, procedures, and mandatory
systems. To ensure standardized training and consistency across Field Offices, this training will
be provided by FBI Headquarters components.

**Recommendation 4:** Jointly develop and implement a plan to increase awareness among Federal
Bureau of Investigation and Homeland Security Investigations agents of each agency's mission,
statutory authorities, and criminal investigative priorities.

**FBI Response to OIG Recommendation 4:** Concur. The FBI's CID will develop resources and materials on the FBI's mission, statutory authorities, and criminal investigative priorities to provide to HSI. The FBI's CID will also provide these materials, and any provided by HSI, to FBI personnel in the field. We are willing to work with HSI counterparts on additional awareness efforts and/or materials as needed. To ensure standardized training and consistency across Field Offices, this will be coordinated by FBI Headquarters components. FBI Field Office management will be encouraged to work directly with their local HSI counterparts to discuss improving awareness and coordination.

**Recommendation 5:** Jointly develop a memorandum of understanding or similar written agreement governing Federal Bureau of Investigation and Homeland Security Investigations operations on overlapping criminal investigative areas.

**FBI Response to OIG Recommendation 5:** Concur. The FBI is willing to work with HSI counterparts to develop a memorandum of understanding or written agreement that defines procedures for the FBI and HSI to coordinate and deconflict our investigative efforts on overlapping criminal investigative areas. The FBI will select points of contact and subject matter experts from both FBI Headquarters and FBI Field Offices to serve on this team and ensure this written agreement is in the best interest of law enforcement efforts throughout the US and along the Southwest Border. The FBI believes that any MOUs or agreements should apply across both agencies, and not be limited to the Southwest Border, as these overlapping investigative areas span the US and the globe.

APPENDIX 5

## DOJ OIG ANALYSIS OF THE FBI'S RESPONSE

The OIG provided a draft of this report to the FBI for its comment.  The FBI's response is included in Appendix 4 to this report.  DOJ OIG's analysis of the FBI's response and the actions necessary to close the recommendations are discussed below.

Recommendation 1:  Each develop and implement its own written policy, consistent with existing departmental policies, to address how Southwest border agents should deconflict investigative targets and events and share relevant information with each other.

Status:  Resolved.

FBI Response:  The FBI concurred with the recommendation and stated that it will review its deconfliction and information sharing policies and procedures and develop additional guidance to deconflict targets and events with HSI if needed.  The FBI plans to conduct this review and any necessary policy changes at the agency level, as opposed to the regional level, due to the multi-jurisdictional and multi-national character of many FBI investigations.

DOJ OIG Analysis:  The FBI's planned actions are responsive to our recommendation.  By October 31, 2019, please provide the results of the review.  Also, please provide a copy of any new deconfliction and information sharing policies that the FBI develops because of this review.

We are aware that ICE did not concur with this recommendation.  DHS OIG has determined that a directive that ICE provided after we issued the draft report meets the intent of the recommendation.  However, DHS OIG considers this recommendation resolved and open, pending receipt of documentation indicating that ICE has implemented and communicated this directive to HSI agents on the Southwest border (see Appendix 7 for DHS OIG's analysis of ICE's response).

Recommendation 2:  Ensure that each agency has a copy of the other's deconfliction policy and that all agents understand the expectations for interagency deconfliction and information sharing.

Status:  Resolved.

FBI Response:  The FBI concurred with the recommendation and stated that its Criminal Investigative Division (CID) will share its deconfliction and information sharing policies with HSI for dissemination.  The FBI plans to ensure that its field office personnel have HSI's deconfliction policies when CID receives them.

DOJ OIG Analysis:  The FBI's planned actions are responsive to our recommendation.  By October 31, 2019, please provide an update on the actions taken to:  (1) share the FBI's deconfliction and information sharing policies with

HSI and (2) disseminate HSI's deconfliction and information sharing policies to field office personnel.

Recommendation 3:  Provide training to Southwest border Federal Bureau of Investigation and Homeland Security Investigations agents on the existing Department of Justice and Department of Homeland Security deconfliction policies and mandatory systems.

Status:  Resolved.

FBI Response:  The FBI concurred with the recommendation and stated that CID will develop resources and provide training to agents on deconfliction policies and mandatory systems.  As part of these resources and trainings, the FBI also stated that it will disseminate the information it receives on DHS/HSI deconfliction policies, procedures, and mandatory systems.  The FBI plans to coordinate these efforts at headquarters to ensure standardized training and consistency across field offices.

DOJ OIG Analysis:  The FBI's planned actions are responsive to our recommendation.  By October 31, 2019, please provide copies of the training materials on deconfliction policies and mandatory systems.  Also, please advise as to when this new training will be implemented.

Recommendation 4:  Jointly develop and implement a plan to increase awareness among Federal Bureau of Investigation and Homeland Security Investigations agents of each agency's mission, statutory authorities, and criminal investigative priorities.

Status:  Resolved.

FBI Response:  The FBI concurred with the recommendation and stated that CID will provide HSI with resources and materials on the FBI's mission, statutory authorities, and criminal investigative priorities.  CID will also provide these materials, along with any responsive materials from HSI, to field office personnel.  The FBI stated that it is willing to work with HSI on awareness efforts and additional materials, as needed.  The FBI plans to coordinate these efforts at headquarters to ensure standardized training and consistency across field offices. The FBI will also encourage field office management to work directly with local HSI counterparts to improve awareness and coordination.

DOJ OIG Analysis:  The FBI's planned actions are responsive to our recommendation.  By October 31, 2019, please provide copies of all materials the FBI disseminates to and receives from HSI.  Also, please provide copies of the training materials the FBI develops and advise as to when this training will be implemented.

Recommendation 5:  Jointly develop a memorandum of understanding or similar written agreement governing Federal Bureau of Investigation and Homeland Security Investigations operations on overlapping criminal investigative areas.

Status:  Resolved.

FBI Response:  The FBI concurred with the recommendation and stated that it is willing to work with HSI to develop an agreement that defines procedures for both agencies to coordinate and deconflict efforts in overlapping criminal investigative areas.  The FBI stated that it plans to select points of contact and subject matter experts from multiple locations to ensure that the agreement best serves law enforcement efforts throughout the United States.  The FBI stated that it believes that any agreements should apply across both agencies and not be limited to certain geographic jurisdictions because these overlapping investigative areas are not limited to specific jurisdictions.

DOJ OIG Analysis:  The FBI's planned actions are responsive to our recommendation.  By October 31, 2019, please provide an update on any progress in the joint drafting of a memorandum of understanding or similar agreement to address overlapping investigative jurisdictions.

We are aware that ICE did not concur with this recommendation.  After receiving ICE's response, we invited ICE and the FBI to meet with us to discuss possible means for satisfying this recommendation; however, ICE refused to meet. Given the agencies' overlapping jurisdictional authorities, which can produce operational conflict, ICE and the FBI should develop an MOU or other agreement to overcome conflicts and better align the agencies' expertise and authorities.  DHS OIG considers this recommendation unresolved and open, pending receipt of sufficient evidence that ICE and the FBI have entered into an agreement that governs overlapping criminal investigative areas (see Appendix 7 for DHS OIG's analysis of ICE's response).

APPENDIX 6

# ICE'S RESPONSE TO THE DRAFT REPORT



Office of the Chief Financial Officer

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

**U.S. Immigration
and Customs
Enforcement**

**JUL 0 3 2019**

| | |
|---|---|
| MEMORANDUM FOR: | Jennifer L. Costello<br>Acting Inspector General<br>DHS Office of Inspector General |
| FROM: | Stephen A. Roncone<br>Chief Financial Officer and<br>Senior Component Accountable Official |
| SUBJECT: | Management Response to Draft Report: "Review of the<br>Federal Bureau of Investigation's and Homeland Security<br>Investigations' Cooperation on Southwest Border<br>Investigations" (Project No. 17-082-ISP-ICE) |

Thank you for the opportunity to review and comment on this draft report. U.S.
Immigration and Customs Enforcement (ICE) appreciates the work of the Office of
Inspector General (OIG) in planning and conducting its review and issuing this report.

We are pleased to note the OIG's recognition that ICE Homeland Security Investigations
(HSI) and the Federal Bureau of Investigations (FBI) task forces along the Southwest
Border have improved cooperation between these agencies. The fight against
Transnational Criminal Organizations that utilize the Southwest Border region for
nefarious purposes takes many forms and requires many law enforcement partners. ICE
HSI remains committed to cooperating with all of its partners to deconflict investigative
targets and avoid duplicative investigations, promote officer safety, and share relevant
investigative information, as appropriate.

The draft report contained five recommendations, with which ICE concurs with three and
non-concurs with two. Attached find our detailed response to each recommendation.
Technical comments were previously provided under separate cover.

Again, thank you for the opportunity to review and comment on this draft report. Please
feel free to contact me if you have any questions. We look forward to working with you
again in the future.

Attachment

www.ice.gov

65

## Attachment: Management Response to Recommendations
## Contained in 17-082-ISP-ICE

The OIG recommended that FBI and HSI:

**Recommendation 1:** Each develop and implement its own written policy, consistent with existing departmental policies, to address how Southwest border agents should deconflict investigative targets and events and share relevant information with each other.

**Response:** Non-concur. ICE HSI employees are directed to utilize target and event deconfliction protocols in a universal manner, regardless of geographic assignment. This direction is promulgated in ICE Directive 10090.1: Investigative Data and Event Deconfliction. Approximately 24 percent of HSI's workforce is permanently assigned to the Southwest border. ICE deconfliction policy is instituted in a standard and universal manner for the interests of safety and efficiency. Any attempt to 'regionalize' deconfliction policy confuses standard procedures for employees and limits the intended benefits. A policy specific to the Southwest border would be complicated by investigations that extend beyond Southwest border jurisdictions and venues. Implementation could be challenged not only by offices outside the Southwest border region, but also by prosecutors who may feel compelled to restrict information sharing for operational security. We request the OIG consider the recommendation resolved and closed.

**Recommendation 2:** Ensure that each agency has a copy of the other's deconfliction policy and that all agents understand the expectations for interagency deconfliction and information sharing.

**Response:** Concur. Through the Special Agents in Charge (SACs) along the Southwest border, ICE HSI Domestic Operations will share ICE's deconfliction policy with the FBI and to request a copy of the FBI policy. ICE HSI has had a requirement to deconflict investigative data and events per ICE Directive 10090.1. Estimated Completion Date (ECD): December 30, 2019.

**Recommendation 3:** Provide training to Southwest border Federal Bureau of Investigation and Homeland Security Investigations agents on the existing Department of Justice and Department of Homeland Security deconfliction policies and mandatory systems.

**Response:** Concur. ICE HSI Domestic Operations will train employees by distributing its deconfliction policy to its workforce, emphasizing the use of mandatory systems and practices. HSI will similarly distribute FBI's relevant policies with the HSI workforce. ECD: September 30, 2019.

2

**Recommendation 4:** Jointly develop and implement a plan to increase awareness among Federal Bureau of Investigation and Homeland Security Investigations agents of each agency's mission, statutory authorities, and criminal investigative priorities.

**Response:** Concur. Through the SACs along the Southwest border, ICE HSI Domestic Operations will furnish the FBI with material identifying the agency mission, statutory authorities, and priorities in an effort to educate FBI employees. Conversely, ICE HSI will distribute material provided by the FBI to its employees to educate HSI. ECD: December 30, 2019.

**Recommendation 5:** Jointly develop a memorandum of understanding or similar written agreement governing Federal Bureau of Investigation and Homeland Security Investigations operations on overlapping criminal investigative areas.

**Response:** Non-concur. As noted in the report, the FBI and HSI share many overlapping authorities, as do other federal investigative agencies. A memorandum of understanding or other agreement is not suitable to govern operations when myriad considerations occur in overlapping cases which include investigative origin, prosecutorial venue, and agency expenditures among other variables. For example, many HSI and FBI investigations are multi-jurisdictional. A Southwest border MOU would be complicated by Southwest border investigations that include non-Southwest border jurisdictions and venues, which would not be beholden to this MOU. As addressed in response to recommendation 1, implementation could be challenged not only by offices outside the Southwest border region, but also by outside prosecutors. A Southwest border MOU would be counterproductive and restrictive, thus preventing HSI field leadership from developing local practices and policies that are more efficient and reflective of working dynamics with the FBI, prosecutors, and other law enforcement partners. We request the OIG consider the recommendation resolved and closed.

3

## DHS OIG MANAGEMENT COMMENTS AND ANALYSIS OF ICE'S RESPONSE

ICE concurred with three of five recommendations.  Appendix 6 contains a copy of ICE's management comments in their entirety.  ICE also provided technical comments, and we incorporated them into the report where appropriate.  We consider Recommendations 1, 2, 3, and 4 to be resolved and open.  We consider Recommendation 5 unresolved and open.  A summary of ICE's responses and DHS OIG's analysis follows.

Recommendation 1:  Each develop and implement its own written policy, consistent with existing departmental policies, to address how Southwest border agents should deconflict investigative targets and events and share relevant information with each other.

ICE Response:  ICE did not concur with this recommendation.  ICE officials informed us that in February 2019 it issued Directive 10090.1:  Investigative Data and Event Deconfliction, which instructs agents to utilize target and event deconfliction systems.  Because the directive applies to all ICE law enforcement officers, including HSI agents, regardless of geographic assignment, ICE noted that issuing Southwest border-specific deconfliction policy would confuse agents and limit the intended benefits.  Additionally, ICE responded that a Southwest border-specific deconfliction policy could complicate investigations extending beyond Southwest border jurisdictions and venues and could lead to restricted information sharing.  ICE requested that DHS OIG consider the recommendation resolved and closed.

DHS OIG Analysis:  We consider this recommendation resolved and open.  ICE's Directive 10090.1 is dated February 15, 2019, but ICE did not inform us of its completion until the draft report was issued.  We have since obtained the directive and determined that it meets the intent of the recommendation.  We consider the issuance of an agency-wide policy in lieu of a regional policy appropriate, as it encompasses HSI agents and investigations on the Southwest border, as well as those in other regions.  This recommendation will remain open pending receipt of documentation indicating that ICE has implemented and communicated this directive to HSI agents on the Southwest border.

Recommendation 2:  Ensure that each agency has a copy of the other's deconfliction policy and that all agents understand the expectations for interagency deconfliction and information sharing.

ICE Response:  ICE concurred with this recommendation.  Through the Southwest border Special Agents in Charge (SAC), ICE HSI Domestic Operations plans to share ICE's recently issued Directive 10090.1 with the FBI, and in turn request a copy of the FBI's deconfliction policy.  ICE anticipates these actions to be complete by December 30, 2019.

DHS OIG Analysis:  We consider these actions responsive to this recommendation, which is resolved and open.  This recommendation will remain

open pending receipt of sufficient evidence that ICE SACs have shared the directive with their FBI counterparts.

 Recommendation 3:  Provide training to Southwest border Federal Bureau of Investigation and Homeland Security Investigations agents on the existing Department of Justice and Department of Homeland Security deconfliction policies and mandatory systems.

 ICE Response:  ICE concurred with this recommendation.  ICE stated that it would train HSI agents by distributing ICE and FBI deconfliction policies and emphasizing the use of mandatory systems and practices.  ICE anticipates completing this training by September 30, 2019.

 DHS OIG Analysis:  We consider these actions responsive to this recommendation, which is resolved and open.  This recommendation will remain open pending receipt of documentation that ICE has distributed the deconfliction policies to agents and provided a copy of the training materials and attendance logs.

 Recommendation 4:  Jointly develop and implement a plan to increase awareness among Federal Bureau of Investigation and Homeland Security Investigations agents of each agency's mission, statutory authorities, and criminal investigative priorities.

 ICE Response:  ICE concurred with this recommendation.  ICE intends to provide the FBI with material identifying HSI's agency mission, statutory authority, and priorities in an effort to educate FBI agents.  Additionally, ICE will distribute materials provided by the FBI in order to educate HSI agents.  ICE anticipates completing these actions by December 30, 2019.

 DHS OIG Analysis:  We consider these actions responsive to this recommendation, which is resolved and open.  This recommendation will remain open pending receipt of sufficient evidence that ICE has provided the FBI with its educational materials and distributed the FBI's educational materials to HSI agents.

 Recommendation 5:  Jointly develop a memorandum of understanding or similar written agreement governing Federal Bureau of Investigation and Homeland Security Investigations operations on overlapping criminal investigative areas.

 ICE Response:  ICE did not concur with this recommendation.  ICE officials stated that an MOU or other agreement is not suitable to govern operations, which involve many variables, such as multiple jurisdictions and venues.  ICE indicated that an MOU would be counterproductive, restrictive, and would prevent HSI field leadership from developing local practices and policies that are more efficient and supportive to working relationships with investigative partners.  ICE requested that DHS OIG consider the recommendation resolved and closed.

 DHS OIG Analysis:  We consider this recommendation unresolved and open.  We agree that crafting a detailed and situation-specific MOU could pose limitations and reduce productivity.  However, a high-level agreement could

69

establish expectations for cooperation between the agencies without creating counterproductive results.  ICE's response suggested that both it and the FBI would face similar problems under an MOU.  However, the FBI concurred with the recommendation, indicating that ICE's concerns are also surmountable.

After receiving ICE's response, we invited ICE and the FBI to meet with us to discuss possible means for satisfying this recommendation; however, ICE refused to meet.  Given the agencies' overlapping jurisdictional authorities, which can produce operational conflicts, ICE and the FBI should develop an MOU or other agreement to align both agencies' expertise and authorities.  This recommendation will remain open pending receipt of sufficient evidence that ICE has entered into an agreement with the FBI that governs overlapping criminal investigative areas.

 

The Department of Justice Office of the Inspector General (DOJ OIG) and Department of Homeland Security Office of Inspector General (DHS OIG) are statutorily created independent entities whose mission is to detect and deter waste, fraud, abuse, and misconduct and to promote economy and efficiency in the operations of their respective departments.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts, please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

To report allegations of employee corruption, civil rights and civil liberties abuses, program fraud and financial crimes, and miscellaneous criminal and non-criminal activity associated with waste, abuse, or fraud affecting the programs and operations of DHS, please visit or call the **DHS OIG Hotline** at oig.dhs.gov/hotline or (800) 323-8603.

## U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL
950 Pennsylvania Avenue, NW, Suite 4706, Washington, DC  20530  0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

## U.S. DEPARTMENT OF HOMELAND SECURITY OFFICE OF INSPECTOR GENERAL
Mail Stop 0305, 245 Murray Lane, SW, Washington, DC  20528  0305

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.dhs.gov | @DHSOIG | DHS OIG |

Also at Oversight.gov