February 19, 2020

**Via ECF**

Hon. Robert M. Illman
Eureka-McKinleyville Courthouse
3140 Boeing Ave
McKinleyville, CA 95519
rmirpo@cand.uscourts.gov

      Re:    *ACLU, et al. v. DOJ et al.*, Case No. 19-CV-00290 (EMC)

Dear Judge Illman:

      This case concerns a request submitted in May 2018 under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records relating to the federal government's use of powerful tools to monitor the speech of U.S. citizens and noncitizens on various social media platforms such as Facebook, Twitter, and Instagram. Plaintiffs American Civil Liberties Union Foundation and American Civil Liberties Union of Northern California Foundation (together, "ACLU") submit this letter in response to the February 5, 2020 hearing and subsequent Minute Order (ECF No. 44), in which the Court ordered the parties to meet and confer and file individual letter briefs stating the parties' respective positions related to Defendants' search, processing, and production of responsive records.

      This letter brief addresses outstanding issues with respect to the search, processing, and production schedules for four of the Defendants and their components subject to Plaintiffs' FOIA request: the Department of Homeland Security's Privacy Office ("DHS Privacy Office"), the Department of Homeland Security's Office of Intelligence & Analysis ("DHS I&A"), the Department of Justice Office of Information Policy ("DOJ OIP"), the Federal Bureau of Investigation ("FBI"), and Department of State ("State Department").[1]

      These Defendants and their components have failed to search for and produce responsive records promptly as required under FOIA. As of the date of this letter, more than a year after Plaintiffs filed this lawsuit and nearly *two years* since Plaintiffs submitted their FOIA Request, the DHS Privacy Office, DHS I&A, and DOJ OIP have yet to produce a single document or even provide a complete schedule for the processing and production of records in response to the Request. Defendants FBI and State Department have begun producing responsive records but are moving too slowly to process and produce remaining records.

      Defendants' repeated delays in searching for, processing, and producing records contravene the purpose of FOIA and forestall public awareness of these agencies' use of social media surveillance and its consequences. The information sought through the Request is urgently needed to inform an ongoing debate about the government's rapidly expanding use of

---

[1] Defendants U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services, and Immigration and Customs Enforcement completed their productions in response to the FOIA Request following the commencement of this litigation.

1

surveillance technologies that can reach the online speech of millions of U.S. citizens and noncitizens. That urgency is compounded by the expansiveness of the redactions and withholdings in the documents Defendants have already produced.

In light of the time-sensitive need for this information, Plaintiffs respectfully ask that the Court impose a firm deadline for the timely search, processing, and production of responsive records by the DHS Privacy Office, DHS I&A, DOJ OIP, FBI, and State Department, taking into account the profound importance of the issue the records address, the urgent need for the records to inform ongoing public discussion and debate, the scope of the redactions in records produced thus far, and Defendants' repeated delays since the filing of Plaintiffs request and this FOIA lawsuit. Additionally, to the extent that the remaining production of documents will extend beyond September 2020, Plaintiffs request that the Court recommend that Defendants that have finished their productions—U.S. Customs and Border Protection, U.S. Citizenship and Immigration Services, and Immigration and Customs Enforcement—be ordered to provide Plaintiffs with *Vaughn* indices and set a schedule for partial summary judgment briefing regarding the redactions and withholdings in those already-completed productions.

## I.     Factual Background

Plaintiffs submitted the Request on May 24, 2018 under the FOIA to seven federal agencies concerning five specific categories of records, including social media surveillance-related policies and guidance, records concerning the purchase or acquisition of social media surveillance technologies, and communications between Defendant agencies and private businesses regarding social media content or surveillance products or content. (ECF No. 1.) Plaintiffs sought expedited processing of the Request due to the urgent need for the requested information.

Publicly available information indicates that the Defendants routinely conduct surveillance of users and speech on social media services.[2] For nearly half a decade, there has been a vigorous and sustained public debate about how and why the federal government monitors and collects the speech of U.S. citizens and noncitizens on social media services, as well as the kinds of software services and products that federal agencies use to conduct such surveillance.[3] Social media surveillance is a major priority for numerous federal agencies, which

---

[2] *See, e.g.,* ECF No. 33, at 2-8 (discussing public records and information demonstrating the surveillance of social media users and speech by Defendants in this case).

[3] *See, e.g.,* Tom Jones, Mari Payton, and Bill Feather, *Leaked Documents Show the U.S. Government Tracking Journalists and Immigration Advocates Through a Secret Database*, NBC 7 San Diego, Jan. 10, 2020, https://www.nbcsandiego.com/news/local/source-leaked-documents-show-the-us-government-tracking-journalists-and-advocates-through-a-secret-database/3438/; Brendan Bordelon, *New Visa Rules Suggest Expanded Plans for 'Extreme Vetting' Via Algorithm,* Nat'l Journal, Apr. 5, 2018, https://goo.gl/9Ux2mX; Chip Gibbons, The FBI is Setting Up a Task Force to Monitor Social Media, The Nation, Feb. 1, 2018, https://goo.gl/Ud6mVD; Lily Hay Newman, *Feds Monitoring Social Media Does More Harm Than Good, Wired*, Sept. 28, 2017*,* https://goo.gl/4obGFi; Aaron Cantú & George Joseph, *Trump's Border Security May Search Your Social Media by 'Tone,'* The Nation, Aug. 23, 2017, https://goo.gl/MuTmVN; Office of Inspector General, *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success (Redacted)*, February 27, 2017, https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-40-Feb17.pdf; Russell Brandom, *Can Facebook and Twitter Stop Social Media Surveillance?*, Verge, Oct. 12, 2016, https://goo.gl/hzA2fY; Ron Nixon*, U.S. to Further Scour Social Media Use of Visa and Asylum Seekers*, N.Y. Times, Feb. 23, 2016, https://goo.gl/y5C7Ba.

have expended millions of dollars on technology that searches and scrapes the social web for purposes that include criminal investigation, intelligence gathering, visa processing, immigration benefits and enforcement, and border screening.[4] The Request seeks government records critical to informing this public debate.

Plaintiffs filed this lawsuit in January 2019 to vindicate the public's right to access records about Defendants' social media surveillance programs and practices. *See* ECF No. 1. Thirteen months later, two Defendants—DHS and DOJ—have not produced a single page of responsive material. Of the 7,876 pages of potentially responsive information the other Defendants have processed to date, more than 3,500 pages have been withheld in full. Many documents these Defendants have produced in part are heavily redacted.

During this time, members of the public and media have remained underinformed about the federal government's expanding social media monitoring efforts, even as indications emerge of the unreliability of such surveillance for its intended purpose, the threat of discriminatory targeting of racial and religious minority groups, and the impact of social media monitoring on speech protected by the First Amendment.[5] Additionally, the public, media, and federal agencies have engaged in a vigorous national debate about the government's efforts to expand the collection, retention, and monitoring of social media information from applicants and recipients of immigrant and nonimmigrant visas.[6]

---

[4] For example, the FBI has long monitored and analyzed social media content for wide-ranging purposes and has sought and has purchased software seeking to enable such practices "enterprise wide." Exhibit B to the Handeyside Decl., at ECF No. 34-2. DHS and its components routinely collect and monitor social media content. DHS has stated that it "has been at the forefront among federal agencies in developing the capacity to incorporate social media in its screening and vetting processes," and the agency convened a "Social Media Vetting Task Force" to examine the department's "current and future use of social media in the DHS vetting process for operational and intelligence purposes." Exhibit G to the Handeyside Decl., at ECF No. 34-7; Ex. H to the Handeyside Decl., at ECF No. 34-8. The State Department has also vastly expanded its collection of social media information in recent years, embarking on a social media screening pilot program at diplomatic posts in early 2016, and since then implementing requirements that visa applicants submit their social media handles in order to travel or immigrate to the United States. Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 20,956 (May 4, 2017); *see also* 60-Day Notice of Proposed Information Collection: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 36,180 (Aug. 3, 2017).

[5] Jeff Horwitz and Dustin Volz, *FBI Surveillance Proposal Sets Up Clash With Facebook*, Wall St. J., Aug. 8, 2019, https://www.wsj.com/articles/fbi-and-facebook-potentially-at-odds-over-social-media-monitoring-11565277021; Tim Lau, *The Government is Expanding Its Social Media Surveillance Activities*, Brennan Center, May 22, 2019, https://www.brennancenter.org/our-work/analysis-opinion/government-expanding-its-social-media-surveillance-capabilities; Zak Doffman, *Your Social Media Is (Probably) Being Watched Right Now, Says New Surveillance Report,* Forbes.com, Nov. 6, 2019, https://www.forbes.com/sites/zakdoffman/2019/11/06/new-government-spy-report-your-social-media-is-probably-being-watched-right-now/#6174908d4f99; Saira Hussain and Sophia Cope, *Deep dive: CBP's Social Media Surveillance Poses Risks to Free Speech and Privacy Rights*, Electronic Frontier Foundation, Aug. 5, 2019, https://www.eff.org/deeplinks/2019/08/deep-dive-cbps-social-media-surveillance-poses-risks-free-speech-and-privacy.

[6] Sandra E. Garcia, *U.S. Requiring Social Media Information From Visa Applicants*, New York Times, June 2, 2019, https://www.nytimes.com/2019/06/02/us/us-visa-application-social-media.html; *see also* Collection of Social Media Identifiers from U.S. Visa Applicants¸ U.S. Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/News/visas-news/20190604_collection-of-social-media-identifiers-from-U.-S.-visa-applicants.html.

### a. Plaintiffs have worked diligently to clarify and narrow the scope of the Request through negotiations with Defendants.

The parties have repeatedly met and conferred about the scope of the searches by Defendants in this case, and Plaintiffs have consistently negotiated in good faith with Defendants about the scope of the Request, search terms, and custodians in order to facilitate the prompt processing and production of records. Plaintiffs have agreed to a narrowed set of custodians for DOJ OIP and the DHS Privacy Office, and have repeatedly agreed to narrow the relevant time frame and substantive parameters of the Request in response to Defendants' proposals.

### b. The DHS Privacy Office, DHS I&A, and DOJ OIP have yet to provide complete processing and production schedules or produce a single responsive record.

Notwithstanding Plaintiffs' efforts, DHS Privacy, DHS I&A, and DOJ OIP have failed to promptly search for and produce responsive records as the FOIA requires. As noted above, none of these Defendants has produced a single document or even provided a firm schedule for producing responsive records.

Defendants indicated in the parties' January 9, 2020 Joint Status Report—approximately one year after Plaintiffs filed this lawsuit—that the DHS Privacy Office had not yet commenced its search. (ECF No. 40.) Defendants did not notify Plaintiffs that the DHS Privacy Office's search had begun until February 5, 2020, and they confirmed on February 10, during the meet and confer directed by this Court, that DHS I&A had commenced its search.

The significant delay by DHS I&A is attributable to DHS's unexplained failure to include I&A in its search, despite the central role DHS I&A plays in the federal government's social media surveillance activities.[7] Plaintiffs submitted the Request to the DHS Privacy Office on May 24, 2018, consistent with DHS's FOIA regulations. *See* 6 C.F.R. 5.3 (stating that "[a] requester may also send his or her request to the Privacy Office," which "will forward the request to the component(s) that it determines to be most likely to maintain the records that are sought"). Yet Plaintiffs learned on October 8, 2019 that DHS had not forwarded the Request to I&A and did not plan to include I&A in its search. Plaintiffs were forced to repeatedly press for the inclusion of I&A, even though information already available publicly confirms that I&A possesses responsive records. DHS agreed to refer the Request to I&A on October 16, 2019, but the referral did not actually occur until January 8, 2020, immediately prior to the deadline for a Joint Status Report to the Court.

DOJ OIP has followed a similar pattern. Plaintiffs agreed on June 3, 2019 to a narrowed set of custodians for OIP's search. Yet not until the filing of the January 9, 2020 Joint Status Report did OIP even begin to articulate a timeline for review and production of documents, stating that the agency has over 25,000 documents to review for responsiveness and that it aims

---

[7] *See, e.g.*, ECF 34-8 Ex. H, 34-9, Ex. I (discussing how an official for Intelligence & Analysis was designated to chair the agency-wide Social Media Vetting Task Force to "to review the Department's current use of social media and identify options to optimize its use across DHS.").

to complete that review in six months. (ECF No. 40). DOJ has not specified a complete schedule for the production of responsive records to Plaintiffs.

### c. The FBI's "Glomar" assertions delayed its processing and production of records.

The FBI delayed its search, processing, and production of records by refusing to even acknowledge the existence or non-existence of records. On June 8, 2018, the FBI responded to the Request by stating that it could neither confirm nor deny the existence of responsive records, despite abundant information in the public realm plainly demonstrating the existence of such records. The ACLU promptly submitted an administrative appeal of this "Glomar" response, and on January 31, 2019, after Plaintiffs had filed this lawsuit, DOJ stated that it had granted the appeal and remanded the Request back to the FBI for a search for responsive records.

Still, the FBI continued to assert a Glomar response to parts 2.a.-c. of the Request. Plaintiffs requested, and the Court ordered, partial summary judgment briefing on the validity of that Glomar assertion. (ECF No. 26.) On November 18, 2019 the Court denied Defendants' motion for partial summary judgment on that issue. (ECF No. 39).

The FBI has taken the position that it will process only 500 pages per month.[8] Defendants indicated in the Joint Status Report of January 9, 2020 that the FBI has 5700 pages remaining to be processed and will not complete processing until November 2020, with an estimated final production date of January 2021. (ECF No. 40.)

### d. The State Department is processing records slowly even as it dramatically expands its collection and monitoring of social media information.

Defendants stated in the January 9, 2020 Joint Status Report that the State Department has over 4000 pages remaining to be processed and is processing those documents at a rate of approximately 450 pages every six weeks. (ECF No. 40.) At the same time, the State Department has massively expanded its collection of social media information. In mid-2019, the State Department implemented a new requirement that almost everyone applying for a visa—more than 14 million people each year—reveal their social media handles to the government.[9] This requirement raises pressing questions about the federal government's evolving efforts to monitor social media users and speech, including whether those handles are being shared with other federal agencies and whether U.S. citizen relatives of those visa holders are being improperly monitored by other federal agencies, including Defendants in this suit. Responsive records that may inform the public debate about this significant expansion of social media surveillance by the State Department are at risk of becoming stale because of the Department's slow processing schedule.

## II.     Legal Authority

---

[8] To date, the FBI has reviewed 3,045 pages of which 310 are produced in whole or in part and 2,735 pages are withheld in full– all since the filing of this lawsuit.
[9] Garcia, *supra* note 5.

5

DHS, DOJ, the FBI, and the State Department have failed to process and produce records responsive to the Request consistently with the FOIA and at a pace that reflects the urgency of concerns about social media surveillance and its nationwide scale. In analogous cases in which processing schedules threatened to render useless the sought-after information, courts have required the federal government to process records significantly faster than these Defendants are either processing or contemplating processing records. Court intervention is therefore warranted to facilitate the prompt production of all responsive records by a date certain.

### a. Courts enforce the FOIA's requirement of prompt disclosure through expedited processing schedules.

Congress enacted the Freedom of Information Act "to ensure that the Government's activities be opened to the sharp eye of public scrutiny.'" *Favish v. Office of Indep. Counsel*, 217 F.3d 1168, 1171 (9th Cir. 2000) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772–74, (1989)). As the Ninth Circuit has recognized, "[c]orruption, government inefficiency, and mistrust of public institutions all flourish 'unless the people are permitted to know what their government is up to.'" *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 861 (9th Cir. 2019) (quoting *Reporters Comm.*, 489 U.S. at 772–73). Central to effectuating the FOIA's goal of fostering government accountability to the public is ensuring disclosure of information about government conduct in a timely manner. *See Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041 (9th Cir. 1999) ("The value of information is partly a function of time."); *Open Soc'y Justice Initiative v. Cent. Intelligence Agency*, 399 F. Supp. 3d 161, 164 (S.D.N.Y. 2019) ("Congress has long recognized that 'information is often useful only if it is timely' . . . ." (quoting H.R. Rep. No. 93-876, at 6271 (1974)).

The FOIA thus provides a 20-business-day deadline for government agencies to "make a determination as to the request," which requires notifying requesters "of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions." *Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 186, 189 (D.C. Cir. 2013) ("*CREW*"); 5 U.S.C. § 552(a)(6)(A)(i). This deadline can be extended to 30 days "if unusual circumstances delay the agency's ability to search for, collect, examine, and consult about the responsive documents." *CREW*, 711 F.3d at 188.

Once the government makes a "determination" as to how to respond to a records request, the "FOIA requires that the agency make the records promptly available." *CREW*, 711 F.3d at 188 (internal quotation marks omitted). Although the agency is permitted "some additional time to physically redact, duplicate, or assemble for production the documents that it has already gathered and decided to produce," the D.C. Circuit has indicated that this additional time would "typically" be "within days or a few weeks of a determination, not months or years." *Id*. at 189. "Unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent [such] abuses." *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) (quoting *Long v. I.R.S.*, 693 F.2d 907, 910 (9th Cir. 1982)). A court "may use its equitable powers to require the agency to process documents according to a court-imposed timeline." *Clemente v. Fed. Bureau of Investigation*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014); *see also Long*, 693 F.2d at 909 ("Congress did not intend to limit the court's

exercise of its inherent equitable powers where consistent with the FOIA." (citing *Renegotiation Board v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 19 (1974)).

Rather than deferring to an agency's asserted processing schedule, federal courts evaluate on a case-by-case basis whether a proposed processing schedule advances the FOIA's goal of prompt disclosure of non-exempt information "to ensure an informed citizenry . . . needed to . . . hold the governors accountable to the governed." *Clemente*, 71 F. Supp. 3d at 268. Courts have identified three factors relevant to this evaluation: (1) the public importance of, and need for, the requested records, *see Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017); (2) whether there is an urgent need for the requested information, *see Clemente*, 71 F. Supp. 3d at 269; and (3) the delay in disclosure of information that would be caused through adoption of the government's proposed schedule, *id.*

Each of these three factors weighs in favor of ordering the relief Plaintiffs seek here.

### b. The Request implicates an issue of profound national importance.

The public interest furthered by a FOIA request is often one of the most important factors considered in determining whether the government is processing information quickly enough to satisfy the FOIA's requirements. For example, in *Clemente*, the court rejected the FBI's proposed schedule of 500 pages per month and found a schedule of 5,000 pages per month to be "reasonable in light of the importance of" the requester's work to investigate serious allegations of "corruption in the FBI's handling of its organized crime cases." 71 F. Supp. 3d at 268–69. This was true even though the court recognized that "the FBI's resources are limited." *Id.* Similarly, in *Seavey*, the court rejected the FBI's proposed 500-pages-per-month processing schedule where the Bureau identified over 100,000 documents that were potentially responsive to a professor's request for records to inform a "project designed to explain the role played by the United States Government's intelligence and law enforcement agencies in the movement against our participation in the Vietnam War." 266 F. Supp. 3d 241, 242, 244 (D.D.C. 2017). Noting that the project was "of substantial substance," the court ordered the FBI to process 2,850 pages a month. *Id.* at 248. Additionally, in a case concerning a FOIA request for FBI records about the profiling and surveillance of the Arab American community, a federal court ordered the FBI to process 3,500 pages per month. *See Boundaoui v. FBI*, No. 17-c-4782 (N.D. Ill. Sept. 26, 2017).

It is difficult to overstate the importance of the issues underlying Plaintiffs' FOIA Request, which concerns the federal government's efforts to monitor, collect, and retain the First Amendment-protected speech of millions of Americans and noncitizens. Each Defendant in this case uses social media surveillance tools extensively. The public has a significant and sustained interest in understanding how these agencies monitor speech on social media, particularly because a substantial amount of modern political and social discourse takes place exclusively on these services. Additionally, the reach of this kind of surveillance is global—it can affect anyone domestically or abroad who uses social media—and its consequences can be severe and life-changing for individuals. The government's monitoring and retention of information about First Amendment-protected speech increases the likelihood that agencies will investigate or otherwise monitor people based on that speech. Such surveillance can chill expressive activity and lead to

the disproportionate targeting of racial and religious minority communities, and those who dissent against government policies. Despite these risks and consequences, the public knows little about the processes and guidelines governing surveillance of social media, how Defendants use collected information, and whether that use is consistent with federal law and the U.S. Constitution.

### c. The need for the sought-after records is urgent, substantial, and growing.

Courts have regularly cited the urgent need for information as a factor justifying expedited production of records. *See, e.g.*, *Open Soc'y*, 399 F. Supp. 3d at 167 (ordering a processing schedule of 5,000 pages a month in light of the "paramount public importance and urgency" in FOIA request). In *Boundaoui*, a filmmaker requested records on the profiling and surveillance of the Arab American community in a Chicago suburb. No. 17-c-4782 (N.D. Ill. Sept. 26, 2017). The FBI identified over 33,000 pages of potentially responsive material and proposed processing only 500 pages a month, arguing that there was "no current urgency" because "the investigation was closed ten years ago." The court rejected the FBI's characterization of the requested information as not urgent and ordered the FBI to produce 3,500 pages a month, noting that "characteriz[ing] the public interest as simply a generalized concern over unwarranted surveillance ignores the specific nature of the surveillance and the targets at issue." Similarly, in *Clemente*, a forensic analyst sought records to "uncover . . . evidence of systemic corruption involving the FBI and its informants associated with organized crime." 71 F. Supp. 3d 262, 265 (D.D.C. 2014). The FBI identified approximately 30,000 responsive pages and first suggested processing 500 pages per month, then later offered to process 2,000 pages per month. *Id.* The court found the requester's proposed 5,000 pages per month to be "reasonable in light of the importance of her work and the possibility that she may have only a limited time in which to do it" because of a medical condition. *Id.* at 269. The court ordered the FBI to process 5,000 pages per month. *Id.*

Here, the urgency of Plaintiffs' Request is a function of the federal government's pervasive and expanding use of social media surveillance, coupled with the continued lack of transparency about the surveillance tools it uses and their consequences. Similar to the programs and practices at issue in *Boundaoui* and *Clemente*, Plaintiffs' Request seeks time-sensitive records urgently needed to inform the public's understanding of how Defendants have built and implemented programs to conduct surveillance, here of social media users and speech. The urgency derives in part from a time limitation technology imposes: surveillance tools change quickly and continue to grow more powerful. Thus, the public must understand the technologies agencies use for surveillance right now, not months or years after their consequences have accrued. And as in *Boundaoui*, the people potentially impacted by this surveillance present not "simply a generalized concern," but the exercise of the First Amendment right to free speech on services where political organizing, activism, and the support of causes may draw the disproportionate scrutiny of these surveillance programs.

Rapid growth in the federal government's use of social media surveillance reinforces this urgency. As explained above, since Plaintiffs submitted the Request in May 2018, the State Department has vastly expanded its collection of social media information from visa applicants for use in determinations about entry into the United States and the granting of immigration

benefits. The FBI, too, has signaled in public contracting documents a significant increase in its social media surveillance activities. (ECF No. 33, at 3 n.7). Such stark growth in the phenomenon at issue in the Request highlights the importance of ensuring that the government produces non-exempt and responsive information at the time the information is relevant to inform public debate. In *Fiduccia v. U.S. Department of Justice*, for instance, the Ninth Circuit reversed a district court decision granting the FBI a two-year stay to produce 1,800 pages of documents. The court recognized that the "value of information is partly a function of time" and noted that "[h]ardly anyone who needs information can anticipate having the same need for it, or use for it, 15 or eight years later." 185 F.3d 1035, 1041 (9th Cir. 1999); *see also Open Soc'y*, 399 F. Supp. 3d at 164 ("Congress has long recognized that 'information is often useful only if it is timely' and that, therefore 'excessive delay by the agency in its response is often tantamount to denial.'" (quoting H.R. Rep. No. 93-876, at 6271 (1974)). Here, it is of the utmost urgency that the public understand why Defendants conduct social media surveillance and whether the manner in which they do so leads to the improper targeting of people based on First Amendment-protected speech, political activism, national origin, or race.

Finally, the extent of the redactions in documents already produced by Defendants underscores the urgent nature of this Request. To date, the FBI and the State Department have produced 3,213 pages in response to this FOIA Request, all of which were produced after Plaintiffs filed their lawsuit. Of those produced pages, more than 2,000 are fully withheld or "deleted." Nearly all of the substantive information in the documents that are not fully withheld has been redacted. Due to the pervasive withholdings and redactions in these already-produced documents, Plaintiffs anticipate that summary judgment briefing before the District Court will be necessary, further delaying the release of responsive and non-exempt documents to the public.

### d. Defendants' proposed schedules entail unacceptable delay.

The foregoing analysis compels the conclusion that DHS, DOJ, the FBI, and the State Department have not satisfied the FOIA's requirement of "prompt" disclosure of non-exempt information.

The DHS Privacy Office, DHS I&A, and DOJ OIP have each failed to produce any documents or provide a definite processing schedule that this Court can evaluate under the above factors.

The FBI and the State Department have been processing and producing documents, but they are doing so too slowly. The FBI's 500-page-per-month processing schedule and the State Department proposed schedule of 450 pages every six weeks are inadequate given the importance and urgency of the requested records. The FBI estimates that its production will not be complete until January 2021, and the State Department has stated that over 4000 pages remain to be processed. (ECF. No. 40.) At these rates, neither the FBI nor the State Department will complete the processing of responsive records until early 2021, nearly *three years* after the FOIA Request was initially filed, and a full *two years* after Plaintiffs filed suit to enforce the public's right to these records. *See Clemente*, 71 F. Supp. 3d at 266, 269 (requiring the Bureau to process 5,000 pages per month and rejecting its offer to process 2,000 pages a month). The FBI and other Defendants are more than capable of processing more than 500 pages per month and should be

9

required to do so here.  *See Open Soc'y*, 399 F. Supp 3d at 168 (denying the State Department's motion to reconsider the 5,000-page-per-month processing schedule ordered by the Court); *Am. Civil Liberties Union of N. Cal. v. Fed. Bureau of Investigation*, No. 10-CV-03759-RS, 2015 WL 1346680, at *2 (N.D. Cal. Mar. 23, 2015) (noting that the FBI had been producing 2,500 pages per month for 20 months); *Elec. Privacy Info. Ctr. v. F.B.I.*, 933 F. Supp. 2d 42, 48 (D.D.C. 2013) ("[T]he FBI indicated on August 1, 2012, that it anticipated being able to process approximately 5,000 pages per month in another case" (citing *Lardner v. FBI*, No. 03-874, Status Report, ECF No. [111] (D.D.C. Aug. 1, 2012)).

      For these reasons, Plaintiffs respectfully ask that the Court impose a firm deadline for the timely search, processing, and production of responsive records to Plaintiffs by the DHS Privacy Office, DHS I&A, DOJ OIP, FBI, and State Department, taking into account the profound importance of the issue the records address, the urgent need for the records to inform ongoing public discussion and debate, the scope of the redactions in records produced thus far, and Defendants' repeated delays since the filing of Plaintiffs request and this FOIA lawsuit. Should the processing and production of remaining records extend beyond September 2020, Plaintiffs further request that the Court recommend that Defendants that have completed their productions be ordered to provide Plaintiffs with *Vaughn* indices so that the parties can proceed with partial summary judgment briefing regarding those Defendants' withholdings and redactions.

      Respectfully,

/s/ *Matthew Cagle*
Matthew Cagle

Hugh Handeyside

cc: Defendants' counsel