UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) CASE NO. 19-CV-00290-EMC ) |
| v. | ) **DECLARATION OF PATRICK HOWARD** ) |
| DEPARTMENT OF JUSTICE, *et al.*, | ) ) |
| Defendants. | ) ) |

I, Patrick A. Howard, declare the following to be true and correct:

1. I am a Branch Chief in the Freedom of Information Act (FOIA) Division, Privacy and Diversity Office, Office of the Commissioner, U.S. Customs and Border Protection (CBP). I have been a Branch Chief in the FOIA Division in Washington, D.C. since February 8, 2015. In this capacity, I oversee a staff of Government Information Specialists, the processing of requests for records submitted to CBP pursuant to the FOIA, the processing of certain requests submitted to CBP pursuant to 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and other activities conducted pursuant to applicable records access provisions.

2. I am familiar with CBP's procedures for responding to FOIA requests. I provide technical and administrative supervision and direction to a group of Government Information Specialists responsible for processing requests for release of CBP documents and information, assist with

1  FOIA litigation matters, and I am personally familiar with the processing of FOIA responses, including, at times, by directly reviewing for adequacy and compliance with federal laws and regulations.

3. I am familiar with the American Civil Liberties Union Foundation's and the American Civil Liberties Union Foundation of Northern California's (hereinafter the Plaintiffs) FOIA request submitted to CBP that was received by the CBP FOIA Division on or about May 24, 2018.

4. All information contained herein is based upon information furnished to me in my official capacity, and the statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties as Branch Chief in CBP's FOIA Division.

5. I submit this declaration in support of the Defendants' motion for summary judgement. The purpose of this declaration is to summarize CBP's FOIA procedures and the steps CBP took in conducting its search of CBP records that were responsive to Plaintiffs' FOIA request. In accordance with the requirements of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), and in conjunction with CBP's Vaughn Index, attached as Exhibit A, this declaration details CBP's withholdings of responsive information pursuant to FOIA exemptions, and addresses the segregability of documents partially withheld or withheld in full.

## CBP'S STANDARD PROCEDURE FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS

6. CBP is the largest federal law enforcement agency in the United States and is responsible for a broad law enforcement and border security mission. CBP's responsibilities include, among other things, ensuring the interdiction of persons and goods illegally entering or exiting the United States – including terrorists and their weapons – while facilitating and expediting the flow of legitimate travelers and trade. CBP is comprised of more than 60,000 employees, approximately

45,000 of those are armed law enforcement officers engaged in carrying out CBP's expansive border security mission (U.S. Border Patrol Agents, CBP Officers, and CBP Air and Marine Agents).

7. CBP's FOIA Division is responsible for handling all FOIA requests received by the agency. Broadly, the FOIA Division reviews FOIA requests, determines whether responsive records exist and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the FOIA Division consults with CBP component agencies, CBP personnel and, when appropriate, with other components within the Department of Homeland Security (DHS) as well as other Executive Branch agencies.

8. Despite the large size of CBP as an organization, the FOIA Division currently consists of 31 full-time staff and FOIA processors, 6 FOIA assistants, and 4 supervisory employees.

9. A Government Information Specialist (GIS), also known as a FOIA processor, is tasked with reviewing information and providing advice and assistance to managers and employees concerning FOIA issues, policies, and procedures. He or she is also responsible for processing FOIA requests for CBP records, a process that involves reviewing the content of records to make a determination regarding the proper disclosure under FOIA. A GIS is responsible for reviewing and preparing draft responses to requests for releases of information and, in so doing, must apply relevant statutes, regulations, agency rules, and/or executive orders as they pertain to FOIA requests. Additionally, a GIS must ensure compliance with DHS regulations, Department of Justice policies, and other applicable laws.

10. A Branch Chief in the FOIA Division is responsible for managing policy formulation, advising agency management, and ensuring compliance with federal laws governing the release of information. Branch Chiefs oversee the release of CBP documents and information, assist with

1  FOIA litigation matters, and oversee the processing of FOIA responses and adherence to federal
2  laws and regulations.
3       11. Where the FOIA Division has no direct access to records that may be responsive to a re-
4  quest, it must determine which CBP component offices are likely to have responsive information
5  and work with those offices to gather any potentially responsive records.  Based on the FOIA
6  Division's familiarity, experience and knowledge with the types of records that each office main-
7  tains, an assessment is made as to where responsive records are likely to be maintained based on
8  a review of the content of the request itself and the nature of the records sought, as well as discus-
9  sions with knowledgeable agency personnel.  Accordingly, when CBP receives a FOIA request
10 that reasonably describes the records requested and complies with the agency's rules governing
11 the procedures for FOIA requests, the office likely to have responsive information is tasked with
12 searching for and retrieving potentially responsive records based on their knowledge of the records
13 maintained by the office and understanding of the information being requested.
14       12. The FOIA Division addresses a broad variety of FOIA requests.  Approximately 85% of
15 requests received are internally referred to as "traveler" requests, where a member of the traveling
16 public requests records related to his or her travel.  Examples of traveler requests include records
17 of a person's entry into and exit from the United States, I-94 records, and records of inspections
18 and interactions with CBP employees.  The FOIA Division generally has access to CBP's travel
19 database systems and is able to query the systems in order to quickly respond to simple FOIA
20 requests with no other office involvement.
21      13. The remaining 15% of requests are internally referred to as "non-traveler" requests and
22 encompass all other types of requests received.  Examples of non-traveler requests include requests
23 from businesses for import and export records, requests for Office of Professional Responsibility

DECLARATION OF PATRICK HOWARD          4
CASE NO. 19-CV-00290-EMC

(OPR) investigation files, and requests for the Procurement Division (Procurement) for contracts CBP has entered into. The FOIA Division rarely has direct access to records that are responsive to non-traveler requests.

14. Plaintiffs' FOIA request is a non-traveler request.

15. During fiscal year 2018 FOIA received 87,388 requests and processed 74,894 requests. During fiscal year 2019 FOIA received 86,133 requests and processed 88,230 requests.

**PLAINTIFFS' REQUEST AND CBP'S SEARCH FOR RESPONSIVE RECORDS**

16. On or about May 24, 2018, Plaintiffs submitted an electronic FOIA request for copies of records pertaining to the use of information collected from social media, attached as Exhibit B. In particular, Plaintiffs set out the following five categories of requested information:

1. All policies, guidance, procedures, directives, advisories, memoranda, and/or legal opinions pertaining to the agency's search, analysis, filtering, monitoring, or collection of content available on any social media network;

2. All records created since January 1, 2015 concerning the purchase of, acquisition of, subscription to, payment for, or agreement to use any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network, including but not limited to:

    a. Records concerning any product or service capable of using social media content in assessing applications for immigration benefits or admission to the United States;

    b. Records concerning any product or service capable of using social media content for immigration enforcement purposes;

    c. Records concerning any product or service capable of using social media content for border or transportation screening purposes;

    d. Records concerning any product or service capable of using social media content in the investigation of potential criminal conduct;

3. All communications to or from any private business and/or its employees since January 1, 2015, concerning any product or service that searches, analyzes, filters, monitors, or collects content available on any social media network;

4. All communications to or from employees or representatives of any social media network (e.g., Twitter, Facebook, YouTube, LinkedIn, WhatsApp) since January 1, 2015, concerning the search, analysis, filtering, monitoring, or collection of social media content; and

5. All records concerning the use or incorporation of social media content into systems or programs that make use of targeting algorithms, machine learning processes, and/or data analytics for the purpose of (a) assessing risk, (b) predicting illegal activity or criminality, and/or (c) identifying possible subjects of investigation or immigration enforcement actions.

17. On or about May 24, 2018, the request was entered into the FOIA online tracking system under CBP-2017-058775. An acknowledgement was sent to the requestor on May 25, 2018, attached as Exhibit C.

18. Following an initial review of the request, it was determined that the office most likely to maintain information responsive to the Request was the Office of Field Operations (OFO), because OFO was determined to have relevant knowledge regarding the subject matter of the request. OFO

is the largest component in CBP, and conducts vetting of international travelers seeking to enter the United States at ports of entry.

19. The FOIA unit submitted a request to OFO. The request was entered into the FOIA tasking and sent electronically to the assigned FOIA contact in OFO. The request was uploaded into the system and the tasking asked that OFO conduct a search of records/information that are responsive to the request.

20. In addition to consulting with relevant subject-matter experts and conducting a manual search for records, OFO searched the electronic record repository identified as likely to contain responsive records, using keyword searches and knowledge of the types of documents maintained in such locations. The documents OFO maintains related to this subject matter are generally stored in common locations on the CBP network to facilitate collaboration and to ensure persons and offices are using the most recent, up-to-date version of a document. In addition to general searches of these common locations using appropriate search terms associated with the request, responsive documents were also identified by reviewing documents provided in response to previous similar requests and the professional knowledge and experience of the CBP personnel responsible for the programs/offices most likely to create and/or maintain such documents. CBP personnel conducting the search were familiar with relevant government databases in which relevant data could be found, and searched these accordingly.

21. Following internal review of the searches conducted and documents identified, it was determined that, in addition to OFO, the Privacy and Diversity Office (PDO), U.S. Border Patrol (USBP), OPR, Office of Acquisition (OA), Office of Information Technology (OIT), Office of Intelligence (OI), Office of Trade (OT), and Office of Public Affairs (OPA), and Air and Marine Operations (AMO) might have records responsive to the FOIA request. The request was provided

to personnel within each office responsible for implementing searches for records in response to FOIA requests, based on their position, subject-matter expertise, and knowledge of their organization's structure and recordkeeping practices.

22. Each office conducted a search for records based on the types of records requested, a review of repositories where such records would reasonably expected to be located, and consultations with subject-matter experts. Each office tailored its searches based on the knowledge of relevant personnel about what records were likely to exist and how they were maintained. These included searches of folders and emails pertinent to the FOIA request at issue, such as those related to programs, systems, and efforts in which the operational use of social media is involved.

23. Between April 2019 and July 2019, all offices responded either by providing records identified in the course of their searches, or by confirming they had records responsive to the request.

24. On June 21, 2019, CBP provided an initial production of responsive records to Plaintiffs.

25. On July 12, 2019, CBP provided a second production of responsive records to Plaintiffs.

26. On August 12, 2019, CBP provided a third production of responsive records to Plaintiffs.

27. On September 13, 2019, CBP provided a fourth production of responsive records to Plaintiffs.

28. On October 15, 2019, CBP provided a fifth and final production of responsive records to Plaintiffs.

29. Following the final production of records to Plaintiffs and after further review within CBP, it was determined certain records should be reprocessed with fewer redactions. The reprocessed records were released to Plaintiffs on December 15, 2020.

30. Additional information regarding the information withheld and the FOIA exemptions applied to the records is contained in CBP's Vaughn Index, attached hereto as Exhibit A.

## CBP'S RESPONSE TO PLAINTIFFS' REQUEST

31. CBP located a total of 362 pages of responsive records. In response to Plaintiffs' request, CBP has released 358 pages in part and withheld one record, consisting of 4 pages, in its entirety.

## JUSTIFICATION FOR WITHHOLDING INFORMATION UNDER FOIA

32. It is my understanding that Plaintiffs have agreed not to challenge CBP's withholding of information under exemptions (b)(3)(A), (b)(6), and (b)(7)(C).

### Exemption (b)(4)

33. Section 552(b)(4) of Title 5 of the U.S. Code exempts from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." This exemption is intended to protect the interests of both the government and submitters of information.  It encourages submitters to voluntarily furnish useful commercial or financial information to the government and provides the government with an assurance that required submissions will be reliable.  The exemption also affords protection to those submitters who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantages that could result from disclosure.  Relevant here, Exemption (b)(4) protects commercial or financial information obtained from a person that is privileged or confidential.

34. As explained in greater detail in the attached Index, in this case, CBP applied Exemption (b)(4) to commercial contracts and orders entered into between CBP and the contractors, as well as to certain information in Privacy Threshold Analyses (PTAs), which I understand are forms submitted by CBP to the DHS Privacy Office to explain CBP pilots and programs and provide recommendations to the DHS Privacy Office on whether further compliance documentation is

necessary for the program. It is my understanding that Plaintiffs have agreed not to challenge (b)(4) exemptions asserted in commercial contracts and orders.

35. Pursuant to Exemption (b)(4), CBP withheld information that contained proprietary commercial or financial information shared by the contractors, including product specifications, descriptions of product capabilities, and how the products may be utilized. All of the records in question contained commercial or financial information that is both customarily and actually treated as private by its owner and provided to the government under circumstances suggesting that the information would be used for official purposes and kept private. The disclosure of this information would adversely affect the contractor's commercial advantages and would reveal information inherent to their commercial enterprise.

### Exemption (b)(5)

36. Section 552(b)(5) of Title 5 of the U.S. Code exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." Relevant here, Exemption 5 protects from disclosure information normally protected in the civil discovery context, including the deliberative process privilege and attorney-client privilege.

37. As explained in greater detail in the attached Index, in this case, Exemption (b)(5) has been applied with respect to internal inter-agency and intra-agency memoranda, correspondence, policy and guidance documents created fewer than 25 years prior to the record request in this case. Specifically, Exemption (b)(5) was applied to issue papers, privacy threshold analyses, social media operational use templates, and intra-agency email communications regarding proposed CBP

activity relating to social media. Within those records, information protected from disclosure by the deliberative process privilege and attorney-client privilege was withheld.

38. In this case, certain documents and portions of documents were withheld under exemption (b)(5) based upon the deliberative process privilege that is incorporated into exemption (b)(5). The general purpose of this privilege is to prevent injury to the quality of agency decisions. Specifically, three policy purposes have been consistently held to constitute the bases for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from the disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. Logically flowing from the foregoing policy considerations is the privilege's protection of the decision-making process of government agencies. In concept, the privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm. One of the most important factors CBP considers in applying Exemption 5 is the role that the document plays in the process of agency deliberations.

39. As explained in greater detail in the attached Index, in this case, CBP applied the (b)(5) Exemption to documents and information that were deliberative in nature and compiled in advance of a final agency decision. The information withheld under the (b)(5) Exemption includes documents prepared to inform agency decisions; documents that reflect analysis undertaken to support recommendations to agency leadership; documents reflecting proposed agency activities; communications among agency leadership and policy advisers containing recommendations, evaluation or comments regarding proposed agency actions; and documents reflecting agency deliberations

and consideration of policy recommendations. Release of the information withheld in this case would reveal agency deliberations and negatively impact the agency's decision-making process.

40. In addition, information from the relevant records was withheld based on attorney-client privilege. The attorney-client privilege protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice. It applies to facts divulged by a client to his attorney, and encompasses any opinions given by an attorney to his client based upon, and thus reflecting those facts, as well as communications between attorneys that reflect client-supplied information. The attorney-client privilege is not limited to the context of litigation.

41. In this case, CBP invoked Exemption (b)(5) based upon the attorney-client privilege in instances when records included legal advice prepared by attorneys of CBP's Office of Chief Counsel, as well as descriptions of communications with counsel undertaken for the purpose of seeking or obtaining legal advice. Such legal communications concerned guidance regarding the scope of CBP's operational use of social media and how it should be legally implemented.

### **Exemption (b)(7)(E)**

42. Section 552(b)(7) of Title 5 of the U.S. Code exempts from disclosure certain records or information that are "compiled for law enforcement purposes." The records at issue in this case were compiled for law enforcement purposes in that the information is created and used by CBP in its law enforcement mission to secure the border of the United States.

43. Section 552(b)(7)(E) of Title 5 of the U.S. Code exempts from disclosure law enforcement records or information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

44. The effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative techniques and methods that are not known to the general public. These law enforcement techniques and procedures are critical tools used by CBP officers to efficiently and effectively carry out CBP's mission to secure the border and to prevent threats, including terrorists, their weapons, and other dangerous items, from entering the United States, and to enforce customs, immigration, agriculture and other federal laws at the border. The disclosure of these techniques and methods would seriously compromise CBP's ability to perform its law enforcement mission at the border.

45. As explained in greater detail in the attached Index, in this case, Exemption (b)(7)(E) has been applied with respect to intra-agency memoranda, directives, standard operating procedures, issue papers, privacy threshold analyses, social media operational use templates, and contracts.

46. Within those records, Exemption (b)(7)(E) has been applied to information regarding law enforcement techniques, procedures, and guidelines, the disclosure of which would risk circumvention of the law, including:

   a. descriptions of the scope and investigatory focus of CBP's operational use of social media;

   b. descriptions of specific law enforcement techniques and types of analysis that CBP does or does not utilize when using publicly available social media information;

   c. descriptions of specific technical tools with unique capabilities utilized by CBP to review and analyze social media information for law enforcement purposes;

   d. names and descriptions of specialized law enforcement units, organizational subunits, and third party agencies, the disclosure of which would reveal the investigatory focus of the law enforcement techniques or procedures at issue;

e. information that would enable access to and/or manipulation of law enforcement processes, databases, and/or information, including email addresses, network addresses, URLs, and methods used internally by CBP personnel in the approval process for engaging in the operational use of social media;

f. information that would enable access to internal processes used by CBP to manage and secure information technology systems used in support of CBP's law enforcement functions;

g. information, such as the quantity, period of performance, and delivery date, that would reveal the degree to which certain law enforcement tools or techniques are available to CBP law enforcement personnel;

h. information regarding the factors considered and criteria utilized when determining whether to use social media information in conducting CBP's law enforcement and border security mission, including the vetting of international travelers or applicants for immigration benefits;

i. descriptions of vulnerabilities and limitations in CBP's operational use of social media;

j. detailed descriptions of how CBP intends to record, report, and store law enforcement information gathered;

k. descriptions of criteria for utilizing particular law enforcement techniques, which could reveal the degree to which such techniques are available;

l. descriptions of the law enforcement processes utilized and information consulted when vetting international travelers or applicants for immigration benefits;

    m. descriptions of how CBP intends to access and utilize commercial tools and the specific types of information accessed while using those tools in support of the CBP law enforcement and national security mission;

    n. descriptions of specific types of information CBP intends to access, and how it intends to utilize such information in conducting particular law enforcement functions;

    o. information that could reveal details about a specific law enforcement investigation, including information that could identify the subject of an investigation and the specific techniques used to uncover potentially illicit activity in an ongoing investigation;

    p. information relating to unique types of evidence obtained using the law enforcement techniques at issue; and

    q. information regarding the factors considered and criteria utilized when information is reported to the Joint Intake Center.

47. CBP withheld, pursuant to Exemption (b)(7)(E), information that would reveal the scope and investigatory focus of CBP's operational use of social media. This non-public information could be used to aid individuals who are a threat to national security and/or engaged in illicit activity by enabling them to take proactive steps to alter their behavior to further conceal criminal activity or predict the Agency's investigative strategy to obfuscate or avoid detection. Because this information can be used to clarify or predict CBP's behavior in specific circumstances, the risk of circumvention of enforcement efforts or harm to the United States is significant.

48. CBP withheld, pursuant to Exemption (b)(7)(E), information regarding specific law enforcement techniques CBP does or does not utilize when using publicly available social media information. This includes the specific types of investigations and investigatory techniques that

CBP undertakes in its social media operations (including details regarding law enforcement operations, programs, activities, and procedures). In addition to information that, in any particular instance, could reveal the nature of CBP's law enforcement interest or concern, CBP also withheld, pursuant to Exemption (b)(7)(E), information that would reveal law enforcement techniques, capabilities, and procedures when aggregated. For example, certain information, in the aggregate, reveals trends and/or specific law enforcement capabilities and techniques employed by particular personnel or in particular situations, which can reveal the likelihood of CBP utilizing certain social media investigative techniques in specific operational locations, in particular circumstances, or against particular subjects of law enforcement interests. The release of this information could reveal specific law enforcement capabilities and provide information regarding the relative likelihood of CBP utilizing particular techniques in certain circumstances or in specific operational locations, which could enable illicit actors to evade law enforcement. This could have the unintended and undesirable effect of placing these law enforcement techniques and strategies in the public domain, available to individuals whose information is at issue, and at the disposal of other similarly situated individuals; educating them as to the investigative techniques used by CBP and thereby assisting them to devise methods to evade detection and apprehension; and, ultimately, impairing the effectiveness of those law enforcement techniques.

49. In addition, the records withheld pursuant to Exemption (b)(7)(E) include information the disclosure of which would reveal internal CBP processes for coordinating investigative and enforcement efforts and would threaten the ability to effectively communicate among law enforcement personnel, both within CBP and with outside agencies. For example, certain elements within CBP are responsible for identifying and targeting certain types of crime, including drug trafficking,

smuggling, and terrorism. Because CBP often shares information among its operational components and with third party agencies, the disclosure of the information could impair CBP's and other agencies' law enforcement operations and their ability to effectively carry out their respective law enforcement and national security missions. The release of this information would impede the effectiveness of law enforcement activities, and endanger agency investigative practices and techniques within CBP and the third party agencies with which CBP collaborates. Disclosure of particular organizational units or third party agencies that utilize specific techniques or are involved in a given investigative effort would risk disclosing the investigative focus of CBP's law enforcement activities.

50. The records withheld pursuant to Exemption (b)(7)(E) further include information that would reveal law enforcement processes, databases, and information that can expose CBP law enforcement processes and computer systems to a risk of unauthorized access, navigation, or disruption and can reveal information about CBP's law enforcement capabilities and limitations. Knowledge of this information would increase the risk of circumvention of laws and regulations, compromise the electronic records system, facilitate improper access to sensitive investigatory and other law enforcement processes and records, impede effectiveness of law enforcement activities, and endanger agency investigative practices and techniques. The disclosure of the internal methods to utilize these systems would enable individuals to interfere with the law enforcement processes through targeted unauthorized requests to CBP's systems or repeated requests that would disrupt CBP's law enforcement activities. The disclosure of the types of systems and databases CBP utilizes in its social media operations would impede CBP's law enforcement mission by alerting individuals to CBP's specific systems and any potential limitations. The types of systems and

approval process to utilize these systems would also reveal additional information about the techniques that CBP utilizes in its social media operations and could be used with other publicly available information to glean information about the procedures and capabilities of CBP. Individuals who have this information regarding CBP law enforcement systems and technical capabilities would have sufficient law enforcement information regarding how CBP conducts its law enforcement operations, which would permit individuals to alter their patterns of conduct, adopt new methods of operation, relocate, change associations, and effectuate other countermeasures, and potentially corrupting the integrity of ongoing investigations. Protecting and maintaining the confidentiality and integrity of CBP's internal systems and processes is imperative in assisting CBP to meet its mission.

51. In addition, information regarding procedures utilized by particular locations or offices, techniques used under certain circumstances, and practical and procedural limits on the use of certain investigative techniques may lead illicit actors to target locations where they may face a decreased risk of detection (a practice known as "port shopping") or to focus their unlawful efforts where they perceive a lower likelihood of exposure.

52. In sum, release of the information withheld under (b)(7)(E) would risk circumvention of law. It could reveal the purpose and investigatory focus of law enforcement procedures and techniques utilized by CBP, including techniques utilized to identify violators and other persons of concern to law enforcement. Disclosure would also permit illicit actors to determine the scope of CBP's technical capabilities, gauge the relative likelihood that particular investigative techniques would be utilized, and infer the existence and nature of CBP's law enforcement interest in certain circumstances. Such information could then be used to develop countermeasures, avoid detection, and frustrate CBP's ability to detect illicit activity and enforce the law. Disclosing this information

could cause harm to CBP's law enforcement efforts, to national security, and to counter terrorism investigations. This would enable wrongdoers to exploit vulnerabilities by altering their patterns of conduct, adopting new methods of operation, and taking other countermeasures, thereby undermining CBP's law enforcement efforts to secure the United States borders.

**SEGREGABILITY**

53. Plaintiffs have been provided with all responsive records not withheld in full that were identified in CBP's search for records in response to Plaintiffs' FOIA request. Where appropriate, CBP asserted FOIA exemptions in the released records. All information withheld is exempt from disclosure pursuant to a FOIA exemption or is not reasonably segregable because it is so intertwined with protected material that segregation is not possible or its release would have revealed the underlying protected material. CBP personnel have reviewed the documents determined to be responsive, line-by-line, to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply, and all reasonably segregable portions of the relevant records have been released to Plaintiffs in this matter. In my determination, any further release of the exempted materials could reasonably lead to the identification of the individuals or other items that are properly protected by the exemptions asserted.

I declare under a penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 28th day of January 2021.

*Patrick Howard*
_____

Patrick A. Howard, Branch Chief
FOIA Division
Privacy and Diversity Office

Office of the Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security

DECLARATION OF PATRICK HOWARD      20
CASE NO. 19-CV-00290-EMC