HUGH HANDEYSIDE (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Fax: 212-549-2583
hhandeyside@aclu.org

MATTHEW CAGLE (CA Bar No. 286101)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
Fax: 415-255-1478
mcagle@aclunc.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF JUSTICE, *et al.*, <br><br> *Defendants*. | Case No. 19-CV-00290-EMC <br><br> **PLAINTIFFS' NOTICE OF CROSS-MOTION; MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO CBP, ICE, AND USCIS** <br><br> Hearing date:  May 20, 2021 <br> Time:  1:30 p.m., by videoconference <br> Judge:  Hon. Edward M. Chen |

**NOTICE OF CROSS-MOTION AND**

**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO DEFENDANTS AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE THAT

on May 20, 2021, at 1:30 p.m. Plaintiffs American Civil Liberties Union Foundation and

American Civil Liberties Union Foundation of Northern California will bring for hearing a

cross-motion for partial summary judgment with respect to Defendants CBP, ICE, and USCIS

pursuant to Federal Rule of Civil Procedure 56 in this Freedom of Information Act ("FOIA")

action on the grounds, *inter alia*, that Defendants are unlawfully withholding agency documents,

and that Defendants CBP and ICE have failed to conduct adequate searches for responsive

records. The hearing will take place before the Honorable Edward M. Chen, by videoconference.

This motion is based on this notice, the attached memorandum of points and authorities, the

accompanying Declaration of Hugh Handeyside and attached exhibits, all pleadings and papers

filed in this action, and such oral argument and evidence as may be presented at the hearing on

the motion.


DATED: March 25, 2021

Respectfully submitted,

By:  */s/ Hugh Handeyside*
Hugh Handeyside
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
hhandeyside@aclu.org

Matthew Cagle
American Civil Liberties Union Foundation of
Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
mcagle@aclunc.org

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

   I.  Social Media Surveillance Conducted by CBP, ICE, and USCIS ..................... 2

   II.  The ACLU's FOIA Request and Defendants' Responses ................................ 6

   III. Procedural Background and Withholdings at Issue ......................................... 6

LEGAL STANDARD ............................................................................................... 6

ARGUMENT ........................................................................................................... 7

   I.  Defendants Improperly Withheld Information Under FOIA Exemption 7(E).......... 7

      A.  CBP Wrongly Withheld Information in Policies, Issue Papers, Privacy Analyses, and Contract Documents. ....................................................................... 8

      B.  ICE Improperly Withheld Program Summaries and Presentation Material.............. 12

      C.  USCIS Improperly Withheld Policies, Program Reviews, and Privacy Compliance Documents. ......................................................................... 15

   II.  Defendants Wrongly Withheld Information Under Exemption 5. .................................. 19

      A.  Defendants Improperly Applied the Deliberate Process Privilege. ......................... 19

         1.  CBP Improperly Withheld Information in Issue Papers, Privacy Documents, and Use Templates. ........................................................... 20

         2.  ICE Improperly Withheld Contract-Related Information. ................................... 21

         3.  USCIS Improperly Withheld Policy, Privacy, and Procurement Information..... 24

      B.  USCIS Improperly Applied the Attorney-Client Privilege........................................ 26

   III. CBP Improperly Withheld Information Under Exemption 4............................................ 31

   IV. CBP's Vaughn Index Is Insufficient. ......................................................... 32

   V.  CBP and ICE Failed to Establish That They Conducted Adequate Searches for Responsive Records. ................................................................... 33

CONCLUSION ..................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*ACLU Found. of Ariz. v. Dep't of Homeland Sec.*,
  2017 WL 8895339 (D. Ariz. 2017) ............................................................ 14, 16, 33

*ACLU of Maine Found. v. Dep't of Homeland Sec.*,
  2019 WL 2028512 (D. Me. 2019) ...................................................................... 18

*ACLU of N. Cal. v. Fed. Bureau of Investigation*,
  146 F. Supp 3d 1161 (N.D. Cal 2015) ..........................................................passim

*ACLU of N. Cal. v. Dep't of Justice*,
  880 F.3d 473 (9th Cir. 2018) ....................................................................... 8, 18

*ACLU of N. Cal. v. Fed. Bureau of Investigation*,
  881 F.3d 776 (9th Cir. 2018) ............................................................................ 9

*ACLU of San Diego & Imperial Counties v. Dep't of Homeland Sec.*,
  2017 WL 9500949 (C.D. Cal. 2017) ................................................................. 18

*ACLU of Wash. v. Dep't of Justice*,
  2011 WL 1900140 (W.D. Wash. 2011) .............................................................. 16

*ACLU v. Dep't of Homeland Sec.*,
  243 F. Supp. 3d 393 (S.D.N.Y. 2017) ...........................................................passim

*ACLU v. Dep't of Justice*,
  2015 WL 3793496 (N.D. Cal. 2015) .................................................................... 8

*ACLU v. Fed. Bureau of Investigation*,
  2013 WL 3346845 (N.D. Cal. 2013) ............................................................. 10, 16

*ACLU v. Immig. & Customs Enf't*,
  448 F. Supp. 3d 27 (D. Mass 2020) .................................................................. 21

*Allard K. Lowenstein Int'l Human Rts. Project v. Dep't of Homeland Sec.*,
  626 F.3d 678 (2d Cir. 2010) ......................................................................... 7, 11

*Am. Immig. Council v. Immig. & Customs Enf't*,
  464 F. Supp. 3d 228 (D.D.C. 2020) ................................................................. 17

*Am. Small Bus. League v. Dep't of Def.*,
  411 F. Supp. 3d 824 (N.D. Cal. 2019) .......................................................... 31, 32

*Assembly of State of Cal. v. Dep't of Commerce*,
  968 F.2d 916 (9th Cir. 1992) ................................................................ 19, 22, 29

ii

*Besson v. Dep't of Commerce,*
   2019 WL 8267696 (D.D.C. 2019) ............................................................... 32

*Bowen v. Food & Drug Admin.,*
   925 F.2d 1225 (9th Cir. 1991) ....................................................................... 8

*Brennan Ctr. for Justice v. Dep't of Justice,*
   697 F.3d at 184 (2d Cir. 2012) .................................................................... 29

*Brinton v. Dep't of State,*
   636 F.2d 600 (D.C. Cir. 1980) ........................................................ 20, 24, 25

*Cal. Native Plant Soc'y v. Envtl. Prot. Agency,*
   251 F.R.D. 408 (N.D. Cal 2008) ........................................................... 19, 22

*Citizens Comm'n on Human Rts. v. Food & Drug Admin.,*
   45 F.3d 1325 (1995) ..................................................................................... 32

*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d (D.C. Cir. 1980) ............................................................. 19, 28, 29

*Ctr. for Biological Diversity v. Off. of Mgmt. & Budget,*
   625 F. Supp. 2d 885 (N.D. Cal. 2009) ......................................................... 27

*Ctr. for Inv. Reporting v. Dep't of Labor,*
   470 F. Supp. 3d 1096 (N.D. Cal. 2020) ....................................................... 32

*Dep't of Air Force v. Rose,*
   425 U.S. 352 (1976) ....................................................................................... 7

*Habeas Corpus Res. Ctr. v. Dep't of Justice,*
   2008 WL 5000224 (N.D. Cal. 2008) ................................................ 20, 22, 26

*Dep't of State v. Ray,*
   502 U.S. 164 (1991) ................................................................................... 6, 7

*Ecological Rts. Found. v. Fed. Emergency Mgmt. Agency,*
   2017 WL 24859 (N.D. Cal. Jan. 3, 2017) ........................................ 20, 23, 26

*Ecological Rts. Found. v. Fed. Emergency Mgmt. Agency,*
   2017 WL 5972702 (N.D. Cal. Nov. 30, 2017)

*Elec. Frontier Found. v. Cent. Intelligence Agency,*
   2013 WL 5443048 (N.D. Cal. 2013) ...................................................... 10, 14

*Elec. Frontier Found. v. Dep't of Justice,*
   2016 WL 7406429 (N.D. Cal. 2016) .................................................. 10, 14, 17

*Elec. Privacy Info. Ctr. v. Drug Enf't Admin.,*
   2016 WL 3557007 (D.D.C. 2016) ............................................................... 17

iii

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
    584 F. Supp. 2d 65, (D.D.C. 2008) ....................................................................... 27

*Envtl. Prot. Agency v. Mink*,
    410 U.S. 73 (1973) ............................................................................................... 7

*Equal Emp't Opp. Comm'n v. Swissport Fueling, Inc.*,
    2012 WL 1648416 (D. Ariz. 2012) ...................................................................... 24

*Families for Freedom v. Customs & Border Prot.*,
    797 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................................. 17

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ........................................................................................ 31

*Hamdan v. Dep't of Justice*,
    797 F.3d 759 (9th Cir. 2015) ....................................................................... passim

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................................ 22

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ............................................................................................. 7

*King v. Dep't of Justice*,
    830 F.2d 210 (D.C. Cir. 1987) ............................................................................ 32

*Knight First Amendment Inst. v. Dep't of Homeland Sec.*,
    407 F. Supp. 3d 311 (S.D.N.Y. 2019) ........................................................... 16, 18

*Knight First Amendment Inst. v. Dep't of Homeland Sec.*,
    407 F. Supp. 3d 334 (S.D.N.Y. 2019) ........................................... 12, 16, 21, 23

*Krikorian v. Dep't of State*,
    984 F.2d 461 (D.C. Cir. 1993) ............................................................................ 26

*Maricopa Audubon Soc'y v. U.S. Forest Service*,
    108 F.3d 1089 (9th Cir. 1997) ....................................................................... 19, 21

*Mead Data Cent., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ............................................................................ 23

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) ............................................................................................. 7

*Morley v. Cent. Intelligence Agency*,
    508 F.3d 1108 (D.C. Cir. 2007) .......................................................................... 26

*Muchnick v. Dep't of Homeland Sec.*,
    225 F. Supp. 3d 1069 (N.D. Cal. 2016) ............................................................... 6

*Nat'l Imm. Project of the Nat'l Lawyers Guild v. Dep't of Homeland Sec.*,
    842 F. Supp. 2d 720 (S.D.N.Y. 2012) ............................................................ 28

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................................ passim

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
    861 F.2d 1114 (9th Cir. 1988) ..................................................................... 19

*North Pacifica LLC v. City of Pacifica*,
    274 F. Supp. 2d 1118 (N.D. Cal. 2003)...................................................... 28, 31

*Oglesby v. Dep't of the Army*,
    920 F.2d 57 (D.C. Cir. 1990) ...................................................................... 34

*Pub. Citizen, Inc. v. Office of Mgmt. & Budget*,
    598 F.3d 865 (D.C. Cir. 2010) ................................................................. 23, 25

*Rosenfeld v. Dep't of Justice*,
    57 F.3d 803 (9th Cir. 1995) ........................................................................ 7, 8

*Roth v. Dep't of Justice*,
    642 F.3d 1161 (D.C. Cir. 2011) ...................................................................... 9

*Schlefer v. United States*,
    702 F.2d 233, (D.C. Cir. 1983) .................................................................... 29

*Schwartz v. Drug Enf't Admin.*,
    2016 WL 154089 (E.D.N.Y. 2016) ............................................................ 9, 16

*Senate of P.R. ex rel. Jud. Comm v. Dep't of Justice*,
    823 F.2d 574 (D.C. Cir. 1987) ..................................................................... 19

*Tax Analysts v. Internal Revenue Serv.*,
    117 F.3d 607 (D.C. Cir. 1997) ..................................................................... 29

*Tax Analysts v. Internal Revenue Serv.*,
    294 F.3d 71 (D.C. Cir. 2002) ...................................................................... 25

*Tigue v. Dep't of Justice*,
    312 F.3d 70 (2d Cir. 2002) ......................................................................... 20

*United States v. Martin*,
    278 F.3d 988 (9th Cir. 2002).................................................................. 26, 28

*Weil v. Inv./Indicators, Research & Mgmt., Inc.*,
    647 F.2d 18 (9th Cir. 1981) ......................................................................... 27

*Wiener v. Fed. Bureau of Investigation*,
    943 F.2d 972 (9th Cir. 1991) .................................................................. 32, 33

*Zemansky v. Envtl. Prot. Agency,*
   767 F.2d 569 (9th Cir. 1985) ..................................................................... 33, 34

**Statutes**

5 U.S.C. § 552(a)(4)(B) .................................................................................... 7

5 U.S.C. § 552(a)(8)(A)(ii)(II) ................................................................... 13, 23

5 U.S.C. § 552(b)(4) ....................................................................................... 31

5 U.S.C. § 552(b)(5) ....................................................................................... 19

5 U.S.C. § 552(b)(7)(E) .................................................................................... 7


**Regulations**

Privacy Act of 1974; System of Records,
   82 Fed. Reg. 43,557 (Sept. 18, 2017) ............................................................. 5

# INTRODUCTION

This Freedom of Information Act (FOIA) lawsuit concerns the extent to which the federal government can conceal its monitoring of the American public's online speech. Numerous federal agencies have invested heavily in surveillance of social media, contracting with vendors for powerful technologies that search, scrape, aggregate, and filter social media content for a variety of purposes—visa processing, immigration benefits and enforcement, and border screening in particular. Defendants U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS) have expanded their use of social media surveillance through various programs and initiatives that include subjecting entire populations of visa holders to continuous monitoring of their social media activity for the duration of their time in the United States. This pervasive surveillance of online speech adversely impacts immigrants, refugees, asylum seekers, and visitors by prompting undue law enforcement scrutiny, baseless denial or revocation of visas or immigration benefits, or placement on watchlists. It also inevitably extends to the speech and associations of citizens and lawful permanent residents of the United States.

Because the public has a vital interest in understanding the nature, extent, and effects of surveillance of social media, Plaintiffs American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of Northern California (together, the ACLU) submitted requests for records under FOIA to seven federal agencies. Plaintiffs filed this lawsuit after agencies failed to respond as FOIA requires.

Since then, Defendants CBP, ICE, and USCIS have produced numerous records that illuminate aspects of their use of social media surveillance. However, they have withheld significant information on agency policies that govern such surveillance, whether it is effective or necessary, which populations it targets, and its impact on individual privacy and free expression. This information is not exempt from disclosure under FOIA, and its value to the public is self-evident: Citizens and noncitizens alike have immense interests in understanding Defendants' justifications for conducting and expanding surveillance of social media, and whether safeguards exist to protect privacy, civil liberties, and civil rights.

Defendants have failed to justify withholdings under Exemptions 4, 5, and 7(E), and CBP and ICE have failed to establish the adequacy of their searches for responsive records. The Court should deny Defendants' motion for summary judgment and grant Plaintiffs' cross-motion.

## FACTUAL BACKGROUND

### I.    Social Media Surveillance Conducted by CBP, ICE, and USCIS

The Department of Homeland Security (DHS)—of which CBP, ICE, and USCIS are components—promotes itself as "at the forefront among Federal agencies in developing the capability to incorporate social media data in its screening and vetting processes."[1] In 2015, DHS convened a "Social Media Vetting Task Force" to examine the "current and future use of social media in the DHS vetting process for operational and intelligence purposes."[2] The DHS Secretary stated in a 2016 memorandum that DHS components were using social media "for over 30 different operational or investigative purposes."[3] As of April 2018, DHS was "developing, testing, and operationalizing the use of social media in various pilots and programs" and in "use-cases" including "[a]ssessment of eligibility . . . for immigration benefits"; "[a]dmissibility determinations, *i.e.* to identify or confirm an applicant's identity, occupation, previous travel and/or other relevant information"; and "[c]riminal and administrative immigration law enforcement activities."[4] DHS also developed "tools and processes" towards its "long term objective of deploying a semi-automated, bulk screening capability for social media."[5]

CBP, ICE, and USCIS have been at the center of DHS's efforts to ramp up social media surveillance and screening. As of 2016, CBP stated that "Social Media has become a critical element for vetting travelers" and that social media was already being "used in a multitude of ways during the vetting process," including "to assist in the vetting of travelers before they arrive

---

[1] Department of Homeland Security Social Media Talking Points and Issue Paper 3, Apr. 2018, attached as Ex. C to the Second Declaration of Hugh Handeyside ("Handeyside Decl.") at 1155. All exhibits are to the Handeyside Declaration unless otherwise indicated.
[2] Email from David J. Palmer, DHS Associate General Counsel, to multiple recipients, Dec. 17, 2015, ECF No. 34–8.
[3] Memorandum from Secretary Johnson to Component Heads Regarding Social Media, Feb. 11, 2016, Ex. C at 1954.
[4] DHS Talking Points, *supra* note 1, Ex. C at 1155, 1153.
[5] *Id.*, Ex. C at 1155.

in the United States" and to evaluate "other factors related to an individual who seeks to immigrate, visit the United States, or otherwise obtain a benefit subject to CBP's vetting."[6] In September 2016, despite opposition from privacy and civil rights groups, CBP began asking citizens and nationals of countries participating in the Visa Waiver Program to provide social media identifiers before traveling to the United States.[7] CBP has made clear that any such information "may be used for national security and law enforcement purposes," and that if an applicant chooses not to provide social media information as part of an application, CBP "may employ tools and search techniques in an attempt to locate and identify public social media accounts and profiles belonging to the applicant, for use in the screening and vetting process."[8] Separately, CBP uses "publicly available search engines and content aggregators" to "monitor[] content on social media sites for information that informs Agency situational awareness."[9]

CBP's policy is to continue expanding its use of social media for operational purposes. In late 2016, CBP's Office of Field Operations wrote that "[d]espite incorporating social media into many aspects of its operational mission, CBP aims to further enable and empower its officers, agents, and analysts to further integrate social media throughout their operational functions," despite "challenges in screening nongovernment maintained databases, including the dynamic nature and magnitude of social media information."[10]

ICE surveils social media extensively. In September 2014, ICE established an "Open Source Team" that it describes as "the first Program within ICE to leverage open source/social media exploitation to . . . utilize government and law enforcement databases in the investigation of national security and public safety concerns that exploit vulnerabilities in the U.S.

---

[6] CBP Use of Social Media Paper, May 25, 2016, Ex. A at CBP 5; CBP Use of Social Media Paper, Sept. 26, 2016, Ex. A at CBP 9; DHS Social Media Talking Points and Issue Paper 3, Mar./Apr. 2018, Ex. C at 1130.

[7] DHS, Privacy Compliance Review of the U.S. Customs and Border Protection Electronic System for Travel Authorization 1, 2017, ECF No. 34–10; CBP Information Issue Paper, Oct. 6, 2016, Ex. A at CBP 1.

[8] DHS Privacy Compliance Review, *supra* note 7.

[9] DHS, Privacy Impact Assessment for the Publicly Available Social Media Monitoring and Situational Awareness Initiative 1, Mar. 25, 2019, ECF No. 34–11.

[10] CBP Issue Paper, *supra* note 7 at CBP 1; Social Media Briefing Paper, Ex. A at CBP 13.

immigration system."[11] Under a separate social media pilot program formalized as the Visa Lifecycle Vetting Initiative (VLVI), ICE "continuously monitor[s] . . . non-immigrant visa holders through the use of an automated social media vetting platform . . . throughout the lifecycle of the visa's validity"—meaning "from the time they file their visa application to the time they depart from the United States."[12] If, during this surveillance, ICE "uncovers derogatory information about a visa applicant," it coordinates with CBP and the State Department for follow-up action.[13] If the applicant has already entered the United States, ICE analysts request an investigation that is "coordinated through the Joint Terrorism Task Force ('JTTF')."[14] According to ICE, the VLVI contract for social media surveillance results in "recommended visa refusals, watchlist nominations, [and] criminal and administrative arrests."[15] The documents are silent on efforts to ensure these actions are not arbitrary, discriminatory, or groundless.

ICE documents also show the extent of its reliance on contracts with private entities for technology to assist in analyzing massive volumes of social media content. It licenses Giant Oak's "GOST" tool, which enables ICE personnel "to access and utilize mission critical open source search and triage capabilities when screening visa applicants, to include continuous monitoring through custom alert services."[16] ICE also uses Giant Oak's "Social Locator" tool, which combines social media information on potentially hundreds of thousands of individuals with "publicly available information" from "credit bureau, utilities, real estate, and criminal databases," along with "proprietary and purchased data."[17] According to ICE, these tools enable it "to leverage data sources in powerful ways to search for persons of interest."[18]

USCIS collects and evaluates social media for various immigration screening-related

---

[11] DHS, Homeland Security Investigations (HSI), Shared Services for Vetting Board Recommendation 2, ECF No. 34–12.
[12] HSI, "Extreme Vetting-Visa Security Program-PATRIOT," Ex. B at 1349; HSI, "The Visa Life Cycle," Ex. B at 1240.
[13] HSI, "Extreme Vetting," *supra* note 12 at 1347–49.
[14] *Id.*
[15] HSI, "FY2018 TEOF Request, HSI National Security Investigations Division, Visa Lifecycle Vetting Initiative Contract - Funding Shortfall," Ex. B at 1713.
[16] HSI, "Giant Oak Contract – 5W's," June 6, 2018, Ex. B at 772.
[17] HSI PowerPoint Presentation, Ex. B at 246.
[18] HSI, "5W's," *supra* note 16 at 772.

purposes. In 2014, its Fraud Detection and National Security (FDNS) Directorate established a Social Media Division that conducts "enhanced FDNS review" for certain asylum and refugee applicants.[19] USCIS also established at least five separate pilot programs for expanded social media screening of immigration applicants.[20] During the course of immigration benefits determinations, FDNS searches and can collect information on applicants from social media platforms that ranges from "[s]tated relationships" and "[b]iographical data" to travel and location information.[21] Content collected through these initiatives—including "social media handles, aliases, associated identifiable information, and search results"—can be retained in the Alien Files system, which USCIS maintains and CBP and ICE can access.[22] Again, these documents seem to lack any consideration of the harms that can flow from the long-term retention of information that can easily be misinterpreted, mistranslated, or misattributed.

USCIS's own reviews of its operational use of social media identified significant limitations, including "labor intensive and time consuming" manual review of content identified through automated tools, difficulty confirming that social media accounts are associated with specific applicants, and inadequate translation and language support.[23] The reviews also suggest that as of March 2017, despite extensive operational use of social media, USCIS lacked "[p]olicy and guidelines on the use of social media in adjudications" and on "what constitutes a national security indicator in the context of social media," raising pressing questions about whether USCIS lacks safeguards against arbitrary or discriminatory use social media.[24]

---

[19] *Refugee Admissions FY 2018: Hearing Before the Subcomm. on Immigr. and Border Sec. H. Comm. on the Judiciary*, 115th Cong. (2017) (written testimony of L. Francis Cissna, Director, USCIS), https://t.ly/xyAn9.

[20] DHS Off. of Inspector Gen., DHS Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success, Feb. 27, 2017, ECF No. 34–9 at 3, 6–9. The DHS Inspector General concluded that the pilot programs lacked "measurement criteria" and were "of limited use in planning and implementing an effective, department-wide future social media screening program." *Id.* at 3, 6.

[21] DHS, USCIS/FDNS Operational Use of Social Media, Jan. 25, 2017, Ex. C at 210–11.

[22] DHS, Privacy Act of 1974; System of Records, 82 Fed. Reg. 43,557 (Sept. 18, 2017).

[23] "USCIS Social Media & Vetting: Overview & Efforts to Date" 3-4, Mar. 2, 2017, Ex. C at 333-34.

[24] *Id.*, Ex. C at 333.

## II.      The ACLU's FOIA Request and Defendants' Responses

Plaintiffs submitted identical FOIA requests to CBP, ICE, and USCIS on May 24, 2018. *See* White Decl., Ex. A, ECF No. 98–6. The request sought the release of five categories of records, including social media surveillance-related policies and guidance, records concerning the acquisition of social media surveillance-related technologies, and records related to the use of social media content in algorithmic decision making and machine-learning processes. *Id.* After Defendants failed to produce responsive records, Plaintiffs exhausted their administrative remedies and filed this lawsuit on January 17, 2019. *See* Compl., ECF No. 1.

CBP ultimately produced 358 pages of records in five tranches between June and October of 2019, and it withheld four pages entirely. Defs.' Mot., ECF No. 98 at 3. ICE produced records between May and August of 2019, with a supplemental production in February 2020, for a total of 2,169 pages. *Id.* USCIS produced 2,645 pages of records in July and August 2019, and April 2020. *Id.* It produced reprocessed versions of these records in October 2020. *Id.*

## III.   Procedural Background and Withholdings at Issue

Following the completion of productions by CBP, ICE, and USCIS, the Court ordered the parties to meet and confer to establish a proposed timeline for partial summary judgment briefing as to those Defendants. ECF No. 52. As a result of that conferral process, and after CBP and ICE produced draft Vaughn indices, Plaintiffs agreed not to challenge certain redactions in each of the three Defendants' productions. Plaintiffs have now further narrowed the redactions and withholdings subject to challenge for the purpose of this cross-motion.[25] A full list of challenged withholdings, with exemptions at issue, is attached below as an Appendix.

## LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Muchnick v. Dep't of Homeland Sec.*, 225 F. Supp. 3d 1069, 1072 (N.D. Cal. 2016) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic

---

[25] In declining to further challenge certain redactions and withholdings, Plaintiffs do not imply that all of those redactions and withholdings were appropriate under FOIA.

society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). The Supreme Court has observed that "[w]ithout question, [FOIA] is broadly conceived" and is animated by a "philosophy of full agency disclosure." *Id.* at 151 (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973) and *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)). It therefore sets a "strong presumption in favor of disclosure." *Ray*, 502 U.S. at 173.

Consistent with that presumption, FOIA exemptions are "explicitly made exclusive and must be narrowly construed," and doubts are resolved in favor of disclosure. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (cleaned up). The government always bears the burden to show that records are subject to an exemption and can be withheld. 5 U.S.C. § 552(a)(4)(B); *Rosenfeld v. Dep't of Justice*, 57 F.3d 803, 1443 (9th Cir. 1995). Government declarations in support of withholdings "must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of bad faith." *Hamdan v. Dep't of Justice*, 797 F.3d 759, 769 (9th Cir. 2015).

## ARGUMENT

### I.    Defendants Improperly Withheld Information Under FOIA Exemption 7(E).

Exemption 7(E) encompasses "records or information compiled for law enforcement purposes," but only where disclosure "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "Techniques and procedures" are "technical method[s]" for "how law enforcement officials go about investigating a crime," whereas guidelines are "indication[s] or outline[s] of future policy or conduct" and refer "to resource allocation." *Allard K. Lowenstein Int'l Human Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010). The Ninth Circuit has held that the "circumvention of the law" qualifier modifies "guidelines" and not "techniques and procedures." *Hamdan*, 797 F.3d at 778.

Exemption 7(E) only exempts investigative techniques not generally known to the public

and "which are so unique as to warrant the exemption." ECF No. 39 at 6 (citations omitted); *ACLU of N. Cal. v. Dep't of Justice*, 880 F.3d 473, 491 (9th Cir. 2018) ("*ACLU*"). A technique or procedure must be truly "specialized" and "calculated" to qualify as exempt. *See ACLU v. Dep't of Homeland Sec.*, 243 F. Supp. 3d 393, 404 (S.D.N.Y. 2017) ("*ACLU v. DHS*"). The Ninth Circuit has found a "detailed, technical analysis" of investigatory techniques exempt but not "basic technical information" about a known technique or procedure. *ACLU*, 880 F.3d at 492 (quoting *Bowen v. Food & Drug Admin.*, 925 F.2d 1225, 1228 (9th Cir. 1991)). Similarly, "Exemption 7(E) cannot be used to withhold information about a technique that is generally known to the public when what is at issue is a specific application of that technique to a specific context," whereas the exemption "protects specific means by which an agency uses a technique where the general technique is known, but the specific means of employing that technique are not." ECF No. 39 at 16–17 (citing *Hamdan*, 797 F.3d at 777–78, and *Rosenfeld*, 57 F.3d at 815).

Conclusory assertions that withheld information would reveal "specifics about how and when the technique at issue is used" are inadequate "if the technique itself is otherwise generally known to the public." *ACLU v. Dep't of Justice*, 2015 WL 3793496, at *12 (N.D. Cal. 2015).

### A.    CBP Wrongly Withheld Information in Policies, Issue Papers, Privacy Analyses, and Contract Documents.

Policy on Operational Use of Social Media. CBP withheld content from a set of rules governing how officers use social media to monitor the online speech of internet users, both covertly and overtly. *See* Ex. A at CBP 125–36 (purpose of policy is to "assign responsibilities and establish general rules of behavior for the operational uses of social media."). CBP redacted information under the headings "Masked Monitoring" and "Undercover Engagement of Social Media," both of which are defined in unredacted passages. *Id.* at CBP 126, 128, 134–36.

CBP has failed to justify withholding this information. The withheld content appears to contain high-level policy rules for the government's covert use of social media accounts through masked monitoring and undercover engagement, including requirements for obtaining use approvals and re-approval periods—not the kind of specialized, non-public techniques or procedures that courts have found exempt. *See ACLU v. DHS*, 243 F. Supp. 3d at 403–04. FOIA,

moreover, is hostile to efforts to withhold information constituting the rules under which agencies operate. It "represents a strong congressional aversion to secret (agency) law, and . . . an affirmative congressional purpose to require disclosure of documents which have the force and effect of law." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (cleaned up). To the extent the redactions set forth limitations on CBP's operational use of social media, such limitations are neither techniques nor procedures. *See* ECF No. 39 at 19 (incapacity not clearly cognizable under Exemption 7(E)); *Schwartz v. Drug Enf't Admin.*, 2016 WL 154089 at *15 (E.D.N.Y. 2016) (limitations do not appear to fall within exemption).

CBP's Vaughn index does nothing to place these redactions within the exemption. It identifies two boilerplate categories of withholdings, neither of which is sufficient to support the redactions, from CBP's master list of such categories.[26] ECF Nos. 98–4 at 27–28, 98–3 at 13–15.

Issue papers and summaries. CBP redacted content in seven programmatic summaries of CBP's collection and screening of travelers' social media. Ex. A at CBP 1–22. The withheld content includes factual descriptions of policies, summaries of "Current Social Media Use" and pilot initiatives, broad policy outlines and rationales for screening social media, and even the CBP office responsible for two of the summaries (*see id.* at 5, 8).

This content falls outside Exemption 7(E). First, CBP has failed to meet its threshold burden to demonstrate that the redacted records were compiled for law enforcement purposes. *See ACLU of N. Cal. v. Fed. Bureau of Investigation*, 881 F.3d 776, 780 (9th Cir. 2018). To meet that requirement, CBP must "establish a rational nexus between the withheld [content] and its authorized law enforcement activities." *See id.* at 781. Although CBP is a law enforcement agency, not all CBP records are compiled for law enforcement purposes. *See id.* (FBI records may or may not meet threshold requirement); *Roth v. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("FBI records are not law enforcement records under FOIA simply by virtue of the function that the FBI serves."). Here, rather than being compiled for law enforcement purposes, the issue papers include basic background information and talking points ("Watch Out For/If Asked") and appear oriented toward justifying CBP's social media collection programs to

---

[26] Plaintiffs challenge the sufficiency of CBP's entire Vaughn index. *See infra* Section IV.

external audiences or high-level policy officials. *See* Ex. A at CBP 3, 13–15, 17, 19, 21. CBP's conclusory statements that the papers were compiled for law enforcement purposes fail to supply the required rational nexus. *See* ECF No. 98–4 at 1–11.

Even if the issue papers met the threshold requirement, CBP still has not shown that they are exempt. As with the policies described above, such high-level summaries do not include the kind of specialized, calculated, or detailed technical information that plausibly constitutes exempt techniques or procedures. The content, moreover, relates to CBP's use of social media to screen travelers, including those from Visa Waiver Program countries through the Electronic System for Travel Authorization (ESTA)—all of which is widely known. At most, some of the content describes the application of a known technique—collection and review of social media—to specific contexts. *See, e.g.*, Ex. A at CBP 6 ("examples" of use), 8 (which ESTA applicants subjected to review), 10 ("general" scenarios for use). *See also Hamdan*, 797 F.3d. at 777–78 (noting that surveillance of a particular place would not qualify for exemption under 7(E)).

Finally, by definition, a CBP office or unit is not a technique or procedure, and this Court has repeatedly rejected similar attempts to withhold the identity of agency units under Exemption 7(E). *See, e.g.*, *Elec. Frontier Found. v. Dep't. of Justice*, 2016 WL 7406429, at *18 (N.D. Cal. 2016) ("*EFF v. DOJ*"); *ACLU v. Fed. Bureau of Investigation*, 2013 WL 3346845, at *9 (N.D. Cal. 2013) ("*ACLU v. FBI*"); *Elec. Frontier Found. v. Cent. Intelligence Agency*, 2013 WL 5443048, at *23 (N.D. Cal. 2013) ("*EFF v. CIA*").

Privacy Threshold Analyses. CBP redacted information in six Privacy Threshold Analyses (PTAs) for various social media surveillance programs and pilots. *See* Ex. A at CBP 23–39, 48–57, 149–60, 296–306, 337–48, 349–58. CBP has failed to meet its burden for these withholdings. According to DHS, PTAs are "[t]he first step in the process for DHS seeking to implement or update a system or program."[27] PTAs are often precursors to publicly available privacy impact assessments (PIAs), which contain the kinds of summary program descriptions, assessments of privacy risks, and "mitigation strategies" that CBP withheld in the PTAs. Indeed,

---

[27] https://www.dhs.gov/compliance.

multiple PIAs correspond to the programs and pilots described in the PTAs.[28] Because equivalent information is already public, CBP cannot justify the withholdings in the PTAs.

Even if public analogs to the PTAs did not exist, the information CBP withheld from the PTAs reflects the application of well-known techniques to the specific contexts described in the PTAs, such as collection of social media information through visa application systems that CBP administers, or the use of social media to assess potential threats to personnel and facilities. As such, they fall outside the exemption. *See Hamdan*, 797 F.3d at 777–78. Nor does the withheld information appear to include the kind of technical, unique, or specialized methods that may warrant withholding as techniques or procedures. *See* ECF No. 39 at 6; *Lowenstein*, 626 F.3d at 682; *ACLU v. DHS*, 243 F. Supp. 3d at 403–04. Finally, data retention periods (*see* Ex. A at CBP 33), names of contractors (*id.* at CBP 50–51, 298–99), and project names and offices (*id.* at CBP 49, 62, 150, 296, 338, 350) do not constitute techniques or procedures. Neither CBP's Vaughn index nor the Howard Declaration demonstrates otherwise, nor has CBP made any showing that disclosing the withheld content could risk circumvention of the law.

Social Media Operational Use Templates. CBP withheld information in three "SMOUTs" related to "Border Encounter Research," "Operational Awareness," and "Border Patrol Intelligence." *See* Ex. A at CBP 161–69, 170–77, 178–91. Here again, CBP has wrongly withheld basic descriptive information about known applications of social media collection in specific contexts such as "situational awareness." *See id.* at CBP 164–65, 172, 182–84; *see supra* n.6–9. Like the issue papers and PTAs, such information falls outside Exemption 7(E).

CBP also withheld from the SMOUTs information reflecting policy limits for the specific operational uses at issue, including rules for how CBP officers use online screen names and identities, the extent of interaction with the public, and whether they observe privacy settings. *See id.* at CBP 166, 173–74, 185. As set forth above regarding CBP's policy on the operational

---

[28] *Compare* Ex. A at CBP 23–39 (PTA for Electronic Visa Update System) *with* Privacy Impact Assessment for the Electronic Visa Update System, DHS/CBP/PIA–033 (Aug. 25, 2016), https://bit.ly/3vLM40u; CBP 48–57, 149–60 (PTAs for border security–related pilot and program) *with* Situational Awareness Initiative PIA, *supra* note 9; *and* CBP 296–306, 337–48, 349–58 (ESTA-related PTAs) *with* Privacy Impact Assessment for the Electronic System for Travel Authorization, DHS/CBP/PIA-007(g) (Sept. 1, 2016), https://bit.ly/3eZIGcK.

11

use of social media, these policy limits do not constitute exempt techniques or procedures, and their redaction is at odds with FOIA. *See Sears, 42*1 U.S. at 153. CBP's Vaughn entries for these withholdings repeat generalized, boilerplate language and fall far short of meeting CBP's burden.

Contract documents. Finally, CBP withheld what appear to be basic product names, requisitioning offices, delivery dates, and periods of performance from contract-related documents. Ex. A at CBP 197–249. This information is non-exempt. The government publishes spending information online, including information that appears to identify the contractors, services, and data CBP redacted here.[29] Even so, such skeletal information does not constitute a non-public technique or procedure. As with its other withholdings, CBP's Vaughn index offers no valid, non-conclusory justification for these redactions that would satisfy its burden.

**B.      ICE Improperly Withheld Program Summaries and Presentation Material.**

 Program summaries. ICE withheld content from multiple memoranda or briefing papers summarizing social media collection and surveillance programs. *See* Ex. B at 1347–49, 1680–81, 1812–13, 1818–26. ICE has not met its burden of demonstrating that this content is exempt.

First, a memorandum titled "Extreme Vetting-Visa Security Program-PATRIOT," *see id.* at 1347–49, appears to correspond to a document the U.S. District Court for the Southern District of New York already concluded was not exempt under Exemption 7 and ordered released. *Knight First Amendment Inst. v. Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 351–52 (S.D.N.Y. 2019).[30] Notably, although ICE in its Vaughn index states that the redacted material includes "challenges particular law enforcement programs have in implementation," ECF No. 98–2 at 29, the unredacted document shows that the content actually pertains to administrative and budget issues, not law enforcement techniques or procedures. In any event, because the content appears to be available publicly, it cannot be withheld here.

Similarly, ICE withheld an entire document on the VLVI, despite the availability elsewhere of information describing that initiative and explaining that it entails continuous

---

[29] *Compare* Ex. A at CBP 197–212 (information related to contract HSHQDC-12-D-00013) *with* Contract Summary, https://bit.ly/3eXx7Tb (same contract); CBP 213–34, 235–41 (information related to contract HSHQDC-13-D-00027) *with* Contract Summary, https://bit.ly/2NFDBeo (same contract).

[30] The unredacted version is available at https://knightcolumbia.org/documents/9ac34446b4.

surveillance of the online speech of populations of visa holders in the United States. Ex. B at 1680–81. ICE's justification for withholding the two-page document is that it summarizes "investigative steps taken in law enforcement investigations where the resulting subjects were eventually arrested as a result of the investigation." ECF No. 98–2 at 43. But because the VLVI relies on the collection and monitoring of social media and open-source information, ICE provides no basis to conclude that any of those "investigative steps" involve non-public techniques or procedures. ICE's Vaughn entry therefore describes the kind of application of known techniques to specific contexts that the Ninth Circuit has held is non-exempt. *See* ECF No. 39 at 16–17. Additionally, the title of the document is "Visa Lifecycle Initiative Summary," which implies a broader description of the program, consistent with content elsewhere in ICE's production. *See* Ex. B at 530, 534, 771–72, 921, 1017, 1046–47, 1239–40, 1349, 1712–14.

ICE failed to meet its burden as to two other programmatic documents that pertain to publicly known techniques and procedures. *See id.* at 1812–13, 1818–26. Both documents, which ICE withheld in full, relate to "Open Source/Social Media Exploitation"—a well-known technique that simply involves the collection or monitoring of publicly available information. *See* ECF No. 98–2 at 50, 53. And nothing in ICE's Vaughn index suggests that the withheld content includes the truly unique, specialized, or detailed technical methods that could justify withholding under Exemption 7(E). *See* ECF No. 39 at 6;  *ACLU v. DHS*, 243 F. Supp. 3d at 403-04. Other ICE documents describe ICE's exploitation of open source and social media information—including "for locating and researching law enforcement suspects" and a range of other investigative purposes (*see* ECF No. 98–2 at 53)—further indicating that ICE cannot validly withhold these records. *See, e.g.*, Ex. B at 774–98 (Performance Work Statement for Open Source/Social Media Data Analytics). At the very least, ICE has failed to segregate non-exempt material from these program summaries. *See* 5 U.S.C. § 552(a)(8)(A)(ii)(II).

Finally, ICE improperly redacted from two emails a list of the U.S. government's overseas posts that issue visas to which ICE applies the VLVI program's automated, continuous monitoring of visa holders' social media activity. Ex. B at 921, 1017. The latter email, dated March 27, 2018 (*id.* at 1017), does not appear to have been compiled for law enforcement

13

purposes. Rather, it was drafted in response to a request from ICE's deputy director for information on how ICE uses Facebook information in its operations, in light of a news article that ICE's chief of staff stated "could stay in the news." *Id.* at 1008–16. Because the information in that email was compiled for the purpose of fielding media inquiries, not for law enforcement purposes, ICE has failed to satisfy Exemption 7's threshold requirement as to that redaction.

In any event, the overseas posts that issue visas to which ICE applies the VLVI program are not exempt under 7(E). As noted above, this Court has repeatedly held that locations subject to law enforcement programs are not exempt as techniques or procedures. *See, e.g.*, *EFF v. DOJ*, 2016 WL 7406429 at \*18 (cities or states involved in DEA program); *EFF v. CIA*, 2013 WL 5443048, at \*23 (N.D. Cal. 2013) ("particular geographic areas" and FBI field offices). *See also ACLU Found. of Ariz. v. Dep't of Homeland Sec.*, 2017 WL 8895339, at \*27 (D. Ariz. 2017) (locations of smuggling routes). ICE, moreover, has failed to show that disclosure of these locations would risk circumvention of the law, not least because the monitoring of applicants from those issuing posts is only "part" of ICE's social media surveillance program, *see* Ex. B at 1017, and other applicants have reason to believe that their social media is still subject to monitoring. *See* ECF No. 39 at 19 (that many agencies collect and share social media information reduces any risk associated with disclosure of surveillance).

PowerPoint presentation content. ICE also withheld content from a series of presentation slides on language translation and open-source, or publicly available, images. Ex. B at 432–48. The material includes an "Image Guide" that ICE's Homeland Security Investigations (HSI) defines as "a reference guide created to identify images and symbols commonly associated with terrorist and criminal organizations or other groups of interest." *Id.* at 434. It also includes content related to an "Arabic Translation Manual" and "[r]ecognizing the differences between 'derogatory' and legitimate uses of Islamic or Arab culture." *Id.* at 444–53.

ICE has failed to show that the redacted content is exempt. The use of images and symbols in open-source research is a commonly known technique. That law enforcement agencies conduct open-source investigations, examine images, and translate content is no great mystery. Similarly, the identities of terrorist groups and criminal organizations are not techniques

or procedures, nor, plainly, are "Islamic symbols." *See id.* at 437–41, 446–48. And even if the withheld content could qualify as techniques or procedures, its use here would at most reflect their non-exempt application to specific contexts. *See Hamdan*, 797 F.3d. at 777–78.

ICE's Vaughn index brings it no closer to meeting its burden. It provides only a generic description that applies to over a hundred pages of content, without any explanation specific to these presentation slides. Nor can ICE show any plausible likelihood that disclosure of the content could lead to circumvention of the law. As the unredacted material indicates, the image guide "is not a comprehensive list of all the symbols that might be encountered during [open-source] analysis." Ex. B at 443. Similarly, the slides labeled "Terrorists" indicate that "the Guide *includes* groups currently designated on US terrorist lists" and "*includes* some lesser known terrorist groups," *id.* at 437–38 (emphasis added), confirming that the redacted content cannot be interpreted as an actual roadmap of HSI's investigative priorities.

### C.      USCIS Improperly Withheld Policies, Program Reviews, and Privacy Compliance Documents.

Guidance and policy documents. USCIS withheld content from policy memoranda describing its "Refugee Social Media Vetting Expansion" (Ex. C at 443–44), "Social Media Use" (*id.* at 1954–55), and "Fraud Detection and National Security Use of Social Media" (*id.* at 2031–32). USCIS has not met its burden as to these withholdings. Each is a short memorandum issued by a senior official describing social media collection programs at the highest level of generality. And each pertains to programs—refugee social media screening, the DHS Social Media Task Force, vetting specific to Syrian refugees—that are already publicly known and reflect the application of known techniques to specific contexts.

The explanations in USCIS's Vaughn index are not to the contrary. Wholly absent from those explanations is any indication that the redacted content implicates specialized or unique non-public techniques or procedures. *See* ECF No. 98–6, Ex. F at 82, 199, 220–21. Rather, the index invokes justifications that courts have rejected, such as "coordination information regarding other law enforcement agencies," *id.* at 83, "which employees within USCIS are authorized to search social media information," *id.* at 199, and "a specific authority . . . to begin

screening certain applicants," *id.* at 220–21. *See, e.g.*, *ACLU of Wash. v. Dep't of Justice*, 2011 WL 1900140, at *2 (W.D. Wash. 2011) (Vaughn statement regarding "information describing the coordination among federal agencies" did not place content within Exemption 7(E)); *ACLU v. FBI*, 2013 WL 3346845, at *9 (insufficient showing that offices and agency units were exempt); *Knight First Amendment Inst. v. Dep't of Homeland Sec.*, 407 F. Supp. 3d 311, 332–33 (S.D.N.Y. 2019) (legal and policy limits on authority "are not protected under Exemption 7(E)").

USCIS also withheld content from two documents titled "Draft Guidance for Use of Social Media in Field Operations Directorate Adjudications," and "Guidance for Use of Social Media in Syrian Refugee Adjudications by the USCIS's Refugee Affairs Division." Ex. C at 1267–78, 2344–53. The redacted content lists questions and "suggested lines of inquiry" regarding social media for USCIS adjudicating officers. *Id.* at 1275–78, 2351–53. But multiple courts have held that such questions are not exempt techniques or procedures, particularly where, as here, the questions are disclosed when posed to individuals. *See, e.g.*, *ACLU v. DHS*, 243 F. Supp. 3d at 403; *Knight*, 407 F. Supp. 3d at 353; *ACLU of Ariz.*, 2017 WL 8895339 at *28. As in those cases, USCIS's questions are not specialized, unique, or non-public techniques or procedures, nor would their disclosure risk circumvention of the law.

Program summaries and reviews. USCIS withheld content from reviews and summaries of various social media surveillance pilot programs, including redactions of the titles and subject matter of the programs, the identities of vendors or contractors, summary data on outcomes, and lessons learned. Ex. C at 277–88, 293–300, 301–18, 331–34, 335–38. Such information does not constitute exempt techniques, procedures, or guidelines, nor does its disclosure raise a plausible risk of circumvention of the law. The DHS inspector general already made public significant information regarding USCIS's pilot programs and the outcomes of these reviews.[31] While the reviews note limitations and challenges encountered in the pilot programs, such limitations are not of themselves exempt techniques or procedures. *See* ECF No. 39 at 19; *Schwartz*, 2016 WL 154089 at *15. USCIS has not shown, moreover, that the identities of vendors or private companies involved with its initiatives fall within Exemption 7(E). *See, e.g.*, *EFF v. Dep't of*

---

[31] *See* Inspector General report, *supra* note 20.

*Justice*, 2016 WL 7406429 at \*17 (government failed to show how disclosing identities of companies involved in program would risk circumvention of the law); *Elec. Privacy Info. Ctr. v. Drug Enf't Admin.*, 2016 WL 3557007, at \*13 (D.D.C. 2016) (same). It is widely known, including through the federal government's own spending and acquisition information, that numerous vendors provide social media surveillance-related technology to federal agencies.[32] The disclosure of specific vendors or products reveals no non-public technique or procedure.

Similarly, USCIS withheld summary data from a spreadsheet containing the results of its program reviews, including whether it located any "derogatory information" about applicants for immigration benefits. Ex. C at 1119–20. This high-level statistical information includes the total results for specific data fields, including the "Total Number of Matches" and summary results for the field "Derogatory Found (Y/N/Maybe)." *Id.* It does not appear to include the actual key words or personal information officers used when analyzing applicants' social media information during the course of the pilot projects—data that USCIS states is present in the remainder of the spreadsheet. *See* ECF No. 98–6, Ex. F at 94–95. Courts have concluded that summary statistical data of this sort is not exempt. *See Families for Freedom v. Customs & Border Prot.*, 797 F. Supp. 2d 375, 391 (S.D.N.Y. 2011) (statistics on "the total number of all arrests made . . . are neither techniques or procedures nor guidelines" (cleaned up)); *Am. Immig. Council v. Immig. & Customs Enf't*, 464 F. Supp. 3d 228, 243 (D.D.C. 2020) (spreadsheet data not exempt under 7(E)). The same is true here: USCIS has failed to show that retrospective summary data on its evaluations of pilot programs constitutes an exempt technique, procedure, or guideline.

USCIS also improperly withheld in its entirety an issue paper titled "USCIS Screening and Vetting." Ex. C at 1541–42. USCIS states in its Vaughn index that the issue paper includes "detailed information about which applications and petitions could be subject to this screen[ing], summaries of future plans," and "outstanding issues to be resolved." ECF No. 98–6, Ex. F at 154–55. But again, information on the kinds of applications or populations USCIS has subjected

---

[32] Detailed award and spending information is available at www.usaspending.gov. Indeed, that USCIS contracted with vendor Babel Street for pilot programs has already been made public in FOIA disclosures. *See* USCIS Presidential Transition Records, *available at* https://www.dhs.gov/publication/presidential-transition-records, at 198–99.

to social media screening is already publicly available. *See, e.g.*, Ex. C at 1920 (letter from DHS secretary noting USCIS social media reviews of Syrian refugees and K-1 visa holders seeking to adjust status).[33] Such high-level applications of USCIS's known use of social media screening are not exempt from disclosure.

      <u>Privacy and First Amendment compliance information</u>. USCIS withheld content from a presentation by the Office for Civil Rights and Civil Liberties on "Protecting the First Amendment in Social Media Research." Ex. C at 1878–1906. USCIS has not demonstrated that this material is exempt. The withheld slides appear to contain interpretation of First Amendment doctrine and explanations of legal and policy limits that fall outside the scope of Exemption 7(E). *See ACLU,* 880 F.3d at 492 (instructions to investigators regarding "how to lawfully obtain electronic location information" not exempt);[34] *ACLU of Maine Found. v. Dep't of Homeland Sec.*, 2019 WL 2028512, at *2 (D. Me. 2019) (interpretation of Supreme Court decisions "do not fall within the ambit of Exemption 7(E)"). Similarly, USCIS cannot validly withhold content on various hypothetical "scenarios" posed in the presentation. *See* Ex. C at 1895–1905. Such scenarios reflect USCIS's application, for instructive purposes, of known techniques. *See Knight*, 407 F. Supp. 3d at 332 ("[M]ere descriptions of codified law and policy, even those including interpretation and application of immigration laws and regulations, are not protected under Exemption 7(E)."); *ACLU of San Diego & Imperial Counties v. Dep't of Homeland Sec.*, 2017 WL 9500949, at *12 (C.D. Cal. 2017) ("synthesis of the governing case law" and "practical pointers" not exempt because they stem from publicly known legal requirements).

      Finally, USCIS withheld nearly all the substantive content from two privacy compliance documents: a DHS "Operational Use of Social Media" form and a privacy threshold analysis. Ex. C at 1308–21, 2258–69. USCIS has not supported its withholding of this material. As noted above, "SMOUTs" and PTAs contain high-level summaries of agency programs and serve as precursors to public-facing privacy impact assessments. *See supra* section I.A. As such, they

---

[33] *See also* USCIS Presidential Transition Records, *supra* note 31, at 198–202 (describing specific targets of various social media pilot programs).

[34] The documents reprocessed and released in accordance with the Ninth Circuit's opinion in that case are available here: https://www.aclunc.org/our-work/legal-docket/aclu-foundation-northern-california-v-doj-location-tracking.

1  reflect privacy-compliance processes and policy limits that are not exempt as techniques or

2  procedures, and their redaction is contrary to FOIA. USCIS, moreover, made no attempt to

3  segregate non-exempt content from anything in the documents that is plausibly exempt.

4  **II.    Defendants Wrongly Withheld Information Under Exemption 5.**

5        Under Exemption 5, the government may withhold "inter-agency or intra-agency

6  memorandums or letters that would not be available by law to a party other than an agency in

7  litigation with the agency." 5 U.S.C. § 552(b)(5). The government relies on two Exemption 5

8  privileges: the deliberative process and attorney-client privileges.

9        **A.    Defendants Improperly Applied the Deliberate Process Privilege.**

10        To establish that the deliberative process privilege applies, an agency must show that a

11  document meets two requirements. First, that it is "predecisional," *i.e.*, "prepared in order to

12  assist an agency decisionmaker in arriving at [their] decision." *Assembly of State of Cal. v. Dep't*

13  *of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992) (citations omitted). Second, an agency must

14  show that it is "deliberative," which means "it must actually be related to the process by which

15  policies are formulated." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118–19 (9th

16  Cir. 1988) (quotation omitted). The key question is whether the "the disclosure of materials

17  would expose an agency's decisionmaking process in such a way as to discourage candid

18  discussion within the agency and thereby undermine the agency's ability to perform its

19  functions." *Assembly of Cal.*, 968 F.2d at 920. To meet its burden, the agency should, at a

20  minimum, describe: (1) the roles of the author and recipient of each document; (2) the

21  document's function and significance in a decision-making process; and (3) the document's

22  subject matter and the nature of the deliberative opinion. *See Maricopa Audubon Soc'y v. U.S.*

23  *Forest Serv.*, 108 F.3d 1089, 1094–95 (9th Cir. 1997); *Cal. Native Plant Soc'y v. Envtl. Prot.*

24  *Agency*, 251 F.R.D. 408, 413 (N.D. Cal 2008) (citing *Senate of P.R. ex rel. Jud. Comm v. Dep't*

25  *of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987); *Coastal States Gas Corp. v. Dep't of Energy*, 617

26  F.2d at 868 (D.C. Cir. 1980). A document is non-exempt where it "is more properly

27  characterized as an opinion or interpretation which embodies the agency's effective law and

28  policy" and thus constitutes the agency's "working law." *Sears, 42*1 U.S. at 153.

19

1      **1.   CBP Improperly Withheld Information in Issue Papers, Privacy Documents, and Use Templates.**

2          <u>Privacy Threshold Analyses</u>. In addition to redactions under Exemption 7(E), CBP

3  withheld information in PTAs—including "risk mitigation strategies" and "recommendations"—

4  as deliberative-process privileged. ECF No. 98–4, Ex. A at 12–13; Ex A at CBP 23–39, 48–57,

5  296–306, 337–48, 349–58. As noted above, *see supra* section I.A, PTAs are part of DHS's

6  process to implement or update a program. Their purpose is to help an agency identify and

7  address the privacy implications raised by a course of policy. "Exemption 5 does not protect . . .

8  communications that promulgate or implement an established policy of an agency." *Brinton v.*

9  *Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980). And it "does not protect a document which is

10 merely peripheral to actual policy formation; the record must bear on the formulation or exercise

11 of policy-oriented judgment." *Habeas Corpus Res. Ctr. v. Dep't of Justice,* 2008 WL 5000224, at

12 *1 (N.D. Cal. 2008) (quoting *Tigue v. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002)).

13         Here, recommendations in the PTAs from the CBP Privacy Office to the DHS Privacy

14 Office are not predecisional. Rather, they are a mechanism for identifying privacy issues and

15 directing how to address those issues in the course of implementing policies—in this context,

16 various forms of immigration-related social media monitoring. Indeed, each PTA includes an

17 unredacted page titled "Privacy Threshold Adjudication" noting the agency's concurrence and

18 identifying additional privacy measures the implementing agency should follow. As

19 adjudications, these determinations are not predecisional. *See Ecological Rts. Found. v. Fed.*

20 *Emergency Mgmt. Agency*, 2017 WL 24859, at *4–5 (N.D. Cal. Jan. 3, 2017) (letters from

21 FEMA and National Marine Fisheries Service staking out each agency's position on the

22 Endangered Species Act were not predecisional). Accordingly, information about the privacy

23 issues raised by a program's implementation is "peripheral" to the policymaking process. *See*

24 *Habeas Corpus*, 2008 WL 5000224 at *1.

25         <u>Issue Papers and summaries</u>. CBP also withheld from issue papers content describing the

26 current status and future plans for CBP's social media surveillance activities. Ex. A at CBP 1–4,

27 8–12, 13–15, 16–17, 18–19, 20–22. CBP has not met its burden of demonstrating that the

28

redacted portions of these records are deliberative or predecisional. As described above, *see supra* section I.A, these are programmatic summaries of CBP's collection and screening of travelers' social media. CBP's Vaughn index asserts, among other things, that the redacted portions contain "[d]escriptions of analyses being conducted," "descriptions of recommended future uses and techniques . . . being evaluated and considered," and "[r]ecommended responses to hypothetical questions" to questions about CBP's use of social media. ECF No. 98–4, Ex. A at 1, 3–6. Yet many of the unredacted portions of these records strongly suggest these documents are filled with "the factual, segregable information Exemption 5 does not protect." *See Knight*, 407 F. Supp. 3d at 347–48 (ICE "Updates Memo" sections summarizing status of pilot programs were not deliberative). In each informational paper, the redacted information primarily appears in the documents' two main sections summarizing past and future steps for the programs (*e.g.*, "Background," "Current Social Media Use," and "Future Actions"), indicating that the redacted content contains straightforward factual summaries, not deliberations about a course of policy. CBP's hypothetical questions and answers explain current policy and practices and therefore are not deliberative. *See ACLU of N. Cal.  v. Fed. Bureau of Investigation*, 146 F. Supp 3d 1161, 1168–69 (N.D. Cal 2015) (documents providing FBI personnel with frequently asked questions and answers on current policy are working law and non-exempt); *see also  ACLU v. Immig. & Customs Enf't*, 448 F. Supp. 3d 27, 38 (D. Mass 2020) (talking points non-exempt where agency failed to show they were more than an explanation of current policy).

## 2.   ICE Improperly Withheld Contract-Related Information.

<u>Contract-related language</u>. ICE withheld under the deliberative process privilege an email that includes contract language related to Giant Oak, a social media surveillance vendor. Ex. B at 62–63. The email, however, is untethered to any decision or policy. To establish that information is subject to the deliberative process privilege, "the agency must identify a specific decision to which the document is predecisional." *Maricopa Audubon Soc'y*, 108 F.3d at 1094. ICE's explanation for withholding the email fails to demonstrate that it was part of a deliberative process rather than addressing solely factual matters. ICE's Vaughn index entry for the email primarily summarizes the deliberative process privilege and what it protects but does not

1  meaningfully identify a policy process the redacted information implicates. *See* ECF No. 98–2,

2  Ex. A at 2; *see Cal. Native Plant Soc'y*, 251 F.R.D. at 413 (citation omitted) (declarations

3  "generally attesting to the fact that the documents are deliberative and pre-decisional" were not

4  sufficient because they "merely assert conclusory statements in a boilerplate format"). ICE's

5  Vaughn index fails to establish that a discussion of draft contract language for the purchase

6  social media monitoring software is not simply the implementation of a decision or "merely

7  peripheral to actual policy formation." *See Habeas Corpus*, 2008 WL 5000224 at *1; *see also*

8  *Sears*, 421 U.S. at 152 ("communications made after the decision and designed to explain it"

9  may not be withheld under the deliberative process privilege). Contract language that explains or

10  implements a policy decision is not exempt.

11      Vendor-related language for third party software. ICE also withheld information in two

12  sets of emails from February and March 2018 regarding the agency's social media monitoring

13  practices and vendors. Ex. B at 1012 (first paragraph), 1014, 1761. Unredacted contextual

14  information and ICE's Vaughn index, however, strongly suggest that the redacted information in

15  both sets of emails involves the recitation of non-deliberative facts. "The deliberative process

16  privilege does not . . . protect material that is purely factual, unless the material is so inextricably

17  intertwined with the deliberative sections of documents that its disclosure would inevitably

18  reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997);

19  *see Assembly of Cal.*, 968 F.2d at 922 (census population information subjected to internal

20  agency adjustment is "purely factual" and nonexempt). The February 2018 email contains the

21  subject line "Companies for Market Research" and includes redacted content that, per ICE's

22  Vaughn index, sets forth "potential recommendations on which companies should be solicited by

23  ICE to provide contracts." Ex. B at 1761; ECF No. 98–2, Ex. A at 45. Yet that description is at

24  odds with the content of the email itself, which includes a block redaction followed by the text,

25  "[w]e *have decided* that we will send solicitations to all nine of the above companies."  Ex. B at

26  1761 (emphasis added). Thus, the content appears neither deliberative nor pre-decisional.

27      The March 2018 emails begin with an unredacted message asking for "accurate

28  information" about how HSI and Enforcement and Removal Operations (ERO), two primary

components of ICE, "use Facebook data" for a "briefing paper." Ex. B at 1009–10, 1014. The redacted responses to that email, *id.* at 1012 (first paragraph), presumably include the facts responsive to the request for "accurate information," not a "give-and-take of the consultative process" protected by the privilege. *See Ecological Rights Found.*, 2017 WL 24859 at *5. Indeed, ICE's Vaughn index states that the redacted information is a "Request for information from the Deputy Director of ICE on how ERO and HSI use Facebook data," further suggesting the redactions contain wholly factual, non-deliberative information. ECF No. 98–2, Ex. A at 19. For both sets of emails, ICE has failed to meet its burden of establishing that the withheld information is both deliberative and predecisional, rather than simply factual or descriptive.

<u>Performance Work Statement for Visa Lifestyle Vetting Initiative</u>. ICE completely withheld multiple records titled "Performance Work Statement, Visa Lifestyle Vetting Initiative." Ex. B at 596–640.[35] ICE's Vaughn and declaration states that this document "is an initial, non-final draft" that was "in the process of being reviewed by divisions within the Office of Homeland Security Investigations," ECF No. 98–2, Ex. A at 11–12, that they are watermarked "DRAFT," *id.*, and that drafts are predecisional "by their very nature." ECF No. 98–1 ¶ 43. Yet "[w]atermarking the memorandum as a 'Draft' does not change the finality of the facts within it." *Knight*, 407 F. Supp. 3d at 347. Consequently, even if parts of the challenged records contain information protected by the deliberative process privilege, the agency must segregate and release non-exempt information. 5 U.S.C. § 552(a)(8)(A)(ii)(II). *See also Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."). Courts have repeatedly recognized that simply because a record contains *some* predecisional and deliberative material, that does not render the *entire record* exempt. *See e.g.*, *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld."). Here, it is simply implausible that

---

[35] ICE produced but fully withheld six versions of the same Performance Work Statement. Although Plaintiffs maintain that ICE has failed to meet its burden for withholding any of the versions, Plaintiffs are willing to limit their challenge to whichever is the most recent version.

23

every piece of information in the Performance Work Statement is deliberative and predecisional. Another similar but publicly available Performance Work Statement from ICE relating to data analysis services is illustrative. Ex. B at 774–98.  It contains significant content primarily focused on factual material and demonstrates that ICE is capable of segregating factual content from information it believes is exempt under the deliberative process privilege. *Id*. ICE must reprocess these records and ensure it has segregated and released all non-exempt information.

### 3.   USCIS Improperly Withheld Policy, Privacy, and Procurement Information.

<u>Guidance and policy documents</u>. USCIS also withheld content under the deliberative process privilege from the two "Guidance for Use of Social Media" documents described above, *see supra* section I.C. Ex. C at 1267–78, 2344–53. USCIS failed to establish that this content is predecisional and deliberative. As their titles indicate, the documents are plainly designed to provide guidance to employees implementing social media policies. Each begins by stating that the "purpose of this guidance" is to give officers an understanding of how to use the results of social media checks in adjudications. Ex. C at 1269, 2346. In both documents, redacted content appears under a section labeled "Adjudicative aid for cases involving social media results" and unredacted text describing the section as "designed solely to provide a framework for interviewing officers." *Id.* at 1275–78, 2351–2353. USCIS asserts that the withheld content "focuses on the types of questions and issues that adjudicators may want to look for when reviewing an application or interviewing an applicant related to social media information." ECF No. 98–6, Ex. F at 115, 287. But such information constitutes the implementation of a policy decision rather than deliberation preceding it. *See Brinton*, 636 F.2d at 605; *ACLU of N. Cal.*, 146 F. Supp 3d at 1168–69 (privilege does not apply to documents advising FBI personnel about how to apply FBI policy to threat assessments). Lists of "what questions to ask . . . are more related to the discovery of facts than they are to the deliberative process leading to a policy or ultimate agency decision." *Equal Emp't Opp. Comm'n v. Swissport Fueling, Inc.*, 2012 WL 1648416, at *16–17 (D. Ariz. 2012). Together, the unredacted text and Vaughn index suggest the redacted information in both documents is a post-decisional guide for how to implement policy.

<u>Email regarding First Amendment and USCIS's authority to collect social media</u>

information. USCIS withheld content from an email exchange regarding its authority to collect or use social media information relating to the exercise of First Amendment-protected activities. Ex. C at 1571. USCIS states that the emails are between USCIS Office of Chief Counsel attorneys, and that because they include a summary of legal issues and draft responses, they are deliberative and predecisional. ECF No. 98–6, Ex. F at 158. USCIS has failed to establish that the emails are privileged. First, the unredacted portion of the exchange states that the redacted text has been "cleared" and is presumably ready for distribution, strongly suggesting it is post-decisional. Ex. C at 1571. Second, to the extent information in the email contains guidance on "USCIS's authority," it constitutes the agency's working law and is not subject to Exemption 5. *See Tax Analysts v. Internal Revenue Serv.*, 294 F.3d 71, 81 (D.C. Cir. 2002) ) (holding that documents explaining tax law and whether certain tax exemptions applied to specific taxpayers constituted "working law," because their "tone . . . indicate[d] that they simply explain[ed] and appl[ied] established policy"); *Public Citizen*, 598 F.3d at 868, 876 (documents that "summariz[ed]" an agency's "existing policy" understandings were not protected by protected by Exemption 5). USCIS's interpretation of First Amendment law applicable to social media surveillance is not protected by the deliberative process privilege.

Privacy Threshold Analysis for Social Media Tool Pilot Evaluation. USCIS withheld an entire PTA titled "S&T Social A2356Media Tool Pilot Evaluation." Ex. C at 2258–2269. As noted above, the role of PTAs is to help USCIS identify and address the privacy implications raised by a pilot that USCIS plans to undertake, and they therefore "promulgate or implement an established policy of an agency." *See Brinton*, 636 F.2d at 605. USCIS asserts that the "privileged information consists of a review of process challenges, concerns, and recommendations." ECF No. 98–6, Ex. F at 264. But it is implausible that the entire PTA consists of such information. CBP, for instance, produced multiple PTAs that are not completely redacted in this manner, demonstrating that such documents contain sections focused on factual material (*e.g.*, "Background," "Tasks"). *See, e.g.*, Ex. A at CBP 23–39, 48–57. USCIS cannot withhold the entire PTA because it asserts that some of the PTA's content is subject to the deliberative process privilege. *See Pub. Citizen*, 598 F.3d at 876 (documents explaining "existing

policy" are not deliberative); *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) ("Factual material that does not reveal the deliberative process is not protected by this exemption."). USCIS should segregate and disclose any portions of the PTA not within the privilege unless it can establish "that non-exempt portions . . . are inextricably intertwined with exempt portions." *See Krikorian v. Dep't of State*, 984 F.2d 461, 466 (D.C. Cir. 1993).

Email regarding DHS's procurement of social media services. USCIS also withheld a series of emails discussing social media surveillance services, with the subject line "DHS procurement of [social media] services in Enhanced Vetting initiative." Ex. C at 1711–12. USCIS states that the emails include "pending process decisions," yet the unredacted final email in the exchange strongly suggests that the redacted information pertains to a public letter DHS received six days prior opposing the use of "unreliable and discriminatory social media monitoring techniques" against immigrants."[36] ECF No. 98–6, Ex. A at 174. This email context—a discussion about public opposition to the acquisition of surveillance technology by DHS, not USCIS—strongly suggests the redacted information is "merely peripheral to actual policy formation." *See Habeas Corpus*, 2008 WL 5000224 at *1–2 (document summarizing issues raised by outside groups and not reflecting deliberations is non-exempt). USCIS has failed to establish that the redacted information involves policy deliberation protected by the privilege.

### B.    USCIS Improperly Applied the Attorney-Client Privilege.

The attorney-client privilege applies only under limited circumstances: "(1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). Boilerplate recitation of attorney-client privilege elements does not justify this exemption. *Ecological Rts. Found. v. Fed. Emergency Mgmt. Agency*, 2017 WL 5972702 *6–7 (N.D. Cal.

---

[36] The redacted text and last email in the email exchange reads: "Regarding the CDT letter . . . noted with interest, not much." Ex. C at 1711. Six days before that email, on April 3, 2018, the Center for Democracy and Technology (CDT) had sent a letter to DHS regarding DHS's selection of a surveillance vendor. *See* https://cdt.org/wp-content/uploads/2018/04/CDT-ltr-H-HS-re-DHS-Visa-Lifecycle-Vetting.pdf.

Nov. 30, 2017) (Vaughn index insufficient where agency failed to provide meaningful

information that records contained legal advice or would reveal confidential communications).

"Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly

construed." *Weil v. Inv./Indicators, Research & Mgmt., Inc*., 647 F.2d 18, 24 (9th Cir. 1981).

    <u>Summary Paper: "Vetting of Aliens in the United States."</u> USCIS improperly withheld in

full a document titled "Impediments to Proposed Expanded Immigration Vetting of Aliens in the

United States." Ex. C at 1475–77. USCIS has failed in at least three ways to meet its burden to

establish that this record is covered by the attorney-client privilege.

    First, USCIS has failed to specify who the "client" is in the purported attorney-client

relationship. If the party invoking the privilege fails to provide sufficient information to establish

the identity of the client and the existence of an attorney-client relationship, it cannot rely on the

privilege. *See Ctr. for Biological Diversity v. Off. of Mgmt. & Budget*, 625 F. Supp. 2d 885, 892–

93 (N.D. Cal. 2009) ("OMB cannot rely on the attorney-client privilege for the challenged

documents" in part because "the declarations do not identify which of [the] stated parties is the

attorney."). USCIS's Vaughn index identifies no client, simply stating that the Summary Paper

was "drafted by Department of Justice (DOJ) Attorneys." ECF No. 98–6, Ex. F at 144–45.

USCIS's declaration does not specify any client for the Summary Paper, nor does it identify any

attorney-client relationship with DOJ at all. ECF No. 98–5 ¶ 32. But an email thread elsewhere

in USCIS's production purportedly refers to the Summary Paper and suggests DOJ drafted it at

the request of the National Vetting Center, a separate component of DHS. Ex. C at 70, 1471–74.

Without specific information identifying a client, no basis exists to conclude an attorney-client

relationship existed between the authors of the Summary Paper and the purported client. *See,*

*e.g.*, *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 79-80 (D.D.C. 2008)

(declining to hold privilege applied in part because the "declarations do not indicate what agency

or executive branch entity is the client").

    Second, because USCIS has not identified a client, it has not established that the

Summary Paper was actually maintained in confidence. The fundamental purpose of the

attorney-client privilege is the "protection of confidential facts," which cannot be "made known

to persons other than those who need to know them." *Coastal States*, 617 F.2d at 863. USCIS's failure to "submit[] evidence that substantiates its claim that the communications were confidential in fact" precludes reliance on the attorney-client privilege. *See ACLU of N. Cal.*, 146 F. Supp. 3d at 1168. USCIS has failed to explain how the Summary Paper—which plainly has been circulated beyond DOJ to USCIS—has remained confidential as required to establish the attorney-client privilege. ECF No. 98–6, Ex. F at 144–45.

Finally, USCIS has failed to establish that a client sought legal, rather than policy, advice, and, relatedly, that the "attorney" in the purported attorney-client relationship was acting in a capacity as a professional legal adviser, rather than as a policymaker. *See Martin*, 278 F.3d at 999 ("The fact that a person is a lawyer does not make all communications with that person privileged."). Instead, in order to qualify for the privilege, the "primary purpose" of the consultation must have been to obtain legal advice. *See North Pacifica LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1128 (N.D. Cal. 2003). Thus, when an attorney conveys advice on policy issues, the communication is not protected by the attorney-client privilege. *Nat'l Imm. Project of the Nat'l Lawyers Guild v. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 729 n.10 (S.D.N.Y. 2012) ("FOIA prohibits agencies from treating their policies as private information."); *ACLU of N. Cal.*, 146 F. Supp. 3d at 1169 (concluding that the FBI had not established attorney-client privilege in part because it "ha[d] not provided sufficient information to determine whether the [documents] consist of advice about specific legal questions and situations, or whether they clarify broadly applicable FBI policies"). USCIS's Vaughn index classifies the document as a "DOJ Summary Paper," ECF No. 98–6, Ex. F at 144, and an email exchange apparently referring to the document states that it is "not really a formal memo." Ex. C at 68, 1471–74. The relevant portion of USCIS's declaration says nothing about DOJ's involvement with this record and whether it contains bona fide legal, rather than policy, advice. *See* ECF No. 98–5 ¶ 32. While the Vaughn index states that the document contains "legal analysis and opinion" on the "specific impediments to proposed expanded immigration vetting of aliens in the United States," that assertion alone does not establish that its primary purpose in this context is legal advice or that the entire Summary Paper constitutes legal advice sought by a client, rather than DOJ's "broadly

applicable [agency] policies." ECF No. 98–6, Ex. F at 144–45; *ACLU of N. Cal.*, 146 F. Supp. 3d at 1169 (ordering production of segregable portions of FAQ documents where agency failed to provide evidence substantiating they were privileged in their entirety).

Even if the Court concludes that the Summary Paper is attorney-client privileged, it is non-exempt working law, because it embodies the agency's legal position on expanded vetting of aliens in the United States. FOIA's statutory purpose is reflected in the "working law doctrine," which is intended to prevent agencies from conducting official government business pursuant to secret rules and interpretations. *See Assembly of Cal.*, 968 F.2d at 920 ("working law" doctrine "insures that the agency does not operate on the basis of 'secret law'"). Even if a document is otherwise protected by the deliberative process or attorney-client privileges, under the "working law" doctrine, agencies cannot rely on Exemption 5 to withhold the rules, interpretations, and opinions that embody their formal or informal law or policy. *Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 195–96, 199–202, 208 (2d Cir. 2012); *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 619 (D.C. Cir. 1997). As such, "Exemption 5, properly construed, calls for 'disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy." *Sears*, 421 U.S. at 153.

The Summary Paper contains key indicia of working law in two respects. First, it is a "summary" of "specific impediments" identified by DOJ attorneys to a particular course of action—in other words, the paper identifies specific reasons why a particular course of action cannot be taken, with effects on policy going forward. *See Schlefer v. United States*, 702 F.2d 233, 242–43, (D.C. Cir. 1983) (legal memoranda interpreting statutes and "provid[ing] important guidance" to the Chief Counsel for future cases were working law, even though not required to be "rigidly followed"); *see also Tax Analysts*, 117 F.3d at 617 ("considered statements of the agency's legal position" are working law, even if "nominally non-binding"). Second, the Summary Paper emanates from DOJ, suggesting that this central authority has transmitted the document to an audience of agencies charged with enforcing the law. *See Sears*, 421 U.S. at 141, 158 (final memoranda used by agency to formulate "a coherent policy" and "some measure of uniformity" were agency law subject to disclosure); *Coastal States*, 617 F.2d at 860 (illustrating

29

1   the precedential value of documents by noting they were "circulated among the area offices").

2       Email regarding First Amendment and USCIS's authority to collect social media

3   information. USCIS also withheld an email described above, *supra* section II.A.3, regarding the

4   agency's "authority to collect and/or use social media information relating to the exercise of First

5   Amendment protected activities." Ex. C at 1571. USCIS states that the emails are "between

6   USCIS OCC attorneys" and that "[t]he information in the emails contains the detailed legal

7   opinions on two specific issues." ECF No. 98–6, Ex. F at 158. The email has been "cleared,"

8   according to unredacted text. Ex. C at 1571. This context and the email's apparent purpose—to

9   convey USCIS's legal authority to collect and use social media information—strongly suggest

10  that it represents the agency's "coherent policy" on this constitutional question and thus contains

11  non-exempt working law. *See Sears*, 421 U.S. at 141. USCIS cannot withhold "secret agency

12  law" that explains its interpretation or understanding of the First Amendment. *Id.* at 153.

13      Regardless, USCIS has failed to meet the elements of the attorney-client privilege. First,

14  neither USCIS's Vaughn index nor its declaration identifies a client for this record. Rather, the

15  sole mention of email in the relevant paragraph of the agency's declaration is the vague

16  statement that USCIS's general production contains "emails from agency counsel to their clients,

17  in particular, agency policy makers, agency decision makers, and agency employees

18  implementing policy." ECF No. 98–5 ¶ 32. Second, USCIS has not established that this email

19  was in fact kept confidential. Indeed, the email appears to have been circulated widely. Its

20  subject line includes "FW," indicating the initial recipient forwarded it, potentially waiving any

21  privilege that attached to the initial communication. Ex. C at 1571. That, along with USCIS's

22  failure to "submit[] evidence that substantiates its claim that the communications were

23  confidential in fact," precludes reliance on the attorney-client privilege. *See ACLU of N. Cal.*,

24  146 F. Supp. 3d at 1168.

25      Email regarding DHS's procurement of social media services. USCIS asserts attorney-

26  client privilege over the series of emails described above, *see supra* section II.A.3, discussing

27  "DHS's potential procurement of social media services as part of the Enhanced Vetting

28  initiative." ECF No. 98–6, Ex. A at 174. USCIS states that the emails contain a "summary of . . .

legal issues and thoughts about pending process decisions" and "information related to OCC's legal opinions regarding the potential courses of actions being considered." *Id.* USCIS's Vaughn index, however, fails to specify a client for the purpose of the privilege, nor does it establish that the "primary purpose" of the exchange related to providing legal advice rather than, as described above, the participants' interest in and policy views on the letter sent to DHS by a third party. *See City of Pacifica*, 274 F. Supp. 2d at 1128.

## III.   CBP Improperly Withheld Information Under Exemption 4.

Exemption (b)(4) encompasses materials that constitute "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Information is "confidential" within the meaning of Exemption 4 where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). Only information originating from the companies themselves can be considered information that they customarily and actually treated as private during their ordinary course of business. *Am. Small Bus. League v. Dep't of Def.*, 411 F. Supp. 3d 824, 830 (N.D. Cal. 2019). Accordingly, government assessments and evaluations cannot be considered confidential for purposes of Exemption 4. *Id.* Evidence that withheld information is publicly available or is ordinarily released by competitors may support a finding that the information is not "customarily and actually kept confidential." *Id.*

CBP withheld information in a privacy threshold analysis that is not confidential within the meaning of Exemption 4. *See* Ex. A at CBP 50, 53. CBP contends that the content includes "the name of the company providing unique, proprietary services to CBP," and has been withheld pursuant to Exemption 4 because the contractor would not customarily make such information available to the public. ECF No. 98–4 at 15. However, internal evaluations conducted by government agencies do not constitute information that belongs to a private company rather than the government. *Am. Small Bus. League*, 411 F. Supp. 3d at 830 (government's evaluation of a contractor's compliance with regulatory requirements must be disclosed). Because the PTA was generated by CBP, a government agency, the information

1    stems from the government, and therefore must be disclosed.

2          CBP has also failed to demonstrate that it provided the relevant vendor with either an

3    express or implied assurance of privacy with respect to their company name. *See* ECF No. 98–4

4    at 15. "[O]nce shared with the government . . . information might *lose* its confidential quality

5    without the government's assurance of privacy." *Am. Small Bus. League*, 411 F. Supp. 3d. at 829

6    (emphasis in original). The federal government regularly includes vendor names on entries

7    posted to its own spending and acquisition portal.[37] *See Ctr. for Inv. Reporting v. Dep't of Labor*,

8    470 F. Supp. 3d 1096, 1117 (N.D. Cal. 2020) (agency's regular practice of releasing information

9    at issue precludes finding of assurance of privacy). CBP has not demonstrated that it extended

10   any express assurances of privacy to the vendor, nor does it describe any circumstances

11   consistent with an implied assurance of privacy, such as provision of information by the vendor

12   through a secure portal. *See Besson v. Dep't of Commerce*, 2019 WL 8267696, at *1 (D.D.C.

13   2019) (Exemption 4 burden not met where declarant does "not say so expressly" that information

14   was disclosed under assurance of privacy).

15   **IV.    CBP's Vaughn Index Is Insufficient.**

16          "Specificity is the defining requirement of the *Vaughn* index." *Wiener v. Fed. Bureau of

17   Investigation*, 943 F.2d 972, 979 (9th Cir. 1991). Its purpose "is to afford the FOIA requester a

18   meaningful opportunity to contest, and the district court an adequate foundation to review, the

19   soundness of the withholding," and it must contain "a particularized explanation of how

20   disclosure of the particular document would damage the interest protected by the claimed

21   exemption." *Id.* at 977–78. "Categorical description of redacted material coupled with

22   categorical indication of anticipated consequences of disclosure is clearly inadequate." *King v.

23   Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987). Similarly, "boilerplate explanations," that

24   do not "tailor the explanation to the specific document withheld," are insufficient and pose an

25   "obvious obstacle to effective advocacy." *Weiner*, 943 F.2d at 978–79. In short, an agency "must

26   disclose as much information as possible without thwarting the purpose of the exemption

27   claimed." *Citizens Comm'n on Human Rts. v. Food & Drug Admin.*, 45 F.3d 1325, 1328 (1995).

28   ───────────────
     [37] Detailed award and spending information is available at www.usaspending.gov.

CBP failed to meet this standard. Throughout its *Vaughn* index, CBP repeats non-specific recitations of the standard for the FOIA exemptions at issue, followed by multiple non-specific bullets drawn from a master list of reasons for withholding content that are set forth in the Howard Declaration. *See* ECF Nos. 98–4, 98–3 ¶¶ 37–41 (Exemption 5 list), 46 (Exemption 7(E) list). The bulleted reasons are vague and wide-ranging. They include, for instance, "descriptions of the scope and investigatory focus of CBP's operational use of social media"; "descriptions of specific law enforcement techniques and types of analysis that CBP does or does not utilize when using publicly available social media information"; and "descriptions of vulnerabilities and limitations in CBP's operational use of social media." ECF No. 98–3 at 13–14. This à la carte invocation of general categories of withholdings is neither particularized nor tailored, *see Weiner*, 943 F.2d at 977–78, and it leaves Plaintiffs and the Court guessing, both as to which bullet applies to any given redaction and how to combine the bullets with unredacted information to ascertain the nature of the information withheld.

Notably, CBP has been faulted for using exactly this approach in other instances. The court in *ACLU of Arizona* noted that CBP's *Vaughn* index in that case repeated, "in each entry at issue," the same general Exemption 7(E) standard "followed by a bullet point list of various types of information running the gamut from procedures relating to performing a records check . . . to guidelines for type and quantum of evidence sought to apprehend or pursue charges against a suspect." 2017 WL 8895339, at *17. The court found that that format did not "afford the requester an opportunity to intelligently advocate release of the withheld documents and to afford the court an opportunity to intelligently judge the contest." *Id.* at *19 (quoting *Weiner*, 943 F.2d at 979). For the same reasons, CBP's *Vaughn* index is insufficient here.

## V. CBP and ICE Failed to Establish That They Conducted Adequate Searches for Responsive Records.

To prevail on summary judgment in a FOIA case, a defendant must establish that "it has conducted a search reasonably calculated to uncover all relevant documents." *Zemansky v. Envtl. Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985). An agency can demonstrate the adequacy of its search through "reasonably detailed, nonconclusory affidavits submitted in good faith." *Id.* at

33

571. "[A]ffidavits describing agency search procedures are sufficient for purposes of summary judgment only if they are relatively detailed in their description of the files searched and the search procedures, and if they are nonconclusory and not impugned by evidence of bad faith." *Id.* at 573. Although an agency is not required to search every record system, it must "[a]t the very least . . . explain in its affidavit that no other record system was likely to produce responsive documents." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). In assessing the adequacy of the agency's search, courts construe facts in the light most favorable to the requestor. *Zemansky*, 767 F.2d at 571.

CBP has not demonstrated that it conducted a reasonable search. The Howard Declaration states that CBP referred Plaintiffs' request to the Office of Field Operations (OFO), which consulted with "subject-matter experts," conducted a manual search for records, and "searched the electronic record repository identified as likely to contain responsive records, using keyword searches and knowledge of the types of documents maintained in such locations." ECF No. 98–3 ¶ 20. It further states that OFO identified responsive records "by reviewing documents provided in response to previous similar requests" and through "the professional knowledge and experience of the CBP personnel responsible for the programs/offices most likely to create and/or maintain such documents." *Id.* The declaration states that the request was also referred to other CBP offices, which conducted searches "based on the types of records requested, a review of repositories where such records would reasonably expected to be located, and consultations with subject-matter experts." *Id.* ¶ 21–22.

What the Howard Declaration lacks, however, is any clear indication that CBP attempted to search for records outside central document repositories, or "common locations on the CBP network." *Id.* ¶ 20. One result of CBP's apparent failure to search outside such repositories is the near-complete absence of any correspondence in CBP's production. CBP produced only a single email, between a Facebook employee and the Director of Cybersecurity and Innovation in the DHS Private Sector Office, regarding CBP's creation of "fake profiles" to surveil social media, in apparent violation of Facebook's policies. Ex. A at CBP 147–48. Even this solitary email did not involve a CBP employee. Thus, CBP's search failed to identify *any* correspondence to or

34

from CBP employees whatsoever, even though multiple parts of the ACLU's request plainly

implicate such correspondence. *See* ECF No. 98–6, Ex. A at 6–7. It is utterly implausible that

CBP generated no correspondence related to the products and systems at issue in the request, and

its failure to locate such correspondence underscores the inadequacy of its search.

ICE has also failed to demonstrate that its search was adequate. According to the Pineiro

Declaration, ICE distributed the request to four components: HSI, the Office of Acquisition

Management (OAQ), the Office of Policy, and the Office of Enforcement and Removal

Operations (ERO). ECF No. 98–1 ¶ 18. The Pineiro Declaration states that HSI employees

"conducted searches of their computers, shared drives, and Outlook" using a set of specific

search terms, *id.* ¶ 23, but the other offices' searches did not extend beyond a central document

repository or a single custodian's files. A section chief in a subdivision of OAQ conducted a

manual search, without search terms, of a shared folder relevant to a specific contract, *id.* ¶ 26—

a search that would not appear to encompass parts 3 and 4 of Plaintiffs' request. *See* ECF No.

98–6, Ex. A at 6. Similarly, a single employee in the Office of Policy searched a shared drive but

did not incorporate other employees' systems or mail files. ECF No. 98–1 ¶ 28. ERO's search

was similarly scant: A single senior detention and deportation officer within a subdivision of

ERO conducted a manual search of her paper files and her own email folders. *Id.* ¶ 31.

The results of these isolated searches by single employees demonstrate their inadequacy.

While HSI located 1,944 pages of responsive records, OAQ, Policy, and ERO located only 133

pages, 47 pages, and 45 pages, respectively. *Id.* ¶¶ 10, 26, 28, 31. ERO's search in particular was

starkly insufficient, given that ERO has six major divisions and 24 field offices and plainly uses

social media surveillance for operational purposes. *See* Ex. B at 4–45 (expenditures of hundreds

of thousands of dollars by ERO on monitoring technology). ERO, OAQ, and the Office of Policy

did not conduct searches reasonably calculated to uncover all relevant documents.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary

Judgment with respect to CBP, ICE, and USCIS and grant Plaintiffs' Cross-Motion for Summary

Judgment as to those Defendants.

1

2                                                Respectfully submitted,

3      DATED: March 25, 2021                      /s/ Hugh Handeyside
                                                  Hugh Handeyside
4                                                 American Civil Liberties Union Foundation
                                                  125 Broad Street, 18th Floor
5                                                 New York, NY 10004
                                                  Telephone: 212-549-2500
6                                                 hhandeyside@aclu.org

7
                                                  Matthew Cagle
8                                                 American Civil Liberties Union Foundation of
                                                     Northern California
9                                                 39 Drumm Street
                                                  San Francisco, CA 94111
10                                                Telephone: 415-621-2493
                                                  mcagle@aclunc.org
11

12                                                Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' CROSS-MOT. FOR PARTIAL SUMM. J. & OPP. TO DEF.'S MOT. RE CBP, ICE & USCIS
CASE NO. 19-CV-00290-EMC

## APPENDIX: INDEX OF PLAINTIFFS' CHALLENGED WITHHOLDINGS

| CBP Records and Withholdings | | |
|---|---|---|
| **Document Bates No.** | **Document description** | **Exemption(s) at issue** |
| 1-4 | Information Issue Paper (Oct. 6,2016) | (b)(5), (b)(7)(E) |
| 5-7 | CBP Use of Social Media Paper (May 25, 2016) | (b)(7)(E) |
| 8-12 | CBP Use of Social Media Paper (Sept. 26, 2016) | (b)(5), (b)(7)(E) |
| 13-15 | Social Media Briefing Paper | (b)(5), (b)(7)(E) |
| 16-17 | Information Issue Paper (June 2,2016) | (b)(5), (b)(7)(E) |
| 18-19 | Information Issue Paper (Aug. 30, 2016) | (b)(5), (b)(7)(E) |
| 20-22 | Information Issue Paper (Apr. 20, 2017) | (b)(5), (b)(7)(E) |
| 23-39 | Privacy Threshold Analysis: Electronic Visa Update System (EVUS) | (b)(5), (b)(7)(E) |
| 48-57 | Privacy Threshold Analysis: Pilot Evaluation | (b)(5), (b)(4), (b)(7)(E) |
| 125-36 | Policy on Operational Use of Social Media | (b)(7)(E) |
| 149-60 | Privacy Threshold Analysis: Office of Intelligence and the Office of Professional Responsibility, July 2, 2018 | (b)(7)(E) |
| 161-69 | DHS Operational Use of Social Media: Office of Intelligence and Investigative Liaison | (b)(7)(E) |
| 170-77 | DHS Operational Use of Social Media: Office of Intelligence and Investigative Liaison | (b)(7)(E) |
| 178-91 | DHS Operational Use of Social Media: U.S. Border Patrol, November 27, 2017 | (b)(7)(E) |
| 197-212 | Contract Number HSHQDC-12-D-00013, Order Number 70B04C18F00001093 | (b)(7)(E) |
| 213-34 | Award Contract Number HSHQDC13D00027, Order Number 70B04C18F00001257 | (b)(7)(E) |
| 235-41 | Delivery Order 70B04C18F00000377 | (b)(7)(E) |
| 242-49 | Contract Number HSHQDC-13-D-00026, Order Number HSBP1017J000831 | (b)(7)(E) |
| 296-306 | Privacy Threshold Analysis: Office of Field Operations (July 8, 2016) | (b)(5), (b)(7)(E) |
| 337-48 | Privacy Threshold Analysis: Office of Field Operations, July 8, 2016 | (b)(5), (b)(7)(E) |
| 349-58 | Privacy Threshold Analysis: Office of Field Operations, January 5, 2018 | (b)(5), (b)(7)(E) |

| ICE Records and Withholdings | | |
|---|---|---|
| **Document Bates No.** | **Document description** | **Exemption(s) at issue** |
| 62-63 | Email titled "Social Locator for OST SOP" | (b)(5) |
| 437-48 | Homeland Security Investigations PowerPoint presentation | (b)(7)(E) |
| 596-640 957-1001 1264-1308 1356- 1400 1717-1760 1983-2027 | Document titled "Procurement Sensitive: Performance Work Statement Visa Lifecycle Vetting Initiative" | (b)(5) |
| 921 | Email titled "VLVI language" | (b)(7)(E) |
| 1008-20 | Email titled "TASKING REQUEST – HSI NSID USE OF FACEBOOK" | (b)(5) (at 1012 top), (b)(7)(E) (at 1017 |
| 1347-49 | Document titled "Extreme Vetting-Visa Security Program-PATRIOT" | (b)(7)(E) |
| 1680-81 | Document titled "Visa Lifecycle Initiative Summary" | (b)(7)(E) |
| 1761 | Email titled "Companies for Market Research" | (b)(5) |
| 1812-13 | Document titled "Open Source/Social Media Exploitation" | (b)(7)(E) |
| 1818-26 | Document titled "Counterterrorism and Criminal Exploitation Unit Open Source/Social Media Exploitation" | (b)(7)(E) |

| USCIS Records and Withholdings | | |
|---|---|---|
| **Document No.** | **Document description** | **Exemption(s) at issue** |
| 277-88 | Review of the Defense Advanced Research Projects Agency 2.0 Social Media Pilot | (b)(7)(E) |
| 293-300 | Review of Refugee Screening Social Media Pilot | (b)(7)(E) |
| 301-18 | Review of K-1 Adjustment of Status Pilots | (b)(7)(E) |
| 331-34 | USCIS Social Media & Vetting: Overview and Efforts to Date | (b)(7)(E) |
| 335-38 | DHS Secretary Briefing Binder – Social Media | (b)(7)(E) |
| 443-44 | Memorandum from DHS Undersecretary for Intelligence and Analysis to the USCIS Deputy Secretary, "U.S. Citizenship and Immigration Services Social Media Vetting Expansion," dated April 1, 2016 | (b)(7)(E) |
| 1119-20 | Concluding pages from "Key Word Spreadsheet" | (b)(7)(E) |

| 1267-1278 | Draft Guidance for Use of Social Media in Field Operations Directorate Adjudications, dated October 27, 2017 | (b)(5), (b)(7)(E) |
|---|---|---|
| 1308-21 | DHS Operational Use of Social Media, Privacy Compliance memorandum, January 25, 2017 | (b)(7)(E) |
| 1475-77 | Memorandum titled "Impediments to Proposed Expanded Immigration Vetting of Aliens in the United States" | (b)(5) |
| 1541-42 | Document titled "IP - USCIS Screening and Vetting" | (b)(7)(E) |
| 1571 | Email, FW: USCIS authority to collect/use social media information relating to the exercise of First Amendment protected activities (draft), dated June 22, 2016 | (b)(5) |
| 1711-1712 | Email, RE: DHS procurement of SM services in Enhanced Vetting initiative, dated April 9, 2018 | (b)(5) |
| 1878-1906 | PowerPoint training presentation, "Protect the First Amendment in Social Media Research," presented to USCIS's FDNS by the Office for Civil Rights and Civil Liberties | (b)(7)(E) |
| 1954-55 | Memorandum from DHS Secretary Johnson to Component Heads, "Social Media Use," dated February 11, 2016 | (b)(7)(E) |
| 2031-32 | Memorandum from USCIS Director to FDNS and RAIO, "Fraud Detection and National Security Use of Social Media" | (b)(7)(E) |
| 2258-69 | Privacy Threshold Analysis, version number 01-2014, "S&T Social A2356Media Tool Pilot Evaluation" | (b)(5), (b)(7)(E) |
| 2344-53 | USCIS's Refugee Affairs Division, Guidance for Use of Social Media in Syrian Refugee Adjudications, dated September 25, 2018 | (b)(5), (b)(7)(E) |