# Exhibit C

**Shirk, Georgette L**

| | |
|---|---|
| **From:** | Gentry, Anthony E |
| **Sent:** | Monday, May 21, 2018 2:04 PM |
| **To:** | Gaffin, Elizabeth S; Elder, Phillip D; Hinds, Ian G |
| **Subject:** | RE: Social media - FORMS project - LPRs |

The document (not really a formal memo) was created in January 2018 and last modified on 1/10/18, by Dylan Cors of the National Security Division (NSD).  His online bio at Linked In is as follows:  Dylan Cors **-** International Director, National Security Division at U.S. Department of Justice.  I concur with Phillip's comments (e.g., we looked at the comments and OCC's opinion has not changed).

> **From:** Gaffin, Elizabeth S
> **Sent:** Monday, May 21, 2018 2:25 PM
> **To:** Elder, Phillip D; Gentry, Anthony E; Hinds, Ian G
> **Subject:** RE: Social media - FORMS project - LPRs

(b)(5)

> Elizabeth Gaffin
> USCIS Office of the Chief Counsel

(b)(6)

> **From:** Elder, Phillip D
> **Sent:** Monday, May 21, 2018 2:23 PM
> **To:** Gentry, Anthony E; Gaffin, Elizabeth S; Hinds, Ian G
> **Subject:** RE: Social media - FORMS project - LPRs
>
> Do we need to respond?  We can say we have looked at the DOJ memo and it doesn't change our opinion.

> **From:** Gentry, Anthony E
> **Sent:** Monday, May 21, 2018 11:52 AM
> **To:** Elder, Phillip D; Gaffin, Elizabeth S; Hinds, Ian G
> **Subject:** FW: Social media - FORMS project - LPRs
>
> OCC only

(b)(5)

-----Original Message-----
From: Sterling, Brian
Sent: Monday, May 21, 2018 10:27 AM
To: Gentry, Anthony E; Brand, Jennifer S; Friedmann, Pamela; Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Bergman, Kristin
Subject: RE: Social media - FORMS project - LPRs

Good Morning All,                     (b)(5)

+ Kristin Bergman (OGC-ILD) for John Dermody

Regards,
Brian

Brian Sterling
Senior Policy Advisor
Office for Civil Rights and Civil Liberties U.S. Department of Homeland Security

(b)(6)

-----Original Message-----
From: Gentry, Anthony E
Sent: Friday, May 18, 2018 6:46 PM
To: Brand, Jennifer S <                            Friedmann, Pamela \            (b)(6)
Pachon, Marc <                    Kaplan, Randall <            Dermody, John
                                                              Sterling, Brian
                        ; Quinn, Kevin T <                Brown, Sara C
(b)(6)                    ; Harp, Bradley              Rigdon, Jerry L

Cc: Johnson, Erik                   Lester-Saura, Victoria
Subject: RE: Social media - FORMS project - LPRs

Jennifer,

Yes, it would be helpful to have the memo.

Thanks.

Tony

Anthony E. Gentry
Counsel for Intelligence & Operations
Office of Chief Counsel
US Citizenship and Immigration Services

(b)(6)

(b)(6)

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain Attorney Work Product information that is privileged, confidential, or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering the e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify us immediately by replying to this message, and please destroy all copies of this e-mail.

-----Original Message-----
From: Brand, Jennifer S
Sent: Friday, May 18, 2018 5:30 PM
To: Friedmann, Pamela; Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Sterling, Brian; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Gentry, Anthony E
Subject: RE: Social media - FORMS project - LPRs

Hi All,
The issue was one that was raised by DOJ folks in a memo in the context of issues for enhanced vetting at NVC but it appears relevant regardless of where the vetting takes place. I can dig up the memo and share it on Monday if that is helpful.

Jennifer S. Brand
Section Chief
Security, Intelligence, and Information Policy Office for Civil Rights and Civil Liberties

(b)(6)

From: Friedmann, Pamela
Sent: Friday, May 18, 2018 5:00:24 PM
To: Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Brand, Jennifer S; Sterling, Brian; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Gentry, Anthony E
Subject: Social media - FORMS project - LPRs

All,

(b)(5)

If OGC or CRCL have remaining concerns, please advise and PLCY will set up a conference call for early next week.

Many thanks for your consideration.  Have a nice weekend, everyone.
Pamela

From: Friedmann, Pamela
Sent: Tuesday, May 15, 2018 12:00 PM                                    (b)(6)
To: Pachon, Marc                              >; Kaplan, Randall <                        ; Dermody, John <                                                        rand, Jennifer S
<                          ; Sterling, Brian <                        Quinn, Kevin T
<                          Brown, Sara C <                        Harp, Bradley J
>; Rigdon, Jerry L
Cc: Johnson, Erik <                        Lester-Saura, Victoria
Subject: Today's 4 pm conf. call re social media and LPRs is postponed.

DHS PLCY will reschedule.
Thank you.
Pamela

Pamela Friedmann
Director, Screening Coordination Office
Threat Prevention and Security Policy
Office of Policy
U. S. Department of Homeland Security                (b)(6)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 1 of*
*14*

For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

**This template is used to assess the Department's Operational Use of Social Media, consistent with Management Directive 110-01.**

The DHS Privacy Office has created this template to determine privacy compliance with Management Directive 110-01, *Privacy Policy for Operational Use of Social Media*. For the purposes of the Management Directive and this template, "Operational Use" means authorized use of social media to collect personally identifiable information for the purpose of enhancing situational awareness, investigating an individual in a criminal, civil, or administrative context, making a benefit determination about a person, making a personnel determination about a Department employee, making a suitability determination about a prospective Department employee, or for any other official Department purpose that has the potential to affect the rights, privileges, or benefits of an individual. Operational use does not include the use of search engines for general Internet research, nor does it include the use of social media for professional development such as training and continuing education or for facilitating internal meetings. The following uses of social media are exempt from the Management Directive and are not subject to this requirement[1]:

  a) Communications and outreach with the public authorized by the Office of Public Affairs (covered by the existing PIAs: DHS/ALL/PIA-031 - Use of Social Networking Interactions and Applications Communications/Outreach/Public Dialogue and DHS/ALL/PIA-036 - Use of Unidirectional Social Media Applications);

  b) The conduct of authorized intelligence activities carried out by the Office of Intelligence and Analysis, the intelligence and counterintelligence elements of the United States Coast Guard, or any other Component performing authorized foreign intelligence or counterintelligence functions, in accordance with the provisions of Executive Order 12333, as amended.

This template shall be used to document the process to be followed by all programs engaging in operational uses of social media; to identify information technology systems, technologies, rulemakings, programs, or pilot projects that involve PII and other activities that otherwise impact the privacy of individuals as determined by the Chief Privacy Officer; and to assess whether there is a need for additional Privacy Compliance Documentation. Components may appeal to the Deputy Secretary for

---

[1] Gathering information by the Office of Operations Coordination and Planning (OPS) to enhance situational awareness is exempt from this requirement and is covered by the existing PIA: DHS/OPS/PIA-004(d) - Publicly Available Social Media Monitoring and Situational Awareness Initiative Update.

For Official Use Only

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 2 of*
*14*

**For Official Use Only**

Homeland Security if there is disagreement over the DHS Privacy Office determination of privacy compliance for the operational use of social media.



**Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 3 of
14*

(b)(5)                    For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

Please complete this form and send it to your Component Privacy Officer.
Upon receipt, your Component Privacy Officer and the DHS Privacy Office will review this
form and may request additional information.

## SUMMARY INFORMATION

**Date submitted for review: 1/25/2017**

**Name of Component:** U.S. Citizenship and Immigration Services, Fraud Detection and
National Security Directorate (FDNS)

**Contact Information:** Kevin T. Quinn

**Counsel[2] Contact Information:** ~~TBD~~

Craig Symons  Chief Counsel USCIS                    (b)(6)

**IT System(s) where social media data is stored: FDNS-DS**

**Applicable Privacy Impact Assessment(s) (PIA):**

**DHS/USCIS/PIA-013-01 - Fraud Detection and National Security Directorate (FDNS)**

**DHS/USCIS/PIA-013(a) - Fraud Detection and National Security Data System (FDNS-DS)**

**Applicable System of Records Notice(s) (SORN):**

**DHS/USCIS/ICE/CBP-001 – Alien File, Index, and National File Tracking System of Records,
November 21, 2013, 78 FR 69864**

**DHS/USCIS-006 - Fraud Detection and National Security Records (FDNS) August 8, 2012, 77
FR 47411**

---

[2] Counsel listed here must certify that appropriate authority exists to engage in particular operational activities involving social
media.

**For Official Use Only**

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 4 of 14*

(b)(5)

For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

### SPECIFIC QUESTIONS

1. **Describe the category of use for collecting personally identifiable information from social media sources. Examples include: law enforcement intelligence, criminal investigations, background investigations, administrative investigations, professional responsibility investigations, benefit or employment determinations, or situational awareness. If use does not fit into one of these categories, please describe in full below. If your component has multiple categories of use, please submit separate template for each category.**

**dministrative investigations** for cases involving possible fraud, national security, or public safety concerns.

During the adjudication of immigration benefits, USCIS officers may discover indicators of potential fraud, criminal, public safety, or national security concerns. Cases where these concerns are identified are referred to local FDNS Immigration Officers (FDNS IOs) for administrative investigation. After completing an administrative investigation, FDNS IOs will either provide the results to the referring adjudicator, who adjudicates the immigration service request on its merits, or refer the case to ICE for removal or criminal prosecution. This USCIS administrative review during adjudication is foundational to future criminal prosecution.

FDNS IOs follow detailed guidance when handling cases involving potential fraud, criminal, public safety, or national security concerns. Additional security and background checks are performed. USCIS records, documents, and materials may be reviewed for consistency with material and information provided by the applicant.[3] While initial concerns may be resolved with these efforts alone, additional information from outside sources is often required.

---

[3] As used in this document, the term applicant includes applicants, petitioners and requestors

(b)(5)

For Official Use Only



# Homeland Security

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)

**Version date: January 25, 2017**
*Page 5 of 14*

**For Official Use Only**

(b)(7)(e)

The internet is a resource that provides access to subscription data sources and publicly available information. Some publicly available information resides on social media websites. USCIS requires the ability to consider that information as it may contradict and/-or substantiate information provided to USCIS by the applicant. Information from social media also enables USCIS to build lines of inquiry when requesting evidence and during

As with all derogatory information uncovered by USCIS that may have an impact on adjudication, applicants will have the opportunity to explain or refute any adverse information discovered through social media research.

As noted in the [ ] FDNS Privacy Impact Assessment , in compliance with DHS Directive 110-01, Privacy Policy for Operational Use of Social Media and Instruction 110-01-001, FDNS IOs will be permitted to access social media sites when conducting administrative investigations only after they have [ ] completed required ￢ training on the use of social media and signed the "Rules of Behavior," FDNS IOs will then complete refresher training and sign the Rules of Behavior annually.

When conducting official government business, FDNS IOs may not provide false or misleading information about their identity to applicants, petitioners, or anybody else under investigation. However, FDNS IOs, with the approval of their supervisor, may establish accounts on social media sites using fictitious name [ ] where otherwise publicly-available information (information for which the account holder has not invoked privacy protection settings) is only available to those who have an account with the service provider or social media platform. FDNS IO [ ] must have approval from their supervisor not to use their official title or agency affiliation, ￢ and to use fictitious names and contact information when creating accounts. ~~These~~ fictitious ~~accounts will be subject to routine audit by FDNS leadership or the Office of Security and Integrity, either by routine audits or by a cause audits.~~

FDNS IOs~~Officers may~~shall~~Officers may~~ not use personal social media accounts for official government business. FDNS IOs must use government-issued equipment to access social media. FDNS IOs ~~cannot~~shall not communicate with users of social media sites and shall not engage other users in any way (e.g., "like" someone's comments), ￢ and may only passively review social media~~information~~. Further, any information, whether it is derogatory or not, found on a social media site that is used in an investigation must be printed and saved in appropriate systems of records, including but not limited to the applicant's alien file and the Fraud Detection and National Security Data System (FDNS-DS).[4]

(b)(7)(e)

---

[4] Privacy Impact Assessment for the Fraud Detection and National Security Data System, DHS/USCIS/PIA-013(a), May 18, 2016.

**For Official Use Only**

(b)(7)(e)

---

**Comment [KTQ8]:** Accept edit.

**Formatted:** Indent: First line: 0.5"

**Comment [OCC15]:** No objection

**Comment [AEG17]:** See KTQ14



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 6 of*
*14*

For Official Use Only

**(b)(5)**

As noted above, USCIS FDNS IOs will never directly interact with social media users. They will no [ ] use their official government email address when an account must be created to access a social media site, unless authorized by their supervisor. or [ ] FDNS IOs will not place their official title or agency affiliation in their screen names. A screen name that includes an officer's true name or agency affiliation presents potential hazards to personnel and may hamper administrative investigations by:

**(b)(5)**

* Providing untraceable and unidentifiable persons who may be interested in harming the Department of Homeland Security and its employees the ability to associate specific personnel with their DHS employer;

* Encouraging those who would intentionally mislead officers by sharing false information; or

* Alerting an individual to the fact that they are being scrutinized by DHS. While de-confliction with law enforcement agencies is always undertaken by USCIS to avoid interference with Law Enforcement investigations,[5] USCIS may be the first USG entity to identify information that suggests an individual may be engaged in fraudulent or criminal behavior or a risk to national security and/or public safety.

Examples of information that can be gathered through social media include, but are not limited to:

- Addresses (Pertinent to relationship verification for family-based benefits).
- Stated relationships (Pertinent to relationship verification for family-based benefits).
- Biographical data (Pertinent to multiple benefit and action determinations).
- Educational and vocational attainment (Pertinent to employment based benefits).
- Professional and business involvement and associations (Pertinent to employment based benefits).
- Travel information (Pertinent to multiple benefit and action determinations).
- Corporate, school and company information—many utilize social media pages rather than commercial websites (Pertinent to multiple benefit and action determinations).
- Resume postings (Pertinent to multiple benefit and action determinations).
- Blog and "Twitter" entries contrary to [ ] information submitted by the applicant. (Pertinent to multiple benefit and action determinations).

---

[5] In accordance with the September 25, 2008 Memorandum of Agreement between USCIS and ICE on the Investigation of Immigration Benefit Fraud.

For Official Use Only



**Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 7 of*
*14*

(b)(5)
**For Official Use Only**

- Location information and street-views of specific addresses: May suggest an address is not a business/industry, not a residence, not a school, not a law office, not a place of worship, or not industrial., etc. (Pertinent to multiple benefit and action determinations).

- An organization's stated purposes and activities (Pertinent to terrorist and/or other inadmissibility grounds in multiple benefit and action determinations).

- An organization's stated membership (Pertinent to determining an individual's past activity, location or membership in a group, which may then concern national security and/or other inadmissibility grounds in benefit determinations

2. **Based on the operational use of social media listed above, please provide the appropriate authorities.**

- Homeland Security Act of 2002, as amended, Pub. L. No. 107-296, 116 Stat. 2135 (2002)
- Immigration and Nationality Act of 1952, Pub. L. No. 82-414, §§ 103 and 287(a)(1) and (b), 66 Stat. 163, as amended
- (8 U.S.C. §              and 1357 (a)(1) and (b)  Powers of immigration
- 8 C.F.R. §§        103.2(b)(16)(i) and (ii)
- DHS Delegation No. 0150.1, Delegation of Authority to the Director of U.S. Citizenship and Immigration Services
- DHS Delegation No. 15002, Delegation to the Director of U.S. Citizenship and Immigration Services to Conduct Certain Law Enforcement Activities
- DHS Directive 110-01, Privacy Policy for Operational Use of Social Media
- DHS Instruction 110-01-001, Privacy Policy for Operational Use of Social Media
- USCIS Acting Director re-delegation of authority under DHS Delegation 15002 to Fraud Detection and National Security and Office of Security and Integrity, dated March 28, 2017, entitled, "Delegation of Authority to Conduct Certain Law Enforcement Activities Including, But Not Limited to, Accessing the Internet and Publicly Available Social Media Content Using a Fictitious Account or Identity.
  - •

**Formatted:** Highlight
**Formatted:** Highlight
**Formatted:** Highlight
**Formatted:** Highlight
**Formatted:** Indent: Left: 0.5", Hanging: 1.5", Tab stops: 0.75", List tab + Not at 2"
**Formatted:** Highlight
**Formatted:** Indent: Left: 0.75", No bullets or numbering, Tab stops: Not at 2"

a) **Has Counsel listed above reviewed these authorities for privacy issues and determined that they permit the Program to use social media for the listed operational use?**

☒ Yes.          ☐ No.

3. **Is this use of social media in development or operational?**

☐ In development.     ☒ Operational.  Date first launched:  Unknown

(b)(5)

**For Official Use Only**

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 8 of*
*14*

(b)(5)

(b)(5)          (b)(7)(e)

4.   Please attach a copy of the Rules of Behavior that outline the requirements below.

    4.   See attached Rules of Behavior (RoB) for FDNS

> **Formatted:** Indent: Left: 0.5", No bullets or numbering

5.   Please describe the Rules of Behavior in effect for the listed operational use of social media.  If users do NOT follow a particular Rule, please detail reasoning for not following that Rule:

    a)   *Equipment.* Use only government-issued equipment when engaging in the operational use of social media;

      ☒ Yes.    ☐ No.  If not, please explain:

    b)   *Email and accounts.* Use online screen names or identities that indicate an official DHS affiliation and use DHS email addresses to open accounts used when engaging in social media in the performance of their duties;

> **Formatted:** Font color: Auto

    **No. –** Pursuant to DHS Delegation 15002, and USCIS re-delegation of DHS Delegation 15002, re-delegation dated March 28, 2017, properly trained and authorized officers or employees of USCIS within or officially detailed to FDNS may access the internet and publicly available social media using a fictitious account or identity. The use of a fictitious account or identity may only be used involving matters under the jurisdiction of FDNS to protect the national security and public safety. This may include [          ] allegations of potential fraud and verification of information to establish eligibility for an immigration benefit.

(b)(5)          (b)(7)(e)

    [          ] A screen name that includes an officer's name or agency affiliation presents potential hazards to personnel and may hamper administrative investigations by:

    * Providing untraceable and unidentifiable persons who may be interested in harming the Department of Homeland Security and its employees the ability to associate specific personnel with their DHS employer;

    * Encouraging those who would intentionally mislead officers by sharing false information; or



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 9 of*
*14*

(b)(7)(e)                                                                        (b)(5)

**For Official Use Only**

(b)(7)(e)

* Alerting an individual to the fact that they are being scrutinized by DHS. While de-conflict with law enforcement agencies is always undertaken by USCIS to avoid interference with ~~L~~law ~~E~~enforcement investigations,[6] USCIS may be the first USG entity to identify information that suggests an individual may be engaged in fraudulent or criminal behavior or a risk to national security and/or public safety.

c)   *Public interaction*. Access publicly available information through social media only by reviewing posted information without interacting with any individual who posted the information;

☒ Yes.    ☐ No.  If not, please explain:

d)   *Privacy settings*. Respect individuals' privacy settings and access only information that is publicly available;

☒ Yes.    ☐ No.  If not, please explain:

e)   *PII collection*: Collect the minimum PII necessary for the proper performance of their authorized duties except for systems subject to Final Rules for Exemption from certain aspects of the Privacy Act;

☒ Yes.    ☐ No.  If not, please explain:

f)   *PII safeguards*. Protect PII as required by the Privacy Act (if applicable) and DHS privacy policy;

☒ Yes.    ☐ No.  If not, please explain:

g)   *Documentation*. Document operational use of social media, including date, site(s) accessed, information collected and how it was used.

☒ Yes.    ☐ No.  If not, please explain:

h)   *Training*. Users complete annual privacy training which has been approved by Component Privacy Officer (or Privacy Point of Contact) based upon training materials provided by the DHS Privacy Office.  Training must include, at minimum: legal

---

[6] In accordance with the September 25, 2008 *Memorandum of Agreement between USCIS and ICE on the Investigation of Immigration Benefit Fraud.*

**For Official Use Only**



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 10 of*
*14*

(b)(7)(e)

**For Official Use Only**

authorities, acceptable operational uses of social media, access requirements, and
requirements for documenting operational uses of social media.

(b)(5)

The Users must also complete any required trainings by the agency, in conjunction with
the privacy training for operational use of social media.  FDNS Officers who are
authorized to access the Internet and publicly available social media content using a
fictitious account or identity must be properly trained pursuant to DHS Delegation
15002

(b)(5)     (b)(7)(e)

☒ Yes.     ☐ No.  If not, please explain:

Mechanisms are (or will be) in place to verify that users have completed training.

☒ Yes, employees self-certify that they have read and understood their Component
Rules of Behavior.

☒ Yes, Component Privacy Officers or PPOCs maintain a record of employee
attendance at privacy training that includes training on the Rules of Behavior.

☐ No.  If not, please explain:


**Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 11 of*
*14*

For Official Use Only

## DHS SOCIAL MEDIA DOCUMENTATION

### (To be Completed by the DHS Privacy Office)

**DATE reviewed by the DHS Privacy Office:**

**NAME of the DHS Privacy Office Reviewer: <Please enter name of reviwer.>**

### DESIGNATION

**This program is covered by the following Privacy Impact Assessment and Privacy Act System of Records Notice:**

**PIA:** <If applicable, include PIA name and number here.>

**SORN:** <If applicable, include SORN name and number here.>

1. **Category of Use:**
   - ☐ Law Enforcement Intelligence;
   - ☐ Criminal law enforcement investigations;
   - ☐ Background investigations;
   - ☐ Professional responsibility investigations;
   - ☐ Administrative or benefit determinations (including fraud detection);
   - ☐ Situational awareness; and
   - ☐ Other. <Please explain "other" category of use here.>

2. **Has Component Counsel reviewed and determined that there is authority to engage in the above Category of Use?**
   - ☐ Yes.          ☐ No.

3. **Rules of Behavior Content: (Check all items that apply.)**
   a. *Equipment.*

For Official Use Only



**Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 12 of
14*

**For Official Use Only**

☐ Users must use government-issued equipment.  Equipment may be non-attributable and may not resolve back to DHS/US IP address.

☐ Users must use government-issued equipment.  Equipment must resolve back to DHS/US IP address.

b.  *Email and accounts.*

☐ Users do not have to use government email addresses or official DHS accounts online.

☐ Users must use government email addresses or official DHS accounts online.

c.  *Public interaction.*

☐ Users may interact with individuals online in relation to a specific law enforcement investigation.

☐ Users may NOT interact with individuals online.

d.  *Privacy settings.*

☐ Users may disregard privacy settings.

☐ Users must respect individual privacy settings.

e.  *PII storage.*

☐ PII is maintained in an exempted Privacy Act System of Records.

Please list applicable SORN here:

☐ PII is maintained in a Privacy Act Systems of Records.

Please list applicable SORN here:

f.  *PII safeguards.*

☐ PII is protected as required by the Privacy Act and DHS privacy policy.

☐ Only a minimal amount of PII is collected and safeguarded, consistent with DHS/OPS-004 – Publicly Available Social Media Monitoring and Situational Awareness Initiative.

g.  *Documentation.*

**For Official Use Only**


# Homeland Security

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 13 of
14*

**For Official Use Only**

☐ Users must appropriately document their use of social media, and collection of information from social media website.

☐ Documentation is not expressly required.

h.   *Training.*

☐ All users must complete annual privacy training that has been approved by Component Privacy Officer.  Training includes:

☐ Legal authorities;

☐ Acceptable operational uses of social media;

☐ Access requirements;

☐ Applicable Rules of Behavior; and

☐ Requirements for documenting operational uses of social media.

☐ Mechanisms are (or will be) in place to verify that users have completed training.

☐ Yes, employees self-certify that they have read and understood their Component Rules of Behavior.

☐ Yes, Component Privacy Officers or PPOCs maintain a record of employee attendance at privacy training that includes training on the Rules of Behavior.

☐ No, certification of training completion cannot be verified.

**DHS Privacy Office Determination**

☐ Program has met requirements to use social media for the stated authorized operational purposes, and must continue compliance with the requirements above.

☐ Program has not yet met requirements to utilize social media for operational purposes.

☐ Program authorities do not authorize operational use of social media.

☐ Rules of Behavior do not comply. <Please explain analysis.>

**For Official Use Only**

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 14 of 14*

**For Official Use Only**

☐ Training required.

Additional Privacy compliance documentation is required:

☐ A PIA is required.

    ☐ New.

    ☐ Updated.  <Please include the name and number of PIA to be updated here.>

☐ A SORN is required:

    ☐ New.

    ☐ Updated.  <Please include the name and number of SORN to be updated here.>

**DHS PRIVACY OFFICE COMMENTS**

**For Official Use Only**

(b)(5)

| Page 5: [1] Comment [OCC13] | IGH | 6/8/2017 1:37:00 PM |
|---|---|---|

| Page 5: [2] Comment [KTQ14] | Quinn, Kevin T | 5/5/2017 4:28:00 PM |
|---|---|---|

| Page 5: [3] Comment [GES18] | Gaffin, Elizabeth S | 5/5/2017 4:28:00 PM |
|---|---|---|

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

**<u>Refugee Screening Review:  The Defense Advanced Research Projects Agency 2.0 Pilot</u>**

**Overview**

In Fiscal Year (FY) 2015, the U.S. Citizenship and Immigration Services (USCIS) deployed multiple pilots – in coordination with the Department of Homeland Security (DHS) Office of Intelligence and Analysis (I&A), the Intelligence Community (IC), and the Department of Defense (DoD) – to assess the feasibility of using social media to screen refugee applicants. During that initial test, USCIS encountered a number of challenges and limitations in using the tool, and determined it did not meet USCIS social media screening needs at that time.

In FY 2016, USCIS initiated pilots, in coordination with DHS Science and Technology (S&T), that used the                platform to screen two different population sets:                 USCIS sought to determine if reviewing the social media presence of these individuals could provide useful information for adjudicating their applications, and gauge how resource intensive this screening would be.

Following a review of the results of the                pilots, USCIS initiated a second pilot utilizing the revamped                platform to screen a new round of refugee applicants –                .  This paper captures the results of that pilot.

In keeping with its previous approach to the                pilots, the USCIS Headquarters Fraud Detection and National Security Directorate (HQFDNS) pilot team took a two-fold approach: first, determined if any of the applicants could be linked to derogatory information that negatively impacted their eligibility or admissibility; and second, evaluated the                tool for USCIS' social media screening requirements.

**                Elicitation Pilot**

In April 2016,                were asked about their social media accounts during                processing in                During the elicitation,                contractors asked applicants about their use of                and, when available, the applicants provided user names, handles, and Web addresses also known as URLs.  The data collected during this pilot was unloaded to the                and given to                in Excel format for ingestion.  Additionally, the elicited data was manually vetted and evaluated.

The results show that elicited data does not replace manual account identification processes or produce major efficiencies.  United States Digital Service (USDS) evaluated the pre-vetted data and came to similar conclusions.[1]

---
[1] See Refugee Social Media Elicitation Pilot Summary – Pre-Vetted for additional information.

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

[      ] **as an Entity Identification & Resolution Tool**
[      ] is an open-source based social media screening tool, which uses personal identifiers (e.g., [              ]) to comb [                              ] for potential user accounts.  <u>Note:</u> [      ] (and all other social media tools) is unable to [          ]

[                                                                    ]

[                                                                    ]

**Methodology**
This pilot focused on [          ] applicants, predominantly [      ] divided into two sets.

- Set 1:  The first set contained [      ] individuals referred to HQFDNS for [      ] enhanced review.[3]
- Set 2:  The second set contained [      ] individuals chosen for the USCIS Elicitation Pilot, led by the Department of State, USDS, and USCIS Refugee, Asylum, and International Operations Directorate (RAIO).[4]

---

[2] See Appendix A for a description of each [      ] tab.

[                                                                    ]

[4] [                    ] were associated with 102 Elicitation Pilot cases.  [              ] of the [    ] individuals participated in the elicitation.  Those associated with the cases who did not participate in elicitation included a number of children who were not asked about social media due to their age.

3

**DRAFT/Pre-Decisional**
**For Official Use Only – Law Enforcement Sensitive**

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

The first set of cases ([     ] enhanced review referrals) was processed through [     ] using a four-step process:

| | Ingest (Step 1) | • *Automated phase.*<br>• [     ] ingested applicant data from WRAPS to help identify social media accounts. |

| | Search (Step 2) | • *Automated phase.*<br>• [     ] searched [                    ] to identify possible social media accounts associated with the applicant, using various biographic combinations and email handles drawn from the WRAPS extract. |

| | Review (Step 3) | • *Manual phase.*<br>• Fraud Detection and National Security (FDNS) officers reviewed and scored the social media accounts returned by QED's search as either a "Possible Match" or "No Match" to the applicant. |

| | Assess (Step 4) | • *Manual phase.*<br>• FDNS officers assessed the social media postings attributed to each "Possible Match" account to determine if they contained derogatory information. |

In conjunction with this process, FDNS officers also manually reviewed each social media account returned by [     ] through the [                    ] to assist with the account confirmation and derogatory resolution steps, and conducted independent searches through [          ] to identify other potential social media accounts.[5]

Due to technical issues with the DARPA tool, the second set of cases (Elicitation Pilot) was not ingested by [     ] in time for the cases to be processed according to the methodology described above.  FDNS officers relied on manual searches using [          ] and the [     ] to identify and vet social media accounts associated with applicants within this group.  Following the completion of this ad hoc process, [     ] subsequently ingested all of the Elicitation Pilot cases, [               ] [               ], which allowed FDNS to evaluate the tool's results against the officers' manual process.

**Entity Identification and Resolution Results**
Mirroring the [          ] pilot's conclusions, this pilot underscored [                    ] [                    ] and highlighted the challenges posed by name-based social media searches and by individuals' privacy settings in conjunction with USCIS' limited authorities.

[                                                                      ]

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

Combining both sets of cases, totaling [          ] applicants referred to HQFDNS for enhanced review and [          ] chosen for the Elicitation Pilot), FDNS officers determined that:

- [   ] individuals had confirmed social media accounts, which accounted for [   ] total accounts:  Facebook [     ], Instagram [   ], Twitter [    ] and YouTube [     ].
- [   ] individuals had [   ] possible social media accounts, but due to privacy settings and platform restrictions these matches were unable to be confirmed or disproven.[6]

Note:  Because [       ] cannot [                                                              ] to manually review accounts identified for each platform, where privacy settings allowed.

(b)(7)(e)

Two of the social media accounts reviewed contained potentially derogatory information:

-
-

Overall, the [     ] tool demonstrated significant limitations identifying potential social media accounts. [     ] yielded many results that did not relate to the refugee applicants. [     ] also failed to identify accounts that FDNS officers were able to identify via manual methods.  While it was difficult to determine the precise source of these shortfalls, DARPA developers have acknowledged that [                                                                                  ]

[          ] Enhanced Review Cases [                    ] reviewed)

- [     ] identified [     ] potential accounts, all of them on Twitter.  FDNS officers determined that:
  - Approximately [                    ] of these accounts were No Match to the refugee applicant, based on a review of the information associated with the account, such as avatar photo, account description, account postings, or username.
  - Approximately [                    ] of the accounts were Potential Matches, which could not be confirmed or disproven in the absence of further identifying information.
  - Approximately [                    ] of the accounts were Confirmed Matches.[8]

---

[6] This total includes a significant number of possible accounts returned by [     ], which were associated with child-aged derivatives.  In keeping with the team's methodology for scoring accounts, they were scored as possible matches since they could not be confirmed or disproven.
[7] An account was considered Unknown when the officer was not able to review the account, either because they could not find it or because privacy restrictions prevented them from viewing it.

[                                                                                                          ]

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

Elicitation Cases [        ] reviewed)

- Refugee applicants participating in the Elicitation Pilot provided [   ] social media account handles, including:
  - ○
  - ○
  - ○
  - ○

- As noted above [      ] only searches against [              ] Of the [  ] combined [                          ] account handles provided via the Elicitation Pilot, [      ] only found [              ] uncovered [   ] additional potential accounts in cases where the applicant was unable to remember their account details, and therefore could not provide the account handle.

- Through the manual review process, FDNS officers identified [   ] additional social media accounts potentially associated with the Elicitation Pilot participants ( [                                              ] Many of these accounts were noted by the [         ] during their Elicitation Pilot interview but they were unable to remember exact account details.
  - ○ [      ] found [       ] accounts identified through manual review.

- FDNS officers found that, of the [              ] who claimed to have no social media accounts [   ] individuals actually had accounts.

**Case Review Metrics – Review Time**

Because the FDNS team used a similar methodology for identifying and vetting the social media accounts for each set of cases, the overall time required for reviewing each case was similar. The average review time in both sets of cases at HQFDNS was less than a half hour. Please see the chart below for additional information.

| | | *Enhanced Review Cases* | *Elicitation Pilot Cases* |
|---|---|---|---|
| | | | |
| | Average Review Time, Per Case:  28 minutes | Average Review Time, Per Case:  25 minutes | |

**Case Review Metrics – Elicitation Method**

During the first phase of the Elicitation Pilot, applicants were asked to log in to [              ] [                                          ] to the [     ] contractor.  During the second phase of the Elicitation Pilot, applicants were verbally asked to provide their [                ] [                              ] if they knew it.  In both the log-in elicitation phase and the verbal

elicitation phase, [                ] provided [                        ]. FDNS' manual review of the Elicitation Pilot cases indicated that it was equally challenging to identify and verify the accounts elicited in both phases. Please see the chart below for additional information.

| **Phase 1 Log-In Elicitation Results –** | | **Phase 2 Verbal Elicitation Results –** | |
|---|---|---|---|
| | | | |
| *Provided to [    ] Staff through Log-In Elicitation* | | *Provided to [    ] Staff through Verbal Elicitation* | |
| *Account Identification through FDNS Social Media Review* | | *Account Identification through FDNS Social Media Review* | |

The high number of possible and unknown accounts identified by FDNS from both phases reflects the different levels of access provided to users who are logged in to a [                ], versus those who are not. The FDNS officers participating in this pilot [                ]

[                                                                      ]

[    ] **Assessment**
Although [            ] as improved the [        ] tool since FDNS first piloted it, it is not a viable option for semi-automated social media screening at this time. The manual review process used by FDNS officers proved to be more effective at identifying accounts, and the [        ] tool yielded no gains in efficiency or throughput.

Among its positive attributes, the [      ] tool:
- Provided a useful profile for each applicant, drawn from [        ] data.
- Presented an intuitive user interface and workflow.
- Offered some capability for [                  ] although this was not tested during this pilot.
- Contained a tailorable report function (also not tested during this pilot).
- May have potential for bulk data ingestion.[9]

Among its negative attributes, the [      ] tool:
- Offered very low match confidence, with officers having both to find actual accounts and to review accounts that were not matched effectively. As part of its search algorithms, [        ] appears to match based on first and last names, or a combination of initials and names – leading to accounts that are entirely unrelated to the applicant.

---
(b)(7)(e)

[        ] believes it has identified the source of the problem with ingestion and resolved it. They are currently in the process of stress-testing the system to confirm this resolution.

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

- Returned zero results for ⬚ likely indicating a systemic problem with the tool's search capabilities.
- Failed to return the complete set of social media postings that were found during manual review of one of the cases for which potentially derogatory findings emerged, which could indicate issues with other accounts.
- Represented a static display of social media information, based on the time that the case was ingested and screened against social media platforms, which meant that any subsequent social media posts would not be captured in the tool.
- Could not be updated by an FDNS officer if an account was found manually.
- Did not offer an option to flag cases/accounts/social media posts for linguist review.
- Only worked in ⬚ making it incompatible with the ⬚ and forcing officers to manually enter information into ⬚ for account review.
- Provided mostly indecipherable machine translation.
- Did not offer a unified case list that indicated where every case was in the workflow process.
- Returned the same accounts as potential matches to multiple people in the same family case – leading to duplicative review.

**Lessons Learned**

The ⬚ Pilot continued the exploration of social media initiated by the ⬚ Pilot and the ⬚ 50-50 Pilot, conducted in conjunction with DHS Science and Technology, as well as previous ⬚ pilots conducted in conjunction with DHS Intelligence and Analysis, the Intelligence Community, and the Department of Defense. The team of FDNS officers assigned to evaluate ⬚ used best practices and tradecraft expertise developed through previous pilots to conduct effective and efficient social media review processes. In addition to the new lessons learned through ⬚ many of the previous lessons learned have still held true.

1. ***Optimal results come from richer and more refined data sets.***

- ⬚
- ⬚
- Elicited data may assist in confirming accounts, but does not replace account identification processes or produce major efficiencies.

2. ***Account restrictions inhibit success.***

- At the present time, FDNS officers are unable to log in to the various social media platforms and can only view what is publicly available, as set by the applicant and as available by a search in the platform for those not logged in.
- The team would more easily and accurately be able to confirm accounts with access to the social media platforms through account creation.
- Many of the Elicitation Pilot Facebook URLs ⬚ indicated that the page was not available to the FDNS officer or presented very limited information because the officer was not logged in to Facebook.

**DRAFT/Pre-Decisional**
**For Official Use Only – Law Enforcement Sensitive**

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

***3.   You have to choose the right social media platforms to search.***
- [____] has access to [_____] However, only [_____] was encountered through review within the [____] tool.
- [_____]

***4.   More than just translations are needed for foreign language records.***
- This pilot led to two potentially derogatory findings, one very significant.  In both cases, [_____] and subject matter expertise in regional culture, religion, and terrorism was needed to fully vet the information on the accounts.
- [_____] provided some machine translation but was unable to translate text on images and had trouble with translating hashtags.
- [_____] can only provide translation for Arabic; other language populations would have to be added to the tool for any future caseloads.

***5.   The refugee population continues to present unique challenges.***
- Based on initial analysis, many refugees do not appear to have social media accounts of any kind.
- From the [_____] analysis, it was suggested that eliciting social media accounts may assist in the social media screening process.  Based on analysis in this pilot, elicitation may also encourage applicants to edit accounts, remove derogatory information, increase privacy settings, or abandon accounts altogether.
- While having elicited account information assisted in confirming accounts, officers were still unable to review content in many of the elicitation cases.  It is unclear if applicant privacy settings were changed as a result of the elicitation or if the accounts were always private.

***6.   Timing of [_____] extracts is critical.***
- The data from [_____] is a spreadsheet extracted to conduct Interagency Checks. The spreadsheet should be tweaked to meet the needs of social media queries, including the addition of pictures for each applicant, and the inclusion of ALL known email addresses, aliases, related U.S.-based phone numbers and addresses, and elicited social media handles, user names, and URLs (if applicable).
- Given that the [_____] data in [____] is a static, one-time extract, officers had to review [_____] with every case to ensure they had the most up-to-date information.

[_____]

9

**DRAFT/Pre-Decisional**
**For Official Use Only – Law Enforcement Sensitive**

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

*7.* [ ] *use has limitations.*

In order to fully evaluate an applicant's social media, officers must visit the social media platforms through the [ ] to review the content.  The [ ] has a number of limitations:

- It only uses the Internet Explorer Web browser, which prevented FDNS officers from using it in combination with [ ]
- It restricts the normal copy/paste function going into and out of the [ ]   This requires users to manually enter information, such as complicated URLs, which can lead to mistakes.
- Officers were occasionally identified as potential bots and were asked to confirm [ ] [ ] images in order to proceed with searches.

*8.* *Tools matter.*

- [ ] attempts to automate the account identification process proved largely unsuccessful.
- Providing elicited data to [ ] did not improve outcomes in any way.
- Officers found reliable results using [ ] However, [ ] public search engine temporarily blocks out users who conduct repeated queries in a short period of time.[11]
- The [ ] has limitations that were not experienced by the initial pilot team using DHS S&T's open network.

---

[1] [ ] does offer business solutions that may mitigate this challenge.

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

**APPENDIX A**          (b)(7)(e)

☐ **Platform Details**

☐ has a simple user interface with four main tabs:  Dashboard, Online Persona Resolution, Derogatory Resolution, and Report.

Dashboard
☐ Dashboard allows a user to search for all available cases that have been ingested by the tool.  ☐ The Dashboard also has two lists of cases:  My In-Progress Cases and My Completed Cases.  Any cases that have been recently manipulated will appear in the My In-Progress Cases side of the platform.[12]

Online Persona Resolution
Once a user clicks on a case ☐ moves to the Online Persona Resolution page.  This page has many features and presents a wealth of applicant information:

---

[12] Due to a glitch in this tab during the pilot, FDNS officers noted that cases appeared as "in progress," even after the officers had reviewed all of the accounts and social media posts associated with the case.  After FDNS informed th ☐ eam, they added a "Completed Case" button that allowed officers to manually mark the case as completed.
[13] FDNS officers were unable to utilize these links due to current USCIS policy and the inability to access ☐ via ☐ which is the only search engine supported by the ☐

(b)(7)(e)
**DRAFT/Pre-Decisional**
**For Official Use Only – Law Enforcement Sensitive**

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional

(b)(7)(e)

## Derogatory Resolution

The Derogatory Resolution tab includes some of the same features of the Online Persona Resolution Tab as well as additional features:

セ

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

Although FDNS officers did not utilize the Report tab during this pilot, it represents the final step in the [____] workflow.  It is accessed after a user scores (or "resolves") all of the social media posts attributed to the Potential Matches.

(b)(7)(e)

Report
The Report tab offers a number of features:

(b)(7)(e)

- 
- 
- 
- 
- 

The Report tab is a summary of the work completed in the prior tabs.  At the present time, there is no function to export the results, or view the results in the aggregate.

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

# U.S. CITIZENSHIP AND IMMIGRATION SERVICES



# REVIEW OF REFUGEE SCREENING SOCIAL MEDIA PILOT

Fraud Detection & National Security Directorate
16 March 2016

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

<sub>(b)(7)(e)</sub>   **50-50 Review:** ⬜ **Pilot**

**Overview**

The Department of Homeland Security (DHS) asked United States Citizenship and Immigration Services (USCIS) to examine the feasibility of using social media for screening refugee applicants.  USCIS sought to determine if reviewing the social media presence of these individuals could provide useful information for adjudicating their applications, and gauge how resource intensive this screening could be.

While USCIS had used social media in a limited capacity for the enhanced vetting of certain refugees, it does not have any experience in using it as a large scale screening tool. The agency therefore decided to approach this work as an open-ended exploration with very flexible research parameters.  The team supporting this pilot utilized an adaptive approach to create, implement, and continually revise its social media screening procedures.

**⬜ as a Screening Platform**

Starting in December 2015, a team of USCIS personnel worked closely with DHS Science and Technology (S&T) to establish a pilot leveraging a commercially available tool for social media screening.  After reviewing more than 16 different companies and their existing data analysis capabilities, S&T experts selected ⬜ for the pilot. S&T worked with DHS OGC and ⬜ to execute a ⬜ to support joint experimentation with social media analytics.

S&T selected the ⬜ social media analytics platform due to its coverage of a ⬜

Of note, due to restrictions ⬜ (and many other social media tools) is unable to screen social media content posted on that platform.

While other government agencies are using ⬜ no agency has evaluated its use for mass screening.  Therefore, this pilot utilized an iterative approach that enabled the S&T/USCIS team to begin identifying technical limitations and

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

desired enhancements to tailor [              ] to better fit USCIS's unique screening requirements. Additional enhancements to the tool were implemented on a weekly basis throughout the pilot.

**Methodology**
USCIS identified [                         ] applicants (the 50-50 population) to serve as the focus of this pilot.  These cases were processed through [            ] using a three-step methodology: [                                                    ] Parts of the process were repeated as technical improvements and lessons learned were identified and applied.

(b)(7)(e)

Identify
(Step 1)

Collect
(Step 2)

Review
(Step 3)

[                                                                      ]

---

[2] These results are referred to in this paper as social media documents (such as a Twitter or Instagram post).  Each document is reviewed to determine whether it has any linkage to a member of the 50-50 population.

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

**Social Media Presence and Platform Utilization**

In Step 1, the identification phase, Officers closely examined the overall social media presence of the 50-50 population. [                    ] Officers determined that:

- [          ] had confirmed social media accounts, which accounted for [    ] total accounts.
- [          ] had a likely social media account but due to privacy settings and platform restrictions this match was unable to be confirmed.
- [          ] had possible accounts that could not be confirmed because they did not clearly relate to the applicant, which accounted for [  ] total accounts.
- [          ] had no identified social media accounts.

<u>Note</u>: A subject could have multiple social media accounts, which could be determined as confirmed, likely, or possible.

In terms of actual confirmed social media accounts associated with the 50-50 population, [          ] was the most popular platform.  See the table below for additional information about platforms associated with the 50-50 population.

| Confirmed | Likely but Unconfirmed | Possible but Unconfirmed |
|---|---|---|
|  |  |  |

<u>Note</u>: As with the K-1 pilot, the 50-50 results do not incorporate social media posted on Facebook, due to limitations preventing third parties from collecting its API. [          ] only collects on platforms that allow collection – [                    ]

**Results**
In keeping with the adaptive learning approach, USCIS ran the 50-50 population through the [                    ] screening process multiple times to [                    ] This was aided by the nature of [          ] data collection and retention capabilities – [                    ] This data may then be re-screened using [          ] to determine how it impacts the number of social media documents returned.

(b)(7)(e)

4

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

| **Round 1** |
|---|
| **(Ending 3/3/16)** |

*Average Time, Step 1*: 97 mins.
*Average Time, Step 2*: 3 days
*Average Time, Step 3*: 42 mins.
*Median Time, Step 3:* 5 mins.

| **Round 2** |
|---|
| **(Ending 3/14/16)** |

*Average Time, Step 1*: 45 mins.
*Average Time, Step 2*: 5 days
*Average Time, Step 3*: 22 mins.

*Analysis of Results*
Members of the 50-50 population had minimal presence on the U.S.-based social media platforms accessible through _____  Beyond that baseline finding, each round of screening yielded valuable insights to inform technical, policy, and programmatic decision-making.  To help ensure consistency with the approach used in the _____ pilot, Officers recorded the same metrics to evaluate each social media document associated with a member of the 50-50 population:

- Filter Category
- Social Media Platform

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

(b)(7)(e)

- Translation Time Required (where machine translation did not adequately translate into English)
- Confirmed Social Media Account

<u>Round 1</u>
Round 1 identified a number of key results:
- No derogatory information was attributed to any member of the 50-50 population.
- Only ☐☐☐☐☐☐ had a confirmed social media account (Instagram) that returned documents via ☐☐☐☐ filters, though, as previously stated, this account was determined to not have derogatory information. Of the ☐ documents associated with this applicant, ☐☐☐☐☐☐☐☐
- The average review time for each document was approximately 1 minute, 40 seconds.
- One hundred and eighty documents required human translation. On average, these documents required 1 minute and 20 seconds to resolve. ☐☐☐☐☐☐☐ who was very active on Instagram, was responsible for 141 of the 180 documents requiring translation.
- The median number of documents per applicant was 1 (which would require 1 minute, and 40 seconds to review), with the average number of documents being 24 (which would require 40 minutes to review).

Nearly half ☐ of the 50-50 returned no social media documents when filtered through the ☐☐☐☐☐ The remaining ☐ subjects returned documents when filtered through the ☐☐☐, the vast majority of which were not related or linked to the subject. Only one of the 50-50 subjects had a confirmed social media account that contained material that matched ☐☐☐ filters.

Approximately ☐☐ of social media documents filtered through the ☐☐☐ came from YouTube, followed by Instagram ☐☐ and Twitter ☐☐ Similar to the ☐☐☐ pilot results ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

**Round 1: Document by Platform**

2%  1%  2%  1%
3%
5%
35%
23%
28%

<u>Round 2</u>
The reduced set of ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐ – coupled with improvements in ☐☐☐☐☐ API matching, led to a major reduction in social media documents returned during Round 2. Key results included:

(b)(7)(e)

6

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

**Lessons Learned**

S&T/USCIS piloted the use of [redacted] for over ten weeks – testing capabilities, finding bugs, developing enhancements, learning about our applicants' use of social media, searching for derogatory information, capturing metrics, and demonstrating use cases to decision makers. With each week, the Pilot team continued to improve its ability to utilize [redacted] to screen social media, [redacted]

Many of the lessons learned derived from the [redacted] pilot remain applicable to the 50-50 population, including [redacted]

In addition, a number of distinct lessons have been learned, which can shape what social media vetting can look like in this setting and in future scaled-up operations.

1. **The refugee population presents unique challenges.**
   - Based on the results of this pilot, the refugee population may have a minimal footprint on common U.S.-based social media platforms. Those over age 60 and those under age 10 can be expected to have little social media presence, and the remainder may be active on platforms other than those collected by [redacted]

   - [redacted] remain the best elements of applicant data for identifying and confirming social media accounts. Eliciting this information and specific social media account handles from refugee applicants should assist the social media screening process. [redacted]

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional**

**2. Timing of ⬚ Extracts is Critical.**
- The ⬚ spreadsheet should be tweaked to better facilitate social media screening of ⬚ including the addition of pictures for each applicant, and the inclusion of all known ⬚

- In at least two instances, Officers found new email addresses for applicants in ⬚ a week or two after they had already screened the subject through ⬚ – timing of the extracts is critical.

**3. Filtering for Relevant Information is Essential.**
- Based on lessons learned in previous pilots, Officers used custom-built ⬚ for the 50-50 pilot. These ⬚ were refined between rounds and yielded progressively better results.

- Conducting English-language biographic searches (First Name, Last Name) proved unhelpful for both the ⬚ and 50-50 pilots. Biographic-based searches can be useful, however, if performed in the applicant's native language, such as Arabic, since it returns more accurate results (The name Mohammed can be spelled dozens of ways in English, for example, but only one way in Arabic). For this pilot, that required a linguistic expert to enter each name in Arabic into the ⬚

**4. Social media screening benefits from officer continuity.**
- Using the same Officer for each step of the ⬚ process (Identify, Collect, and Review) is more effective and efficient versus having a different person be responsible for different elements of the process. By conducting Step 1, officers quickly become familiar with each individual's personal information (biographical information, familial relationships, etc.), which enables them to build ⬚ for collecting in Step 2. In order to accurately assess the results returned as part of Step 3, an officer needs to be intimately familiar with the facts of the case.

(b)(7)(e)

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES



# REVIEW OF K-1 ADJUSTMENT OF STATUS
# SOCIAL MEDIA PILOTS

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

**Executive Summary**

USCIS examined three techniques to screen [____] adjustments of status cases: manually searching social media sites; using a commercial application [_____] scores to select cases for manual review; and using another commercial application, [_____], to filter social media information, [_____] through DHS S&T. USCIS has determined that neither of these techniques are ready for use in large scale social media screening. While the S&T/USCIS team using [_____] has learned many significant lessons about social media and has become more efficient, [_____ _____] USCIS recommends continuing research and development on [_____] and other services and tools to build the capabilities necessary for screening on the large scale envisioned and, until such capability is delivered, [_____ _____]

Other lessons learned:

- [_____] **This time is contingent on the particular platforms to be reviewed and the type of identifying information available pertaining to the subject.** [_____] [_____] **make it easier to locate social media accounts and may reduce processing time.**

- **Social media screening requires dedicated, and preferably on-site, language support.**

- **Close collaboration between S&T SMEs, USCIS officers and** [_____] **technicians led to rapid improvements in the technology and its use.**

- **Photos contained in government systems also helped confirm identities when photos on the social media site are available.**

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

- **Derogatory information found in other government systems can provide a more complete picture of the applicant's background and risk profile.**

(b)(7)(e)

- **Identifying potentially derogatory social media records is only one step in the adjudicative process.**
    - USCIS must determine how evidence will be used to reach an adjudicative decision.
    - USCIS must determine how it can share the evidence that it collects with other internal DHS components, other federal agencies, and state and local law enforcement.
- **Social media research on USCIS applicants falls into three discrete steps:**
    - Use all available information to identify social media accounts pertaining to the applicant;
    - Collect content from the pertinent social media platforms; and
    - Analysis the content to identify information that will impact USCIS decisions or other actions.
- **S&T is a highly capable USCIS partner and can establish operationally relevant technical capabilities to address emergent requirements for operational organizations**

(b)(7)(e)

    - Effective pilot operations can be created by combining S&T and USCIS authorities
        - S&T coordinated Department level approvals for the pilot and rapidly established a Privacy Impact Assessment to complement USCIS privacy policies within several days
        - S&T made space, equipment, and expertise available to work with immigration officers and accommodate pilot operations in 2 days.

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

## Introduction

The Department of Homeland Security (DHS) asked United States Citizenship and Immigration Services (USCIS) to examine the feasibility of using social media to screen individuals in the United States who entered via ⬚ visas and who are now seeking adjustment to ⬚ status.  USCIS sought to determine if reviewing the social media presence of ⬚ applicants could provide useful information for benefit adjudication and how resource intensive the screening would be.

While USCIS had used social media in a limited capacity for the enhanced vetting of certain refugees it did not have any experience in using it as a large scale screening tool. The agency therefore decided to approach this work as an open-ended exploration with very flexible research parameters.

USCIS identified a population of approximately ⬚ seeking adjustment.  Each of the ⬚ Adjustment of Status pilots studied part of this population.  The teams supporting each pilot were granted limited autonomy to create, implement, and continually revise their own social media screening procedures.

(b)(7)(e)

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

**Manual Reviews and** ▭ **at the National Benefits Center**

**Manual Reviews**

The USCIS National Benefits Center (NBC) is a central hub for the processing and adjudication of many immigration benefit requests, which includes the screening and vetting of the applicants. USCIS took advantage of this expertise and had the NBC Fraud Detection and National Security Immigration Officers (IOs), Supervisory IOs (SIOs), and an Intelligence Research Specialist look for and review social media accounts related to ▭ of the ▭ nonimmigrants seeking adjustment to ▭ status[1].

Using the ▭ the NBC used biographic information available in the A-file ▭ to search ▭ for social media accounts.  NBC personnel started each search with ▭ ▭ The NBC only detected social media accounts for ▭ nonimmigrants.

The NBC reviewed the parts of the social media accounts visible to the general public (they did not "friend" or "direct message" anyone) and tried to find records that could potentially impact the adjustment of status application.  The personnel chose a very expansive approach to

▭

▭ In addition, automated translation tools were not able to translate foreign language writing in picture and video files nor spoken words in video and audio files. Only ▭ nonimmigrants that had social media accounts had potentially derogatory social media records related to national security or public safety despite the notably low threshold for being flagged.

---

[1] This pilot was ended after ▭ reviews because NBC personnel were using their own personally identifiable information to create accounts to log into ▭

▭

▭

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

(b)(7)(e)

Manual reviews require a significant time investment. USCIS staff at the NBC explored ☐ ☐ to determine if it could be used to automatically detect which cases have social media accounts in order to avoid spending time investigating applicants with no social media presence. ☐

☐

☐ When searching for an individual, the ☐ will signal, on a ☐ scale, the confidence in having found the right person and the recentness of the data. A Reliability score of ☐ indicates high confidence; a Reliability score of ☐ indicates low confidence. Likewise, a Relevance score of ☐ indicates high probability of current actionable information. For example, returning a ☐ score would indicate successful entity resolution but out of date location information. A score of ☐ indicates high confidence at identifying information on the entity of interest and recent social media information on that person.

Cases with ☐ scores should be less likely to have social media than those with ☐ scores. Among the ☐ cases manually reviewed by the NBC, ☐ had scores of ☐ Among these, ☐ had scores of ☐ and ☐ had scores of ☐

- Among the ☐ scores, upon manual review, ☐ ( 54%) had no detectable social media accounts and ☐ (15%) had potentially derogatory information.
- Among the ☐ scores, upon manual review ☐ (47%) had no detectable social media accounts and ☐ (11%) had potentially derogatory information.

While this is a very simple comparison, it suggested that USCIS will not be able to leverage ☐ scores to meaningfully prioritize screening efforts without significant changes to the technology.

In January 2016, NBC reviewed an additional ☐ cases with ☐ scores. NBC also reexamined the ☐ scores from an earlier review in December 2015, this means NBC personnel manually reviewed a total ☐ cases with ☐ scores.

- Among the ☐ scores, upon manual review, ☐ (29%) had no records and ☐ (10%) had potentially derogatory information.

The additional case reviews did not establish that ☐ scores are a reliable indicator pointing toward a social media presence. Furthermore, NBC was often able to locate a social media presence for ☐ scores. The ☐ scores and ☐ scores had similar proportions of potentially derogatory information under the broad definition used at the NBC.

(b)(7)(e)

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

USCIS language support staff provided translations of social media records for some cases flagged as potential national security concerns. [                    ] [4] While the translations resolved some potential issues, most were not, as shown in the table below. If USCIS officers need to determine which social media records are potential national security concerns, and which are not, they will need training and clear guidance.

| Effect of Translations on Potentially Derogatory Information | (b)(7)(e) |
| --- | --- |
| | |

## Final Steps

The NBC will collect and review all necessary translations, work with partners in law enforcement and intelligence to determine if the social media records are still potentially derogatory, and then work with other USCIS stakeholders to determine how to resolve potentially derogatory social media records for adjudication.

## Lessons Learned

- [                                                            ]

---

[4] Social media records are an unusual workload for the language support staff and many documents were difficult to read due to image quality.

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

- **Automatic foreign language translation was not sufficient.** (b)(7)(e)
- **Additionally, USCIS language support staff spent** ☐ **that needed translation.**
- **Identity verification is crucial.** If USCIS cannot prove that an individual is the account owner, the evidence cannot be considered in adjudicative decisions.
- (b)(7)(e) ☐ **scores are not ready to be used to prioritize manual reviews.** The search parameters will need significant changes in order to better identify social media accounts and to triage social media records for review.
- **Officers will need clear guidance on what type of social media records are potentially derogatory and worth further investigation, and if determined to be derogatory, how to use that information.**
- **Derogatory information found in other government systems can provide a more complete picture of the applicant's background and risk profile.**
- **Officers will need clear guidance on how to share potential concerns with colleagues in law enforcement.**

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

[        ] **Pilot**

[        ] **as a Screening Platform**

Starting in December 2015, a team of USCIS Immigration Officers worked closely with DHS Science and Technology (S&T) to establish pilot operations and begin to develop baseline requirements for social media screening, utilizing currently available social media data analysis capabilities.  After reviewing more than 16 different companies and capabilities, S&T experts selected [        ] for the pilot. S&T worked with DHS OGC and [        ] to execute a [                                ] to support joint experimentation with social media analytics.

S&T selected the [        ] social media analytics platform due to its instant coverage of a

Data retention policies are automatically enforced and can be configured per data source or user. While other government agencies are using [                        ] no agency has evaluated its use for mass screening.  Therefore, this pilot utilized a cooperative, iterative approach that enabled the S&T/USCIS team to revamp [        ] to better fit its unique screening requirements.  Personnel from USCIS and S&T identified technical limitations and desired enhancements to [        ] technicians, which were generally resolved or implemented. Additional enhancements to the tool continue to be implemented on a weekly basis as the joint pilot operations continue. According to [        ] this process had the added benefit of improving the platform for the law enforcement and intelligence community partners already using the tool.

**Methodology**
After a review of an initial population of approximately [        ] adjustment applicants against [                ] resulted in [        ] results, USCIS prioritized [   ] interview-ready cases from that population for review. The [   ] cases were processed through [            ] using a three step methodology: 1) Identify social media accounts; 2) Collect social media information; and 3)

(b)(7)(e)     **For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

Review and analyze filtered results.  Because this pilot was breaking new ground, using an advanced social media analytics capability, the methodology was under constant refinement. Parts of the process were repeated as technical improvements and lessons learned were identified and applied.

*Step 1 – Identify*

*Step 2 – Collect*

*Step 3 – Review*

---

[5] Presently [          ] relies on the website [          ] to generate People Search results. [          ] is currently identifying additional data sources to enhance its People Search function, including [          ]
[          ]

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

**Results**
In keeping with the iterative learning approach described above, USCIS ran the ⬚
applicants through the ⬚ screening process multiple times, primarily to gauge the
impact of refining the ⬚. This was aided by the nature of ⬚ data
collection and retention capabilities – once an initial collection is performed on a given ⬚
⬚ This
data may then be re-screened using ⬚ to determine how it impacts the number of
potential social media matches returned.

| Round 1 |
| :---: |
| (Ending 1/21/16) |

| |
| --- |
| *Average Time, Step 1*: 2 hours[7] |
| *Average Time, Step 2*: 5 days |
| *Average Time, Step 3*: N/A |

| Round 2 |
| :---: |
| (Ending 2/13/16) |

| |
| --- |
| *Average Time, Step 1*: N/A[8] |
| *Average Time, Step 2*: 12 hours[9] |

---

[6] In this instance, due to a software error, the returns ⬚
[7] Officers were instructed to take no more than two hours for Step 1, although some cases took less time.
[8] Officers relied on the Step 1 results for rounds 2-4.

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

| *Average Time, Step 3*: 1.2 hours | |
|---|---|

| **Round 3** |
|---|
| (Ending 2/13/16) |

| | |
|---|---|
| *Average Time, Step 1*: N/A | |
| *Average Time, Step 2*: 24 hours | |
| *Average Time, Step 3*: N/A | |

is able to store results and rounds 2-4 rescreened these results using the smaller thus the Step 2 times are artificially shorter for Rounds 2-4.

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

| Round 4 |
|---|
| (Ending 2/23/16) |

| | |
|---|---|
| *Average Time, Step 1*: N/A | |
| *Average Time, Step 2*: 12 hours | |
| *Average Time, Step 3*: 68  mins | |
| *Median Time, Step 3*:  28 mins | |

*Round 4 – In Depth*
The dramatic reduction in social media matches returned during Round 4 enabled Immigration Officers to essentially redo the Step 3 process for the ⬚ while capturing a number of critical metrics to aid in evaluating the pilot's accomplishments.  For each social media match, Immigration Officers recorded the following:

- Filter Category
- Social Media Platform
- ⬚
- ⬚
- Translation Time Required (where machine translation did not adequately translate into English)
- Confirmed Social Media Account

Round 4 identified a number of key results:

- No derogatory information was attributed to a ⬚ applicant[10] or petitioner.
- Only one ⬚ applicant's social media account returned matches via ⬚ filter. These matches were linked to innocuous Instagram posts that featured common words ⬚
- The average review time per potential match was two minutes.
- Only ⬚ matches required human translation.  On average, these matches required 1.5 minutes to resolve.  One match, however, led to a social media account possibly linked to a ⬚ applicant, which contained numerous ⬚ videos that required approximately two hours of translation.
- The median number of potential matches per applicant was 14 (which would require 28 minutes to review), with the highest number of potential matches being 198 (which would require 2 hours and 30 minutes to review) and the lowest number being 0.

---

[10] This result is validated by the (non-social media) retrospective ⬚ review conducted by NCTC that found no derogatory information.

For Official Use Only – Law Enforcement Sensitive
DRAFT/Pre-Decisional 2 26 5:15pm version

*Round 4 – Social Media Platforms*          (b)(7)(e)

Some ▢ of matches, the largest group, came from ▢ Missing from this pie chart is ▢ due to its corporate decision to prevent third parties from collecting on its API feed. ▢ only collects on platforms that allow collection – ▢

To address this shortcoming, Immigration Officers used ▢ to identify potential ▢ accounts for the ▢ applicants and their petitioners, and then manually reviewed each of them, where privacy settings allowed. By clicking on the cover photo of the account, Immigration Officers were occasionally able to review other photos, albums, and mobile uploads. Potentially derogatory information was discovered on one of the ▢ applicants through this manual review – ▢

**Social Media Potential Matches**

In addition to reviewing each potential match returned by ▢ data collection process, Immigration Officers also more closely examined the overall social media presence of the ▢ and their petitioners (see *Figure 1*). Approximately ▢ of the ▢ or their petitioners, had confirmed social media accounts. A social media account is considered confirmed when it contains identifiers that match an applicant's data,

| Social Media Platform Accounts | | |
|---|---|---|
| *Confirmed* | *Likely* | *Possible* |
| | | |

*Figure 1*

Some applicants have profile pictures of themselves, which facilitates this process. Others choose stock images or landscapes for their profile pictures, making it difficult to confirm the account without substantial other evidence.

▢ of the ▢ or their petitioners, had likely social media accounts. Likely social media accounts are found by using applicant information ▢ but privacy settings or platform restrictions prevent the officer from full confirmation of the account or verification of the images.

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

[____] or more of the [_____] or their petitioners, had possible social media accounts.  Possible social media accounts are those where the applicant's biographic information matches that of a social media account, but there are no other data points available to make an informed determination.

[_____] of the [___] had no accounts identified by this process.  The applicants may not use social media, or the applicant may have such a common name that confident identification of the account is too labor-intensive.  Privacy settings set by the applicant may also impact whether social media accounts can be identified or confirmed.[11]

**Lessons Learned**

The S&T/USCIS Pilot Cell has been using [_____] for nine weeks – testing capabilities, finding bugs, developing enhancements, learning about our applicants' use of social media, searching for derogatory information, capturing metrics, and demonstrating use cases to decision makers.

During this time, a number of significant lessons have been learned, which can shape what social media vetting can look like in this setting and in future scaled-up operations.

- **Optimal results come from richer and more refined data sets.**
  - U.S. government metrics and vernacular, such as a receipt number, are not useful for either identifying social media accounts, nor are they discussed on social media.
  - Common names and famous names are noisy. [_____]
  
  - [_____]
  - Richer data sets upfront reduce officer "swivel chairing" between U.S. Government holdings and commercial databases for additional leads to identify accounts – expediting Step 1 in the Babel Street process.

- **Filter management is key.**
  - This pilot began with a data call to USCIS components for [_____] [_____] were collected, provided to S&T and uploaded into [_____]. The result was 2.4 million potential matches to the applicant pool, and it bogged down the accounts, exceeding the initial thresholds established for the pilot.

---

[11] Restrictions on th[_____] may have also affected the officers' ability to confirm accounts.

(b)(7)(e)
**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

- o [                                                          ]
- o [                                    ] should aim to reduce potential matches and identify truly derogatory information.
- o Choosing [                                              ] that generate false positive results (e.g. social media matches with no actionable information or relevance to the applicant) may cause [                ] to miss truly derogatory information.
- o New filters with relevant [                                    ] tailored to the target population's socio-cultural characteristics, will need to be tested and analyzed.

- **Account restrictions inhibit success.**
  - o At the present time, officers are unable to log-in to the various social media platforms, and can only see what is 1) public, as set by the applicant and 2) public, as available by a search in the platform.
  - o The team will be able to more easily and accurately confirm accounts with access to the social media platforms.

- **You have to choose the right social media platforms to search.**
  - o [                          ] has API feeds to [      ] social media sites plus deep and dark web.
  - o The team decided in the beginning to select ALL available platforms to screen our applicant information against.
  - o [                                                                              ]
  - o Based on this [      ] pilot, [                ] is potentially a rich source of social media for USCIS applicants. Barring changes to [                      ] restriction, however, [                        ] and similar social media analyzers will not be able to provide an automated data collection capability [                      ]

- **More than just translations are needed for foreign language records.**
  - o While [                  ] has machine translation capabilities, at times the translations are imperfect and require human review. Subject matter experts who can comprehend the essence of videos, postings, text, and other various media, and who understand cultural, religious, and colloquial terminology, must be available in either a reach-back capacity or onsite to facilitate this work.
  - o Having said that, only [      ] of the [      ] potential matches required additional human translation, and only one required extensive review.

17

(b)(7)(e)

**For Official Use Only – Law Enforcement Sensitive**
**DRAFT/Pre-Decisional 2 26 5:15pm version**

- o  Developing a list of [ ] [ ] may help reduce noise and find truly derogatory records.

- **Close Collaboration with technicians rapidly improved capabilities.**
  - o  The USCIS team has been in constant contact with S&T experts and [ ] technicians to develop new capabilities related to our unique mission and evolving use case.  Officers have helped to develop "user stories" and [ ] [ ] has conducted testing and implemented changes to their platform.  S&T translated technical requirements and needs to [ ] for implementation. This type of close collaboration in an open research environment is the main reason for the rapid reduction in social media record matches.
  - o  S&T is working through automated interface standards so that [ ] and other social media tools can interface directly with USCIS system. This work is advanced and will accelerate potential future implementation of automation for screening and vetting workflows.
  - o  The collaboration resulted in 17 major fixes and enhancements to [ ] and another 23 are in progress.

(b)(7)(e)

For Official Use Only/Internal Use Only| Draft and Deliberative

Updated on: March 2, 2017

(b)(7)(e)


**U.S. Citizenship and Immigration Services**

# USCIS Social Media & Vetting:  Overview and Efforts to Date

## Accomplishments

USCIS has implemented a suite of social media checks for certain refugee populations, establishing a team within USCIS's Fraud Detection and National Security Directorate to oversee and conduct these checks.

USCIS has worked with [                                                                    ] as well as partners in the law enforcement, defense, and Intelligence Community (IC)  to develop tools and techniques for social media research, and continues to improve use of social media for screening and vetting applicants.

## Pilots

***Refugee Pilot 1***: During Q1 of FY15, USCIS, in collaboration with [            ] the Intelligence Community (IC), and/or the Department of Defense (DOD), implemented social media exploitation in [      ] [                        ] cases.

***Refugee Pilot 2***: Following the first sample of cases, USCIS sent an additional batch of [                ] [                        ] cases through [            ] the IC, and/or DOD.

***Refugee Pilot 3***: USCIS tested the use of a social media tool created by the [                    ] [                                ] to screen against [                                ]. USCIS screened [                                ] cases (approximately [                        ] identified for enhanced screening against the [                    ] in order to assess its capabilities.  FDNS encountered a number of challenges, limitations, and inefficiencies with the tool and concluded that it does not meet USCIS needs for social media screening.

## Refugee Pilots 1, 2, and 3 Results
Although applicant data was successfully used to identify some applicants' social media accounts, the

For Official Use Only/Internal Use Only| Draft and Deliberative

(b)(7)(e)

**Pilot:** Beginning in December 2015, USCIS conducted social media research on ⬚ cases in three ways:

1. Approximately ⬚ cases of ⬚ applicants for adjustment of status were reviewed using the commercial social media screening applications under an ICE contract.
   - The same ⬚ cases were initially screened with the support of DHS/S&T using ⬚ of these cases that were pending an interview with a USCIS Field Office were subsequently prioritized for analyst review and evaluation.
2. Staff at the USCIS National Benefits Center manually searched and reviewed ⬚ and ⬚ on ⬚ adjustment applicants.

- As of June 22, 2016, no ⬚ adjustment of status application has been denied for social media information.
- The results of this vetting, including the ⬚ review, the ⬚ review, and the manual review, were compiled in a final report that identified a number of lessons learned and detailed the challenges in utilizing social media for screening purposes.

**Refugee Pilot 4:** USCIS ran data from ⬚ applicants and their family members through a commercial application called ⬚ in early January 2016, to screen for social media. The pilot found that this group of individuals had minimal presence on U.S.-based social media platforms accessible through ⬚ (or other social media applications). An analysis of this pilot identified a number of lessons learned.

**2.0 Pilot Pilot 5:** In April 2016, USCIS began another pilot with the ⬚ social media screening tool to vet ⬚ applicants, drawn predominantly from the ⬚ populations. As of June 22, 2016, no ⬚ applications have been denied solely based on social media information found during the pilot.

- Although the tool was improved from the previous iteration, USCIS determined ⬚ was not a viable option for semi-automated social media screening. An analysis of this pilot identified a number of lessons learned.

**Operational Enhancement – Semi-Automated Social Media Review:** Beginning in FY16 Q1, FDNS instituted a manual ⬚ search and review for ⬚ cases referred for Enhanced Review. FDNS is continuing this check for all ⬚ cases referred for Enhanced Review. On August 1st, 2016, USCIS began conducting semi-automated checks of a number of social media sites for ⬚ Enhanced Review cases and ⬚ cases with national security concerns ⬚ Since January 2017, USCIS has also conducted social media checks on all refugee applicants being interviewed in ⬚ regardless of country of origin. USCIS has screened over ⬚ total refugee applicants with these social media checks. While at this time, no refugee applications have been denied solely based on social media information found during ongoing social media review, USCIS

⬚

**Additional Populations:** In January 2017, USCIS began exploring the expansion of social media checks to additional populations. FDNS is working with counterparts in the Refugee, Asylum, and International Operations Directorate to expand social media checks to ⬚ applicants, beginning with those

(b)(7)(e)

For Official Use Only/Internal Use Only| Draft and Deliberative

individuals from certain countries of concern. Additionally, FDNS is working to expand social media vetting to certain cases with national security concerns. Each of these programs are planned to be in place by Q3 2017.

## Tool-Specific Limitations

- Despite the use of [redacted] additional foreign and domestic social media platforms [redacted]

- [redacted] offers over [redacted] different social media and dark/deep web searches, including several [redacted] but can return large volumes of data that has to be manually reviewed to determine whether the information relates to the applicant or not.

- For the [redacted] searches can only be conducted based on the [redacted] of the applicant. [redacted] is able to search [redacted] related to an applicant and has some capability to identify social media account information based on the [redacted]

- [redacted] appears to mitigate some (but not nearly all) of the language and social media platform limitations, but is not currently capable of analyzing or producing reports on the results it generates.

- No commercial tool is currently able to provide meaningful automated content from [redacted] [redacted] to be conducted manually.

## Challenges

- Even when an automated tool is used to search, all social media screening and vetting requires a manual review of information which is labor intensive and time consuming.  Officers have to review information first to assess whether the social media accounts identified by the tool are associated with the applicant.  If the officer determines the social media accounts belong to the applicant, the officer must then review the content of the social media postings to determine if any national security indicators are present.

- Most of the information derived from social media sites is written in languages other than English and requires translation support. [redacted] has some translation capabilities, and S&T is currently working with the [redacted] for additional ad hoc translation support.

- [redacted]

- Policy and guidelines on the use of social media in adjudications is needed as well as policy and guidelines to define what constitutes a national security indicator in the context of social media.

## Preliminary Findings

- Analysis and evaluation of various tools is ongoing.  However, tools and processes employed to date need to be improved in order to ensure a viable means of screening immigration applicants' social

For Official Use Only/Internal Use Only | Draft and Deliberative

(b)(7)(e)

For Official Use Only/Internal Use Only| Draft and Deliberative

media on a widespread basis in an efficient manner. Current tools and processes still require significant manual labor, even for the semi-automated checks.

(b)(7)(e)

- 

- Access to social media for immigration purposes is still new, with best practices under development.

- 

(b)(7)(e)

For Official Use Only/Internal Use Only | Draft and Deliberative



*DHS Secretary Briefing Binder*

# Social Media

## Background

(b)(7)(e)

USCIS use of social media is governed by DHS Directive 110-01, "Privacy Policy for Operational Use of Social Media." This policy requires USCIS to receive approval from the DHS Privacy Office regarding the privacy implications of any planned operational use of social media. USCIS use of social media also requires authorization from senior agency leadership. A policy memo was signed by USCIS leadership on April 7, 2015, authorizing a small group of USCIS Fraud Detection and National Security Directorate (FDNS) officers to conduct social media research in the refugee vetting context. In early FY16, a team of FDNS officers, who received specialized training in social media use, began conducting manual _____ reviews for certain _____ cases referred for enhanced review. FDNS currently conducts routine social media screening for certain _____

FDNS, in collaboration with the _____ has conducted several pilots leveraging the use of social media in the screening and vetting process for certain refugees and certain applicants for adjustment of status. Pilot efforts to date include:

- Refugee Pilot 1: During Q1 of FY15, USCIS, in collaboration with _____ the Intelligence Community, and the Department of Defense (DOD), implemented social media review on _____
- _____: Following the first sample of cases, USCIS sent an additional batch of _____ through _____ the Intelligence Community, and DOD.
- Refugee Pilot 3: USCIS tested the use of a social media tool created by the _____ USCIS screened 200 pending _____ (approximately 1,200 individuals) identified for enhanced screening through the _____ tool in order to assess its capabilities. FDNS encountered a number of challenges, limitations, and inefficiencies with the tool and concluded that it did not meet USCIS needs for social media screening.
  - *Refugee Pilots 1, 2, and 3 Results: Although applicant data was successfully used to identify some applicants' social media accounts, the information in the*

(b)(7)(e)

- _____ Pilot: In January 2016, USCIS conducted social media research on certain _____ (fiancé) adjustment cases in three ways:

Warning! This document, along with any attachments, contains NON-PUBLIC INFORMATION exempt from release to the public by federal law. It may contain confidential, legally privileged, proprietary or deliberative process inter-agency/intra-agency material. You are hereby notified that any dissemination, copying, or further distribution of this information to unauthorized individuals (including unauthorized members of the President-elect Transition Team) is strictly prohibited. Unauthorized disclosure or release of this information may result in loss of access to information, and civil and/or criminal fines and penalties.

**Homeland Security**

*DHS Secretary Briefing Binder*

(b)(7)(e)

- o Approximately [        ] cases of [      ] applicants for adjustment of status were reviewed using the [          ] commercial social media screening applications under an ICE contract.
- o The same [      ] cases were initially screened with the support of DHS S&T using [            ], a commercial application. [          ] of these cases that were pending an interview with a USCIS Field Office were subsequently prioritized for analyst review and evaluation.
- o Staff at the USCIS National Benefits Center manually searched and reviewed [                    ] on [      ] adjustment applicants.
  - ▪ *The results of this vetting, including the [          ] review, the [          ] and the manual review, were compiled in a final report that identified a number of lessons learned and detailed the challenges in utilizing social media for screening purposes.*

- 50-50 Pilot/Refugee Pilot 4: In January 2016, in collaboration with DHS S&T, USCIS ran data from [                            ] through [          ] to review social media. The pilot found that this group of individuals had minimal presence on U.S.-based social media platforms accessible through [          ] (or other social media applications). No derogatory information was identified or associated with the pilot data set.
  - o *The results of this vetting were compiled in a final report that identified a number of lessons learned and detailed the challenges in utilizing social media for screening purposes.*

- [          ] Pilot/Refugee Pilot 5: In April 2016, USCIS conducted another pilot with social media screening tool to vet [          ] applicants, drawn predominantly from the [          ] Although the tool was improved from the previous iteration, USCIS determined [          ] id not meet USCIS needs and was not a viable option for semi-automated social media screening.
  - o *The results of this vetting were compiled in a final report that identified a number of lessons learned and detailed the challenges in utilizing social media for screening purposes.*
  - o *Two of the social media accounts reviewed contained potentially derogatory information:*

(b)(7)(e)

Warning!  This document, along with any attachments, contains NON-PUBLIC INFORMATION exempt from release to the public by federal law.  It may contain confidential, legally privileged, proprietary or deliberative process inter-agency/intra-agency material. You are hereby notified that any dissemination, copying, or further distribution of this information to unauthorized individuals (including unauthorized members of the President-elect Transition Team) is strictly prohibited. Unauthorized disclosure or release of this information may result in loss of access to information, and civil and/or criminal fines and penalties.

**Homeland Security**                (b)(7)(e)                          *DHS Secretary Briefing Binder*

## Current Status

In accordance with the Social Media Expansion Plan for Refugees Concept of Operations (CONOPS), FDNS continues to deploy a risk-based phased approach for the expansion of social media review for refugees. Beginning in FY16 Q1, FDNS instituted a manual [____] search and review f[____]fugee cases referred for enhanced review. On August 1, 2016, USCIS began conducting semi-automated checks of a number of social media sites for[____]refugee cases referred for enhanced review and [_____]refugee cases with national security concerns.

As of November 4, 2016, USCIS has conducted social media screening on approximately [____] refugee cases or approximately[_____] At this time, no refugee applications have been denied solely based on social media information.

FDNS, a part of the DHS Social Media Task Force, continues to collaborate with partner components and agencies to explore semi-automated solutions. DHS S&T is currently undergoing an acquisition process to evaluate a number of commercially-available tools to determine if any meet the operational requirements of USCIS and other DHS components that possess a need to access social media information for lawful purposes.  USCIS, for both manual searches and semi-automated searches currently in operation, only seeks access to publically available social media information for the purposes of screening and vetting, in accordance with privacy, civil rights, and civil liberties oversight.

As of November 4, 2016, no immigration benefits have been denied solely or primarily because of information uncovered through social media vetting.  In a small number of cases, information discovered through social media screening had limited impact on the processing of those cases – specifically in developing additional lines of inquiry.  In cases of benefit denial, the denial was based on information found outside of social media, such as through routine security and background checks, or uncovered during an interview.

## Challenges

- The process of social media screening and vetting necessitates a labor intensive, manual review in which officers must first attempt to assess whether the content relates to an individual with a pending immigration benefit request.  Even if information that definitively relates to such an individual is found, [_____]
  [_____] but may be helpful in developing additional lines of inquiry when adjudicating the benefit request.

- [_____]

Warning!  This document, along with any attachments, contains NON-PUBLIC INFORMATION exempt from release to the public by federal law.  It may contain confidential, legally privileged, proprietary or deliberative process inter-agency/intra-agency material. You are hereby notified that any dissemination, copying, or further distribution of this information to unauthorized individuals (including unauthorized members of the President-elect Transition Team) is strictly prohibited. Unauthorized disclosure or release of this information may result in loss of access to information, and civil and/or criminal fines and penalties.



FOR OFFICIAL USE ONLY

U.S. Department of Homeland Security
Washington, DC 20528

(b)(7)(e)

 Homeland Security

APR 0 1 2016

**INFORMATION**

**MEMORANDUM FOR THE SECRETARY**

THROUGH:     Alejandro Mayorkas
            Deputy Secretary

FROM:       Francis X. Taylor
            Under Secretary for Intelligence and Analysis

            León Rodríguez
            Director, U.S. Citizenship and Immigration Services

SUBJECT:    **U.S. Citizenship and Immigration Services Refugee Social
            Media Vetting Expansion**

**Purpose**: To update you on U.S. Citizenship and Immigration Services' (USCIS) efforts
to expand social media vetting of refugees

**Summary:** On February 11, 2016, you directed the further expansion of social media use
at DHS consistent with the law and appropriately protecting civil rights, civil liberties, and
privacy. To that end, on December 15, 2015, you and the Deputy Secretary asked the
Under Secretary for Intelligence and Analysis, Frank Taylor, to lead a Social Media Task
Force to review the Department's current use of social media and identify options to
optimize its use across the Department.

(b)(7)(e)

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

(b)(7)(e)

This package includes the detailed USCIS Concept of Operations (CONOPS) for expanding Social Media Reviews of Refugees (ATCH 1), a second CONOPS, in partnership with the Department of State (DOS), to                                    the

evaluation                                    and social media guidance for adjudicators (ATCH 1, Appendix C).

Attachments:                    (b)(7)(e)

1. USCIS Social Media Review of Refugees Concept of Operations
2.                    Concept of Operations
3. USCIS Refugee Social Media Review Pilot Evaluation
4. USCIS Social Media Review Guidance for Adjudicators

cc: DHS Social Media Task Force

**Total Number of Documents**

**Total Number of Matches** (b)(7)(e)

**Total Number of Unread By Filter** (b)(7)(e)

1120

(b)(7)(e)

**(Y/N/Maybe)**

(b)(7)(e)

**Derogatory Found (Y/N/Maybe)**

(b)(7)(e)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Department of Homeland Security Social Media Talking Points and Issue Paper**

**Top Line Department of Homeland Security Talking Points**

(b)(5)          (b)(7)(e)

- Social media is a prominent component of modern society, and the Department of Homeland Security's (DHS's) efforts to protect the homeland must evolve as society evolves.  DHS is committed to fulfilling its national security and mission priorities in ways that remain consistent with the Constitution, Federal laws, regulations, and policies to protect individual privacy and preserve civil rights and civil liberties.
- Given the nature of DHS's mission, it is important for DHS to ask for and review social media information from noncitizens who are seeking to travel to and enter the United States or applying for other immigration and related benefits.
    - Publicly available information found in social media postings may be used by DHS officers to assess the validity of immigration benefit claims legitimate travel and to identify potential threats to national security and public safety.
    - DHS does not currently use social media information to perform routine travel-related vetting of U.S. citizens or lawful permanent residents of the United States.
- DHS's current use of social media, with regard to vetting, is primarily to assist in the manual adjudication of cases to confirm or identify relevant information about identity, occupation, previous travel, and other factors related to an individual who seeks to immigrate, visit the United States or otherwise obtain a benefit administered by DHS.
    - DHS makes decisions based on                    consideration of all available information.   .  Specifically, DHS uses social media information to create a more holistic view of the applicant in order to better inform adjudication decisions.
    - Human review of all automated match results occurs before any final action or determination.
    - As a matter of policy, DHS does not use social media information as the sole basis for the denial             of any benefit.  Derogatory information that an applicant is unaware of and that may be used in an unfavorable decision is provided to the applicant in an interview, request for evidence, or notice of intent to deny.
    - DHS uses publicly available information on social media platforms, consistent with the privacy settings the applicant has set for those platforms.
    - Collection occurs in the least intrusive manner possible, collecting only the minimum information necessary to meet the relevant mission needs.
- DHS is a leader among federal agencies in developing the capability to effectively use social media in its vetting programs and in creating a framework of safeguards, training, auditing, and policies needed to protect individual privacy, and preserve civil rights and civil liberties.
- To ensure privacy is considered and appropriate privacy protections are included in the Department's operational use of social media, the DHS Privacy Office implemented a DHS Privacy Policy for the Operational Use of Social Media (DHS Management

1

UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Directive 110-01-001, "Privacy Policy for Operational Use of Social Media") in 2012. This policy requires:

- o  Program Managers to consult with counsel to ensure that appropriate authority exists to engage in categories of operational use of social media before Component employees engage in those activities.
- o  Program Managers to complete a Social Media Operational Use Template documenting the authority and purpose(s) of their social media use as well as a description of those uses. Templates are submitted through component privacy offices to the Chief Privacy Officer for a prompt review and determination as to whether a new or updated Privacy Impact Assessment (PIA) or System of Record Notice (SORN) is required.
- o  Personnel using social media for operational use to sign social media specific Rules of Behavior that outline their requirements for using social media in the course of their work and the consequences of failure to adhere to those requirements.
- o  Personnel to receive tailored annual privacy training for the operational use of social media.
- •  DHS's long-term goal is the development of a semi-automated, bulk vetting [        ] capability that will enable DHS to screen the content of relevant social media accounts and utilize all information of interest during the adjudication of [        ] travel and benefits, consistent with aforementioned policies and protections, in order to identify national security and public safety threats and to combat fraud. [        ]

[        ]

**Background**

DHS has been at the forefront among Federal agencies in developing the capability to incorporate social media data in its screening and vetting processes.  U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), U.S. Transportation Security Administration (TSA), and U.S. Citizenship and Immigration Services (USCIS) have been developing, testing, and operationalizing the use of social media in various pilots and programs.  The Office of Science and Technology (S&T) has been developing tools and processes towards realizing DHS's long term objective of deploying a semi-automated, bulk vetting~~screening~~ capability for social media.  Through this work, DHS has advanced its understanding of the challenges in screening non-government maintained databases, including the dynamic nature and magnitude of multilingual, multicultural social media information.

Social media vetting involves three lines of effort prior to any adjudicative decisions: *(1)Identity Resolution*; *(2)Identification of "Information of Interest,"* and, *(3)Thresholding*.

*(1) Identity Resolution:* To match and verify an on-line identity to an applicant, officers/analysts use biographic and biometric (photographs) identifiers provided on an application to identify and validate the applicant's social media account [        ] Confirming an on-line identity manually is resource intensive due to the uncertainty of

2

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY                    (b)(7)(e)

whether an applicant's [               ]ocial media account and potential misidentification of an on-line identity.  When on-line identifiers (such as usernames) are not provided as part of a respective application, this process is even more complicated and requires the initial identification of a subject's social media footprint through manual research, before identity resolution (or confirmation of suspected social media presence) can be undertaken.

*(2) Identification of "Information of Interest":* "Information of interest" includes any information that may be relevant to the issuance or denial of a benefit.  It can be used to verify positive information about an individual as well as identify derogatory data. Current methods to identify "information of interest" are also resource intensive, involving manual content review and interpretation of social media postings of a given applicant across multiple platforms (i.e., the totality of an applicant's social media footprint).

*(3) Thresholding:*  Social media information can be both positive and confirmatory of a claim, or derogatory.  Determining the threshold for positive confirmation or derogatory information – a process that is relative to each use case and population screened – is time intensive, manual, and context specific, and requires significant analytic judgment.

**DHS Component Social Media Operational Use Cases**

**CBP Social Media Talking Points**

- CBP currently uses social media to assist in the vetting of travelers before they arrive in the United States, as well as for the manual adjudication of cases to confirm or identify relevant information about identity, occupation, previous travel, and other factors related to an individual who seeks to immigrate, visit the United States, or otherwise obtain a benefit subject to CBP's vetting[               ]
  - Publicly available information found in social media postings may be used by CBP analysts to confirm information contained in the benefit application, assist with determining eligibility, and to identify any derogatory information that may preclude admission to the U.S.

UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL

(b)(5)                          (b)(7)(e)

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

- o CBP makes decisions based on the totality of the circumstances.  Specifically, CBP uses social media information to create a more holistic view of the applicant in order to better inform adjudication decisions.
  - o As a matter of policy, CBP does not use social media information as the sole basis for the denial of a benefit, but rather, CBP couples that information with all other available information to make an informed decision.
- DHS is a leader among federal agencies in developing the capability to effectively use social media in vetting programs and in creating the framework of safeguards, training, and policies needed to ensure respect for privacy, civil rights, and civil liberties.
  - o CBP uses publicly available information on social media platforms consistent with the privacy settings the applicant has set for those platforms.
  - o This use is governed by a strict CBP Social Media policy, use limitations, and access controls described in PIAs and SORNs available to the public on the DHS website (www.dhs.gov/privacy).
  - o The CBP Privacy Office reviews and approves all CBP personnel who will have access to social media.
- CBP currently provides introductory and operational security awareness social media training to CBP employees who use social media for operational purposes.
  - o CBP is in the process of formalizing advanced social media and open source collection training curriculum.

(b)(5)          (b)(7)(e)

**UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL**

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(b)(7)(e)

Student and Exchange Visitor Program

UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL

(b)(5)     UNCLASSIFIED//FOR OFFICIAL USE ONLY     (b)(7)(e)

(b)(5)                  UNCLASSIFIED//FOR OFFICIAL USE ONLY            (b)(7)(e)

**USCIS Social Media Talking Points**

- Social media vetting may be part of the background check process relating to individuals who have submitted a request for immigration benefits and/or to verify information submitted in an immigration benefit request.  Social media information can be both positive and confirmatory, or derogatory.  In general, derogatory information that an applicant is unaware of and that may be used as part of an unfavorable decision is provided to the applicant in an interview, request for evidence, or notice of intent to deny. Such required disclosure to the applicant is inclusive as to whether it of would include social media information considered relevant to the case.

- USCIS only collects social media information that is relevant and necessary to matters under consideration by the agency.

- All USCIS officers authorized to review social media are trained to limit collection of information to that which is relevant and necessary to adjudicative, investigative, or incident response matters, and to base decisions only upon the criteria provided by law, which would not include political views, unless such collection and use is relevant to the adjudication and the information is authorized to be collected (such as a request for asylum or refugee status based on persecution for political opinion).

- Currently, the Social Media Division (SMD) of USCIS's Fraud Detection and National Security Directorate (HQFDNS) conducts social media checks to support adjudication of certain asylum and refugee cases. In FY2017, HQFDNS SMD conducted social media checks on approximately 6,400 cases.

- HQFDNS SMD continues to work with DHS, USCIS, and FDNS leadership to determine the way forward to best expand social media screening and vetting in a way that aligns with oversight and legal boundaries and supports the USCIS mission.

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

- In June 2017, HQFDNS SMD initiated an operational testing pilot with the Field Operations Directorate (FOD) at the Miami District Office to test the capabilities and operational processes developed by HQFDNS SMD in the field environment.

- The evaluation for this pilot was completed in December 2017 and is currently under FDNS leadership review for the way forward in expanding social media vetting capability to FDNS in field offices, district offices, and service centers.

(b)(7)(e)

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

### Department of Homeland Security Social Media Talking Points and Issue Paper

**Top Line Department of Homeland Security Talking Points**

- Social media is a prominent component of modern society, and the U.S. Department of Homeland Security's (DHS) efforts to protect the homeland must evolve as society evolves. DHS is committed to fulfilling its national security and mission priorities in ways that remain consistent with the Constitution, Federal laws, regulations, and policies to protect individual privacy and preserve civil rights and civil liberties.
- Given the nature of DHS's missions, there are circumstances in which DHS may reviews social media information of individuals. These use-cases include, but are not limited to, the following:
    - o Assessment of eligibility for immigration benefits
    - o Admissibility determinations, *i.e.*, to identify or confirm an applicant's identity, occupation, previous travel and/or other relevant information;
    - o Adjudication of aviation-related credentials
    - o Criminal and administrative immigration law enforcement activities;
    - Identification of potential threats to public safety or national security;

- DHS's current use of social media for screening-related activities is primarily to assist in the manual adjudication of cases to confirm or identify an applicant's identity, occupation, previous travel and/or other information that is relevant to the adjudication of benefits, including the identification of potential threats to public safety or national security.
    - o DHS makes decisions based on consideration of all available information. Specifically, DHS uses social media information to create a more holistic view of the applicant in order to better information adjudication decisions.

    - o Human review of all automated match results occurs before any final action or determination is made.
    - o As a matter of policy, DHS does not use social media information as the sole basis for the denial or granting of any benefit with the exception of certain USCIS discretionary overseas adjudications.

1

UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL

---

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Italic

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: (Default) Times New Roman, 12 pt

Formatted: Bulleted + Level: 1 + Aligned at: 0.25" + Indent at: 0.5"

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Times New Roman, 12 pt

Formatted: Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

Formatted ... [1]

Formatted ... [4]

Formatted ... [5]

**Comment [P4]:** From J Higgins: This may not be the case for refugee applicants. Sugg ... [6]

**Comment [OCC5]:** See thresholding verbiage (i.e., "It can be used to verify p ... [7]

Formatted: Font: Calibri, 11 pt

Formatted: Font: Times New Roman, 12 pt

Formatted: Font: Calibri, 11 pt

Formatted: Font: Times New Roman, 12 pt

(b)(7)(e)

(b)(5)                    UNCLASSIFIED//FOR OFFICIAL USE ONLY

- Note:  If an immigration benefit decision will be adverse to the
  applicant or petitioner and is based on derogatory information,
  generally he/she shall be advised of this fact and offered an
  opportunity to rebut the information and present information in his/her
  own behalf before the decision is rendered.

(b)(7)(e)

(b)(5)

- DHS uses publicly available information on social media platforms, consistent
  with the privacy settings the applicant has set for those platforms.
- Collection occurs in the least intrusive manner possible, collecting only the
  minimum information that is relevant and necessary to meet DHS's mission
  needs.

> **Formatted:** Font: Times New Roman, 12 pt
>
> **Formatted:** Bulleted + Level: 1 + Aligned at: 0.75" + Indent at: 1"

- DHS is a leader among federal agencies in developing the capability to effectively use
  social media in its vetting programs and in creating a framework of safeguards, training,
  auditing, and policies needed to protect individual privacy, and preserve civil rights and
  civil liberties.
- To ensure privacy is considered and appropriate privacy protections are included in the
  Department's operational use of social media, the DHS Privacy Office implemented a
  DHS Privacy Policy for the Operational Use of Social Media (DHS Management
  Directive 110-01-001, "Privacy Policy for Operational Use of Social Media") in 2012.
  This policy requires:
  - Program Managers to consult with counsel to ensure that appropriate authority
    exists to engage in categories of operational use of social media before
    Component employees engage in those activities.
  - Program Managers to complete a Social Media Operational Use Template
    documenting the authority and purpose(s) of their social media use as well as a
    description of those uses.  Templates are submitted through component privacy
    offices to the Chief Privacy Officer for a prompt review and determination as to
    whether a new or updated Privacy Impact Assessment (PIA) or System of Record
    Notice (SORN) is required.
  - Personnel using social media for operational use to sign social media specific
    Rules of Behavior that outline their requirements for using social media in the
    course of their work and the consequences of failure to adhere to those
    requirements.
  - Personnel to receive tailored annual privacy training for the operational use of
    social media.
- DHS's long-term goal is the development of a semi-automated[1], bulk screening
  capability that will enable DHS to screen the content of relevant social media accounts
  and utilize all information of interest.

(b)(7)(e)

(b)(5)

---

[1] In the context of these talking points, "semi-automated" is defined as automated social media screening and
vetting capability with manual review of the results.

2

(b)(7)(e)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(b)(7)(e)

(b)(5)

[REDACTED] consistent with aforementioned policies and protections, in order to identify carry out its mission, including identifying national security and public safety threats, enforcing the nation's immigration laws, -and [REDACTED] combatting fraud [REDACTED]

(b)(5)

## Background

DHS has been at the forefront among Federal agencies in developing the capability to incorporate social media data in its screening and vetting processes. U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), U.S. Transportation Security Administration (TSA), and U.S. Citizenship and Immigration Services (USCIS) have been developing, testing, and operationalizing the use of social media in various pilots and programs. The Office of Science and Technology (S&T) has been developing tools and processes towards realizing DHS's long term objective of deploying a semi-automated, bulk screening [REDACTED] capability for social media. Through this work, DHS has advanced its understanding of the challenges in screening non-government maintained databases, including the dynamic nature and magnitude of multilingual, multicultural social media information.

Social media evaluation [REDACTED] involves three lines of effort prior to an [REDACTED] action: *(1)Identity Resolution*; *(2)Identification of "Information of Interest,"* and, *(3)Thresholding*.

(b)(5)            (b)(7)(e)

*(1) Identity Resolution:* To match and verify an on-line identity to an applicant, officers/analysts use biographic and biometric (photographs) identifiers provided on an application to identify and validate the applicant's social media account on-line presence. Confirming an on-line identity manually is resource intensive due to the uncertainty of whether an applicant has an on-line presence an [REDACTED] misidentification of an on-line identity. When on-line identifiers (such as usernames) are not provided as part of a respective application, this process is even more complicated and requires the initial identification of a subject's social media footprint through manual research, before identity resolution (or confirmation of suspected social media presence) can be undertaken.

*(2) Identification of "Information of Interest":* "Information of interest" includes any information that may be relevant to the issuance or denial of a benefit. It can be used to verify positive information about an individual as well as identify derogatory data. Current methods to identify "information of interest" are also resource intensive, involving manual content review and interpretation of social media postings of a given applicant across multiple platforms (i.e., the totality of an applicant's social media footprint).

*(3) Thresholding:* Social media information can be both positive and confirmatory of a claim, or derogatory. Determining the threshold for positive confirmation or derogatory

3

UNCLASSIFIED//FOR OFFICIAL USE ONLY

information – a process that is relative to each use case and population screened – is time intensive, manual, and context specific, and requires significant analytic judgment.

## DHS Component Social Media Operational Use Cases

(b)(5)

**CBP Social Media Talking Points**

(b)(7)(e)

- CBP officers review social media, in certain circumstances, to assist in determining a traveler's admissibility to the United States as well as the traveler's eligibility to travel under the Visa Waiver Program.
    - o  Social media may be used to support or corroborate a traveler's information, which will help facilitate legitimate travel by providing an additional means to adjudicate issues related to relevant questions about identity, intentions upon entry, previous travel, and other factors.  It may also be used to identify potential deception or fraud.  Social media may help distinguish individuals of additional concern from those individuals whose information substantiates their eligibility for travel.

Formatted

(b)(5)

Formatted: Indent: Left: 0.25"

(b)(7)(e)

(b)(5)

- DHS is a leader among federal agencies in developing the capability to effectively use social media [        ] programs and in creating the framework of safeguards, training, and policies needed to ensure respect for privacy, civil rights, and civil liberties.
    - o  CBP uses publicly available information on social media platforms consistent with the privacy settings the applicant has set for those platforms.
    - o  This use is governed by a strict CBP Social Media policy, use limitations, and access controls described in PIAs and SORNs available to the public on the DHS website (www.dhs.gov/privacy).
    - o  The CBP Privacy Office reviews and approves all CBP personnel [        ] who will have access to social media.
- CBP currently provides introductory and operational security awareness social media training to CBP employees who use social media for operational purposes.
    - o  CBP is in the process of formalizing advanced social media and open source collection training curriculum.

4

(b)(5)

**UNCLASSIFIED//FOR OFFICIAL USE ONLY**

(b)(7)(e)

**UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL**

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(b)(7)(e)

Student and Exchange Visitor Program

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(b)(7)(e)

UNCLASSIFIED//FOR OFFICIAL USE ONLY//PRE-DECISIONAL

(b)(5)                                  UNCLASSIFIED//FOR OFFICIAL USE ONLY                        (b)(7)(e)

**TSA Social Media Talking Points**

As mentioned above TSA has been testing the use of social media to assist with its transportation security mission as part of the DHS social media task force.  Accordingly, TSA conducted a social media pilot use case from July 2017 through January 2018, where they tested the application of social media against a subset of higher risk credential holders.  Following the pilot, TSA, in line with other department components, has decided to further invest in this mission space for its vetted and credentialed populations and will:

- Only use publicly available information;
- Abide by its Social Media Operational Use Template (SMOUT);
- Abide by DHS and TSA privacy and legal policies;
- Not engage in undercover operations, "befriend" subjects, or engage in attempts to get behind privacy settings of social media platforms;
- Engage in a holistic approach considering the totality of the circumstances and using all available information to determine whether an individual is eligible for inclusion in a TSA-vetted population.

**USCIS Social Media Talking Points**

**Formatted:** Font: Times New Roman, 12 pt

(b)(5)

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(b)(7)(e)

- Social media checks may be part of the background check process relating to individuals who have submitted a request for immigration benefits and/or to verify information submitted in an immigration benefit request.  Social media information can be both positive and confirmatory, or derogatory.  If an immigration benefit decision will be adverse to the applicant or petitioner and is based on derogatory information of which the applicant or petitioner is unaware, generally he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered.

- All USCIS officers authorized to review social media are trained to limit collection of information to that which is relevant and necessary to adjudicative, investigative, or incident response matters, and to base decisions only upon the criteria provided by law, which would not include political views, unless such collection and use is relevant to the adjudication and the information is authorized to be collected (such as a request for asylum or refugee status based on persecution for political opinion).

- Currently, the Social Media Division (SMD) of USCIS's Fraud Detection and National Security Directorate (HQFDNS) conducts social media checks to support adjudication of certain asylum and refugee cases.  In FY2017, HQFDNS SMD conducted social media checks on approximately 6,400 cases.

- HQFDNS SMD continues to work with DHS, USCIS, and FDNS leadership to determine the way forward to best expand social media screening [          ] in a way that aligns with oversight and legal boundaries and supports the USCIS mission.

- In June 2017, HQFDNS SMD initiated an operational testing pilot with the Field Operations Directorate (FOD) at the Miami District Office to test the capabilities and operational processes developed by HQFDNS SMD in the field environment.

- The evaluation for this pilot was completed in December 2017 and is currently under FDNS leadership review for the best way forward to expand its social media capability to FDNS in field offices, district offices, and service centers.

(b)(5)    UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Formatted:** Default, Indent: Left:  0.25",
Space After:  0 pt, Add space between
paragraphs of the same style, Line spacing:
single, Bulleted + Level: 1 + Aligned at:
0.5" + Indent at:  0.75"

**Formatted:** Default, Indent: Left:  0.5",
Space After:  0 pt, Add space between
paragraphs of the same style, Line spacing:
single

**Formatted:** Default, Indent: Left:  0.25",
Space After:  0 pt, Add space between
paragraphs of the same style, Line spacing:
single, Bulleted + Level: 1 + Aligned at:
0.5" + Indent at:  0.75"

**Formatted:** Default, Space After:  0 pt, Add
space between paragraphs of the same
style, Line spacing:  single

**Formatted:** Default, Indent: Left:  0.25",
Space After:  0 pt, Add space between
paragraphs of the same style, Line spacing:
single, Bulleted + Level: 1 + Aligned at:
0.5" + Indent at:  0.75"

**Formatted:** Default, Space After:  0 pt, Add
space between paragraphs of the same
style, Line spacing:  single

**Formatted:** Default, Indent: Left:  0.25",
Space After:  0 pt, Add space between
paragraphs of the same style, Line spacing:
single, Bulleted + Level: 1 + Aligned at:
0.5" + Indent at:  0.75"

**Formatted:** Default, Space After:  0 pt, Add
space between paragraphs of the same
style, Line spacing:  single

**Formatted** ... [8]

**Formatted** ... [9]

**Formatted** ... [10]

**Formatted** ... [11]

**Formatted** ... [12]

**Formatted** ... [13]

10

| Page 1: [1] Formatted | DHS PLCY | 4/25/2018 12:33:00 PM |
|---|---|---|

Normal, Add space between paragraphs of the same style, Line spacing:  single,  No bullets or numbering

| Page 1: [2] Comment [ICE-OPLA2] | ICE-OPLA (b)(7)(c) | 4/13/2018 11:30:00 AM |
|---|---|---|

(b)(5)

| Page 1: [3] Comment [KT(3] | Kim, Trinh (CTR) | 4/3/2018 2:46:00 PM |
|---|---|---|

(b)(5)

| Page 1: [4] Formatted | DHS PLCY | 4/25/2018 12:34:00 PM |
|---|---|---|

Add space between paragraphs of the same style, Line spacing:  single, Bulleted + Level: 1 + Aligned at: 0.75" + Indent at:  1"

| Page 1: [5] Formatted | DHS PLCY | 4/25/2018 12:34:00 PM |
|---|---|---|

Bulleted + Level: 1 + Aligned at:  0.75" + Indent at:  1"

| Page 1: [6] Comment [P4] | POLARIS Office (b)(7)(e) | 3/13/2018 8:53:00 PM |
|---|---|---|

(b)(5)

| Page 1: [7] Comment [OCC5] | Gentry, Anthony E | 3/8/2018 9:18:00 AM |
|---|---|---|

(b)(5)

| Page 10: [8] Formatted | ICE-OPLA (b)(7)(c) | 4/18/2018 2:39:00 PM |
|---|---|---|

Default, Indent: Left:  0.25", Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single, Bulleted + Level: 1 + Aligned at: 0.5" + Indent at:  0.75"

| Page 10: [9] Formatted | ICE-OPLA (b)(7)(c) | 4/18/2018 2:39:00 PM |
|---|---|---|

Default, Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single

| Page 10: [10] Formatted | ICE-OPLA (b)(7)(c) | 4/18/2018 2:39:00 PM |
|---|---|---|

Default, Indent: Left:  0.25", Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single, Bulleted + Level: 1 + Aligned at: 0.5" + Indent at:  0.75"

| Page 10: [11] Formatted | ICE-OPLA (b)(7)(c) | 4/18/2018 2:39:00 PM |
|---|---|---|

Default, Indent: First line:  0.5", Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single

| Page 10: [12] Formatted | ICE-OPLA (b)(7)(c) | 4/18/2018 2:39:00 PM |
|---|---|---|

Default, Indent: Left:  0.25", Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single, Bulleted + Level: 1 + Aligned at:  0.5" + Indent at:  0.75"

| Page 10: [13] Formatted | ICE-OPLA | | 4/18/2018 2:39:00 PM |
|---|---|---|---|

Default, Space After:  0 pt, Add space between paragraphs of the same style, Line spacing:  single

(b)(7)(c)



U.S Citizenship and
Immigration Services
Field Operations Directorate

# GUIDANCE FOR USE OF
# SOCIAL MEDIA IN
# FIELD OPERATIONS DIRECTORATE
# ADJUDICATIONS

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

# TABLE OF CONTENTS

I.  PURPOSE ...................................................................34

II.  BACKGROUND .........................................................34

III.  FDNS PROVIDES SOCIAL MEDIA RESULTS .............................34

IV.  POTENTIALLY DEROGATORY INFORMATION ............................4

V.  CONFIRMING RESULTS RELATE TO THE APPLICANT ............................5

VI.  PRESENTING SOCIAL MEDIA INFORMATION ............................6

VII.  IMPACT ON ADJUDICATION ...................................7

    A.  CREDIBILITY ...................................................7

    B.  INADMISSIBILITY ............................................8

    C.  CARRP ..........................................................8

    D.  OTHER GROUNDS OF INELIGIBILITY ............................8

VIII.  POINTS OF CONTACT.........................................8

IX.  APPENDIX A: ADJUDICATIVE AID FOR CASES INVOLVING SOCIAL MEDIA RESULTS (SUGGESTED LINES OF INQUIRY)...................................910

(b)(7)(e)

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

## I.    PURPOSE

The purpose of this guidance is to provide adjudicating officers an understanding of how to consider and apply the results of social media checks during interviews and adjudications.

This guidance does not supersede any other guidance.  Immigration Services Officers (ISOs) must obey all other adjudication policies and procedures.

## II.    BACKGROUND

In late 2015, USCIS began developing the Social Media Pilot Plan (SMPP), now known as the Social Media Limited Implementation Plan (SMLIP).  The SMLIP was intended to explore the operational requirements, process, and functionality for using social media during the course of USCIS's work and to identify and examine potential benefits, limitations, associated costs, challenges, and risks associated with that use.  Of particular relevance to FOD, social media information may help Fraud Detection and National Security Immigration Officers (FDNS IOs) and ISOs identify information that is material to benefit adjudication and potentially derogatory information.

## III.    FDNS PROVIDES SOCIAL MEDIA RESULTS

In general, FDNS will provide social media results as a result of an ISO's Referral to FDNS following an initial interview with the applicant.  However, FDNS may also perform social media research if the case merits further research before the interview (for example, if the case is linked to a System Generated Notification in the Fraud Detection and National Security Data System).

Social media findings by FDNS IOs will be included in a Statement of Finding (SOF), Referral to ICE (RTI), or Background Check and Adjudicative Assessment (BCAA). FDNS will clearly identify how they found any indicators of potentially derogatory information on social media linked to an individual[1], will include screenshots of the potentially derogatory social media findings as a separate FDNS-DS attachment, a general description of the social media account and how it is used, and a thorough analysis of why the information is potentially derogatory.  In addition, the FDNS IO will explain why the potentially derogatory information may be material and why they believe

---

[1] To simplify the document, applicant herein refers to an applicant, petitioner, beneficiary, or requestor.

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

the social media profile belongs, or does not belong, to the person in question.  An ISO should ask FDNS to provide more information if they believe FDNS has not met these requirements.

The ISO will review the potentially derogatory social media information to determine if it is material to the adjudication, to develop relevant lines of questioning, and to incorporate these findings in the adjudicative process, as appropriate.  Examples of relevant lines of questioning are contained as an appendix to this document.

# IV.    POTENTIALLY DEROGATORY INFORMATION

Potentially derogatory social media results may negatively impact admissibility or removability (such as terrorism-related and national security grounds), other eligibility factors  (such as validity of claimed relationships, memberships in organizations, or criminal issues), or credibility.  Due to the nature of social media, it may be difficult to conclusively determine the intent behind certain aspects of social media activity.  It may be difficult to definitively attribute the activity to the applicant, determine the intent of certain activity, and to understand the activity in context (due to dialect, historical or religious connotations, slang, jargon, sarcasm, sentiment, symbolism, ambiguity, etc…).

Additionally, if the social media activity indicates an articulable link to a national security concern as described in INA 212(a)(3)(A), (B), or (F), the case must proceed through the Controlled Application Review and Resolution Program (CARRP) process.

**Examples of Potentially Derogatory Information**
Examples of potentially derogatory social media activity may include, but are not limited to:
- Evidence of engaging in terrorist activities as defined in INA 212(a)(3)(B);
- Potential support for armed groups/activity or for individuals/organizations associated with armed groups/activity, as defined in INA 212(a)(3)(B);
- Describing past/present/intended actions or affiliations which would make the applicant inadmissible under INA 212(a)(3)(B);
- Symbols relating to unlawful armed activity (photographs, flags, etc.);
- A social media user name that references violence or armed activity;
- Commentary that references violence or armed activity;
- Involvement with gangs or gang activity;
- Commentary that references criminal activity or suggests a public safety threat;
- Evidence of fraud, including marriage, employment, or other benefit fraud;
- Evidence that is inconsistent with information submitted on an application or petition; and

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

- Evidence of support of or active engagement in any illicit activity conducted by close family or friends.

## V.  CONFIRMING RESULTS RELATE TO THE APPLICANT

FDNS IOs will include analysis explaining how they discovered the social media activity, why they believe it can be attributed to the applicant, and if there is any ambiguity in the attribution. In many cases, an FDNS IO may provide the ISO social media information even if it cannot be clearly attributed to the applicant. This difficulty could be caused by similar biographic data, shared email accounts, or shared phone accounts. Listed below are different scenarios that officers may encounter when reviewing social media vetting results.

### Social Media Account May Not Be Attributable to the Applicant

In cases where there is uncertainty that the social media account belongs to the applicant, the ISO must determine if the potentially derogatory information is relevant to the adjudication. If the information is not relevant to the adjudication, then further attribution is not required. If the information appears relevant, then the ISO must establish if the social media activity can be attributed to the applicant. This can be established by assessing how the account was initially linked to the applicant (email, phone number, name, etc.) and using related lines of questioning to determine if the account belongs to the applicant.

If the applicant credibly testifies that the social media activity is attributable to a different individual, then the officer should explore that individual and their relationship to the applicant. Concerns related to the applicant's relationship with that individual should be further explored. If the individual responsible for the social media activity raises national security concerns, the extent of the applicant's relationship to the individual with national security concerns should be explored, and the applicant's own activities and attitudes should also be assessed as they relate to those of the other individual. Officers should further assess any terrorism-related inadmissibility grounds (TRIG) or national security concerns that arise through the applicant's relationship to the individual and follow standard procedures for addressing such issues.

See Appendix A for suggested lines of questioning in cases where attribution is at question.

### Social Media Account Attributable to the Applicant

If the FDNS IO determines that the social media activity is attributable to the applicant, the ISO should review the activity and verify the attribution.

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

The ISO must first determine if the potentially derogatory information is relevant to the adjudication.  If the information is not relevant, there is no need for further analysis.  If it is relevant, the officer should follow appropriate lines of inquiry to assess the derogatory information and its effect on the applicant's eligibility, assess potential TRIG and national security concerns, and follow standard CARRP, TRIG, and Public Safety procedures for addressing such issues that may arise.

During an interview, the officer should follow appropriate lines of inquiry to further verify that the social media account with potentially derogatory information belongs to the applicant and to discover if any other individual has access to, or uses, the same account.  If the applicant credibly denies responsibility for the potentially derogatory information, attempt to identify the responsible party and the party's relationship to the applicant.  Concerns related to the applicant's relationship with the responsible party should be explored, as previously outlined.

See Appendix A for suggested lines of questioning in cases where the account clearly belongs to the applicant.

## VI.    PRESENTING SOCIAL MEDIA INFORMATION

If an ISO intends to use the potentially derogatory information as evidence in a decision, the ISO must present the potentially derogatory information to the applicant during an interview or by issuing a Notice of Intent to Deny (NOID).  The applicant must be given the opportunity to respond. The ISO must consider any response given during the interview or in response to the NOID.

An ISO may initially let the applicant know that the officer possesses information that needs clarification or may contradict information provided in testimony.  If appropriate, the ISO may directly state what concerns were identified on the applicant's social media account so that the applicant has the opportunity to fully address the concern.  This will allow the interviewing and reviewing officers to determine the full impact of the potentially derogatory information on the applicant's eligibility.

ISOs may not show applicants the SOF, RTI, or BCAA.  They must instead show the social media information separately.  Officers should use discretion in determining how to appropriately present potentially derogatory information sourced from social media, and may consult with their immediate supervisor or team leader on a case-by-case basis.

If an officer presents social media information, either by describing the information or by showing screenshots to the applicant, the officer should memorialize the interaction and

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

take a sworn statement. This will prove that the individual was presented with the evidence and given a chance to respond to it.

***Note that the officer must never show the applicant a copy of the SOF, RTI, BCAA, or any other For Official Use Only (FOUO) document. The officer should also not disclose how USCIS obtained the social media information. However, the officer may describe the results to the applicant. For example, if social media results included a photograph of the applicant holding a weapon, then the officer could state that there is a photograph of that nature displayed on the social media outlet. If an officer chooses to show the applicant the derogatory information, the relevant screen shots must be detached from the FOUO document.***

## VII.  IMPACT ON ADJUDICATION

Officers should consider social media results in the totality of the circumstances when coming to an adjudicative decision. Generally, social media results should not be the sole basis for a final decision but should instead be used to develop additional lines of questioning, prepare requests for evidence, and corroborate elements of the claim. Social media is to be considered in the context of the testimony, prior statements, documentation, and other material elements of the case, as well as the context in which the potentially derogatory information was shared on social media. Assessing the context of the social media findings might include weighing credible testimony that content was posted in jest, or by another user, or that a posting did not constitute sincere endorsement of a potentially derogatory activity.

## A.  CREDIBILITY

The officer must present an applicant with any material inconsistency or implausibility arising from the social media results that the officer intends to use in a denial. The officer must inform the applicant of the nature of the concern and give the applicant an opportunity to explain. Then the officer must weigh the explanation provided in the totality of the circumstances. If an officer finds that an applicant is not credible regarding a material element of his/her case, and the applicant cannot meet the required burden of proof, then the case should be denied.

For example, if an applicant testified that he/she had never used a weapon, however his/her social media results included photographs of the applicant firing weapons, the officer would confront the applicant with the inconsistency and allow the applicant an opportunity to explain. If the applicant were able to provide a reasonable explanation which resolved the inconsistency, then the officer could find the applicant credible. If the

applicant were unable to resolve the inconsistency with a reasonable explanation, then the case may be deniable.

## B.    INADMISSIBILITY

**Applicant Admits Inadmissible Activities**
If social media results indicate that an applicant is inadmissible or removable and the applicant admits to such activity, then the case should be adjudicated accordingly.

**Applicant Denies Inadmissible Activities**
If the applicant denies such activity, in addition to assessing the applicant's credibility, the officer will assess whether the applicant has met his/her burden of establishing that he/she is not subject to the inadmissibility by the heightened clearly and beyond doubt standard that applies to inadmissibilities.  If the applicant cannot meet his/her burden with regards to the potential inadmissibility, the applicant may be found inadmissible and, in certain circumstances, also not credible, and the case will be denied.

(b)(7)(e)

## D.    OTHER GROUNDS OF INELIGIBILITY

If social media results lead the officer to any other adverse findings, for example a finding that the applicant had participated in persecution or was involved in marriage fraud, the officer must question the applicant to fully develop the ground(s) of ineligibility.  Then, after considering the totality of the circumstances, the case would be adjudicated in accordance with standard procedure.

## VIII.  POINTS OF CONTACT

Please direct inquiries regarding FOD social media policy through proper channels to the Field Operations Directorate FDNS Operations Branch at USCISFODFDNSOps@uscis.dhs.gov.

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

## IX.    APPENDIX A: ADJUDICATIVE AID FOR CASES INVOLVING SOCIAL MEDIA RESULTS (SUGGESTED LINES OF INQUIRY)

This adjudicative aid serves as a starting point for exploring potentially derogatory social media findings during an interview.  Officers should keep in mind that not all potential social media scenarios are addressed in this adjudicative aid.  **These lists are non-exhaustive and are designed solely to provide a framework for interviewing officers in various scenarios. Officers should not be limited to only following the suggested lines of inquiry as listed here. Officers must follow up and thoroughly probe any additional concerns not identified in this aid.**  The questions do not necessarily have to be asked in any particular order, but rather should flow naturally through the course of the interview.  **Additionally, note that multiple sections below may apply to the same case; it is not necessary to repeat questions which have already been asked.**

(b)(7)(e)          (b)(5)

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

(b)(7)(e)

(b)(5)

(b)(7)(e)          (b)(5)

**DELIBERATE, PRE-DECISIONAL DOCUMENT – DO NOT DISTRIBUTE**

(b)(7)(e)

(b)(5)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 1 of*
*13*

For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

**This template is used to assess the Department's Operational Use of Social Media,
consistent with Management Directive 110-01.**

The DHS Privacy Office has created this template to determine privacy compliance with
Management Directive 110-01, *Privacy Policy for Operational Use of Social Media*. For the purposes of the
Management Directive and this template, "Operational Use" means authorized use of social media to
collect personally identifiable information for the purpose of enhancing situational awareness,
investigating an individual in a criminal, civil, or administrative context, making a benefit determination
about a person, making a personnel determination about a Department employee, making a suitability
determination about a prospective Department employee, or for any other official Department purpose
that has the potential to affect the rights, privileges, or benefits of an individual. Operational use does not
include the use of search engines for general Internet research, nor does it include the use of social media
for professional development such as training and continuing education or for facilitating internal
meetings. The following uses of social media are exempt from the Management Directive and are not
subject to this requirement[1]:

a)  Communications and outreach with the public authorized by the Office of Public Affairs
(covered by the existing PIAs: DHS/ALL/PIA-031 - Use of Social Networking Interactions and
Applications Communications/Outreach/Public Dialogue and DHS/ALL/PIA-036 - Use of
Unidirectional Social Media Applications); and

b)  The conduct of authorized intelligence activities carried out by the Office of Intelligence and
Analysis, the intelligence and counterintelligence elements of the United States Coast Guard,
or any other Component performing authorized foreign intelligence or counterintelligence
functions, in accordance with the provisions of Executive Order 12333, as amended.

This template shall be used to document the process to be followed by all programs engaging in
operational uses of social media; to identify information technology systems, technologies, rulemakings,
programs, or pilot projects that involve PII and other activities that otherwise impact the privacy of
individuals as determined by the Chief Privacy Officer; and to assess whether there is a need for
additional Privacy Compliance Documentation. Components may appeal to the Deputy Secretary for

---

[1] Gathering information by the Office of Operations Coordination and Planning (OPS) to enhance situational
awareness is exempt from this requirement and is covered by the existing PIA. *See* DHS/OPS/PIA-004(d) Publicly
Available Social Media Monitoring and Situational Awareness Initiative Update, *available at* www.dhs.gov/privacy.

For Official Use Only



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 2 of*
*13*

**For Official Use Only**

Homeland Security if there is disagreement over the DHS Privacy Office determination of privacy
compliance for the operational use of social media.



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 3 of*
*13*

For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

Please complete this form and send it to your Component Privacy Officer.
Upon receipt, your Component Privacy Officer and the DHS Privacy Office will review this
form and may request additional information.

## SUMMARY INFORMATION                    (b)(6)

**Date submitted for review:** 4/30/2018

> **Comment [KTQ1]:** Edit accepted.

**Name of Component:** U.S. Citizenship and Immigration Services, Fraud Detection and
National Security Directorate (FDNS)
**Contact Information:** Kevin T. Quinn

**Counsel[2] Contact Information:**
Craig Symons Chief Counsel USCIS,

**IT System(s) where social media data is stored:** FDNS-DS

**Applicable Privacy Impact Assessment(s) (PIA):**

**DHS/USCIS/PIA-013-01 Fraud Detection and National Security Directorate (FDNS)**

**DHS/USCIS/PIA-013(a) Fraud Detection and National Security Data System (FDNS-DS)**

**Applicable System of Records Notice(s) (SORN):**

**DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records,
September 18, 2017, 82 FR 43556**

> **Comment [KTQ2]:** Edit accepted.

**DHS/USCIS-006 Fraud Detection and National Security Records (FDNS) August 8, 2012, 77
FR 47411**

---

[2] Counsel listed here must certify that appropriate authority exists to engage in particular operational activities
involving social media.

For Official Use Only



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 4 of*
*13*

For Official Use Only

# DHS OPERATIONAL USE OF SOCIAL MEDIA

### SPECIFIC QUESTIONS

1.

(b)(7)(e)

³ As

For Official Use Only

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 5 of 13*

**For Official Use Only**

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**   (b)(5)      (b)(7)(e)
*Page 6 of 13*

For Official Use Only

$^8$ *See*

(b)(7)(e)

(b)(7)(e)

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 7 of 13*

**For Official Use Only**

**For Official Use Only**

(b)(7)(e)

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 8 of*
*13*

For Official Use Only

(b)(7)(e)

(b)(7)(e)

 **Homeland Security**

The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

**Version date: January 25, 2017**
*Page 9 of*

**For Official Use Only**

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 10 of
13*

For Official Use Only

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 11 of 13*

For Official Use Only

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 12 of 12*

For Official Use Only

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 13 of*

For Official Use Only

(b)(7)(e)



The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
703-235-0780, pia@dhs.gov
www.dhs.gov/privacy

(b)(7)(e)

**Version date: January 25, 2017**
*Page 14 of
14*

**For Official Use Only**

**Shirk, Georgette L**

| | |
|---|---|
| **From:** | Gentry, Anthony E |
| **Sent:** | Monday, May 21, 2018 10:52 AM |
| **To:** | Elder, Phillip D; Gaffin, Elizabeth S; Hinds, Ian G |
| **Subject:** | FW: Social media - FORMS project - LPRs |
| **Attachments:** | Vetting--constitutional issues--NSD outline.docx; PRA Social Media OMB questions REDLINE DRAFT 4.26.18 (CRCL2).docx |

OCC only

(b)(5)

Key point, immigration is different.

-----Original Message-----
From: Sterling, Brian
Sent: Monday, May 21, 2018 10:27 AM
To: Gentry, Anthony E; Brand, Jennifer S; Friedmann, Pamela; Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Bergman, Kristin
Subject: RE: Social media - FORMS project - LPRs

Good Morning All,

Thanks to OCC for the analysis below.  It is the first we have seen specifically related to the forms and is helpful.  Per (b)(5)

CRCL received this in January through our own involvement in the development of the NVC, but we have not since had an update or further information.  Accordingly, we noted the potential conflict in our comments to the draft PRA so counsel could connect with DOJ or the NVC legal working group as appropriate.

CRCL takes no position regarding the Department's legal authority to collect social media handle (b)(5) r

+ Kristin Bergman (OGC-ILD) for John Dermody

Regards,
Brian

Brian Sterling
Senior Policy Advisor
Office for Civil Rights and Civil Liberties U.S. Department of Homeland Security

(b)(6)

-----Original Message-----
From: Gentry, Anthony E
Sent: Friday, May 18, 2018 6:46 PM

1472

To: Brand, Jennifer S <_____(b)(6)_____> Friedmann, Pamela <_____>; Pachon, Marc<_____>; Kaplan, Randall <_____> Dermody, John <_____> Elder, Phillip D <_____> Sterling, Brian <_____>; Quinn, Kevin T <_____>; Brown, Sara C <_____>; Harp, Bradley J <_____>; Rigdon, Jerry L <_____>

Cc: Johnson, <_____>; Lester-Saura, Victoria <_____> Gaffin, Elizabeth S <_____>; Hinds, Ian G <_____>

Subject: RE: Social media - FORMS project - LPRs

Jennifer,

Yes, it would be helpful to have the memo.

Thanks.

Tony

Anthony E. Gentry
Counsel for Intelligence & Operations
Office of Chief Counsel
US Citizenship and Immigration Services

(b)(6)

This e-mail (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain Attorney Work Product information that is privileged, confidential, or otherwise protected by applicable law. If the reader of this e-mail is not the intended recipient or the employee or agent responsible for delivering the e-mail to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this e-mail or its contents is strictly prohibited. If you have received this e-mail in error, please notify us immediately by replying to this message, and please destroy all copies of this e-mail.

-----Original Message-----
From: Brand, Jennifer S
Sent: Friday, May 18, 2018 5:30 PM
To: Friedmann, Pamela; Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Sterling, Brian; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Gentry, Anthony E
Subject: RE: Social media - FORMS project - LPRs

Hi All,
The issue was one that was raised by DOJ folks in a memo in the context of issues for enhanced vetting at NVC but it appears relevant regardless of where the vetting takes place. I can dig up the memo and share it on Monday if that is helpful.

Jennifer S. Brand
Section Chief
Security, Intelligence, and Information Policy Office for Civil Rights and Civil Liberties
_____

_____ (b)(6)

From: Friedmann, Pamela
Sent: Friday, May 18, 2018 5:00:24 PM
To: Pachon, Marc; Kaplan, Randall; Dermody, John; Elder, Phillip D; Brand, Jennifer S; Sterling, Brian; Quinn, Kevin T; Brown, Sara C; Harp, Bradley J; Rigdon, Jerry L
Cc: Johnson, Erik; Lester-Saura, Victoria; Gaffin, Elizabeth S; Hinds, Ian G; Gentry, Anthony E
Subject: Social media - FORMS project - LPRs

All,                                                                                                          (b)(5)

USCIS has provided the thoughts below which we would like to share with the group for consideration/comment.

If OGC or CRCL have remaining concerns, please advise and PLCY will set up a conference call for early next week.

Many thanks for your consideration.  Have a nice weekend, everyone.
Pamela

From: Friedmann, Pamela                                                                      (b)(6)
Sent: Tuesday, May 15, 2018 12:00 PM
To: Pachon, Marc <_____; Kaplan, Randall <_____; Dermody, John
<_____; Brand, Jennifer S
<_____Sterling, Brian <_____; Quinn, Kevin T
<_____Brown, Sara C <_____; Harp, Bradley J
<_____Rigdon, Jerry L <_____

3

1474

Cc: Johnson, Erik <[              ]; Lester-Saura, Victoria [              ]    (b)(6)
Subject: Today's 4 pm conf. call re social media and LPRs is postponed.

DHS PLCY will reschedule.
Thank you.
Pamela

Pamela Friedmann
Director, Screening Coordination Office
Threat Prevention and Security Policy
Office of Policy
U. S. Department of Homeland Security

(b)(6)

(b)(5)



(b)(5)



(b)(5)



(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, - 2018

Formatted: Strikethrough

Formatted: Not Strikethrough

**Supporting Statement for Paperwork Reduction Act**
**Generic Information Collection Submissions for**
**"Generic Clearance for the Collection of Social Media Information on Immigration and Foreign Travel Forms"**
**Office of Management and Budget Control No. 1601-NEW**

## A. JUSTIFICATION

1. **Circumstances Making the Collection of Information Necessary**

Executive Order (EO) 13780, "*Protecting the Nation from Foreign Terrorist Entry into the United States*" requires the implementation of uniform vetting standards and the proper collection of all information necessary for a [                    ] rigorous evaluations of all grounds of inadmissibility or bases for the denial of immigration-related benefits. *See* 82 FR 13209 (Mar. 9, 2017). The EO requires the [                    ] Department of Homeland Security [          ] DHS") to collect standard data on immigration and foreign traveler forms and/or information collection [                    ] This data, will be collected [          ] from certain populations on applications [          ] for entrance into the United States or [      ] immigration-related benefits [      ] and is necessary for identity verification, vetting and national security screening and [          ] inspection conducted by DHS.

This collection of information is necessary to comply with Section 5 of the EO to establish screening and vetting standards and procedures to enable DHS [          ] to assess an alien's eligibility to travel to or, be admitted to the United States, or to receive an immigration-related benefit from DHS. This data collection is also used to review publicly available social media information, which in turn is used to validate an applicant's identity information and to determine whether such travel or grant of a benefit poses a law enforcement or national security risk to the United States.

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

---

[1] ~~At this juncture, interviews are not contemplated as part of this generic PRA. Not included on the 15 high value data element PRA.~~

(b)(5)

DRAFT/PREDECISIONAL/FOUO

~~July 19, 2017~~December 13, 2017April 26, - 2018

**Formatted:** Strikethrough

**Formatted:** Not Strikethrough

DHS will collect biographic data pertaining to social media information, including the social media platforms used by the applicant and User Identifications                     on immigration and foreign traveler collection instruments and systems.  DHS will update its forms and systems to collect information, as outlined in this supporting statement,          from individuals who seek admissibility or other benefits when that information is not already collected.  The information to be collected is as follows:

**Formatted:** Highlight

*Electronic Forms:*

**Formatted:** Highlight

The following social media questions will appear as follows on          ctronic forms:

> Please enter information associated with your on-line presence over the past five years:

- Provider/Platform (dropdown bar will provide multiple choices):
- Social Media Identifier(s)-over the past five years (free text field for applicant to enter information)(

The forms will          allow the applicant to provide as many platforms and identifiers as necessary.

*Paper Forms:*

Please enter information associated with your on-line presence over the past five years:

> Provider/Platform:  (a list will be provided along with space for "other"_____
> Social Media Identifier(s): _____

Note:  A sufficient          amount of space on the paper form will be provided          o allow the applicant appropriate room~~space~~ to provide all necessary platforms/identifiers.

The platforms listed may be updated by the Department by adding or removing platforms, consistent with the uses described in this supporting statement and after approval from the Office of Management and Budget.

*CBP Authorities:*

CBP has the following statutory and regulatory authorities, as an agency of the U.S. Government, to collect social media information from applicants for travel benefits:

- CBP is responsible for preventing the entry of terrorists and instruments of terrorism into the United States, securing the borders, and enforcing the immigration laws.[2]  To exercise its authority with respect to both inbound and outbound border crossings of U.S. citizens and aliens alike, CBP gathers

---

[2] *See* Homeland Security Act § 402, 6 U.S.C. § 202.

2

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~December 13, 2017April 26, 2018

> **Formatted:** Strikethrough
>
> **Formatted:** Not Strikethrough

information about individuals who may seek entry into the United States. CBP's general law enforcement authorities empower it to gather information, including information found via [ ] social media, which is relevant to its enforcement missions.[3] For example, under the Immigration and Nationality Act (INA)(Public Law 89-236), CBP Officers, Border Patrol Agents, and other immigration officers have authority to, among other things, "take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States; or concerning any matter which is material or relevant to the enforcement of the [INA] and the administration of the immigration and naturalization functions of the Department."[4]

- Under this broad authority to take and consider "evidence," CBP may use information obtained from social media where relevant to its immigration enforcement mission under Title 8 of the U.S. Code. Further, should the facts and circumstances of a particular investigation so require, CBP may also use social media in connection with its extensive customs enforcement authorities under title 19 of the U.S. Code.[5]

- [ ]

In addition, CBP has the following statutory and regulatory authorities to collect additional biographic data pertaining to social media, on the following forms:

- **Electronic System for Travel Authorization (ESTA):** Collection of data through this form is authorized by Section 711 of The Secure Travel and Counterterrorism Partnership Act of 2007 (part of the Implementing Recommendations of the 9/11 Commission Act of 2007, also known as the "9/11 Act," Public Law 110-53). The authorities for the maintenance of this system are found in: Title IV of the Homeland Security Act of 2002, 6 U.S.C. 201 *et seq.*, the Immigration and Nationality Act, as amended, including 8 U.S.C. 1187(a)(11) and (h)(3), and implementing regulations contained in part 217, title 8, Code of Federal Regulations; the Travel Promotion Act of 2009, Public Law 111-145, 22 U.S.C. 2131.
- **I-94W Nonimmigrant Visa Waiver Arrival/Departure Record**: Collection of data through this form is authorized by 8 U.S.C. 1103, 1187 and 8 CFR 235.1, 264, and 1235.1.
- **Electronic Visa Update System (EVUS):** Collection of data through this form is authorized by INA § 104(a) (8 U.S.C. § 1104(a)). The authorities for the maintenance of this system are found in: Title IV of the Homeland Security Act of 2002, 6. U.S.C. § 201 et seq., the Immigration and National Act, as amended, including sections 103 (8 U.S.C. § 1103), 214 (8 U.S.C. § 1184), 215 (8 U.S.C. § 1185), and 221 (8 U.S.C. § 1201), and 8 CFR part 2; the Travel Promotion Act of 2009, Public Law 111-145, 22 U.S.C. § 2131; and 8 Code of Federal Regulations Parts 212, 214, 215, and 273.

---

[3] *See, e.g.*, 8 U.S.C. § 1357(b).
[4] 8 C.F.R. § 287.5(a)(2); *see also id.* § 287.2 ("Whenever a special agent in charge, port director, or chief patrol agent has reason to believe that there has been a violation punishable under any criminal provision of the immigration and nationality laws administered or enforced by the Department, he or she shall immediately initiate an investigation to determine all the pertinent facts and circumstances and shall take such further action as he or she deems necessary.").
[5] *See, e.g.*, 19 U.S.C. §§ 1436, 1592, & 1595. As noted above with respect to the INA, these provisions do not mention social media specifically, but because CBP has authority to enforce these and other customs statutes, it may utilize social media when conducting authorized operations or investigations related to its customs enforcement mission.

3

(b)(5)
DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

Formatted: Strikethrough
Formatted: Not Strikethrough

*USCIS Authorities:*
USCIS has the following statutory and regulatory authorities, as an agency of the U.S. Government, to collect social media information from applicants for immigration benefits:

- 8 C.F.R §§ 204.5(m)(12) and 214.2(r)(16) provide that, in the context of adjudicating an immigrant or nonimmigrant religious worker petition, USCIS may verify the supporting evidence submitted by the petitioner "through any means determined appropriate by USCIS," including by "review of any other records that the USCIS considers pertinent to the integrity of the organization" with which the religious worker is affiliated.
- 8 C.F.R. § 103.2(a)(1) requires that every benefit request be executed and filed in accordance with the form instructions and clarifies that "such instructions are incorporated into the regulations requiring its submission." Specific language in the instructions to Form I-129 F (Petition for Alien Fiancé(e)) and Form I-485 (Application to Register Permanent Residence or Adjust Status) explains that the Department has the right to verify information for immigration benefits through a number of methods, including, but not limited to, the review of public records and information

In addition, USCIS has the following statutory and regulatory authorities to collect additional biographic data pertaining to social media, on the following forms:

- **N-400, Application for Naturalization:** Collection of data through this form is authorized by INA § 337 [8 U.S.C. § 1448]; 8 U.S.C. § 1421; 8 CFR § 316.4 and 8 CFR §316.10.
- **I-131, Application for Travel Document:** Collection of data through this form is authorized by INA §§ 103, 208, 212, 223 and 244; 8 CFR §§ 103.2(a) and (e); 8 CFR § 208.6; 8 CFR § 244.16; Section 303 of Pub. L. 107-173.
- **I-192, Application for Advance Permission to Enter as a Nonimmigrant:** Collection of data through this form is authorized by INA § 212 [8 U.S.C. § 1182].
- **I-485, Application to Register Permanent Residence or Adjust status:** Collection of data through this form is authorized by INA ACT 245 [8 U.S.C. § 1255]; Public Law 106-429, Section 902 of Public Law 105-277.

4

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

Formatted: Strikethrough
Formatted: Not Strikethrough

- **I-589, Application for Asylum and for Withholding of Removal:** Collection of data through this form is authorized by INA §§ 101(a)(42), 208(a) and (b), and 241(b)(3) and 8 CFR §§ 208.6 and 1208.6.
- **I-590, Registration for Classification as Refugee:** This information collection is authorized by INA section 207 (8 U.S.C. 1157) for a person who seeks refugee classification and resettlement in the United States.  A refugee is defined in 8 U.S.C. 1101(a)(42) and Section 101(a)(42) of the Act.
- **I-730, Refugee/Asylee Relative Petition:** This information collection is authorized by section 207(c)(2), and 208(c) of the INA (8 U.S.C. 1157 and 1158) for an asylee or refugee to request accompanying or following-to-join benefits for his or her spouse and unmarried minor child(ren).
- **I-751, Petition to Remove Conditions on Residence:** Collection of data through this form is authorized by INA § 216 [8 U.S.C. 1186(a)]; 8 CFR Part 216.
- **I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status:** Collection of data through this form is authorized by INA § 203(b)(5) [8 U.S.C. § 1153] and 216(a) [8 U.S.C. § 1186(b)].

*DHS Authorities and Privacy Policies:*

DHS will collect this information for identity verification, vetting and national security screening and inspection purposes.  Questions included on DHS forms and intake systems are relevant to the adjudication of the benefits sought and to ensure national security screening and vetting, as per the Executive Order 13780.  Information collected by DHS adheres to DHS's statutory authorities.

In addition to the DHS component specific authorities previously cited, DHS components must also adhere to a DHS Directive 110-01 "Privacy Policy for Operational Use of Social Media." This policy requires DHS Operational Components to receive approval from the DHS Privacy Office regarding the privacy implications of any planned operational use of social media to ensure that it is compliant with Departmental privacy policies and standards.[6]  DHS employees, who are permitted and trained to utilize social media for operational purposes during the performance of their duties, must adhere to DHS privacy policies, as determined by the Chief Privacy Officer.  [Note:  SCO defers to DHS PRIV to include sufficient information here to address OMB/OIRA's questions esp. re. constitutional rights.  If the material is not appropriate for the text of a Fed Register notice, it can be included in comment bubbles.]

**2.  Purpose and Use of the Information Collection**

*Data Use by DHS*

---

[6] DHS authorities under the "Privacy Policy for Operational Use of Social Media" are as follows:  Public Law 107-347, "E-Government Act of 2002" as amended, Section 208 [44. United States Code (U.S.C.) § 3501 note]; Title 5, U.S.C., Section 552a, "Records Maintained on Individuals" [The Privacy Act of 1974, as amended]; Title 6 U.S.C., Section 142, ""Privacy Officer"; Title 44, U.S.C., Chapter 35, Subchapter III, "Information Security" [The Federal Information Security Management Act of 2002, as amended (FISMA)]; Delegation 13001, "Delegation to the Chief Privacy Officer".

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

> **Formatted:** Strikethrough
> **Formatted:** Not Strikethrough

When adjudicating immigrant and other travel benefits, Department of Homeland Security (DHS) officers and analysts examine the totality of information available to them before granting or denying the benefit. DHS uses publicly available information on social media platforms—consistent with the privacy settings the applicant has set for those platforms—to create a more holistic view of the applicant in order to better inform adjudication decisions. As a matter of policy, DHS does not use social media information as the sole basis for the denial or granting of any benefit with the exception of certain USCIS discretionary overseas adjudications.

> **Formatted:** Highlight

Generally speaking, information used to adjudicate these benefit applications includes, but is not limited to, searches of Intelligence Community (IC), law enforcement, and immigration databases (both internal and external to DHS); interviews, when appropriate; and collaboration with others federal officers and agencies investigating or otherwise interested in the applicant. Social media information will be used as an additional source of information during the adjudication of benefits confirm identity, information provided by the applicant, and address any issues related to the application for a DHS benefit. Social media information may be shared with other agencies that have a need to know the information to carry out their national security, law enforcement, immigration, or other homeland security functions. Information sharing with agencies outside DHS will abide by information sharing agreements between the agencies and be consistent with applicable statutory and regulatory requirements.

> **Formatted:** Highlight

DHS is a framework of safeguards, training, and policies needed for effective use of social media in vetting programs while ensuring respect for privacy, civil rights, and civil liberties. DHS's use of social media in the adjudication of benefits is governed by strict privacy provisions, use limitations, and in adherence with all constitutionally protected rights and freedoms.[7] All DHS policies regarding the use of social media information are reviewed by DHS Oversight Offices, including the Office of General Counsel, the Privacy Office, and the Office of Civil Rights and Civil Liberties and must be formally approved by the Privacy Office before implementation.

> **Formatted:** Highlight
> **Formatted:** Highlight

[NOTE: PLACEHOLDER LANGUAGE – TO ADDRESS OMB/OIRA'S COMMENTS]

DHS is committed to fulfilling its national security and mission priorities in ways that remain consistent with the Constitution, Federal laws, regulations, and policies to protect individual privacy and preserve civil rights and civil liberties. Collection of social media is limited to information which is relevant and necessary to adjudicative, investigative, or incident response matters, and any decisions are based only upon criteria provided by law, which would not include political views, unless such collection and use is relevant to the adjudication and the information is authorized to be collected (such as a request for asylum or refugee status based on persecution for political opinion). Further, the collection of social media identifiers will not be used to prevent travel or deny an immigration benefit based on an applicant's race, ethnicity, religion, or sexual orientation. These factors are safeguarded under DHS's civil rights and civil liberties policies and are not relevant in determining eligibility for travel or immigration benefits.

> **Formatted:** Highlight
> **Formatted:** Highlight

DHS's use of data, including social media data, adheres to the Privacy Impact Assessment (PIA) and Systems of Records Notice (SORN) for the respective forms outlined in this Supporting Statement.

---

[7] All access controls described in relevant Privacy Impact Assessments and System of Records Notices are available to the public on the DHS website (www.dhs.gov/privacy.

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, · 2018

| Formatted: Strikethrough |
| Formatted: Not Strikethrough |

No DHS benefit application is guaranteed approval, and all can be denied for a variety of reasons; however, an applicant who does not have a social media presence will not be denied a benefit solely on that basis. Nevertheless, if an applicant willfully misrepresents information, or does not provide sufficient information for proper adjudication of a request for a benefit, said benefit may be denied.

As of the submission of this Federal Register Notice, DHS currently will not use social media handle information to communicate with the applicant.

*Submission of Intentionally Inaccurate Data by Applicant*

Inadmissibility based on willful misrepresentation requires a finding that a person willfully misrepresented a material fact.[8] For a person to be inadmissible based on willful misrepresentation, the officer must find all of the following elements:

- The person procured, or sought to procure, a benefit under U.S. immigration laws;
- The person made a false representation;
- The false representation was willfully made;
- The false representation was material; and
- The false representation was made to a U.S. government official, generally an immigration or consular officer.[9]

If the person succeeded in obtaining the benefit under the INA, he or she would be inadmissible for having procured the benefit by willful misrepresentation. If the attempt was not successful,[10] then the person would still be inadmissible for having "sought to procure" the immigration benefit by willful misrepresentation. In each case, evidence of intent to deceive is not required.[11] They provide

DHS [        ] will only submit a collection for approval under this generic clearance for the following forms:

*CBP Forms:*

- OMB No. 1651-0111 – Electronic System for Travel Authorization (ESTA)

- OMB No. 1651-0139 – Electronic Visa Update System (EVUS)

*USCIS Forms:*

---

[8] See INA 212(a)(6)(C)(i). For a definition of materiality, see Chapter 3, Adjudicating Inadmissibility, Section E, ~~Materiality~~~~and Materiality~~ [8 USCIS-PM ~~J.3~~J.3 (E)].
[9] See *Matter of Y-G-*, 20 I&N Dec. 794, 796 (BIA 1994).
[10] For example, the misrepresentation was detected and the benefit was denied.
[11] See *Matter of Kai Hing Hui*, 15 I&N Dec. 288, 289-90 (BIA 1975).

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

**Formatted:** Strikethrough
**Formatted:** Not Strikethrough

- OMB No. 1615-0052 – N-400 Application for Naturalization
- OMB No. 1615-0013 – I-131 Application for Ttravel Ddocument
- OMB No. 1615-0017 – I-192 Application for Aadvance Ppermission to Eenter as a Nnonimmigrant:
- OMB No. 1615-0023 – I-485 Application to Rregister Ppermanent Rresidence or Aadjust Sstatus
- OMB No. 1615-0067 – I-589 Application for Aasylum and for Wwithholding of Rremoval
- OMB No. 1615-0068 – I-590 Registration for Classification as a Refugee
- OMB No. 1615-0037 – I-730 Refugee/Asylee Relative Petition
- OMB No. 1615-0038 – I-751 Petition to Rremove Cconditions on Rresidence
- OMB No. 1615-0045 – I-829 Petition by Eentrepreneur to Rremove Cconditions on Ppermanent Rresident Sstatus

If these conditions are not met, DHS will submit an information collection request to OMB for approval through the normal PRA process.

To obtain approval for a collection that meets the conditions of this generic clearance, a standardized form will be submitted to OMB along with supporting documentation (e.g., a copy of the updated application form). Approval will only be granted if the agency demonstrates the collection of information complies with the specific circumstances laid out in this supporting statement.

For the purposes of this request, DHS has determined that the Department shall elicit social media information from applicants for immigration and other travel benefits through the following instructions:

*Electronic Forms:*

The following social media questions will appear as follows on electric forms:

Please enter information associated with your on-line presence over the past five years:

- Provider/Platform (dropdown bar will provide multiple choices):
- Social Media Identifier(s)over the past five years (free text field for applicant to enter information):

The forms will allow the applicant to provide as many platforms and identifiers as necessary.

*Paper Forms:*

Please enter information associated with your on-line presence over the past five years:

Provider/Platform:  (a list will be provided along with space for "other"_____
Social Media Identifier(s): _____

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26,- 2018

| | Formatted: Strikethrough |
| | Formatted: Not Strikethrough |

Note:  A sufficient amount of space on the paper form will be provided to allow the applicant appropriate room to provide all necessary platforms/identifiers.

The platforms listed may be updated by the Department by adding or removing platforms, consistent with the uses described in this supporting statement and after approval from the Office of Management and Budget.

## 3.  Consideration Given to Information Technology

Where appropriate, DHS collects information electronically from an applicant and pursues internal and external data analysis, as required by policy and existing law.  ~~In addition, and where feasible, DHS uses online collaboration tools to reduce burden.~~

USCIS is currently engaged in an agency-wide effort to move the processing of immigration benefits from paper-based to an electronic environment, accessible to both USCIS employees and customers.

### CBP Forms:

- OMB No. 1651-0111 – Electronic System for Travel Authorization (ESTA):  This form is only available in electronic format.
- OMB No. 1651-0111 - Nonimmigrant Visa Waiver Arrival/Departure Record (I-94W):  This form is only available in paper format.  It is a paper form used in lieu of an ESTA when applying for admission at a land border, or on specific occasions at other ports of entry, without immediate access to the electronic format above.
- OMB No. 1651-0139 – Electronic Visa Update System (EVUS):  This form is only available in electronic format.

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

| | Formatted: Strikethrough |
| | Formatted: Not Strikethrough |

*USCIS Forms:*

- OMB No. 1615-0052 – N-400 Application for Naturalization.  This form may be filed electronically or in paper format.

- OMB No. 1615-0013 – I-131 Application for travel document:  This form is only available in paper format.
- OMB No. 1615-0017 -- I-192 Application for advance permission to enter as a nonimmigrant:  This form is only available in paper format.
- OMB No. 1615-0023 – I-485 Application to register permanent residence or adjust status:  This form is only available in paper format.
- OMB No. 1615-0067 – I-589 Application for asylum and for withholding of removal:  This form is only available in paper format.
- OMB No. 1615-0068 – I-590 Registration for Classification as a Refugee.  This form is only available in paper format.
- OMB No. 1615-0037 – I-730 Refugee/Asylee Relative Petition.  This form is only available in paper format.
- 
- OMB No. 1615-0038 – I-751 Petition to remove conditions on residence:  This form is only available in paper format.
- OMB No. 1615-0045 – I-829 Petition by entrepreneur to remove conditions on permanent resident status:  This form is only available in paper format.
- 

## 4.  Duplication of Information

The Department seeks to expand, through the collection of social media information, current screening and vetting procedures performed on applicants for immigration and other travel benefits.  The new information collection submitted for approval under this information collection request is not already widely collected, available and shared among Federal border control, immigration benefit, enforcement, and law enforcement agencies, and is necessary to determine if the alien is eligible to travel to or enter the United States or receive an immigration benefit.

In order to minimize any duplication of efforts, the Department has identified for this submission only forms that are deemed primary applications for either admission into the United States or receipt of an immigration benefit.  As such, foreign traveler forms that would not grant an immediate benefit but would instead move the applicant toward an application for an immigrant or nonimmigrant visa to the Department of State have not been included.

The Department recognizes that some of the forms included in this submission are used by a small number of applicants who would then apply for a visa from the Department of State.  However, these forms are also used by certain travelers who would not be required to consular process.  As such, they are included with this submission to ensure that the Department is able to effectively standardize its data collection activities.

## 5.  Reducing the Burden on Small Businesses or Other Small Entities

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

**Formatted:** Strikethrough

**Formatted:** Not Strikethrough

The Department has undertaken efforts to increase the availability of electronic forms to reduce the burden on the public. A selection of immigration and foreign traveler forms collecting this information are fully electronic and available online. DHS seeks to allow for the collection of data electronically to the extent feasible, to reduce the burden on the public and create greater efficiencies.

*CBP Forms:*

None of the forms that are the subject of this information collection are filed by small businesses or entities.

- OMB No. 1651-0111 – Electronic System for Travel Authorization (ESTA): This form is only available in electronic format.
- OMB No. 1651-0111 - Nonimmigrant Visa Waiver Arrival/Departure Record (I-94W): This form is only available in paper format. It is a paper form used in lieu of an ESTA when applying for admission at a land border, or on specific occasions at other ports of entry, without immediate access to the electronic format above.
- 
- OMB No. 1651-0139 – Electronic Visa Update System (EVUS): This form is only available in electronic format.
- 

*USCIS Forms:*

- OMB No. 1615-0052 – N-400 Application for Naturalization
- OMB No. 1615-0013 – I-131 Application for travel document:
- OMB No. 1615-0017 – I-192 Application for advance permission to enter as a nonimmigrant:
- OMB No. 1615-0023 – I-485 Application to register permanent residence or adjust status
- OMB No. 1615-0067 – I-589 Application for asylum and for withholding of removal
- OMB No. 1615-0068 – I-590 Registration for Classification as a Refugee. This form is only available in paper format.
- OMB No. 1615-0037 – I-730 Refugee/Asylee Relative Petition. This form is only available in paper format.
- OMB No. 1615-0038 – I-751 Petition to remove conditions on residence
- OMB No. 1615-0045 – I-829 Petition by entrepreneur to remove conditions on permanent resident status

6. **Consequences of Not Conducting Collection or Collecting Less Frequently**

Without the information requested, DHS will not be able to adequately determine the eligibility of aliens to travel or be admitted to the United States or to receive an immigration benefit from DHS. In addition, without

11

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26,- 2018

**Formatted:** Strikethrough

**Formatted:** Not Strikethrough

the requested information, DHS's ability to identify threats to national security and public safety in an accurate and timely manner may be hindered.

7. **Special Circumstances**

There are no special circumstances.

8. **Consultations with Persons Outside the Agency**

In accordance with 5 CFR 1320.8(d), a 60-day notice for public comment was published in the Federal Register on **Month, Day, Year** at XX FR XXXXX; and a 30-day notice on **Month, Day, Year** at XX FR XXXXX, requesting comments from the public.

9. **Payment or Gift**

There are no payments or gifts provided to the respondents for providing this information.

10. **Confidentiality**

No assurance of confidentiality is provided. All data submitted under this collection will be handled in accordance with applicable U.S. laws and DHS policies regarding personally identifiable information.

   A. Public Law 107-347, "E-Government Act of 2002," as amended, Section 208 [44 U.S.C. § 3501 note]
   B. Title 5, United States Code (U.S.C.), Section 552a, "Records maintained on individuals" [The Privacy Act of 1974, as amended].
   C. Title 6, U.S.C., Section 142, "Privacy officer."
   D. Title 44, U.S.C., Chapter 35, Subchapter II, "Information Security" [The Federal Information Security Modernization Act of 2014 (FISMA)].
   E. DHS Directive 047-01, "Privacy Policy and Compliance" (July 25, 2011).
   F. DHS Instruction 047-01-001, "Privacy Policy and Compliance" (July 25, 2011).

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

| Formatted: Strikethrough |
| Formatted: Not Strikethrough |

G. Privacy Policy Guidance Memorandum 2008-01/Privacy Policy Directive 140-06, "The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security." (December 29, 2008).
H. Privacy Policy Guidance Memorandum 2017-01, DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information. (April 25, 2017).
• Refugees and asylees are protected by the confidentiality provisions of 8 CFR 208.6; 8 U.S.C. § 1103.  Aliens in TPS status have the confidentiality protections described in 8 CFR 244.16; 8 U.S.C. § 1254a(c)(6).  There are no confidentiality assurances for other aliens applying for the benefit.
o  The system of record notices associated with this information collection are:
    o  DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, September 18, 2017, 82 FR 43556 (all USCIS forms).
    o  DHS/USCIS-007 Benefits Information System, October 19, 2016, 81 FR 72069 (Forms N-400, I-131, I-192, I-485, I-590, I-730, I-751, I-829).
    o  DHS/USCIS-010 Asylum Information and Pre-Screening System of Records November 30, 2015, 80 FR 74781 (Form I-589).
    o  DHS/CBP-006 Automated Targeting System, May 22, 2012, 77 FR 30297 (Form I-192).
    o  DHS/USCIS–017 - Refugee Case Processing and Security Screening Information System of Records October 19, 2016, 81 FR 72075 (Forms I-730).
    o  DHS/CBP Electronic Visa Update System (EVUS) System of Records, September 1, 2016, 81 FR 60371 (EVUS Form); Final Rule for Privacy Exemptions, November 25, 2016, 81 FR 85105.
    o  DHS/CBP-009 – Electronic System for Travel Authorization (ESTA), September 2, 2016, 81 FR 60713 (ESTA Form); Final Rule for Privacy Act Exemptions, August 31, 2009 74 FR 45069.
    o  DHS/CBP-016 – Nonimmigrant Information System March 13, 2015, 80 FR 13398 (Form I-94W).
    o  DHS/USCIS-015 – Electronic Immigration System-2 Account and Case Management System of Records April 5, 2013 78 FR 20673 (Form I-131).

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, - 2018

| | Formatted: Strikethrough |
| Formatted: Not Strikethrough |

**11. Sensitive Nature**

There are no questions of a sensitive nature included in this generic clearance request.

**12. Burden of Information Collection**

A variety of instruments and platforms will be used to collect information from respondents. The annual burden hours requested ~~XXXXXX~~are based on the number of collections we expect to conduct over the requested period for this clearance.

| | | A | B | C (=AxB) | D | E (=CxD) | F | (=ExF) |
|---|---|---|---|---|---|---|---|---|
| Type of Responden t | Form Name / Form Number | #. of Responden ts | #. of Respo nses per Respo ndent | # of Responses | Avg. Burden per Response (in hours) | Total Annual Burden (in hours) | Avg. Hourly Wage Rate* | Total Annual Respondent Cost |
| Individuals or households | Electronic System for Travel Authorization (ESTA): | 23,010,000 | 1 | 23,010,000 | 0.383 | 8,812,830 | $33.40 | $294,348,522 |
| Individuals or households | I-94W Nonimmigrant Visa Waiver Arrival/Departure | 941,291 | 1 | 941,291 | 0.267 | 251,325 | $33.40 | $8,394,245 |

DRAFT/PREDECISIONAL/FOUO
July 19, 2017December 13, 2017April 26, 2018

| Formatted: Strikethrough |
| Formatted: Not Strikethrough |

| | Record | | | | | | |
|---|---|---|---|---|---|---|---|
| Individuals or households | Electronic Visa Update System (EVUS): | 3,595,904 | 1 | 3,595,904 | 0.417 | 1,499,492 | $33.40 | $50,083,032 |
| Individuals or households | N-400 Application for Naturalization: | 830,673 | 1 | 830,673 | 0.550 | 456,870 | $33.40 | $15,259,463 |
| Individuals or households | I-131: Application for travel document: | 594,324 | 1 | 594,324 | 0.684 | 406,518 | $33.40 | $13,577,688 |
| Individuals or households | I-192 Application for advance permission to enter as a nonimmigrant: | 10,448 | 1 | 10,448 | 0.584 | 6,102 | $33.40 | $203,795 |
| Individuals or households | I-485 Application to register permanent residence or adjust status | 574,000 | 1 | 574,000 | 0.750 | 430,500 | $33.40 | $14,378,700 |
| Individuals or households | I-589 Application for asylum and for withholding of removal | 157,372 | 1 | 157,372 | 0.534 | 84,037 | $33.40 | $2,806,824 |
| Individuals or households | I-590, Registration for Classification as Refugee | 51,600 | 1 | 51,600 | 0.083 | 4,283 | $33.40 | $143,046 |
| Individuals or households | I-730, Refugee /Asylee Relative Petition | 6,039 | 1 | 6,039 | .033 | 199 | $33.40 | $6,656 |
| Individuals or households | I-751 Petition to remove conditions on residence | 159,119 | 1 | 159,119 | 0.550 | 87,515 | $33.40 | $2,923,016 |
| Individuals or households | I-829 Petition by entrepreneur to remove conditions on permanent resident status | 3,859 | 1 | 3,859 | 0.567 | 2,188 | $33.40 | $73,081 |
| | | | | | | | | |
| Total | - | - | - | 33,380,888 | - | 12,374,078 | - | $413,294,197 |

*The above Average Hourly Wage Rate is the May 2016 Bureau of Labor Statistics average wage for All Occupations [or Insert Other Category from BLS Table] of $23.86 times the wage rate benefit multiplier of 1.4 (to account for benefits provided) equaling $33.40. The selection of "All Occupations" was chosen as the expected respondents for this collection could be expected to be from any occupation.*

*The Average Burden per Response for each form reflects an aggregate of the estimated time burden pre-response for each question being added to the form. Some forms contain one or more of the questions contained in the Generic Clearance, so the total amount listed for each form reflects only that additional burden.*

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

**Formatted:** Strikethrough

**Formatted:** Not Strikethrough

**13. Costs to Respondents**

16

(b)(5)

DRAFT/PREDECISIONAL/FOUO
~~July 19, 2017~~~~December 13, 2017~~April 26, 2018

| Formatted: Strikethrough |
| Formatted: Not Strikethrough |

No additional costs to the public are anticipated.

**14. Costs to Federal Government**

These costs will be captured in the specific forms under the OMB Control Numbers identified above. Its costs will be accounted for depending on the number of questions added to each form and the system changes that are required to capture that data. We have no estimate for the aggregate costs for system updates for all of the subject forms.

**15. Reason for Change**

This is a new generic clearance. This request is being submitted for review and approval to fulfill the requirements of EO 13780 (Section 5) to establish screening and vetting standards and procedures in order to enhance DHS's ability to assess an alien's eligibility to travel to, be admitted to, or receive an immigration-related benefit from DHS. This data collection also is used to validate an applicant's identity information and to determine whether such travel or grant of a benefit poses a law enforcement or national security risk to the United States.

**16. Tabulation of Results, Schedule, Analysis Plans**

DHS does not intend to employ the use of statistics or the publication thereof for this information collection.

**17. Display of OMB Approval Date**

We are requesting no exemption.

**18. Exceptions to Certification for Paperwork Reduction Act Submissions**

These activities comply with the requirements in 5 CFR 1320.9.

| Page 2: [1] Comment [A15] | Author | |
|---|---|---|

(b)(5)

| Page 3: [2] Comment [CRCL22] | CRCL | 4/27/2018 3:20:00 PM |
|---|---|---|

(b)(5)

| Page 4: [3] Comment [CRCL31] | CRCL | 4/27/2018 3:22:00 PM |
|---|---|---|

(b)(5)

FOR OFFICIAL USE ONLY

(b)(7)(e)

**IP – USCIS SCREENING AND VETTING**

1

FOR OFFICIAL USE ONLY

(b)(7)(e)

FOR OFFICIAL USE ONLY

**Shirk, Georgette L**

| | |
|---|---|
| **From:** | Hinds, Ian G |
| **Sent:** | Wednesday, June 22, 2016 5:02 PM |
| **To:** | Gaffin, Elizabeth S; Forest, Laura L; Gentry, Anthony E |
| **Subject:** | FW: USCIS authority to collect/use social media information relating to the exercise of First Amendment protected activities (draft) |

| | |
|---|---|
| **Importance:** | High |

**See version Dea cleared below.  I plan to send to Cristina in the morning.**

**Ian**

(b)(5)

**Shirk, Georgette L**

| | |
|---|---|
| **From:** | Gentry, Anthony E |
| **Sent:** | Monday, April 09, 2018 8:13 AM |
| **To:** | Gaffin, Elizabeth S; Quinn, Kevin T; Brown, Sara C |
| **Subject:** | RE: DHS procurement of SM services in Enhanced Vetting inititative |

Regarding the CDT letter...noted with interest, not much.

**From:** Gaffin, Elizabeth S
**Sent:** Monday, April 09, 2018 9:00 AM
**To:** Quinn, Kevin T; Brown, Sara C
**Cc:** Gentry, Anthony E
**Subject:** RE: DHS procurement of SM services in Enhanced Vetting inititative

(b)(5)

Elizabeth Gaffin
USCIS Office of the Chief Counsel

(b)(6)

**From:** Quinn, Kevin T
**Sent:** Monday, April 09, 2018 8:55 AM
**To:** Gaffin, Elizabeth S; Brown, Sara C
**Cc:** Gentry, Anthony E
**Subject:** RE: DHS procurement of SM services in Enhanced Vetting inititative

(b)(5)

K

**Kevin T. Quinn**
USCIS - Fraud Detection and National Security
Chief – Social Media Division

(b)(6)

**From:** Gaffin, Elizabeth S
**Sent:** Monday, April 09, 2018 8:53 AM
**To:** Quinn, Kevin T; Brown, Sara C
**Cc:** Gentry, Anthony E
**Subject:** RE: DHS procurement of SM services in Enhanced Vetting inititative

(b)(5)

Elizabeth Gaffin
USCIS Office of the Chief Counsel

(b)(6)

---

**From:** Quinn, Kevin T
**Sent:** Monday, April 09, 2018 8:39 AM
**To:** Gaffin, Elizabeth S; Brown, Sara C
**Cc:** Gentry, Anthony E
**Subject:** RE: DHS procurement of SM services in Enhanced Vetting inititative

(b)(5)                (b)(6)

USCIS - Fraud Detection and National Security
Chief – Social Media Division

(b)(6)

**From:** Gaffin, Elizabeth S                     (b)(6)
**Sent:** Monday, April 9, 2018 8:24 AM
**To:** Brown, Sara C                    Quinn, Kevin T <
**Cc:** Gentry, Anthony E <
**Subject:** DHS procurement of SM services in Enhanced Vetting inititative

(b)(6)

You are probably already aware of this

Elizabeth Gaffin
USCIS Office of the Chief Counsel

(b)(6)



# Office for Civil Rights & Civil Liberties

# Protecting The First Amendment
# in
# Social Media Research

## *Presented to*

# Fraud Detection & National Security

DRAFT // FOR OFFICIAL USE ONLY



# First Amendment

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

DRAFT // FOR OFFICIAL USE ONLY



# What is First Amendment Protected Activity?

### First Amendment Protected Activity:

- Public statements, thoughts, and opinions
- Association with other people, organizations, and informal groups
- Religious beliefs, practices, and expressions
- Media reporting and news stories

### Many Types of Protected Activity in Social Media:

- Text
- Emojis
- Pictures
- Videos
- Music and lyrics
- "Likes"
- Forum posts
- Sharing, re-posting, re-tweeting

DRAFT // FOR OFFICIAL USE ONLY



# Reasonably Related

- Social media content must be "reasonably related" to the purpose for which you are investigating.

- Ask yourself "how is this helpful or relevant to the adjudication?"

DRAFT // FOR OFFICIAL USE ONLY

1881



## USCIS Operational Use of Social Media MD [   ] states:

"Employees will limit collection of information related to First Amendment protected activities that have taken place <u>in the United States or related to activities undertaken by United States Citizens abroad</u> to the information that is reasonably related to adjudicative, investigative or incident responses matters."

DRAFT // FOR OFFICIAL USE ONLY



# Individuals Protected Under MD [  ]

- All persons in the U.S.

- U.S. citizens in the U.S. and abroad

DRAFT // FOR OFFICIAL USE ONLY



## Social Media Research Must Be:

- Limited Purpose

- Tailored

- Even-Handed

DRAFT // FOR OFFICIAL USE ONLY



## Limited Purpose

- You must have a valid adjudicative, investigative, or incident response purpose <u>before</u> examining First Amendment protected activities.

DRAFT // FOR OFFICIAL USE ONLY

1885



# Limited Purpose (Continued)

(b)(7)(e)

DRAFT // FOR OFFICIAL USE ONLY



(b)(7)(e)

(b)(7)(e)



DRAFT // FOR OFFICIAL USE ONLY



# Even-Handed

- Social media collection should be done without regard to an individual's viewpoint, or the fact of speaking itself, unless expressly relevant to the enforcement of a statute or regulation.

DRAFT // FOR OFFICIAL USE ONLY

1889

(b)(7)(e)



DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)



DRAFT // FOR OFFICIAL USE ONLY



## Knowledge Check

In the course of investigating potential marriage fraud you discover that a K visa applicant is a member of an environmental rights group, that some have labeled as "extremist."

Is social media information on that association suitable for collection?

DRAFT // FOR OFFICIAL USE ONLY

1892



# Scenarios

DRAFT // FOR OFFICIAL USE ONLY



# Document Fraud Scenarios

DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# Document Fraud Scenario 1



DRAFT // FOR OFFICIAL USE ONLY

1895



(b)(7)(e)

# Document Fraud Scenario 2

DRAFT // FOR OFFICIAL USE ONLY



# Benefit Fraud Scenarios

DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# Benefit Fraud Scenario 1



DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# Benefit Fraud Scenario 2



DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# Benefit Fraud Scenario 3



DRAFT // FOR OFFICIAL USE ONLY

1900



# National Security Scenarios

DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# National Security Scenario 1



DRAFT // FOR OFFICIAL USE ONLY

1902

# National Security Scenario 2



DRAFT // FOR OFFICIAL USE ONLY

(b)(7)(e)

# National Security Scenario 3



DRAFT // FOR OFFICIAL USE ONLY

1904

(b)(7)(e)

# National Security Scenario 4



DRAFT // FOR OFFICIAL USE ONLY



Questions?

DRAFT // FOR OFFICIAL USE ONLY

The Honorable Jeanne Shaheen
United States Senate
Washington, DC 20510

Dear Senator Shaheen:

I write in response to your December 15, 2015 letter. I take this opportunity to spell out, comprehensively, where the Department of Homeland Security has been, is now, and is going with regard to the various uses of social media. There is widespread misunderstanding in this regard.

I begin by addressing the public claim of a former DHS official, John Cohen, that in 2014, I refused to change an existing policy that supposedly forbade reviewing social media postings in connection with screening for immigration benefits. That claim is false, and Mr. Cohen has not worked at DHS in a year and a half. In fact, since I became Secretary, we have <u>expanded</u> the use of social media by the Department.

At the point at which I became Secretary in December 2013, there was uncertainty within the Department about the use of social media, despite a written 2012 policy on the topic. In 2014, in an effort spearheaded by the Deputy Secretary, we resolved that U.S. Citizenship and Immigration Services (USCIS), in particular, could and should make use of social media in connection with the consideration of immigration benefits. Beginning in 2014, we launched three pilot programs that involved consulting the social media of applicants for certain immigration benefits. One pilot, involving the use of social media in vetting of Syrian refugees, is ongoing. Aside from these pilots, USCIS is now conducting a review of the Facebook profiles of Syrian refugee applicants referred for enhanced vetting, and is reviewing social media information of certain K-1 fiancé visa holders who are currently applying for adjustment of status to lawful permanent resident.

Further, within the Department, use of social media is not limited to USCIS by any means. Today, social media is used for over 30 different operational or investigative purposes by U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, Transportation Security Administration, Federal Emergency Management Agency, the U.S. Coast Guard, U.S. Secret Service, our Office of Intelligence and Analysis, and other Components.

The Honorable Jeanne Shaheen
Page 2                                    (b)(5)

     Finally, we have determined to expand the use of social media even further, for operational purposes across the Department, consistent with law.  We have established a Social Media Task Force for this purpose.

     –As part of this effort, the Task Force is examining the resource and technical challenges involved with more extensive use of social media, as well as its effectiveness as a component of the review process for applicants for various immigration benefits.

     With regard to your concern that reports indicated the San Bernardino assailants may have posted openly on social media, Federal Bureau of Investigation Director James Comey stated at a December 16 news conference that the FBI found no evidence that either assailant posted on social media about supporting jihad.  The FBI Director went on to say that the assailants were "showing signs in their communication of their joint commitment to jihad and to martyrdom" through private messages, rather than publicly visible postings.  I defer to the FBI for any updates to the Director's December 16 comments

     Thank you for your interest in this important matter.  The co-signers of your letter will receive separate, identical responses.  Should you wish to discuss this matter further, please do not hesitate to contact me.

               Sincerely,

               Jeh Charles Johnson

FOR OFFICIAL USE ONLY

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 11, 2016

MEMORANDUM FOR COMPONENT HEADS

FROM:          Secretary Johnson

SUBJECT:          Social Media Use                    (b)(7)(e)

---

Social media can provide the Department with critical information related to the execution of our mission.  The Department uses social media in a number of ways, which have expanded during my time as Secretary.  Today, social media is used for over 30 different operational or investigative purposes by U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, Transportation Security Administration, Federal Emergency Management Agency, United States Coast Guard, United States Secret Service, Office of Intelligence and Analysis and other DHS components and offices.

I have directed the further expansion of social media use across the Department, consistent with the law and appropriately protecting civil rights, civil liberties, and privacy.  To that end, on December 15, 2015, the Deputy Secretary and I asked the Under Secretary for Intelligence and Analysis, Frank Taylor, to lead a Task Force to review the Department's current use of social media and identify options to optimize its use across the Department.

I have reviewed and concur with the Task Force's recommendations based on the initial findings of its review.

The Center of Excellence will be staffed by personnel from across the Department, including an individual from each of the oversight offices, who understand their Component's authorities. In addition, the Center of Excellence will be led by a Board of Governance, which will act as a steering committee and decision making body and will meet regularly to discuss Department-wide social media issues relating to operational, policy, and oversight issues.

To guide the Department's further use of social media, to include executing the two priority missions described above, the Task Force developed an Implementation Plan, attached herein.

I hereby direct Under Secretary Taylor and Department component heads to execute this Implementation Plan, and to achieve full operational capability of the Social Media Center of Excellence by August 1, 2016. I authorize the Task Force Chair and Co-Chairs to make amendments to the implementation plan, as necessary. I should be provided regular updates to ensure these actions are being implemented and to be apprised of any necessary amendments to the Implementation Plan. To be clear, the establishment of the Social Media Center of Excellence, as well as this memorandum, are not intended to preclude other appropriate and lawful uses of social media consistent with individual Components' legal authorities.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Washington, DC 20529



U.S. Citizenship
and Immigration
Services

(b)(5)

Subject File Number

(b)(7)(e)

## Memorandum

Use of Social Media for Syrian Refugee Processing
Page 2

b. Complete all training for the operational use of social media offered by FDNS, and acknowledge that they have read and understand the Rules of Behavior for that operational use of social media.

No employee may engage in the operational use of social media unless such use is consistent with this memo and all DHS and USCIS policies governing the operational use of social media.

Additionally, employees will limit collection of information related to First Amendment protected activities that have taken place in the United States or related to activities undertaken by United States Citizens abroad to the information that is reasonably related to adjudicative, investigative or incident responses matters.

These FDNS employees must also continue to coordinate with various U.S. Government entities currently conducting social media research to evaluate current procedures and best practices for social media research.

| | |
|---|---|
| **From:** | Palmer, David (b)(7)(c) |
| **Sent:** | Thursday, December 17, 2015 10:15 AM |
| **To:** | sacco, Michael; Puchalsky, Brian; Dermody, John; Hinds, Ian G; Doolin, Joel; Gentry, Anthony E; Cox, John; Tonelli, Michelle P; |
| **Cc:** | Maher, Joseph; Meyer, Jonathan; Mathias, Susan |
| **Subject:** | FW: Social Media Task Force |
| | |
| **Importance:** | High |

Colleagues:

As Joe Maher advised in the email below, the Department has convened a Social Media Vetting Task Force, chaired by Undersecretary Taylor, to examine the Department's current and future use of social media in the DHS vetting process for operational and intelligence purposes.  We will be faced with several tasks in connection with this task, many if not all of which will require detailed knowledge about how our operational clients use social media in their vetting processes.   You have been named as your Office's POC on this matter.

We have an immediate assignment that requires your input.  Undersecretary Taylor has asked that we conduct a review of all legal authorities for operational and intelligence social media use across DHS and within each component.   Much of this information should already exist, particularly if your client has filed a DHS Operational Use of Social Media Form with the Privacy Office.  We kindly need your response to this no later than **Noon on Monday, December 21**.  There is unfortunately no flexibility in that deadline.

Please note that this assignment will likely require that you contact your operational components and those colleagues in your offices who represent those components to identify their specific statutory and regulatory authorities to carry out their mission.  Please note that this is NOT a Privacy Act analysis, but rather a discussion of our clients' authorities to carry out their missions and how their using social media falls within those authorities.

Please direct any questions to me                    or to Susan Mathias                    We look forward to working with all of you.

Best regards,                                        (b)(6)

David

David J. Palmer
Associate General Counsel
Legal Counsel Division
Office of the General Counsel
Department of Homeland Security

(b)(6)

**From:** Maher, Joseph
**Sent:** Wednesday, December 16, 2015 2:47 PM
**To:** OGC Component Managers; OGC HQS Managers
**Cc:** Palmer, David; Bunnell, Stevan E; Ludtke, Meghan; Meyer, Jonathan; Shahoulian, David; Mathias, Susan; Kelliher, Brian
**Subject:** Social Media Task Force
**Importance:** High

Chief Counsel and AGCs,

Pursuant to the Deputy Secretary's direction, the Department has convened a Social Media Vetting Task Force with representatives from each of the components.  Under Secretary Taylor is heading this task force, with Tom Bush and Kelli Ann Burriesci/Seth Stodder leading the task force on a day-to-day basis.   Under Secretary Taylor convened the first meeting of the task force today and directed some very aggressive timelines for deliverables that will be used for advising the Secretary and the White House.

You will undoubtedly be consulted by your clients on various aspects of the social media review, but OGC will be expected to provide certain deliverables in the coming days.

OGC's point on this is David Palmer, and he will need your assistance and expertise in the products delivered on behalf of OGC.  **Please be on the lookout for quick-request emails from David in the coming days.**

Thank you in advance for your help on this important project.

Joe

Joseph B. Maher
Principal Deputy General Counsel
U.S. Department of Homeland Security

(b)(6)

*This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited.  If you have received this in error, please reply immediately to the sender and delete this message.  Thank you.*


# Homeland Security

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

**Privacy Threshold Analysis**
**Version number: 01-2014**
*Page 1 of 12*

**PRIVACY THRESHOLD ANALYSIS (PTA)**

**This form is used to determine whether**
**a Privacy Impact Assessment is required.**

Please use the attached form to determine whether a Privacy Impact Assessment (PIA) is required under the E-Government Act of 2002 and the Homeland Security Act of 2002.

Please complete this form and send it to your component Privacy Office. If you do not have a component Privacy Office, please send the PTA to the DHS Privacy Office:

Senior Director, Privacy Compliance
The Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528

(b)(6)

PIA@hq.dhs.gov

Upon receipt from your component Privacy Office, the DHS Privacy Office will review this form. If a PIA is required, the DHS Privacy Office will send you a copy of the Official Privacy Impact Assessment Guide and accompanying Template to complete and return.

A copy of the Guide and Template is available on the DHS Privacy Office website, www.dhs.gov/privacy, on DHSConnect and directly from the DHS Privacy Office via email:

(b)(6)

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

**Homeland Security**

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)          (b)(7)(e)

# Homeland
# Security

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)                          (b)(7)(e)

**Homeland Security**

(b)(5)          (b)(7)(e)

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

**Homeland Security**

(b)(5)   (b)(7)(e)

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy



Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)          (b)(7)(e)

**Homeland Security**

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)          (b)(7)(e)

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



(b)(5)

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy



Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)          (b)(7)(e)

Homeland
Security

Privacy Office
U.S. Department of Homeland Security
Washington, DC 20528
202-343-1717, pia@dhs.gov
www.dhs.gov/privacy

(b)(5)                    (b)(7)(e)

Case 3:19-cv-00290-EMC   Document 109-3   Filed 03/25/21   Page 196 of 205



U.S Citizenship and
Immigration Services
Refugee Affairs Division

# GUIDANCE FOR USE OF
# SOCIAL MEDIA IN
# SYRIAN REFUGEE ADJUDICATIONS

Case 3:19-cv-00290-EMC   Document 109-3   Filed 03/23/21   Page 197 of 205

# **TABLE OF CONTENTS**

I.     PURPOSE ....................................................................................................................3

II.    BACKGROUND ..........................................................................................................3

III.   PRESENTATION OF SOCIAL MEDIA RESULTS...............................................3

IV.    DEROGATORY INFORMATION .............................................................................3

V.     CONFIRMING RESULTS RELATE TO THE APPLICANT ...............................4

VI.    CONFRONTING AN APPLICANT USING SOCIAL MEDIA RESULTS.........5

VII.   IMPACT ON ADJUDICATION ................................................................................6

     A.     CREDIBILITY ...............................................................................................6

     B.     INADMISSIBILITY.......................................................................................6

     C.     CARRP HOLDS & DISCRETIONARY DENIALs ..................................7

     D.     OTHER GROUNDS OF INELIGIBILITY ................................................7

VIII.  POINTS OF CONTACT: ...........................................................................................7

IX.    APPENDIX: ADJUDICATIVE AID FOR CASES INVOLVING SOCIAL MEDIA RESULTS ..................................................................................................................8

(b)(7)(e)

## I.  PURPOSE

The purpose of this guidance is to provide officers with information and tools to use the results of social media checks in the refugee adjudication process.

## II.  BACKGROUND

In early 2016, USCIS began implementing social media checks or searches in a few adjudication types.  As a result of this effort, in January/February 2016 the Syria Enhanced Review Process was expanded to include social media checks on all Syrian cases referred to the Fraud Detection and National Security Directorate (FDNS) by the Refugee Affairs Division (RAD).  In cases where FDNS enhanced review results in findings of potentially derogatory information, those results are detailed in a Refugee Case Analysis and Threat Summary (RCATS) document and provided to RAD for use in the interview and adjudication process.  The RCATS document includes FDNS results of open source, classified and social media research permissible in a For Official Use Only format.

## III.  PRESENTATION OF SOCIAL MEDIA RESULTS

Social media findings by FDNS are included in the RCATS, in the Social Media Results section.  In this section, FDNS will identify whether they found any indicator of potentially derogatory information on social media linked to an applicant, and if so, the RCATS may include screenshots of the social media findings, as well as FDNS analysis of why the information is potentially derogatory. Prior to adjudicating a Syrian refugee case, the interviewing officer is required to review the entry for that case on the Syria Case Profiles ECN, and if a case has an RCATS attached, the officer will review it to inform their lines of questioning and incorporate these findings in the adjudicative process, as appropriate.  Officers must place on HQ hold all cases where FDNS has provided RAD with potentially derogatory information (including from social media results).  The RAD Security Vetting and Program Integrity (SVPI) unit will review those HQ holds and make a final determination on the case.  Refer to the Syria Field Resource Guide for the most recent guidance on the Syrian review process.

## IV.  DEROGATORY INFORMATION

Generally, derogatory information sourced from social media includes any information that could impact the applicant's eligibility for resettlement through the U.S. Refugee Admission Program (USRAP).  Derogatory social media results may negatively impact an applicant's access to the USRAP, whether they meet the refugee definition (including persecutor bar), admissibility (including terrorist related and national security grounds),

firm resettlement or credibility. Due to the nature of social media, it may be difficult to conclusively determine the intent behind certain aspects of social media activity. Such challenges may include definitively attributing the activity to the applicant, determining the intent of certain activity, and considering factors such as context, sentiment, or the possibility of sarcasm or joking.

Social media activity will be considered derogatory if it negatively impacts the applicant's access, refugee claim, admissibility, firm resettlement or credibility. Additionally, if the social media activity implicates an articulable link to a national security concern as described in INA 212(a)(3)(A), (B), or (F), the case must proceed through the Controlled Application Review and Resolution Program (CARRP) process.

Examples of potentially derogatory social media activity may include, but are not limited to:
- Evidence of engaging in terrorist activities as defined in INA 212(a)(3)(B)
- Indicates potential support for armed groups/activity or for individuals/organizations associated with armed groups/activity, as defined in INA 212(a)(3)(B)
- Describing past/present/intended actions or affiliations which would make the applicant inadmissible under INA 212(a)(3)(B)
- Symbols relating to armed activity (photographs, pictures, flags, etc.)
- A social media user name that references violence or armed activity
- Commentary that references violence or armed activity

If derogatory information is identified prior to interview, SVPI will review the information prior to interview to determine if there is a force protection issue that would make the interview of the applicant inadvisable for security reasons, and if so, will inform the appropriate RAD Desk Officer and Regional Security Officer (RSO) responsible for that region.

## V.    CONFIRMING RESULTS RELATE TO THE APPLICANT

In the Social Media Results section of the RCATS, FDNS will include analysis of how they discovered the social media activity, how they attributed it to the applicant, and whether there is any ambiguity in the attribution. In some cases, it may not be clear that the social media activity can actually be attributed to the applicant. This could occur in cases of similar names, shared email accounts, shared phone accounts, or where profile-type photos do not appear to be of the applicant.

In cases where there is uncertainty that the social media account belongs to the applicant, the officer must first establish if the social media activity can be attributed to the applicant. This may be established by assessing how the account was initially linked to

the applicant (email, phone number, name, etc.) and using lines of questioning to determine if the account belongs to the applicant.

If the applicant testifies that the social media activity is attributable to a different individual, then the officer should explore who that individual is and that individual's relationship to the applicant.  Concerns related to the applicant's relationship with that individual should be further explored.  If the individual responsible for the social media activity raises national security concerns, the extent of the applicant's relationship to the individual with national security concerns should be explored, as well as the applicant's own activities and attitudes should also be assessed as they related to those of the other individual.  Officers should further assess any Terrorist Related Inadmissibility Ground (TRIG) or national security concerns that arise through the applicant's relationship to the individual and follow standard procedure for addressing such issues.

See Appendix for suggested lines of questioning in cases where attribution is at question.

If the social media activity is attributable to the applicant, the officer should directly confront the applicant with the activity and provide the applicant the opportunity to explain.  The officer should follow appropriate lines of inquiry to assess potential TRIG and national security concerns, and follow standard procedure for addressing such issues.

See Appendix for suggested lines of questioning in cases where the account clearly belongs to the applicant.

# VI.   CONFRONTING AN APPLICANT USING SOCIAL MEDIA RESULTS

An officer must address the potentially derogatory information and its impact on the applicant's eligibility by confronting the applicant and giving him/her the opportunity to respond. Officers should use discretion in determining how to appropriately confront applicants with potentially derogatory information sourced from social media, and may consult with their immediate supervisor or team leader on a case-by-case basis.

An officer may initially let the applicant know that the officer possesses information that needs clarification or may contradict information provided in testimony.  If appropriate, the officer may directly state what concerns were identified on the applicant's social media account so that the applicant has the opportunity to fully address the concern.  This will allow the interviewing and reviewing officers to determine the full impact of the potentially derogatory information on the applicant's eligibility.   However, the officer should never show the applicant a copy of the RCATS itself or the information contained in the Social Media Results section, nor disclose how USCIS obtained the information.

## VII.   IMPACT ON ADJUDICATION

Officers should consider social media results in the totality of the circumstances when coming to an adjudicative decision.  This includes consideration of testimony, prior statements, documentation, and other material elements of the case, as well as the context in which the potentially derogatory information was shared on social media.  Assessing the context of the social media findings might include weighing credible testimony that content was posted in jest, or by another user, or that a posting did not constitute sincere endorsement of a concerning activity.

Pursuant to current policy, officers must place on HQ hold for SVPI review all cases where FDNS has provided RAD with potentially derogatory information sourced from social media.  Refer to the <u>Syria Field Resource Guide</u> for the most recent guidance on the Syrian review process.

### A.   CREDIBILITY

Pursuant to standard procedure (see <u>RAIO Credibility Lesson Plan</u>), the officer must confront an applicant on any material inconsistency, lack of detail, or implausibility arising from the social media results.  The officer must inform the applicant of the nature of the concern and give the applicant an opportunity to explain.  Then the officer must weigh the explanation in the totality of the circumstances.   If an officer finds an applicant not credible to a material element of his/her case, then the case should be denied per standard procedure.

For example, if an applicant testified that he/she had never used a weapon, however his/her social media results included photographs of the applicant firing weapons, the officer would confront the applicant with the inconsistency and allow the applicant an opportunity to explain.  If the applicant were able to provide a reasonable explanation which resolved the inconsistency, then the officer could find the applicant credible and place the case on HQ hold for SVPI review per standard procedure.  If the applicant were unable to resolve the inconsistency with a reasonable explanation, then the case would be denied based on an adverse credibility finding that was material to an inadmissibility.

### B.   INADMISSIBILITY

If social media results indicate that an applicant is inadmissible, e.g. images of military-type training by, potential current membership in, or evidence of material support to, a terrorist organization, and the applicant admits to such activity, then the case should be denied due to the applicable inadmissibility, per standard procedure.

If the applicant denies such activity, in addition to assessing the applicant's credibility, the officer will assess whether the applicant has met his/her burden of establishing that

he/she is not subject to the inadmissibility by the heightened clearly and beyond doubt standard that applies to inadmissibilities.  If the applicant cannot meet his/her burden with regards to the potential inadmissibility, the applicant may be found inadmissible and, in certain circumstances, also not credible, and the case will be denied.

(b)(7)(e)

## D.    OTHER GROUNDS OF INELIGIBILITY

If social media results lead the officer to any other adverse findings, for example a finding that the applicant had participated in persecution or was firmly resettled, then the case would be denied in accordance with standard procedure.

## VIII.  POINTS OF CONTACT

Please direct inquiries regarding RAD social media policy to the RAD Branch Chiefs for Policy and SVPI with the appropriate Regional Operations desk in copy.

Case 3:19-cv-00290-EMC   Document 109-3   Filed 03/29/21   Page 203 of 205

# IX.   APPENDIX: ADJUDICATIVE AID FOR CASES INVOLVING SOCIAL MEDIA RESULTS

**Exploration of potentially derogatory social media findings should not be limited to the suggested questions in this adjudicative aid.  Any additional concerns not identified in this aid should be thoroughly probed.  These questions are not exhaustive and are designed solely to provide a framework for interviewing officers in particular scenarios.  They should not be asked explicitly in this order, but should flow naturally through the course of the interview.  It is requested that any USCIS personnel that uses this aid not produce hard copies of this document and keeps it as an electronic copy only.**   (b)(7)(e)        (b)(5)

(b)(7)(e)  (b)(5)



(b)(5)

(b)(7)(e)

FOR OFFICIAL USE ONLY (FOUO) − LIMITED OFFICIAL USE / LAW ENFORCEMENT SENSITIVE    DATE: 9/25/2018

2353

(b)(5)                                    (b)(7)(e)

(b)(7)(e)  (b)(5)