UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF JUSTICE, *et al.*, <br><br> *Defendants*. | Case No. 19-CV-00290-EMC <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' STATUS REPORT** |

Plaintiffs American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of Northern California submit this response to Defendants' status report, ECF No. 114. The status report demonstrates that the Department of Homeland Security (DHS) has failed to comply with this Court's order of March 26, 2021, ECF No. 110, and remains in longstanding breach of its obligations under FOIA.

Despite artful and unnecessarily complex framing, DHS Privacy Office's explanation amounts to a rejection of compliance with their basic statutory obligations, including the obligation to ensure the public knows about the government's operations – here, the surveillance of the American public's online speech and associations.

DHS's status report makes clear that the DHS Privacy Office has not completed the steps set forth in the Court's March 26 order, which directed DHS to "immediately undertake and complete the ingestion of materials potentially responsive to Parts 2, 3, and 5" of Plaintiffs' request. *See id.* at 2. The report reveals multiple failures to calculate reliable page-count estimates. DHS implies, but does not state explicitly, that all records potentially responsive to Part 2 of Plaintiffs' request have been uploaded for processing, but it notably fails to indicate whether it has uploaded *any* records potentially responsive to Parts 3 and 5 of the request. Either way, DHS has not, and cannot, "propose [a] timeline for the processing of responsive documents and the completion of the production," ECF No. 110 at 2, because it still does not know how many documents and pages are at issue. It cannot generate a page count as to Part 2, because it did not complete the process of necessary to do so, and it cannot generate a page count as to Parts 3 and 5, because it apparently has not even begun the process of de-duplicating and imaging that dataset. *See* Status Report, ECF No. 114 at 4 ("DHS does not know how many documents Search 3 will yield . . . .").[1] The result is a wildly divergent set of estimates of potential page counts—a reflection of DHS Privacy's failure to complete the threshold steps necessary to generate *reliable* page-count estimates.[2]

Thus, DHS has failed to provide Plaintiffs and the Court with the requisite

---

[1] In addition to DHS Privacy's failure to meet the requirements of the Court's order as to Parts 2, 3, and 5 of the request, the Status Report also shows that DHS Privacy failed to produce records responsive to Part 1 of the request by March 31, 2021, as stipulated by the parties and ordered by the Court. *See* ECF Nos. 110 at 1-2; 114 at 4.

[2] The estimate ranges DHS Privacy included appear unreliable for other reasons. For instance, DHS Privacy states that "the first 10GB portion" of Search 2 generated 2,101 pages of records. Given that in total, Search 2 yielded 31 gigabytes of data, that implies that the 2,101 pages may constitute roughly a third of the volume of returned data for that search—only a small fraction of DHS Privacy's estimate of between 550,000 and 1.1 million pages. *See* ECF No. 114 at 4.

clarity regarding the volume of responsive documents. That leaves Plaintiffs facing a familiar conundrum: without a reliable estimate of the volume of documents at issue, Plaintiffs cannot meaningfully confer about, or provide responsive proposals regarding, a production schedule. Nor can Plaintiffs meaningfully confer regarding potential further narrowing of the scope of DHS's search, because of the continuing ambiguity as to the universe of documents at issue and whether specific documents, document types, search terms, DHS components, or other variables are driving up the volume of either the documents or the data returned through these searches. *Plaintiffs have been in this position for approximately two years*. *See, e.g.*, ECF No. 53 at 4-5 (describing Plaintiffs' repeated efforts to facilitate DHS Privacy's search as far back as June 2019); ECF 67 at 4-5 (recounting Plaintiffs' communications and repeated efforts to reach agreement on search parameters); ECF No. 107 at 3 (listing prior filings noting DHS Privacy's failure to proceed with a search and set forth a processing schedule).

Even setting aside DHS Privacy's noncompliance with the Court's order, its status report raises serious concerns in other respects. First, DHS Privacy indicates that it "will continue to ingest data into FOIAXpress in order to use FOIAXpress for production" of records, and that DHS Privacy used a separate document management platform here "for the limited purpose of estimating a page count and developing a production schedule." ECF No. 114 at 2. For virtually the lifespan of this case, DHS Privacy has cited the limitations of the FOIAXpress platform—per DHS Privacy, it only permits ingestion of data in 10-gigabyte increments, *see id.*— as an explanation for its failure to proceed with processing records, and/or as a reason why the search parameters must be narrowed. *See, e.g.*, ECF Nos. 49 at 4; 55 at 4, 59; 64 at 3-4; 65 at 2; 79 at 6-7; 107 at 2-3. Plaintiffs, in turn, have repeatedly argued that technical limitations in DHS's FOIA processing system simply cannot dictate the scope of Plaintiffs' request for public records or whether DHS Privacy responds to Plaintiffs' request in a timely manner. *See, e.g.*, Joint

Status Report, ECF No. 55 at 5; 79 at 3-4. In turn, this Court cited DHS's purported technical limitations in finding the agency's proposal to be "unacceptable". ECF No. 110 at 2. DHS Privacy's stated intention to continue using a glaringly inadequate platform to process records responsive to Plaintiffs' request raises the specter of continued delay and obfuscation over the relevant timetable. Plaintiffs maintain that it is up to Defendants to determine how best to meet their obligations under FOIA, but the arbitrary, unexplained shortcomings in their FOIA management software should have no bearing on those obligations.

Second, the pace of processing described in DHS Privacy's status report is completely at odds with the Court's order that DHS "promptly evaluat[e]" ingested material. ECF. No. 110 at 2. DHS bases its estimates for a virtually open-ended production timetable on a processing rate of 250 pages per month—a grossly inadequate pace that fails to account for (a) DHS's pattern of egregious, chronic delays in even searching for responsive records, (b) the apparently high volume of potentially responsive documents, and (c) the urgent need for information about DHS's surveillance of the Americans public's online speech and associations. In analogous circumstances, courts have ordered agencies to process records at a much higher rate. For example, in *Clemente v. Federal Bureau of Investigation*, the court rejected the FBI's proposed schedule of 500 pages per month and found a schedule of 5,000 pages per month to be "reasonable in light of the importance of" the subject matter of the request at issue. 71 F. Supp. 3d 262, 268-69 (D.D.C. 2014). This was true even though the court recognized that "the FBI's resources are limited." *Id*. Similarly, in *Seavey v. Department of Justice*, the court rejected the FBI's proposed 500-pages-per-month processing schedule and ordered the FBI to process 2,850 pages a month where the FBI had identified over 100,000 pages of potentially responsive documents. 266 F. Supp. 3d 241, 242, 244 (D.D.C. 2017). *See also Boundaoui v. Fed. Bureau of Investigation*, Case No. 1:2017-cv-04782 (N.D. Ill. Sept. 26, 2017) (ECF No. 43) (ordering the FBI to process 3,500 pages

4

per month); *Ctr. for Media Justice v. Fed. Bureau of Investigation*, Case No. 4:19-cv-01465-DMR (N.D. Cal. Apr. 15, 2020) (ECF No. 72) (ordering the FBI to process 2,000 pages of records per month). Plaintiffs submit that the processing rate should be determined once DHS Privacy has produced a reliable estimate of the overall volume of documents at issue, but that the rate must account for DHS Privacy's multi-year failure to search for and produce responsive records.

Third, Plaintiffs again note that DHS Privacy arbitrarily chose a cut-off date of January 14, 2020 for parts 2, 3, and 5 of the request—a date approximately nine months earlier than the date DHS "tasked" its component to conduct a search for records. *See* ECF No. 114 at 2. Absent a compelling justification, the cut-off date should be the date of the search itself. *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 2015 WL 4452136 at *10 (N.D. Cal. 2015) (appropriate cut-off date for responsive records "is the day searching began") (citing cases); *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002); *see* ECF. No. 79 at 3; 107 at 4. That is doubly important here, given DHS Privacy's pattern of unexplained, unsupported delay in conducting the search.

In light of the foregoing, Plaintiffs respectfully request that the Court:

(1) Order DHS Privacy to complete immediately all actions necessary to generate reasonably specific, reliable estimates of the pages of records potentially responsive to parts 2, 3, and 5—including identifying the number of pages associated with particular components, de-duplication, page imaging, and/or accounting for the extent to which Excel files, embedded objects and images, or other artifacts of the record search have artificially inflated the number of potentially responsive records; and

(2) Order DHS Privacy to communicate to Plaintiffs within 14 days of the order estimates of the volume of potentially responsive records attributable to specific document types, components, date ranges, and any other reasonably ascertainable categories of information that could aid the parties in identifying

5

ways to further adjust search parameters in order to reduce the volume of responsive records to a manageable amount.

    Finally, Plaintiffs request that the parties then submit a status report within 28 days of the Court's order setting forth their positions as to the appropriate processing rate and schedule.

Respectfully submitted,

DATED: April 23, 2021

s/*Hugh Handeyside*
Hugh Handeyside
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
hhandeyside@aclu.org

Matthew Cagle
American Civil Liberties Union Foundation
   of Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
mcagle@aclunc.org

*Attorneys for Plaintiffs*