BRIAN M. BOYNTON
Acting Assistant Attorney General
ELIZABETH SHAPIRO
Deputy Director, Federal Programs Branch
ELIZABETH TULIS
Trial Attorney
Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
T: 202-514-9237
E: Elizabeth.tulis@usdoj.gov
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, et al., <br><br> Defendants. | Case No. 3: 19-cv-00290-EMC <br><br> **REPLY IN FURTHER SUPPORT OF DHS'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CBP, ICE, AND USCIS AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION** <br><br> Hearing Date:  July 1, 2021 <br> Time:  1:30 pm <br> Place:  Zoom Video Conference |

**REPLY IN FURTHER SUPPORT OF DEFENDANT DEPARTMENT OF HOMELAND SECURITY'S MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CBP, ICE, AND USCIS AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.    CBP, ICE, and USCIS Properly Withheld Information under FOIA Exemption  7(E)...... 2

    A.    The Challenged Exemption 7(E) Withholdings by CBP Were Proper.................. 7

    B.    The Challenged Exemption 7(E) Withholdings by ICE Were Proper ................. 12

    C.    The Challenged Exemption 7(E) Withholdings by USCIS Were Proper ............ 15

II.    CBP, ICE and USCIS Properly Withheld Information under Exemption 5 .................... 22

    A.    CBP's Exemption 5/Deliberative Process Withholdings Were Proper. .............. 22

    B.    ICE's Exemption 5/Deliberative Process Withholdings Were Proper ................ 24

    C.    USCIS's Exemption 5/Deliberative Process and Exemption 5/Attorney-Client Privilege Withholdings Were Proper. .................................................................. 27

III.    Plaintiffs' Exemption 4 Arguments Were Mooted Before Summary Judgment Briefing Commenced. ......................................................................................................... 31

IV.    CBP's Declarations and Vaughn Index Satisfy Defendant's Burden.............................. 32

V.    ICE's Search Was Adequate.......................................................................................... 33

VI.    CBP Has Agreed to Undertake a Supplemental Search.................................................. 34

CONCLUSION ....................................................................................................................... 35

i

**TABLE OF AUTHORITIES**

**Cases**

*ACLU of Ariz. v. DHS,*
  2017 WL 8895339 (D. Ariz. 2017)............................................................................ 17

*ACLU of N. Cal. v. DOJ,*
  880 F.3d 473 (9th Cir. 2018) ................................................................ 3, 5, 24, 30

*ACLU of Washington v. DOJ,*
  2011 WL 1900140 (W.D. Wash. 2011) ...................................................................... 15

*ACLU v. DHS,*
  243 F. Supp. 3d 393 (S.D.N.Y. 2017)........................................................................ 17

*ACLU v. FBI,*
  881 F.3d 776 (9th Cir. 2018) ........................................................................ 7, 9, 10

*ACLU v. FBI,*
  2013 WL 3346845 (N.D. Cal. 2013) ............................................................................ 6

*Advocs. for the W. v. DOJ,*
  331 F. Supp. 3d 1150 (D. Idaho 2018) ...................................................................... 30

*Afshar v. U.S. Dep't of State,*
  702 F.2d 1125 (D.C. Cir. 1983)................................................................ 28, 29, 30

*Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.,*
  626 F.3d 678 (2d Cir. 2010)........................................................................................ 3

*Am. Immigration Lawyers Ass'n v. DHS,*
  852 F. Supp. 2d 66 (D.D.C. 2012) .............................................................. 17, 18, 19

*Ancient Coin Collectors Guild v. Dep't of State,*
  641 F.3d 504 (D.C. Cir. 2011)...................................................................... 25, 27, 28

*Anguiano v. U.S. Immigr. & Customs Enf't,*
  356 F. Supp. 3d 917 (N.D. Cal. 2018) ........................................................................ 3

ii

*Asian Law Caucus v. DHS*,

    08-cv-842, 2008 WL 5047839 (N.D. Cal. Nov. 24, 2008) ...................................................... 17

*Bowen v. U.S. Food & Drug Admin.*,

    925 F.2d 1225 (9th Cir. 1991) ................................................................................................. 4

*Brinton v. Department of State*,

    636 F.2d 600 (D.C. Cir. 1980) ......................................................................................... 22, 23

*Coastal States Gas Corp. v. U.S. Dep't of Energy*,

    617 F.2d 854 (D.C. Cir. 1980) ......................................................................................... 25, 26

*Council v. U.S. Immigr. & Custom Enf't*,

    464 F. Supp. 3d 228 (D.D.C. 2020) ...................................................................... 19, 20, 21, 22

*DOJ v. Reps. Comm. for Freedom of the Press*,

    489 U.S. 749 (1989) .............................................................................................................. 30

*Elec. Frontier Found. v. DHS*,

    12-5580 PJH, 2014 WL 1320234 (N.D. Cal. Mar. 31, 2014) ................................................. 4

*F.T.C. v. Warner Commc'ns Inc.*,

    742 F.2d 1156 (9th Cir. 1984) .............................................................................................. 25

*Families for Freedom v. U.S. Customs & Border Prot.*,

    797 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................................................... 19

*Frontier Found. v. CIA*,

    2013 WL 5443048 (N.D. Cal. 2013) ....................................................................................... 6

*Frontier Found. v. DOJ*,

    739 F.3d 1 (D.C. Cir. 2014) .................................................................................................. 31

*Frontier Found. v. DOJ*,

    2016 WL 7406429 (N.D. Cal. 2016) ....................................................................................... 6

*Hamdan v. DOJ*,

    797 F.3d 759 (9th Cir. 2015) ....................................................................................... *passim*

iii

*Knight First Amendment Inst. at Columbia Univ. v. DHS*,

  407 F. Supp. 3d 334 (S.D.N.Y. 2019).................................................................... 16, 27

*KXTV, LLC v. USCIS*,

  2020 WL 1082779 (E.D. Cal. Mar. 6, 2020) ......................................................... 6

*Lahr v. NTSB*,

  569 F.3d 964 (9th Cir. 2009) ................................................................................. 32

*Nat'l Immigr. L. Ctr. v. U.S. Immigr. & Customs Enf't*,

  149632-PSG-MAN-X, 2015 WL 12684437 (C.D. Cal. Dec. 11, 2015)................... 4

*N.Y. Times Co. v. DOJ*,

  282 F.Supp.3d 234 (D.D.C. 2017) ......................................................................... 30

*N.Y. Times Co. v. DOJ*,

  806 F.3d 682 (2d Cir. 2015)................................................................................... 31

*Nat'l Sec. Archive v. CIA*,

  752 F.3d 460 (D.C. Cir. 2014) ............................................................................ 26, 27

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,

  861 F.2d 1114 (9th Cir. 1988) ............................................................................ 25, 26

*NLRB v. Sears, Roebuck & Co.*,

  421 U.S. 132 (1975)............................................................................................ *passim*

*Rosenfeld v. DOJ*,

  57 F.3d 803 (9th Cir. 1995) ................................................................................... 3

*Sack v. DOD*,

  823 F.3d 687 (D.C. Cir. 2016)............................................................................... 4, 7

*Schlefer v. United States*,

  702 F.2d 233 (D.C. Cir. 1983) ............................................................................... 31

*Schwartz v. DEA*,

  2016 WL 154089 (E.D.N.Y. 2016)......................................................................... 6

iv

*Shapiro v. DOJ*,

    No. 12-CV-313 (BAH), 2020 WL 3615511 (D.D.C. July 2, 2020), *reconsideration denied*,

    No. 12-CV-313 (BAH), 2020 WL 5970640 (D.D.C. Oct. 8, 2020) .......................................... 4

*Sheridan v. OPM*,

    278 F. Supp. 3d 11 (D.D.C. 2017) .............................................................. 5, 7, 15, 27

*Tax Analysts v. IRS*,

    117 F.3d 607 (D.C. Cir. 1997) ................................................................................ 31

*U.S. Fish & Wildlife Serv. v. Sierra Club*,

    141 S. Ct. 777 (2021) ........................................................................................ 26, 27

**Statutes**

5 U.S.C. § 552(b)(7)(E) ................................................................................................. 6

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant Department of Homeland Security ("DHS" or "Defendant") respectfully submits this reply in further support of its motion for summary judgment with respect to the searches and withholdings of CBP, ICE, and USCIS and in opposition to Plaintiffs' cross-motion.

Plaintiffs' challenges to Defendant's withholdings under FOIA Exemptions 5 and 7(E) rest on mischaracterizations and misapplication of case law and fail to counter the justifications offered in Defendant's declarations and Vaughn indexes. Those documents detail the specific types of information withheld and logically and plausibly demonstrate that such information falls within the scope of the cited exemptions. Underlining Defendant's continued good faith efforts to release as much information as possible, after reviewing Plaintiffs' filing, the relevant DHS components also reassessed the challenged withholdings to determine whether any additional releases could be made. USCIS, ICE, and CBP have now reprocessed certain records and produced those less-redacted records to Plaintiffs, mooting some of Plaintiffs' challenges.

In addition, Plaintiffs' objections to certain of CBP's original withholdings under Exemption 4 are based on redactions that were lifted before summary judgment briefing commenced. Reprocessed versions of the records at issue were provided to Plaintiffs in December 2020, prior to the pending cross-motions. Because CBP already released the information that Plaintiffs claim was improperly withheld, Plaintiffs' Exemption 4 arguments are meritless.

To the extent Plaintiffs challenge the general adequacy of CBP's declarations and Vaughn index, their argument is also meritless. CBP's Vaughn index, along with its declarations, include detailed descriptions of the types of information withheld under each invoked Exemption. No legal precedent supports Plaintiffs' suggestion that CBP was required to provide a sentence-by-sentence, redaction-by-redaction accounting of the withheld information. Nor does any governing precedent support Plaintiffs' contention that CBP's Vaughn index was required to include an even greater level of detail.

1

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

Plaintiffs' challenge to ICE's search rests on a misunderstanding of the duties of different ICE offices and Plaintiffs' unsupported surmise that ICE was not thorough enough in conducting its search. As set forth in ICE's original declaration, ICE identified all offices reasonably likely to possess responsive records, and personnel within those offices further targeted the search based on the content of Plaintiffs' request and their knowledge of the records and records systems at issue. Plaintiffs identify no basis for the Court to question the good faith or veracity of ICE's declarant. Regardless, as further explained in ICE's supplemental declaration, the divisions of ICE's Office of Enforcement and Removal Operations that appear to be the primary focus of Plaintiffs' challenge were not likely to possess responsive records.

As set forth in the stipulation of the parties filed earlier this week, the parties have agreed that briefing on and resolution of Plaintiffs' challenge to CBP's search may be suspended until CBP has completed the supplemental search described in the stipulation and produced any non-exempt responsive materials. Thus, the adequacy of CBP's search is not before the Court at this time.

Accordingly, the Court should grant DHS's motion for summary judgment with respect to CBP, ICE, and USCIS and deny Plaintiffs' cross-motion.

## **ARGUMENT**

### I.    CBP, ICE, and USCIS Properly Withheld Information under FOIA Exemption 7(E).

Plaintiffs' challenges to Defendant's withholdings under FOIA Exemption 7(E) ignore statutorily defined elements of the exemption and rely on mischaracterizations and misapplication of FOIA case law.

First, Plaintiffs largely ignore two of the three categories of information that Exemption 7(E) protects from disclosure. The exemption covers not only law enforcement "techniques," but also law enforcement "procedures" and "guidelines." As the Second Circuit explained in a case repeatedly cited by Plaintiffs, "[t]he phrase 'techniques and procedures' . . . refers to how law enforcement officials go about investigating a crime." *Allard K. Lowenstein Int'l Hum. Rts.*

2

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

*Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010). A "technique" is "a technical method of accomplishing a desired aim," while a "procedure" is "a particular way of doing or of going about the accomplishment of something." *Id.* (quoting Webster's Third New International Dictionary (1986)). A "guideline," in turn, is "an indication or outline of future policy or conduct." *Id.* (quoting Webster's Third New International Dictionary); *see also, e.g.*, *Anguiano v. U.S. Immigr. & Customs Enf't*, 356 F. Supp. 3d 917, 923-24 (N.D. Cal. 2018) ("As used in Exemption 7(E), 'guidelines' refer to how the agency prioritizes its investigative resources, while 'techniques and procedures' cover 'how law enforcement officials go about investigating a crime.'" (citations omitted)). Plaintiffs pay scant attention to the fact that the exemption references both techniques *and* procedures, and they largely ignore the justifications for Defendant's 7(E) withholdings that are based on protection of law enforcement guidelines.

Plaintiffs' suggestion that information falls outside the scope of Exemption 7(E) if it does not describe "technical, unique, or specialized methods," Pls. Opp. & Cross-Motion ("Opp.") at 11; *see also id.* at 8, 10, 13, 15, 16, is not supported by any controlling precedent. The sole Ninth Circuit case cited by Plaintiffs does not even hint at such a narrow rule, but rather identifies "records that provide a 'detailed, technical analysis of the techniques and procedures used to conduct law enforcement investigations'" as *one* category of information that may be protected by Exemption 7(E) even if the techniques or procedures at issue are generally known to the public. *ACLU of N. Cal. v. DOJ*, 880 F.3d 473, 491 (9th Cir. 2018) (citation omitted).

Moreover, as Plaintiffs concede, Opp. at 8, with respect to "techniques" specifically, Exemption 7(E) "protects specific means by which an agency uses a technique, where the general technique is known, but the specific means of employing that technique are not." ECF No. 39 at 16-17 (citing *Hamdan v. DOJ*, 797 F.3d 759, 777-78 (9th Cir. 2015), and *Rosenfeld v. DOJ*, 57 F.3d 803, 815 (9th Cir. 1995)). Indeed, in *Hamdan*, the Ninth Circuit identified information regarding the "specific means" of using a known technique and information comprising "detailed, technical analysis" of known techniques or procedures as separate examples of information within the scope of the Exemption. In that case, the court held that the

3

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

agency had properly withheld information that the agency's affidavits merely described as "techniques and procedures related to surveillance and credit searches," on the basis that the affiant stated that the records would "reveal techniques that, if known, could enable criminals to educate themselves about law enforcement methods used to locate and apprehend persons." *Hamdan*, 797 F.3d at 777-78.

As one court recently summarized, "Exemption 7(E) applies even when the identity of the techniques has been disclosed or are generally known, but the manner and circumstances of the techniques are not generally known, or the disclosure of additional details could reduce their effectiveness." *KXTV, LLC v. USCIS*, No. 2:19-CV-00415 (JAM) (CKD), 2020 WL 1082779, at *7 (E.D. Cal. Mar. 6, 2020) (citing *Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1228-29 (9th Cir. 1991)). Applying this principle, courts have found a wide range of information protected under Exemption 7(E). *See, e.g.*, *Sack v. DOD*, 823 F.3d 687, 694 (D.C. Cir. 2016) (finding proper withholding of reports that detailed "whether a particular agency's polygraph procedures and techniques are effective" and identified "strengths and weaknesses of particular polygraph programs"); *Shapiro v. DOJ*, No. 12-CV-313 (BAH), 2020 WL 3615511, at *40 (D.D.C. July 2, 2020), *reconsideration denied*, No. 12-CV-313 (BAH), 2020 WL 5970640 (D.D.C. Oct. 8, 2020) (upholding FBI's withholding of identities of surveillance targets, because revealing "identities of these targets could . . . reveal the FBI's procedure or technique for selecting specific surveillance methods and begin to unveil, in mosaic-like fashion, the FBI's surveillance playbook"); *Nat'l Immigr. Law Ctr. v. U.S. Immigr. & Customs Enf't*, No. CV-149632-PSG-MAN-X, 2015 WL 12684437, at *13 (C.D. Cal. Dec. 11, 2015) (upholding agency's withholding of "information a law enforcement agent must provide to obtain a DMV photo, and the information the DMV retains"); *Elec. Frontier Found. v. DHS*, No. C 12-5580 PJH, 2014 WL 1320234, at *4 (N.D. Cal. Mar. 31, 2014) (finding proper the withholding of location of CBP's drone operations, and noting that "if the targets of drone operations knew where the operations were likely to be conducted, they could avoid those areas and increase the likelihood of evading detection"). Contrary to Plaintiffs' suggestion, Opp. at 11, the details that

4

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

may be redacted under Exemption 7(E) are not limited to words and phrases that themselves "constitute" techniques, procedures, or guidelines. *See, e.g.*, *Sheridan v. OPM*, 278 F. Supp. 3d 11, 19 (D.D.C. 2017) (noting that the requirement that disclosure would reveal law enforcement techniques or procedures "is met, *inter alia*, where a record would disclose details about a law enforcement technique or procedure itself, . . . or would disclose information regarding 'when ... agencies are likely to employ' certain techniques or procedures" and "is also satisfied if the record would disclose assessments about whether certain techniques or procedures 'are effective'" (internal citations omitted)).

Second, and relatedly, several of Plaintiffs' challenges rest on an incorrect and overbroad reading of cases holding that Exemption 7(E) does not protect information that would merely disclose that a known law enforcement technique was applied in a "specific context." *See* Opp. at 8, 10, 11, 13, 15. This carve-out addresses situations in which the agency is withholding information that would merely disclose the application of a known law enforcement technique to "particular facts." *ACLU*, 880 F.3d at 491. According to this principle, an agency could not invoke Exemption 7(E) to protect, for example, the mere fact that a known technique was used to investigate a particular individual, or to surveil a particular place. *See Hamdan*, 797 F.3d at 778; *see also id.* at 777 (explaining that the problem for the government in *Rosenfeld* was that the government had argued that the redacted information concerned "the specific application" of a technique—a pretext phone call—"because it used 'the *identity of a particular individual*, Mario Savio, as the pretext'" (emphasis added)). Merely disclosing that a known technique or procedure was used in one particular instance, or was applied to "particular facts," is substantively different from disclosing that the agency uses the technique or procedure in a certain category of cases, that the agency deploys the procedure within certain geographic regions, or that the procedure is deployed by particular agency units.

Third, Plaintiffs incorrectly suggest that courts have adopted a rule that categorically excludes certain law enforcement-related information from the scope of Exemption 7(E). For example, Plaintiffs mistakenly suggest that the identities of particular agency offices or units and

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

the "locations subject to" particular "law enforcement programs" are categorically excluded from protection under Exemption 7(E). *See* Opp. at 10, 14, 16. But none of the cases cited by Plaintiffs set forth such a rule. Rather, courts merely held that the defendant agencies had not adequately demonstrated that withholding of information was necessary to prevent disclosure of law enforcement techniques, procedures, or guidelines in those instances. *See, e.g.*, *ACLU v. FBI*, 2013 WL 3346845, at *9 (N.D. Cal. 2013) (finding that the FBI had "not sufficiently met its burden in this case"); *Elec. Frontier Found. v. CIA*, 2013 WL 5443048, at *23 (N.D. Cal. 2013) (finding that FBI's declaration lacked "sufficient specificity"). One cited case, moreover, did not even involve the withholding of individual units or offices within an agency, but rather the identities of the *agencies* themselves. *See Elec. Frontier Found. v. DOJ*, 2016 WL 7406429, at *18 (N.D. Cal. 2016).

Fourth, Plaintiffs' suggestion that Exemption 7(E) does not protect law enforcement information that contains "rules" or "policy," Opp. at 8-9, is contradicted by the plain language of FOIA, unsupported by the case law, and illogical. Indeed, Exemption 7(E) explicitly encompasses law enforcement "guidelines." 5 U.S.C. § 552(b)(7)(E). Plaintiffs' citation to *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) is misplaced: that case concerned Exemption 5 and the deliberative process privilege, not Exemption 7(E)'s protection of law enforcement information. *See id.* at 150-53.

Fifth, Plaintiffs' assertion that Exemption 7(E) does not protect information regarding the "limitations" of a particular law enforcement technique or procedure, Opp. at 9, is incorrect. Indeed, neither of the two opinions cited by Plaintiffs on this point included any such holding. *See* ECF No. 39 at 19 (addressing withholding of the fact of whether FBI lacked certain broad capabilities, not the limitations or other details of a particular law enforcement technique or procedure); *Schwartz v. DEA*, 2016 WL 154089, at *15 (E.D.N.Y. 2016) (suggesting that it was "not clear" whether Exemption 7(E) covered "limitations," but assuming that it does and concluding that agency had not demonstrated that disclosure of withheld information would reveal such limitations). Indeed, assessment of whether a law enforcement technique is

6

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

1    "effective," for instance, is information that falls squarely within the scope of Exemption 7(E*)*.

2    *See Sheridan*, 278 F. Supp 3d at 19 (quoting *Sack v. DOD*, 823 F.3d 687, 694 (D.C. Cir. 2016)).

3        Plaintiffs' challenges to the DHS components' individual withholdings under Exemption

4    7(E) do not refute the government's logical and plausible explanations for the redactions.

### A. The Challenged Exemption 7(E) Withholdings by CBP Were Proper

6    <u>Policy and Operational Use of Social Media</u>. Plaintiffs' challenge to CBP's 7(E)

7    withholdings in the document titled "Policy on Operational Use of Social Media," CBP 125-36,

8    rests largely on the false legal premises addressed above. Further, Plaintiffs' assertion that the

9    information withheld merely consists of "high-level policy rules," Opp. at 8, is pure supposition,

10   and does not counter the justification offered in CBP's Vaughn index and declaration. As CBP

11   explained, the redacted information consists of "[d]escriptions of the scope and investigatory

12   focus of CBP's operational use of social media," "[d]escriptions of specific law enforcement

13   techniques and the types of analysis that CBP does or does not utilize when using publicly

14   available social media information," and "[d]escriptions of criteria for utilizing particular law

15   enforcement techniques, which could reveal the degree to which certain such techniques are

16   available." Howard Decl., Ex. A at 28. Contrary to Plaintiffs' assertion, Opp. at 9, this

17   explanation is not "boilerplate." In justifying its withholdings, an agency "need only disclose

18   what it can without 'thwarting the claimed exemption's purpose,'" *Hamdan*, 797 F.3d at 775

19   (citation omitted), and the agency thus is not required to provide a level of detail that "would

20   compromise the very techniques the government is trying to keep secret," *id.* at 777.  Here, CBP

21   identified three distinct categories of information withheld under Exemption 7(E), and Plaintiffs

22   offer no argument that these categories of information fall outside the scope of the exemption.

23       <u>Issue papers and summaries.</u>" Plaintiffs' arguments with respect to the 7(E)

24   withholdings in what they term "issue papers and summaries" (CBP 1-22), are equally infirm.

25   *See* Opp. at 9-10. As an initial matter, Plaintiffs fail to counter CBP's showing that the withheld

26   information was compiled for law enforcement purposes. "There is no 'one-size-fits-all' test for

27   the required demonstration." *ACLU v. FBI*, 881 F.3d 776, 781 (9th Cir. 2018). Here, redacted

28

7

information comprises details like descriptions of the "scope and investigatory focus of CBP's operational use of social media" and descriptions of "specific law enforcement techniques and types of analysis that CBP does or does not utilize when using publicly available social media information." Howard Decl., Ex. A at 2-3. Such information clearly intersects with CBP's "law enforcement mission to secure the border of the United States." Howard Decl. ¶ 42. In any case, to avoid any doubt on this point, CBP has confirmed in a supplemental declaration that the information at issue "was created and used by CBP in its law enforcement mission to secure the border of the United States through the operational use of social media." Supplemental Declaration of Patrick Howard ("Suppl. Howard Decl.") ¶ 5.

Plaintiffs point to no information that calls into question the veracity of this explanation. Plaintiffs cite no legal precedent supporting their suggestion that documents that include "background information and talking points" or that "appear oriented toward justifying [a law enforcement program] to external audiences or high-level policy officials," Opp. at 9-10, cannot contain information compiled for law-enforcement purposes. And Plaintiffs identify no facts in tension with the conclusion that there is a rational nexus between the withheld information and CBP's law enforcement duties.

CBP's description of the withheld information also places it comfortably within the scope of Exemption 7(E). *See* Howard Decl., Ex. A at 1-10; *see also* Suppl. Howard Decl. ¶ 8 (explaining that the documents at issue describe "the efficacy of, and contain information regarding, specialized techniques and procedures related to CBP's operational use of social media" and that their purpose was "to aid CBP decisionmakers regarding the development of policy, the allocations of resources, and the implementation of procedures and techniques relating to CBP's law enforcement mission"). Plaintiffs have offered no basis to challenge the accuracy of this description. Plaintiffs' arguments for why the withheld information is non-exempt rest on the false legal premises that only "specialized, calculated, or detailed technical information" is protected by Exemption 7(E), that particular details are categorically excluded from the scope of the Exemption, *see supra* at 3-6, and on Plaintiffs' unsupported assertion that

8

the redacted information consists merely of "high-level summaries," Opp. at 10. That the information withheld may *relate* to programs or procedures that are publicly known, Opp. at 10, is immaterial, since CBP's withholdings are limited to details regarding such programs and procedures that are not generally known to the public. *See* Suppl. Howard Decl. ¶ 9.

Privacy Threshold Analyses. Plaintiffs' challenge to CBP's 7(E) withholdings in the Privacy Threshold Analyses ("PTAs") rests largely on Plaintiffs' speculation that the information withheld is already available in the public sphere. *See* Opp. at 10-11. But neither Plaintiffs' observation that "PTAs are often precursors to publicly available privacy impact assessments," Opp. at 10, nor Plaintiffs' contention that the withheld information "reflects the application of well-known techniques to the specific contexts described in the PTAs," Opp. at 11, demonstrate that the specific information redacted in the documents at issue is already generally known to the public. Indeed, as CBP confirms in its supplemental declaration, the withheld information is non-public. Suppl. Howard Decl. ¶ 10. Plaintiffs provide no basis to conclude that these representations are false or made in bad faith. Plaintiffs' speculation that the withheld information in the PTAs duplicates information in publicly available Privacy Impact Assessments ("PIAs"), Opp. at 10-11, is unfounded. *See* Suppl. Howard Decl. ¶ 10. In fact, the information in the PTAs is "substantially more detailed than the information in the publicly available PIAs," and includes "non-public descriptions of sensitive law enforcement techniques and procedures." *Id.*

Plaintiffs' remaining arguments rest on the false legal premise that agencies can only withhold non-public details regarding known techniques and procedures if they consist of "technical" information, *see supra* at 3-4; an incorrect and overbroad application of the principle that Exemption 7(E) does not protect information that merely discloses the application of a known technique in a "specific context," *see supra* at 4; and their assertion that certain details—here, purportedly, "data retention periods," "names of contractors," and "project names and offices"—are categorically excluded from protection under Exemption 7(E). Opp. at 11. As explained above, Plaintiffs' suggestion that details such as "project names and offices" are

9

categorically excluded from protection under Exemption 7(E) is unsupported. *See supra* at 5-6. However, Plaintiffs' argument is also based on an inaccurate description of the withheld categories of information. CBP's redactions did not include "names of contractors," but rather protected names and descriptions of specific technical tools with unique capabilities used by CBP to review and analyze social media for law enforcement purposes. Suppl. Howard Decl. ¶ 10. CBP in one document withheld the name of a tool's developer, which is similar to, closely associated with, and would tend to reveal the capabilities of the specialized tool used by CBP. *Id.*

To the extent CBP withheld information that could be described as "project names and offices," such redactions were likewise used to protect non-public information about law enforcement techniques, procedures, and guidelines, as explained by CBP's declarant. *See* Howard Decl. ¶¶ 48-49, 51. For example, "[d]isclosure of particular organizational units or third party agencies that utilize specific techniques or are involved in a given investigative effort would risk disclosing the investigative focus of CBP's law enforcement activities." *Id.* ¶ 49. Further, "information regarding procedures utilized by particular locations or offices . . . may lead illicit actors to target locations where they may face a decreased risk of detection (a practice known as 'port shopping') or to focus their unlawful efforts where they perceive a lower likelihood of exposure," thus risking circumvention of the law. *Id.* ¶ 51. To the extent Plaintiffs challenge the withholding of "data retention periods," CBP has reprocessed the relevant PTA without those redactions, mooting that issue. Suppl. Howard Decl. ¶ 10.

Finally, contrary to Plaintiffs' suggestion, Opp. at 11, to the extent CBP withheld information that would disclose non-public details of law enforcement techniques and procedures (versus guidelines), it was not required to make a showing that disclosure would "risk circumvention of the law." *See Hamdan*, 797 F.3d at 778. Regardless, CBP has explained that disclosure of the information at issue would reveal sensitive non-public details about CBP's law enforcement activities, and "permit bad actors to develop countermeasures, avoid detection, and frustrate CBP's ability to detect illicit activity and enforce the law." Suppl. Howard Decl. ¶ 10.

10

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

<u>Social Media Operational Use Templates</u>. Plaintiffs' challenge to 7(E) withholdings in Social Media Operational Use Templates ("SMOUTs") again rests on speculation—here, that CBP merely withheld "basic descriptive information." Opp. at 11. In fact, the SMOUTs "discuss the specific circumstances in which CBP may use certain law enforcement techniques relating to the operational use of social media." Suppl. Howard Decl. ¶ 11. Further, Plaintiffs' suggestion that non-public information about CBP's law enforcement techniques must fall outside the sphere of Exemption 7(E) to the extent it reflects CBP "rules" or "policy" regarding operational use of such techniques, 11-12, is at odds with the plain language of FOIA and unsupported by any precedent. *See supra* at 6.

Plaintiffs' contention that CBP's justifications for these withholdings are merely "generalized, boilerplate language" and do not satisfy CBP's burden, Opp. at 12, are without basis. CBP detailed several distinct categories of law enforcement information withheld in these documents, including, for example, "[d]escriptions of the scope and investigatory focus of CBP's operational use of social media" and "[d]escriptions of specific types of information CBP intends to access, and how it intends to utilize such information in conducting particular law enforcement functions." Howard Decl., Ex. A at 33-34. In its supplemental declaration, CBP has further explained that the withheld information "when combined with other information released [under FOIA] or that is otherwise publicly available, could reveal sensitive details about the specific technique employed in particular kinds of circumstances." Suppl. Howard Decl. ¶ 11. By revealing "the types of illicit activities or the circumstances in which CBP is likely to use certain techniques," disclosure "would permit bad actors to understand how CBP conducts" particular law enforcement activities, risking circumvention of the law. *Id.* These descriptions explain why the withheld information falls within the scope of the exemption without revealing details that "would compromise the very techniques the government is trying to keep secret." *Hamdan*, 797 F.3d at 778.

<u>Contract documents</u>. Plaintiffs' challenge to the 7(E) withholdings in CBP 197-249 rests on speculation that the information duplicates information that CBP has made public in other

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

contexts. Opp. at 12. But Plaintiffs' speculation is unsupported, and, as CBP's supplemental declaration confirms, incorrect. Suppl. Howard Decl. ¶ 12. Plaintiffs' bald assertion that information cannot be withheld pursuant to 7(E) unless the redacted word or phrase itself "constitute[s] a . . . technique or procedure," Opp. at 12, is likewise contradicted by the plain language of FOIA and unsupported by any precedent, as explained above. *See supra* at 5. As CBP explains, disclosure of the withheld information "would indicate the scope, specific type, and extent of CBP's operational use of social media in a certain field." Suppl. Howard Decl. ¶ 12. Such information "demonstrates CBP's technical capabilities and potential limitations," and the agency thus has a legitimate law enforcement interest in protecting it from disclosure. *Id.*

**B. The Challenged Exemption 7(E) Withholdings by ICE Were Proper.**

"Program summaries." Plaintiffs' contention that a particular memorandum (bates-stamped 1347-49) has already been released by ICE based on an order in another case, Opp. at 12, is incorrect. The case is now on appeal and the order of disclosure has been stayed pending appeal. *See* Order Granting Stay, *Knight First Amendment Inst. v. DHS*, No. 17-cv-7572 (ALC), (S.D.N.Y. 2019), ECF No. 170. Further, Plaintiffs' suggestion that the withheld information merely "pertains to administrative and budget issues" and, contrary to ICE's declaration, would not reveal "challenges particular law enforcement programs have in implementation," Opp. at 12, is pure speculation. Plaintiffs identify no basis to question the veracity y of ICE's description of the withheld material.

Plaintiffs' challenge to ICE's 7(E) redactions in the document titled "Visa Lifestyle Initiative Summary," ICE 1680-1681, consists of speculation that the withheld information is already public, Opp. at 12-13, and a reassertion of Plaintiffs' overbroad and incorrect interpretation of the principle that information that merely describes the application of a known technique to particular facts does not fall within the scope of Exemption 7(E). *See supra* at 5.

Plaintiffs' challenge to the documents bates-stamped 1812-1813 and 1818-26 again rests largely on unsupported speculation that the redacted information is already publicly known. Opp. at 13. The fact that some information about a program is publicly available does not affect the

12

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

validity of ICE's withholding of additional, non-public details, as have been redacted here. *See* Supplemental Declaration of Fernando Pineiro ("Suppl. Pineiro Decl.") ¶¶ 6-7. Plaintiffs' suggestion that the unredacted material "implies a broader description of the program," devoid of sensitive, non-public details, Opp. at 13, is again pure speculation, and does not contradict ICE's explanation of the withholdings. Nor have Plaintiffs' offered any basis to question the good faith of ICE's declarant's affirmation that all reasonably segregable material has been released. *See* Pineiro Decl. ¶¶ 51-53; Suppl. Pineiro Decl. ¶ 13.

Plaintiffs' suggestion that the information withheld in documents bates-stamped 921 and 1017 was not compiled for law enforcement purposes, Opp. at 13-14, is unfounded. As ICE's declarant explains, the withheld information consists of overseas posts that "were selected to complement existing [Homeland Security Investigations] screening efforts in response to national security threats and global acts of terrorism perpetrated in those countries." Suppl. Pineiro Decl. ¶ 8; *see also id.* ¶ 7. This is more than sufficient to demonstrate a rational nexus between the information at issue and ICE's law enforcement mission.

Plaintiffs' contention that details of "locations" cannot be covered by Exemption 7(E) is, as discussed above, legally unsupported and misconstrues the case law. *See supra* at 5-6. Finally, to the extent the redacted information concerns law enforcement guidelines, ICE has also demonstrated that release would risk circumvention of the law. *See* Suppl. Pineiro Decl. ¶¶ 7-8. Plaintiffs suggest that there can be no such risk because "the monitoring of applicants from [the specified issuing posts] is only 'part' of ICE's social media surveillance program." Opp. at 14. This argument is illogical: definitively revealing particular overseas posts where a particular law enforcement program is active not only could undermine the effectiveness of the law enforcement efforts at those posts, but also, by process of elimination, would reveal the countries or areas where the program at issue is *not* employed. Suppl. Pineiro Decl. ¶ 8.

Plaintiffs' challenge to the 7(E) withholdings in the PowerPoint presentation bates-stamped 432-448 again rests on the false legal premises that that redacted words and phrases must themselves "constitute" law enforcement techniques or procedures, and that any details

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

about the particulars of an agency's use of a known law enforcement technique are merely the "application" of the technique to "specific contexts." Opp. at 15. As explained above, *see supra* at 5, these assumptions are legally unsupported. Further, as ICE's declarant explains, the withheld details of ways ICE is able to identify potential groups that pose a threat to national security—the identifiers shown in the PowerPoint—are not known to the public. Suppl. Pineiro Decl. ¶ 9.

Plaintiffs' contention that ICE's Vaughn index provides an inadequate "generic" description of the redacted content, Opp. at 15, is also unsupported. The Vaughn index explains that the document was partially redacted in order to protect "tactics using open source research for locating and researching law enforcement suspects, what data points are used and exploited, screen shots of how databases should be researched, and other investigative steps." Pineiro Decl., Ex. A, at 8. Plaintiffs do not offer any argument that these categories of information fall outside the scope of Exemption 7(E). Moreover, Plaintiffs' suggestion that release of the withheld information would not risk circumvention of the law because the image guide at issue "is not a comprehensive list of all the symbols that might be encountered during [open-source] analysis," Opp. at 15, is illogical. Revealing the withheld information would alert individuals to ICE's guidance regarding specific identifiers that may trigger law enforcement scrutiny, and allow them to avoid detection or use the identifiers in ways that would mislead law enforcement operations. Suppl. Pineiro Decl. ¶ 9. The fact that law enforcement personnel might also take an interest in symbols or images beyond those addressed in the document does not affect that calculus.

Plaintiffs also illogically contend that disclosure of information on the slide labeled "Terrorists" would not risk circumvention of the law. Opp. at 15. Plaintiffs suggest that there is no such risk because the guide at issue "includes groups currently designated on US terrorist lists" as well as "some lesser known terrorist groups," and therefore "cannot be interpreted as an actual roadmap of HSI's investigative priorities." Opp. at 15. Plaintiffs offer no further

14

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

explanation for this bald, conclusory statement, simply hinting that the word "includes" somehow prevents the document from describing investigative priorities. *Id.* at 15.

### C. The Challenged Exemption 7(E) Withholdings by USCIS Were Proper.

<u>USCIS 443-44, 1954-55, 2031-32</u>. As an initial matter, upon further review, USCIS has lifted the 7(E) redactions on the pages bates-stamped 1954-55 and 2031-32. Accordingly, Plaintiffs' arguments with respect to those pages are now moot.

With respect to the memorandum bates-stamped 443-44, Plaintiffs contend that the document "describe[es] social media collection programs at the highest level of generality." Opp. at 15. They effectively argue that the "generality" of the *unredacted* portions of this document and the fact that the document "pertain[s] to" programs that are publicly known preclude the withheld information from falling within the scope of Exemption 7(E). This suggestion is legally and factually baseless. USCIS's Vaughn index describes in detail the nature of the withheld information. As USCIS explains, the information withheld under (b)(7)(E) includes:

> a summary of [certain social media vetting] pilots taking place, the countries and application types that were part of the screening efforts and the time period that those screening efforts took place, coordination information regarding other law enforcement agencies that were working with USCIS on its social media vetting process, and the current outstanding decisions to be made for future expansion of the agency's use of social media screening.

White Decl., Ex. F at 83. Plaintiffs point to no information indicating that these details are already generally known to the public.

Nor do Plaintiffs identify legal authority supporting their contention that the types of information withheld are excluded from the protection of Exemption 7(E). Indeed, no case cited by Plaintiffs stands for the proposition that, for instance, "coordination information regarding other law enforcement agencies" cannot be protected by Exemption 7(E). In the case they cite, *ACLU of Washington v. DOJ*, 2011 WL 1900140, at *2 (W.D. Wash. 2011), the court's quibble was that the agency's Vaughn was too conclusory, not that "information describing … coordination among federal agencies" is categorically excluded from Exemption 7(E). While Plaintiffs cite cases in which courts concluded that the government had not adequately justified

15

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

the withholding of related sorts of information, Plaintiffs do not demonstrate that USCIS's explanation in this case is insufficient. As USCIS explains, the redacted content, "if disclosed, would reveal the specific individuals that are likely to be subject to social media screening and the methods used by the agency," and would "put individuals on notice as to what information is considered as part of the screening and vetting process, which areas and applicants will be subject to screening, and the specific factors being considered by law enforcement during the vetting process." White Decl., Ex. F at 83. USCIS's explanation thus establishes that the redacted information falls within the scope of Exemption 7(E).

USCIS 1267-78, 2344-53. Plaintiffs' argument with respect to the documents titled "Draft Guidance for Use of Social Media in Field Operations Directorate Adjudications" and "Guidance for Use of Social Media Refugee Adjudications by the USCIS's Refugee Affairs Division" rests on a handful of cases in which district courts concluded that agencies did not adequately justify the withholding of information regarding questions asked during interviews or examinations. Opp. at 16. To the extent those cases could be read to hold that, because individual interviewees are aware of the particular questions they are asked during their interviews, USCIS's guidelines regarding interview questioning are generally known to the public, they are unpersuasive.

In *Knight*, for example—now on appeal—the district court's finding that specific questions and screening techniques, used by USCIS to determine whether an immigration applicant had terrorist ties, were not exempt rested on the court's unsupported speculation about the memories and activities of immigration applicants. *See Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 334, 353 (S.D.N.Y. 2019), *appeal filed*, No. 20-3837 (2d Cir. Nov. 12, 2020). Specifically, the court assumed that the "applicants will remember and report questions related to terrorism to other people," and that, if applicants were to make such reports, they would effectively disclose to the general public the screening techniques described in the documents at issue. *Id.* In *ACLU v. DHS*, while the court concluded that the questions that CBP asked of certain Juvenile Referral Program applicants were not protected, it acknowledged

16

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

that information regarding screening or interview questions could sometimes be properly withheld under Exemption 7(E), distinguishing the questions at issue from questions that were part of "methods used to ferret out fraud or terrorism from otherwise innocuous conduct." *ACLU v. DHS*, 243 F. Supp. 3d 393, 403 (S.D.N.Y. 2017). *ACLU of Arizona*, in turn, did not involve guidelines for questioning interviewees or applicants, but rather the agency's redaction of "questions asked during traffic stops as reflected in the narratives." *ACLU of Ariz. v. DHS*, 2017 WL 8895339, at *28 (D. Ariz. 2017). The magistrate judge recommended a finding that the agency's 7(E) withholding was unjustified because "[t]he records generally appear[ed] to include unredacted instances of questions asked by agents and responses received" and the agency had "pointed to no specific instance justifying application of Exemption 7(E) to questions asked during traffic stops." *Id.* Nowhere did the court suggest that law enforcement interview or screening questions are categorically excluded from the protection of Exemption 7(E).

Here, USCIS's declarations and Vaughn index amply demonstrate why disclosure of the withheld information would reveal a variety of non-public details of law enforcement techniques, procedures, or guidelines, and risk circumvention of the law. White Decl. ¶¶ 33-37 & Ex. F at 115, 287; Supplemental Declaration of Terri White ("Suppl. White Decl.") ¶ 16. As relevant to Plaintiffs' challenge—which addresses only a  subset of those details—USCIS withheld information that would disclose "the specific questions that can be used by immigration officers to question applicants to verify social media results as part of social media vetting." Suppl. White Decl. ¶ 17. As USCIS's declarant explains, "public knowledge of how and when questions are asked could enable aliens to conceal or misrepresent activities and associations that would pose a national security or public safety concern." *Id*. Such information falls comfortably within the scope of Exemption 7(E). *See, e.g.*, *Asian Law Caucus v. DHS*, No. 08-cv-842, 2008 WL 5047839, at *5 (N.D. Cal. Nov. 24, 2008) (finding that agency properly withheld question topics asked in screening known or suspected terrorists attempting to enter the United States); *Am. Immigration Lawyers Ass'n v. DHS*, 852 F. Supp. 2d 66, 77 (D.D.C. 2012) (concluding that USCIS properly withheld a "questionnaire . . .  filled out by USCIS/ICE Site Inspectors,

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

documenting their personal observations," including "the actual questions asked onsite," which "provide[d] the foundation for any additional impromptu or follow-up questions that might later be asked"). Plaintiffs' suggestions to the contrary, Opp. at 16, are based on the false legal premise that only "specialized" or "unique" law enforcement procedures fall within the scope of the Exemption, *see supra* at 3-4, and the incorrect assumption that the withheld information is already generally known to the public, *see* Suppl. White Decl. ¶ 16.

USCIS 277-88, 293-300, 301-18, 331-34, 335-38. Plaintiffs' arguments with respect to the documents they term "program summaries and reviews," Opp. at 16-17, rest largely on false legal premises addressed above, *see supra* at 2-7. Plaintiffs do not engage with USCIS's explanations for these withholdings, instead relying again on the unsupported assertion that certain details are categorically excluded from the protection of Exemption 7(E). Opp. at 16.

Moreover, Plaintiffs' assertion that *some* information about vendors' provision of "social media-surveillance technology to federal agencies" has already been made public, Opp. at 17, fails to demonstrate that the specific information withheld by USCIS here is non-exempt. As USCIS has affirmed in its supplemental declaration, all public information contained in these documents has been segregated and released. Suppl. White Decl. ¶ 17. As the declarant explains, the information withheld under 7(E) "includes nonpublic methods for conducting vetting and screening of certain cases with a national security or public safety concern, the specific cases and applicants that would be screened, and the challenges and limitations in the process." *Id.* Further, revealing such information about USCIS's screening techniques, procedures, and guidelines would risk circumvention of the law because it would provide an applicant with "a strong incentive to falsify or misrepresent information," which "could significantly impact the effectiveness of [the relevant] screening and vetting procedures." *Id.* Thus, the withheld information falls comfortably within the scope of the Exemption.

USCIS 1119-20. These material at issue on these pages is information in a spreadsheet that contains a report of social media screening, and the total number of cases identified as matching accounts filtered by key words, languages, and other search terms used to identify

18

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

accounts that may contain information that indicates possible fraud, public safety, or national security concerns. Suppl. White Decl. ¶ 18. To the extent Plaintiffs challenge USCIS's withholding, on page 1120, of a summary of the total accounts identified during a particular search and the total accounts that contained derogatory information, those redactions have now been lifted and Plaintiffs' argument is moot. *Id.*

The remaining redactions protect a list of key words, acronyms, and filters used by immigration officers to search social media profiles of applicants and the total number of profiles located using those terms. *Id.* As USCIS's declarant affirms in her supplemental declaration, these details are non-public. *Id.* Plaintiffs' suggestion that this is non-exempt "high-level statistical information," Opp. at 17, is unfounded. Indeed, the two district court cases cited by Plaintiffs are inapposite. One involved data on a "total number of arrests," *Families for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 391 (S.D.N.Y. 2011), and the other did not involve a dispute about "statistical information" but rather whether CBP could justify its withholding of "unique identifiers" in a certain data set on the basis that release of such information would risk circumvention of the law, *see Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*, 464 F. Supp. 3d 228, 243 (D.D.C. 2020).

Release of the details withheld by USCIS in this case, in contrast, would disclose details of the methods used by immigration officers in social media screening, including the specific words used to search social media information for indications of possible fraud, public safety, or national security concerns. Suppl. White Decl. ¶ 18.  It would also reveal guidelines for such screening and risk circumvention of the law because it would put individuals on notice as to what information is considered as part of the screening and vetting process, and what terms are considered important factors during that process. *Id.*

<u>USCIS 1541-42</u>. USCIS has now lifted the majority of the 7(E) redactions on page 1541, and all of the 7(E) redactions on page 1542. Suppl. White Decl. ¶ 19. Accordingly, Plaintiffs' challenge to those withholdings are largely moot. The remaining information was properly withheld pursuant to Rule 7(E) because it consists of nonpublic details of techniques and

19

procedures that are part of the operational use of social media to screen certain applicants, including detailed information about the technological capabilities that USCIS is trying to acquire to conduct such screening and the applicants who would be subject to the screening if USCIS does acquire such capabilities. *Id.* If released, the information would reveal methods currently used in the vetting process by law enforcements and immigration officers, the future enhancements the agency is considering, and the types of applications that may be subject to scrutiny. *Id.* Further, release of such information would put individuals on notice regarding certain guidelines for such vetting and screening, which could cause them to avoid filing certain benefit application types or to avoid revealing certain aspects of their biographic history, risking circumvention of the law. *Id.* Plaintiffs' speculation that the withheld information is already publicly available, Opp. at 18, is unfounded. *See* Suppl. White Decl. ¶ 19.

USCIS 1878-1906. USCIS has now lifted many of the original 7(E) redactions on these pages, largely mooting Plaintiffs' arguments. Suppl. White Decl. ¶ 20. As USCIS's declarant explains in her supplemental declaration, the 7(E) redactions that remain protect non-public details of methods for screening and vetting of certain cases that pose a national security or public safety concern, and the particular factor(s) that trigger such concerns and the vetting process. *Id.* The redactions also cover detailed instructions regarding what social media may or may not be searched for various immigration benefit types, how the information collected may be used in the determination, and specific scenarios that illustrate parameters for such social media searches and collection. *Id.* The withheld information also includes guidelines regarding areas of concern that should be a focus of screening, and the specific questions that can be used by immigration officers to verify social media results as part of social media vetting. *Id.* Release of such information would risk circumvention of the law by enabling aliens to conceal or misrepresent activities, associations, or other information that would pose a concern. *Id.* Release of the withheld information could also result in individuals hiding the use of certain social media platforms when applying for certain benefit types, also thus risking circumvention of the law. *Id.* Thus, the withheld material falls comfortably within the scope of the Exemption.

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

USCIS 1308-21. Plaintiffs challenge Exemption 7(E) withholdings in a draft document titled "DHS Operational Use of Social Media." USCIS has now fully released pages 1311-12 and 1315-21, as well as portions of previously redacted information on pages 1313-14. Suppl. White Decl. ¶ 21.

The remaining information withheld under Exemption 7(E) includes nonpublic details of methods for vetting and screening cases that pose a national security or public safety concern, and the particular factor(s) that trigger such concerns and additional vetting processes. *Id.* The withheld information also includes law enforcement guidelines in that it details areas of concern for which officers should screen, and specific methods that should be used to conduct vetting. *Id.* These include technological details, including information about how to access and use DHS's databases to conduct social media screening, as well as specifications of factors that may indicate potential fraud, criminal, public safety, or national security concerns. *Id.* Release of such information would risk circumvention of the law because it would put individuals on notice of what information is considered as part of the screening and vetting process, limitations of access, and how to exploit the capabilities used by the agency during screening. *Id.* This could result in individuals hiding their use of certain information on social media platforms or engaging in other behavior to avoid proper vetting. *Id.* Thus, the information remains properly withheld under Exemption 7(E).

USCIS 2258-2269. Plaintiffs' challenge to USCIS's Exemption 7(E) withholdings in this draft Privacy Threshold Analysis have been largely mooted, as USCIS has reprocessed this record and fully released pages 2261-62, 2265-69, and portions of previously withheld information on pages 2260 and 2263-64. Suppl. White Decl. ¶ 22.

Plaintiffs cite no authority in support of their suggestion that USCIS was barred from redacting law enforcement information in the PTA because PTAs can serve as "precursors" to "public-facing privacy impact assessments." Opp. at 18. USCIS's declarant has affirmed that the information that remains withheld is nonpublic, Suppl. White Decl. ¶ 22, and Plaintiffs identify no evidence contradicting that affirmation.

21

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

Nor is there any basis to conclude that the withheld information consists, not of details regarding law enforcement procedures, techniques or guidelines, but rather non-exempt "privacy-compliance processes and policy limits." Opp. at 19. As set forth in USCIS's supplemental declaration, the remaining redactions protect nonpublic details of methods for vetting and screening cases that pose a national security or public safety concern, and the particular factor(s) that trigger such concerns and additional vetting processes. Suppl. White Decl. ¶ 22. The withheld information also includes law enforcement guidelines, in that it contains descriptions of areas of concern for which officers should be screening and the specific questions that can be used by immigration officers in verifying social media results as part of social media vetting. *Id.* The release of such information would risk circumvention of the law because public knowledge of how and when questions are asked in screening or vetting could enable aliens to conceal or misrepresent activities, associations, or other information that would pose a national security or public safety concern. *Id.* Release of the withheld information could also result individuals hiding the use of certain social media platforms when applying for certain benefit types based on their knowledge that a social media search will be conducted. *Id.* Thus, the information is protected by Exemption 7(E).

## II.    CBP, ICE and USCIS Properly Withheld Information under Exemption 5.

Like their Exemption 7(E) arguments, Plaintiffs' challenges to the components withholding under Exemption 5 rest on false legal premises and often fail to engage with the descriptions and explanations offered in the components' declarations and Vaughn indexes.

### A.    CBP's Exemption 5/Deliberative Process Withholdings Were Proper.

PTAs. In challenging CBP's Exemption 5 withholdings in the PTAs, Plaintiffs rely on a vastly overbroad reading of the D.C. Circuit's observation, in *Brinton v. Department of State*, 636 F.2d 600, 605 (D.C. Cir. 1980), that "Exemption 5 does not protect . . . communications that promulgate or implement an established policy of an agency." Opp. at 20. With this statement, the D.C. Circuit was addressing the concept of working law or "secret law," *id.*, and distinguishing recommendations and advisory opinions from post-decisional communications

22

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

that explain the "basis for agency policy already adopted," *Sears*, 421 U.S. at 152. Contrary to Plaintiffs' suggestion, neither the D.C. Circuit nor any other court has adopted a rule that deliberations regarding an agency decision or policy that is subsidiary to the agency's adoption of some broader policy fall outside the scope of the privilege.

In this case, the redacted information consists, for example, of "[d]escriptions of recommended future uses and techniques for social media information being evaluated and considered by CBP personnel pending a decision on the feasibility and effectiveness of incorporating such uses and techniques into CBP operations." Howard Decl., Ex. A at 4. Plaintiffs' attempt to re-cast such recommendations and analyses as directives or "adjudications," Opp. at 20, is a mere rhetorical sleight that ignores CBP's descriptions of the actual content of the withheld material.

<u>"Issue papers and summaries."</u> Plaintiffs' challenge to CBP's Exemption 5 withholdings in the documents they term "issue papers and summaries" rests entirely on speculation about the redacted content. Based on factual content in the *unredacted* portions of the records, Plaintiffs surmise that CBP has redacted "factual, segregable information that Exemption 5 does not protect." Opp. at 21. But CBP's release of such factual information in the unredacted portions of the documents merely underscores the fact that CBP did properly segregate non-exempt material. As Plaintiffs effectively concede, CBP's descriptions of the withheld content (e.g., "[d]escriptions of analyses being conducted…") place it squarely within the scope of Exemption 5 and the deliberative process privilege. Plaintiffs identify no basis—beyond their unsupported speculation—for the Court to question the declarant's veracity.

Further, Plaintiffs' argument that "CBP's hypothetical questions and answers . . . are not deliberative," Opp. at 21, mischaracterizes the redacted content. As set forth in CBP's Vaughn index, the redacted information includes "*[r]ecommended* responses to hypothetical questions contained in briefing materials developed by CBP staff *to suggest responses for agency decision makers* if asked in future inquiries about CBP's operational use of social media." Howard Decl., Ex. A at 6 (emphasis added). In other words, like the other redacted material, this information

23

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

consists of recommendations to agency decisionmakers in advance of a decision regarding a policy-related issue—specifically, CBP's operational use of social media. Suppl. Howard Decl. ¶ 14. As explained by CBP's declarant, information related to recommended responses to questions about CBP's use of social media was withheld where it either discussed hypothetical future policies or addressed the subject matter of ongoing internal analyses regarding the potential capabilities and limitations of certain techniques relating to the operational use of social media. *Id.* As noted by CBP's declarant, release of such deliberative material "could discourage and chill open, frank discussions on matters of policy between subordinates and superiors," and negatively impact CBP's decision-making process in the future. *Id.* Thus, the information was properly withheld under Exemption 5 and the deliberative process privilege. *See, e.g.*, *ACLU of N. Cal.*, 880 F.3d at 490 (explaining that "[t]he deliberative process privilege protects the internal decision making processes of government agencies").

### B.  ICE's Exemption 5/Deliberative Process Withholdings Were Proper.

ICE 62-63. Plaintiffs' challenge to ICE's withholding of a discussion of draft contract language for a contract with a "social media surveillance vendor," Opp. at 21, relies on speculation and false legal premises. As an initial matter, the decision to which the email relates is self-evident—a decision as to "contract language regarding Social Locator technology." Pineiro Decl., Ex. A at 1. Plaintiffs' contention that the withheld material "address[es] solely factual matters," Opp. at 21, is pure surmise and is contradicted by the agency's declaration, which makes clear that release of the withheld content would reveal the agency's deliberations regarding what language should be included in a contract. Plaintiffs' suggestion that the discussion at issue are is merely the "implementation of a decision" and/or "peripheral to actual policy formation" appears to rest on misapplication of legal precedents regarding "working law." *See id.* The "working law" doctrine removes from the protection of Exemption 5 "opinions and interpretations which embody the agency's effective law and policy." *Sears*, 421 U.S. at 153 (quotation marks omitted). Plaintiffs identify no ground to conclude that the deliberative email at issue here falls into that category.

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

ICE 1012, 1014. Plaintiffs speculate that the redacted information on these pages consists of "non-deliberative facts." Opp. at 22. In doing so, Plaintiffs mischaracterize the explanations for the redactions offered by the agency. For example, with respect to the pages bates-stamped 1012 and 1014, Plaintiffs assert that "ICE's Vaughn index states that the redacted information is a "Request for information from the Deputy Director of ICE on how ERO and [Homeland Security Investigations ("HSI")] use Facebook data," arguing that this purported description "suggest[s] that the redactions contain wholly factual, non-deliberative information." Opp. at 22. However, what the Vaughn index actually states is that partial redactions were made to a "*draft response* and *recommended edits* to a draft response to a request for information from the Deputy Director of ICE on how ERO and HSI use Facebook data." Pineiro Decl., Ex. A at 19 (emphasis added).

That the comments on the draft were made "for the purpose of providing accurate information to the Deputy Director," *id.*, does not change the deliberative nature of the information withheld. In assessing whether redacted content "reflects the give-and-take of the consultative process," *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), the legitimacy of withholding "does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011); *see also Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988) ("[E]xemption 5 'was intended to protect not simply deliberative material, but also the deliberative process of agencies.'" (citation omitted)). The privilege does not cover "[p]urely factual material," *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citation omitted), but does apply where the "factual material . . . is so interwoven with the deliberative material that it is not severable." *Id.*

While draft documents are not automatically privileged, drafts commonly satisfy the standard for withholding under the deliberative process privilege. *See, e.g.*, *U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S. Ct. 777, 786 (2021) ("A draft is, by definition, a preliminary version

25

of a piece of writing subject to feedback and change."); *Coastal States*, 617 F.2d at 866 (finding the deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"); *see, e.g.*, *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (describing importance of protecting drafts); *Nat'l Wildlife Fed'n*, 861 F.2d at 1122 (protecting working drafts).

Here, in the withheld material reflects agency personnel's deliberations regarding what information should be shared with the public regarding HSI's use of social media in HSI operations. Suppl. Pineiro Decl. ¶ 10. It includes agency officers' and/or employees' editorial comments, recommendations, and judgments, such as decisions to insert or delete material from the information that ICE is deciding whether to release to the public. *Id.* Thus, the withheld draft text and comments are deliberative and predecisional, "reflect[ing] the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. They therefore fall comfortably within the scope of Exemption 5 and the deliberative process privilege.

ICE 1761. ICE has lifted the challenged redactions on this page and re-released the record to Plaintiffs. Suppl. Pineiro Decl. ¶ 12. Accordingly, Plaintiffs' arguments with respect to those withholdings are moot.

ICE 596-640. Plaintiffs' challenge to ICE's withholding of an "initial, non-final draft" of a document titled "Performance Work Statement Visa Lifecycle Vetting Initiative" Plaintiffs' rests on the presumption that ICE was required to identify, segregate, and release any "factual material" within this draft document. Opp. at 23-24. However, no governing precedent supports such a presumption. Indeed, Plaintiffs' contention rests entirely on a statement in a single district court opinion, in a case now on appeal. *See id.* at 23 (citing *Knight First Amendment Inst.*, 407 F. Supp. 3d at 347). To the extent that opinion could be read to suggest a rule of the sort Plaintiffs seek, it is unpersuasive because it ignores the deliberative nature of the drafting process. *See, e.g.*, *Sierra Club*, 141 S. Ct. at 786 ("A draft is, by definition, a preliminary version of a piece of writing subject to feedback and change."); *Nat'l Sec. Archive*, 752 F.3d at 465 (rejecting

26

argument that CIA was required to disclose reasonably segregable factual portions of draft history, because draft was "exempt in its entirety under Exemption 5"). *Cf. Ancient Coin Collectors Guild*, 641 F.3d at 513 (explaining that the selection and organization of facts can be part of the deliberative process).

In this case, ICE has explained that the document at issue "was prepared by ICE and was in the process of being reviewed by divisions within the Office of Homeland Security Investigations in anticipation of procuring a contract." Pineiro Decl., Ex. A at 11. This draft document "contains an unfinalized version of a Performance Work Statement, which includes draft responsibilities, draft scope and objectives, and various personnel responsibilities." Suppl. Pineiro Decl. ¶ 11. Not only would release of such draft language—reflecting an internal agency deliberation— "discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel," Pineiro Decl., Ex. A at 12, it also "would cause confusion to the public and to other vendors regarding what performance would be required under the contract," Suppl. Pineiro Decl. ¶ 11. Accordingly, the information was properly withheld under Exemption 5 and the deliberative process privilege.

### C. USCIS's Exemption 5/Deliberative Process and Exemption 5/Attorney-Client Privilege Withholdings Were Proper.

As Defendant informed the Court, upon review of Plaintiffs' cross-motion and the record in this case, USCIS determined that it could release additional information in certain records at issue. *See* ECF No. 117, ¶ 5. Specifically, USCIS is no longer invoking Exemption 5 with respect to pages 1267-1278, 2344-2353, or 2258-2269. Suppl. White Decl. ¶¶ 5, 6, 8. USCIS's reprocessing renders moot Plaintiffs' arguments that USCIS improperly withheld information under Exemption 5 in these documents.

USCIS 1571. Plaintiffs' challenge to USCIS's Exemption 5/deliberative process withholdings in this document rest on unsupported speculation about the redacted material and misapplication of legal precedents. Plaintiffs' challenge boils down to two arguments: (1) an unredacted portion of the document refers to text having been "cleared," and this means that the

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

withheld material cannot be predecisional, and (2) to the extent the information "contains guidance on 'USCIS's authority,' it constitutes working law." Opp. at 25. Neither of these arguments has merit.

First, Plaintiffs' speculation that the withheld information is post-decisional is unfounded. As explained by USCIS's declarant, as indicated by the subject line, the text at issue is a draft. Suppl. White Decl. ¶ 7. It had only been "cleared" by one individual, and would be sent to another individual, specifically, a Division Chief within the USCIS Office of Policy and Strategy, for her review prior to review by USCIS leadership. *Id.*

Second, Plaintiffs' suggestion that the document constitutes "working law" is groundless. The working law doctrine provides that the deliberative process privilege does not protect "'opinions and interpretations' which embody the agency's effective law and policy." *Sears*, 421 U.S. at 153. As the D.C. Circuit has explained, "'[w]orking law' refers to 'those policies or rules, and the interpretations thereof, that either create or determine the extent of the substantive rights and liabilities of a person.'" *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1141 (D.C. Cir. 1983) (citation omitted).

Here, the information at issue—which is in any case merely a draft text—discusses "three options being considered" as part of the agency's methods for collecting publicly available information and "how the First Amendment may or may not restrict those options." Suppl. White Decl. ¶ 7. Thus, the withheld information does not even reflect a final legal opinion to inform the agency's policy judgments, let alone a policy, rule, or interpretation that "create[s] or determine[s] . . . substantive rights and liabilities." *Afshar*, 702 F.2d at 1141.

Finally, the material redacted under Exemption 5 in this document is also protected by the attorney-client privilege. *See* White Decl., Ex. F at 158; Suppl. White Decl. ¶ 12. The emails at issue "are between USCIS [Office of Chief Counsel] attorneys and include a summary of the legal issues and draft responses." *Id.* ¶ 12. The email concerns a "a request for legal guidance regarding USCIS's authority to collect and use social media information, specifically in relation to First Amendment protected activities," *id.*, and the client—USCIS—is self-evident. As

28

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

USCIS's declarant affirms, the email was not distributed outside DHS. *Id.* Plaintiffs' surmise that the information was not kept confidential because "the email appears to have been circulated widely," Opp. at 30, is unsupported speculation.

Accordingly, the Exemption 5 redactions in this document were proper pursuant to both the deliberative process privilege and the attorney-client privilege.

USCIS 1711-12. USCIS has lifted certain redactions in this email chain, and is no longer asserting the Exemption 5 in conjunction with the attorney-client privilege for this document. The Exemption 5/deliberative process redactions that remain protect information that consists of questions posed by members of USCIS's Social Media Working Group (specifically, Fraud Detection and National Security employees) related to upcoming decisions that the working group was considering, a statement regarding a specific technology request that ICE made for use as part of DHS's vetting and enforcement screening, and the employees' thoughts about pending process decisions. Suppl. White Decl. ¶ 9. Plaintiffs' supposition about the "context" of these emails, and their suggestion, on the basis of this supposition, that the redacted material may be "merely peripheral to actual policy formation," Opp. at 26, is speculation upon speculation. As USCIS has affirmed, the information withheld as privileged relates to "questions USCIS received regarding DHS's potential procurement of social media services as part of the Enhanced Vetting initiative," and the discussions at issue concern "pending process decisions." Suppl. White Decl. ¶ 9; White Decl., Ex. F at 174. Accordingly, the information at issue is both pre-decisional and deliberative, and it was properly withheld under Exemption 5 and the deliberative process privilege.

USCIS 1475-1477. USCIS withheld this "Summary Paper," which was prepared by Department of Justice ("DOJ") for DOJ's client, DHS, pursuant to Exemption 5 and the attorney-client privilege. White Decl., Ex. F at 144-45; Suppl. White Decl. ¶ 10. As USCIS's declaration makes clear, this attorney-client communication between DOJ and DHS contained legal, not policy, advice, and has not been shared outside of the government. Suppl. White Decl. ¶ 10. There is no basis for Plaintiffs' speculation, Opp. at 27-28, that the document has not been

29

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

maintained in confidence. Nor is there ground for Plaintiffs' suggestion that the document does not contain "bona fide legal" advice. *Id.* at 28.

Plaintiffs' challenge to USCIS's withholding of the document rests largely on Plaintiffs' mistaken argument that the document constitutes "working law." Plaintiffs mischaracterize and misapply the working law doctrine. As noted above, the "working law" doctrine precludes invocation of the deliberative process privilege where documents that the privilege would otherwise protect "embody the agency's effective law and policy." *Sears*, 421 U.S. at 153. As an initial matter, because the Summary Paper at issue was withheld as attorney-client privileged, and not on the basis of the deliberative process privilege, it is doubtful that the "working law" doctrine—even as a theoretical matter—could apply. *See, e.g.*, *Advocs. for the W. v. DOJ*, 331 F. Supp. 3d 1150, 1169 (D. Idaho 2018) (noting that the working law "exception applies *only* to documents that would otherwise be exempt under the deliberative process privilege"); *N.Y. Times Co. v. DOJ*, 282 F.Supp.3d 234, 241 n.2 (D.D.C. 2017) ("The Court is aware of no case that has ever applied the 'working law' exception to abrogate the attorney client privilege. . . ."). *Cf. ACLU of N. Cal.*, 880 F.3d at 489 (holding that there is no working law exception to the attorney work-product privilege). Indeed, Plaintiffs point to no case in which a court has held that the working law doctrine precluded application of the attorney-client privilege.

In any case, there is no basis to conclude that the Summary Paper constitutes working law—that is, the "effective law and policy" of the agency. *Sears*, 421 U.S. at 153. The basic concept of "working law" derives from FOIA's affirmative requirement that agencies must disclose "rules governing relationships with private parties and . . . demands on private conduct." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989). Legal advice that "describes the legal parameters of what an agency is permitted to do, [but that] does not state or determine [an agency's] policy," is not working law. *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 10 (D.C. Cir. 2014). Contrary to Plaintiffs' suggestion, a document containing legal guidance does not become "working law" on the basis that the guidance might have "effects on policy going forward." Opp. at 29.  Here, document at issue contains "legal opinions and analysis

30

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

regarding impediments to proposed expanded immigration vetting of aliens in the United States." Suppl. White Decl. ¶ 10. It does not consist of guidance prescribed by DHS for use in adjudicating individual cases, *cf. Schlefer v. United States*, 702 F.2d 233, 242-43 (D.C. Cir. 1983); or to otherwise govern DHS's dealings with the public, *cf. Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). Indeed, the document does not even a "statement[ ] of the agency's"—*i.e.*, *DHS*'s—"legal position" on a matter before the agency. *Tax Analysts*, 117 F.3d at 618. Courts have routinely held that advice from DOJ about legal parameters relevant to various policy decisions does not constitute "working law." *See, e.g.*, *N.Y. Times Co. v. DOJ*, 806 F.3d 682, 687 (2d Cir. 2015) (rejecting "the general argument that the legal reasoning in OLC opinions is 'working law,' . . . not entitled to be withheld under FOIA Exemption 5"); *Elec. Frontier Found.*, 739 F.3d at 8 (holding that "OLC did not have the authority to establish the 'working law' of the FBI" and OLC opinion was not a "conclusive or authoritative statement of [the FBI's] policy").

Accordingly, the Summary Paper was properly withheld under Exemption 5 and the attorney-client privilege.

### III.    Plaintiffs' Exemption 4 Arguments Were Mooted Before Summary Judgment Briefing Commenced.

Plaintiffs' argument that CBP improperly withheld information pursuant to Exemption 4 focuses on certain information on pages bates-stamped CBP 50 and 53. However, CBP reprocessed the records at issue and released the reprocessed records to Plaintiffs in December 2020. Suppl. Howard Decl. ¶ 15. The redactions that Plaintiffs' challenge were not present in the reprocessed documents. The documents attached as Exhibit A to Plaintiffs' filing come from CBP's original production, which has been superseded. For the Court's reference, the reprocessed versions of those documents are attached as an exhibit to the Supplemental Howard Declaration. *See* Suppl. Howard Decl., Ex. C.

31

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### IV.    CBP's Declarations and Vaughn Index Satisfy Defendant's Burden.

For the reasons set forth above, CBP has logically and plausibly justified its withholdings in this case, and Plaintiffs' challenges should be rejected. Plaintiffs' assertion that CBP's Vaughn index was insufficient to satisfy the agency's burden, Opp. at 32-33, is groundless. CBP's Vaughn index—in both its original and amended form—describes in detail the different kinds of information withheld in each document at issue, and explains why such information falls within the scope of the cited exemptions. *See* Howard Decl., Ex. A; Suppl. Howard Decl., Ex. A. As described in CBP's declarations, and self-evident from the Vaughn index, many documents contained protected information of a similar nature. Thus, the descriptions in CBP's Vaughn index are naturally repetitive. This does not mean that the descriptions are "boilerplate." Opp. at 32. Further, contrary to Plaintiffs' suggestion, Opp. at 33, CBP was not required to provide a sentence-by-sentence, redaction-by-redaction accounting of the withheld information. In other words, CBP was not required to provide a map to allow Plaintiffs to pinpoint which type of information falls beneath each individual redaction. *See, e.g.*, *Hamdan*, 797 F.3d at 780 (explaining that an agency simply "must describe the document or information being withheld in sufficient detail to allow the plaintiffs and the court to determine whether the facts alleged establish the corresponding exemption").

A Vaughn index "must be detailed enough for the district court to make a de novo assessment of the government's claim of exemption," *Lahr v. NTSB*, 569 F.3d 964, 989 (9th Cir. 2009), but is never required to provide a level of detail that would thwart the purpose of the exemption, *Hamdan*, 797 F.3d at 778. In *Hamdan*, for instance, the Ninth Circuit concluded that the FBI had adequately justified its withholding of information regarding certain law enforcement techniques and procedures, despite the bare description of the withheld information—"techniques and procedures related to surveillance and credit searches," and in one document, "a stratagem, the details of which if revealed would preclude its use in future cases." *Id.* at 777. These bare descriptions, in conjunction with the FBI's statement that disclosure would "reveal techniques that, if known, could enable criminals to educate themselves about law

32

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.

enforcement methods used to locate and apprehend persons," were sufficient to satisfy its burden under Exemption 7(E). *Id.* Here, CBP has done much more than that, specifying numerous, distinct types of details that were withheld under each exemption. Accordingly, CBP's Vaughn index and declarations are sufficient to satisfy its burden under FOIA.

## V.    ICE's Search Was Adequate.

Plaintiffs' challenge to ICE's search rests on the assumption that that the searches conducted by certain ICE offices were inadequate because they failed to locate large numbers of records. Opp. at 35. However, the mere fact that a search did not locate a large number of records—or even that a search did not locate certain responsive records—does not establish its inadequacy. As the Ninth Circuit has explained:

> In evaluating the adequacy of the search, the issue is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate. The failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate.

*Hamdan*, 797 F.3d at 770–71 (internal citations, quotation marks, and alterations omitted).

In this case, Plaintiffs take issue with the search methods used by certain ICE offices and custodians, Opp. at 35, and suggest that the relatively low numbers of responsive records located by these offices establish the inadequacy of ICE's search, *see id.* But ICE explained in detail the manner in which offices likely to possess responsive records were identified, and how FOIA points of contact ("POCs") directed custodians' searches. Pineiro Decl. ¶ 12. As explained in ICE's declaration, "individuals and component offices are directed to conduct searches of their file systems, including both paper files and electronic files, which in their judgment, based on their knowledge of the way they routinely keep records, would most likely be the files to contain responsive documents." *Id.* Plaintiffs identify no evidence that the searches of particular offices were inappropriate given the nature of those offices' responsibilities and the manner in which records in those offices are maintained.

Plaintiffs primarily challenge the sufficiency of the search conducted by ICE's Office of Enforcement and Removal Operations ("ERO"). However, as ICE's declarant explains, ERO has

33

a broad mission that includes identification and arrest, domestic transportation, bond management, and supervised release, including alternatives to detention, and the identification and arrest of aliens who present a danger to national security or public safety makes up only a portion of ERO's responsibilities. Suppl. Pineiro Decl. ¶ 5. Moreover, any ERO-wide programs or systems used operationally with respect to this last aspect of ERO's mission would not be implemented at the Field Office level, but rather within specific divisions at the Headquarters level. *Id.* Further, only one item in Plaintiffs' FOIA request (Part 5) sought documents related to the operational use of social media, seeking records relating to "the use or incorporation of social media content into systems or programs that make use of targeting algorithms, machine learning processes, and/or data analytics for the purpose of (a) assessing risk, (b) predicting illegal activity or criminality, and/or (c) identifying possible subjects of investigation or immigration enforcement actions." Suppl. Pineiro Decl. ¶ 5. At the time of the search, ERO did not have any systems or algorithms that incorporated the use of social media for "targeting algorithms, machine learning processes, and/or data analytics." *Id.* As with their objections to the results of other ICE offices, Plaintiffs' suggestion that ERO's search was inadequate is based on unsupported speculation about the agency's activities.

Because ICE provided a "reasonably detailed" account of its search, *Hamdan*, 797 F.3d at 770, including explaining that the relevant records systems and files were identified based on relevant individuals' subject matter knowledge and knowledge of how records are maintained, *see* Pineiro Decl. ¶ 12, and Plaintiffs have identified no basis to doubt the good faith of ICE's declarant, Plaintiffs' argument that ICE's search was inadequate is without merit.

## VI.   CBP Has Agreed to Undertake a Supplemental Search.

As noted in the stipulation submitted by the parties, ECF No. 124, CBP has agreed to undertake a supplemental search. *See also* Suppl. Howard Decl. ¶ 18. The parties have stipulated to a suspension of briefing on the issue of CBP's search, ECF No. 124 at 1, and that adjudication of the remaining issues in the parties' cross-motions need not await the completion of CBP's supplemental search and production of records, *id.*

34

1

## **CONCLUSION**

2          For the foregoing reasons, the Court should grant DHS's motion for summary judgment

3    with respect to CBP, ICE, and USCIS, and deny Plaintiffs' cross-motion for summary judgment.

4

5    Dated:  May 21, 2019                              Respectfully Submitted,

6                                                      BRIAN M. BOYNTON
                                                       Acting Assistant Attorney General
7

8                                                      ELIZABETH SHAPIRO
                                                       Deputy Director, Federal Programs Branch
9

10                                                     */s/ Elizabeth Tulis*
                                                       ELIZABETH TULIS
11                                                     U.S. Department of Justice, Civil Division
                                                       1100 L Street, NW
12                                                     Washington, DC 20005
                                                       Phone: 202-514-9237
13                                                     Email:  elizabeth.tulis@usdoj.gov

14

15                                                     *Attorneys for Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

28

*ACLU v. DOJ*, No. 3: 19-cv-00290-EMC
DHS Reply and Opp. to Cross-Mot.