HUGH HANDEYSIDE (*pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
Fax: 212-549-2583
hhandeyside@aclu.org

MATTHEW CAGLE (CA Bar No. 286101)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
Fax: 415-255-1478
mcagle@aclunc.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *et al.*,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>DEPARTMENT OF JUSTICE, *et al.*,<br><br>      *Defendants*. | Case No. 19-CV-00290-EMC<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO CBP, ICE, AND USCIS**<br><br>Hearing date:   July 1, 2021<br>Time:          1:30 p.m., by videoconference<br>Judge:         Hon. Edward M. Chen |

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

WITHHOLDINGS AND ISSUES IN DISPUTE .......................................................... 1

ARGUMENT ............................................................................................................... 1

    I.   Defendants Have Failed to Justify Withholdings Under Exemption 7(E). ....................... 1

        A.  CBP Has Failed to Meet Its Exemption 7 Burden. ....................................................... 3

        B.  ICE Has Failed to Meet Its Exemption 7 Burden. ........................................................ 6

        C.  USCIS Has Failed to Meet Its Exemption 7 Burden. ................................................... 7

    II.  Defendants Have Failed to Justify Withholdings Under Exemption 5. ........................... 9

        A.  CBP Has Failed to Meet Its Exemption 5 Burden. ...................................................... 9

        B.  ICE Has Failed to Meet Its Exemption 5 Burden. ..................................................... 10

        C.  USCIS Has Failed to Meet Its Exemption 5 Burden. ................................................ 12

    III. ICE Has Failed to Demonstrate That it Conducted an Adequate Search. ....................... 14

    IV. The Court May Conduct *In Camera* Review if Warranted. ........................................... 15

CONCLUSION .......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*ACLU of N. Cal. v. Dep't of Justice,*
   880 F.3d 473 (9th Cir. 2018) .................................................................................. 2, 4, 5

*ACLU of N. Cal. v. Fed. Bureau of Investigation,*
   146 F. Supp. 3d 1161 (N.D. Cal. 2015) ................................................................. 10, 14

*Assembly of State of Cal. v. Dep't of Com.,*
   968 F.2d 916 (9th Cir. 1992) .................................................................................. 11, 12

*Coastal States Gas Corp. v. Dep't of Energy,*
   617 F.2d 854 (D.C. Cir. 1980) ...................................................................................... 13

*Habeas Corpus Res. Ctr. v. Dep't of Justice,*
   2008 WL 5000224, (N.D. Cal. Nov. 1, 2008) ...................................................... 10, 13

*Hamdan v. Dep't of Justice,*
   797 F.3d 759 (9th Cir. 2015) .............................................................................. 2, 7, 15

*Knight First Amendment Inst. v. Dep't of Homeland Sec.,*
   Case No. 20-3837 (2d Cir. Feb. 23, 2021) ..................................................................... 6

*Lahr v. Nat'l Transp. Safety Bd.,*
   569 F.3d 964 (9th Cir. 2009) ................................................................................ 11, 13

*Milner v. Dep't of Navy,*
   562 U.S. 562 (2011) ....................................................................................................... 2

*N. Pacifica, LLC v. City of Pacifica,*
   274 F. Supp. 2d 1118 (N.D. Cal. 2003) ....................................................................... 12

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ................................................................................................. 3, 12

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.,*
   861 F.2d 1114 (9th Cir. 1988) ..................................................................................... 10

*Ray v. Turner,*
   587 F.2d 1187 (D.C. Cir. 1978) .................................................................................. 15

*Rosenfeld v. Dep't of Justice,*
   57 F.3d 803 (9th Cir. 1995) ........................................................................................... 2

*Roth v. Dep't of Justice,*
   642 F.3d 1161 (D.C. Cir. 2011) .................................................................................... 3

*Zemansky v. Env't Prot. Agency,*
    767 F.2d 569 (9th Cir. 1985) ................................................................................ 14

**Statutes**

5 U.S.C. § 552(b)(5) ....................................................................................................... 11

# INTRODUCTION

This Freedom of Information Act (FOIA) lawsuit seeks records concerning the U.S. government's collection and monitoring of social media information—well-known techniques that Defendants U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS) have long used for various purposes. Plaintiffs challenged Defendants' withholding of an array of information as unjustified under FOIA. Subsequently, in what Defendants label "good faith efforts to release as much information as possible," they reprocessed records, released previously redacted material, and submitted supplemental declarations, while continuing to withhold significant information in those records. Defs.' Reply, ECF No. 126 at 1. Defendants have thus conceded that many of their original withholdings were unsupported, yet they now effectively ask the Court to presume that each of their remaining withholdings is valid based on Defendants' say-so alone.

FOIA does not countenance such a presumption, nor is the disclosure of information under FOIA a matter of Defendants' discretion or "good faith." Rather, FOIA imposes a presumption in favor of disclosure and places the burden on Defendants to demonstrate that information falls within one or more statutory exemptions, which must be narrowly construed.

CBP, ICE, and USCIS have not carried that burden. They have failed to rebut Plaintiffs' challenges to remaining withholdings under Exemptions 5 and 7(E), and ICE has failed to establish that it conducted an adequate search for responsive records.

## WITHHOLDINGS AND ISSUES IN DISPUTE

Because Defendants have now lifted redactions from certain records, a revised Appendix of challenged withholdings is attached.[1] Additionally, CBP has now determined that it should have conducted a search for responsive email records. ECF No. 125. Briefing on the adequacy of CBP's search is therefore suspended pending that search and production of records. *Id.*

## ARGUMENT

### I.    Defendants Have Failed to Justify Withholdings Under Exemption 7(E).

Defendants' expansive interpretation of Exemption 7(E) strays from settled law and

---

[1] Plaintiffs agree that the remaining withholdings at issue no longer implicate Exemption 4.

defies the Supreme Court's instruction that exemptions be construed narrowly. *See Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). It is beyond dispute that "Exemption 7(E) only exempts investigative techniques not generally known to the public" and that are "so unique as to warrant the exemption." *Hamdan v. Dep't of Justice*, 797 F.3d 759, 777 (9th Cir. 2015); Order, ECF No. 39 at 6. The Ninth Circuit, moreover, has repeatedly cautioned against defining what constitutes an investigative technique or procedure with undue specificity, as doing so would allow the government to withhold information under Exemption 7(E) "under any circumstances." *Rosenfeld v. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995); *see also Hamdan*, 797 F.3d at 777. To avoid allowing the government to unilaterally define the scope of the exemption, the Ninth Circuit has held clearly that "[i]f an agency record discusses the application of a publicly known technique to particular facts, the document is not exempt under 7(E)." *ACLU of N. Cal. v. Dep't of Justice*, 880 F.3d 473, 491 (9th Cir. 2018) ("*ACLU*") (cleaned up).

*ACLU* is instructive. There, the government argued that withheld records included "such non-public details as where, when, how, and under what circumstances" electronic surveillance techniques are used, information the government argued could enable people to evade detection. *Id.* at 492. The court rejected that argument and held the records non-exempt, concluding that although they included detailed descriptive and basic technical information, the techniques they described are all publicly known, and disclosure raised no risk of circumvention of the law.[2] *Id.*

Thus, for each 7(E) withholding, Defendants bear the burden of demonstrating not only that the content would disclose actual techniques, procedures, or guidelines for law enforcement investigations, but also that such techniques or procedures are not already publicly known and that the content does not reflect the application of known techniques in particular contexts.

Defendants have not met that burden. They largely ignore the binding authority above and the corpus of public information about their use of social media surveillance techniques, including specific information about their collection, filtering, and analysis of social media information vis-à-vis targeted populations. *See, e.g.*, Pls.' Mot., ECF No. 108 at 2–5. And while Defendants repeat in their original and new declarations that some of the withheld information is

---

[2] The records ordered released are attached as Exhibit D to the Third Handeyside Declaration.

non-public, they fail to demonstrate that it is *exempt* from disclosure.

### A.    CBP Has Failed to Meet Its Exemption 7 Burden.

Policy on Operational Use of Social Media (Ex. A at 125–36).[3] Defendants have failed to justify the redactions in CBP's key policy on operational use of social media. They simply reiterate that the content is exempt, but *ACLU* compels the opposite conclusion. Masked monitoring and undercover engagement on social media are, manifestly, publicly known techniques, and the withheld content closely parallels the content the Ninth Circuit held non-exempt in *ACLU. See* Ex. D (describing policies and approval processes for various known surveillance techniques). Defendants make no attempt to explain how, for instance, re-approval periods (Ex. A at 135 ¶¶ 7.5.2, 7.6.4) or the internal process for approval of these known techniques (*id.* ¶ 7.6.2) could fall within the exemption. And USCIS has belatedly conceded that similar content in its own records cannot be withheld. *See* Ex. C at 1312–13.[4]

Issue papers and summaries (Ex. A at 1–22). CBP has similarly failed to demonstrate that the information it withheld from seven programmatic summary documents was compiled for law enforcement purposes or is exempt under 7(E). CBP now states that these documents were "created and used by CBP in its law enforcement mission to secure the border of the United States through the operational use of social media." Suppl. Howard Decl., ECF No. 127 ¶ 5. But that conclusory statement amounts to little more than an assertion that because CBP is a law enforcement agency, its Exemption 7(E) withholdings *per se* meet the threshold requirement—an assertion that courts have flatly rejected. *See Roth v. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011). Nor does CBP's new justification explain the specific purpose of documents that provide general talking points on CBP's programs. *See* Ex. A at 3, 14, 17, 19, 21 ("Watch Out For/If Asked"). Because CBP has not supplied the required rational nexus to a legitimate law

---

[3] Unless otherwise indicated, exhibits cited here are to the Third Handeyside Declaration. All records with contested withholdings, and further relevant materials, are attached thereto.

[4] Nor can Defendants so easily cast aside *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). *See* Defs.' Opp., ECF No. 126 at 6. While that case addressed Exemption 5, it articulated a broader principle against "secret agency law" that the Department of Justice itself has embraced. *See* Dep't of Justice, *FOIA Update: Disclosure of Prices* (Jan. 1, 1981), t.ly/JdQx (describing *Sears*' hostility to "withholding final decisions" in context of Exemption 4).

enforcement purpose, the records fall short of Exemption 7's threshold requirement.

In any event, CBP has not demonstrated that the content is exempt. The documents address programs and initiatives that are publicly known. *See* Pls.' Cross-Mot., ECF No. 108 at 2–3, 10. To the extent the content reflects CBP's application of known social media exploitation techniques to specific populations or in particular contexts, it is non-exempt under *ACLU*, *Hamdan*, and *Rosenfeld*. Nothing in either CBP declaration suggests the records contain even the "basic technical information" that the Ninth Circuit has still found non-exempt, much less any "detailed, technical analysis." *See ACLU*, 880 F.3d at 492. That CBP continues to withhold even the component that authored the documents—which cannot constitute a technique, procedure, or guideline—underscores that its invocation of Exemption 7(E) is overbroad and unsupportable.

Privacy Threshold Analyses (Ex. A at 23–39, 48–57, 149–60, 296–306, 337–48, 349–58). CBP applied that same grossly overbroad approach to withholding content from various PTAs. Defendants argue that Plaintiffs have not "demonstrate[d] that the specific information redacted in the documents at issue is already generally known to the public." ECF No. 126 at 9. But it is not Plaintiffs' burden to so demonstrate, nor is it necessary that all the withheld information already be in the public realm. Indeed, such a requirement would defeat FOIA's purpose entirely. Rather, it is *Defendants'* burden to demonstrate that disclosure not only would reveal a non-public technique, procedure, or guideline, but also that the content does not reflect the application of a known technique or procedure in a particular context.

Even a cursory review of the PTAs makes clear that Defendants have not met that burden. For instance, CBP withheld "privacy risk mitigation strategies" (Ex. A at 26), project names (*id.* at 49, 150), administering offices (*id.* at 49, 297, 338, 350), and "publicly available information" to be collected (*id.* at 51–52, 151–54, 300–01, 342–43, 352–53)—information that would be obvious to virtually any user of social media and that CBP lists in public-facing privacy impact assessments (PIAs). *See, e.g.*, ECF No. 34-11 at 3. CBP also withheld the purpose of the collection and material on First Amendment limitations. Ex. A at 31, 151. Such content falls outside Exemption 7(E), a conclusion that USCIS has belatedly reached for its own previously redacted PTA. *Compare* Ex. A at 54–57, 157–60, 303–06, 346, 356–57 *with* Ex. C at

2258–69. CBP's new rationale that the content includes "names and descriptions of specific technical tools with unique capabilities," ECF No. 126 at 10, does not satisfy its burden, as "basic technical information" on known techniques is non-exempt. *See ACLU*, 880 F.3d at 492.

Social Media Operational Use Templates (Ex. A at 161–69, 170–77, 178–91). CBP's withholding of significant information in various SMOUTs follows the same pattern and fares no better. CBP's new explanation that the SMOUTs "discuss the specific circumstances in which CBP may use certain law enforcement techniques relating to the operational use of social media," ECF No. 126 at 11, still does not meet its burden, since it neither demonstrates that the techniques at issue are not publicly known nor accounts for the Ninth Circuit's repeated admonitions in *ACLU*, *Hamdan*, and *Rosenfeld* as to the application of known techniques.

And again, context underscores that CBP's redactions are not plausibly exempt. For instance, CBP withheld the general purposes of the collection (Ex. A at 182–84), internal approval requirements (*id.* at 183), and legal authorities (*id.* at 184). It also withheld rules for how officers use online screen names and identities, the extent of their interaction with the public, and whether they respect users' privacy settings. *Id.* at 166, 173–74, 185, 188. Such policy limits are non-exempt—a conclusion that USCIS has now embraced. *See* Ex. C at 1315–17. CBP also apparently withheld information that is already available in a PIA (*see* Ex. A at 169) and definitions from CBP's social media policy directive—despite the fact that none of the definitions in the directive itself are redacted. *Compare* Ex. A at 177, 182 *with id.* at 126–28.

Contract information (Ex. A at 197–249). CBP falls far short of meeting its burden as to the basic contracting information it withheld—information that includes simply the name of the products being acquired, delivery dates, acquiring offices, and basic descriptions of the products. It is illogical that any of that information constitutes a technique or procedure, much less a non-public one. CBP's new explanation that the withheld content "would indicate the scope, specific type, and extent of CBP's operational use of social media in a certain field," ECF No. 126 at 12, runs headlong into the Ninth Circuit's ruling in *ACLU*. *See also* Dep't of Justice, *supra* note 4 (the "public's right to scrutinize" procurement process "must be recognized").

**B.      ICE Has Failed to Meet Its Exemption 7 Burden.**

Program summaries (Ex. B at 921, 1017, 1347–49, 1680–81, 1812–13, 1818–26). Defendants' argument regarding ICE's "Extreme Vetting" memorandum makes no sense. *See* Ex. B at 1347–49. As Plaintiffs previously noted, an unredacted version of the memo is already available publicly.[5] Thus, Plaintiffs' description of the withheld content is anything but "pure speculation." *See* ECF No. 126 at 12. Contrary to ICE's Vaughn index, that content addresses administrative and budget issues, not law enforcement techniques or procedures—a clear basis on which "to question the veracity of ICE's description" of the material. *See id.* That the case in which the document was produced is now on appeal is of no moment. The document is already public, and ICE has not appealed the court's ruling on it. *See* Br. of Appellant, *Knight First Amendment Inst. v. Dep't of Homeland Sec.*, No. 20-3837 (2d Cir. Feb. 23, 2021), ECF No. 40.

ICE's continued insistence that administrative and budget issues are exempt under 7(E) casts further doubt on their full withholding of a document on the Visa Lifecycle Vetting Initiative (VLVI). *See* Ex. B at 1680–81. Defendants make no attempt to rebut Plaintiffs' showing as to this document, nor has ICE provided a basis to conclude that any of the "investigative steps" purportedly described in the document involve non-public techniques or procedures. *See* ECF No. 108 at 13. Similarly, ICE does not explain how a "Summary" of the VLVI could be fully exempt when detailed information about it is available elsewhere. *See id.*

The same is true of the programmatic documents on "Open Source/Social Media Exploitation" that ICE withheld in full. *See* Ex. B at 1812–13, 1818–26. ICE's original and new explanations for those withholdings merely describe the application to particular contexts of the known techniques identified in the documents' titles. *See* Suppl. Pineiro Decl., ECF No. 128 ¶¶ 6–7. And again, Defendants fail to explain how "procedures and steps used to conduct open source investigations" are exempt when detailed information about such procedures and steps is set forth in other ICE documents. *See* ICE Vaughn, ECF No. 98-2 at 50–51; Ex. B at 774–98.

Finally, ICE has not carried its burden as to its withholding of the overseas visa-issuing posts to which ICE applies VLVI-related surveillance. *See* Ex. B at 921, 1017. The identities of

---

[5] *See* https://knightcolumbia.org/documents/9ac34446b4.

those posts constitute neither techniques nor procedures, nor guidelines for law enforcement investigations or prosecutions. And Defendants do not contend that the posts somehow constitute a "specific *means*" of deploying an investigative technique, as would be necessary to demonstrate the content is exempt under *Hamdan*. *See* 797 F.3d at 777–78. Indeed, the technique or means here is both clear and publicly known: continuous monitoring of individuals' social media. Instead, the overseas posts, like "satellite surveillance of a particular place," are precisely the kind of "*application* of a known technique" that *Hamdan* court found non-exempt. *See id.*

ICE's circumvention argument is immaterial, because risk of circumvention of the law has no bearing on Exemption 7(E)'s techniques-and-procedures clause. *See Hamdan*, 797 F.3d at 778. The argument also rests on the illogical assumption that applicants from countries or posts not subject to VLVI-related screening would have no reason to believe their speech on social media is surveilled. No reasonable social media user would so believe, given the pervasiveness of U.S. government surveillance of social media. *See, e.g.*, Pls.' Mot., ECF No. 108 at 2–5.

Presentation content (Ex. B at 432–48). ICE still has not met its burden as to presentation material on language translation and publicly available images. ICE's new explanation that the content details "ways ICE is able to identify potential groups that pose a threat to national security" ignores the obvious. *See* Defs.' Opp., ECF No. 126 at 14. "Islamic symbols" and the Shahada, or Muslim profession of faith, cannot validly be equated with any "threat to national security," nor could they in any way constitute a technique, procedure, or guideline. *See* Ex. B at 446. And it strains logic to suggest that criminals or would-be terrorists will study ICE's examples of such symbols or open-source images associated with "recognized terrorist organizations" and decide that they are in the clear if they do not use those symbols or images on social media. ICE does not contend that the symbols are in any way secret—indeed, they are posted on social media. ICE has not plausibly placed this content within Exemption 7(E).

### C. USCIS Has Failed to Meet Its Exemption 7 Burden.

Guidance documents (Ex. C at 1275–78, 2351–53). As an initial matter, although Defendants in their brief continue to defend the withholdings in the document titled "Refugee Social Media Vetting Expansion" (Ex. C at 443–44), USCIS has now reprocessed it without any

redactions, and the unredacted content shows why it should never have been withheld. It describes Department of Homeland Security social media vetting efforts generally and discloses no non-public technique or procedure. Defendants' continued insistence that this content could validly be withheld exemplifies their unduly expansive approach to Exemption 7(E).[6]

That same approach is evident in Defendants' continued withholding of "lines of inquiry" in two guidance documents. *See* Ex. C at 1275–78, 2351–53. Defendants fail to demonstrate that questions routinely disclosed to applicants and their attorneys during the immigration process are somehow exempt—a notion that courts have rejected. *See* Pls.' Mot., ECF No. 108 at 16. Other documents in USCIS's production reinforce that these questions reflect not a specialized technique or procedure but mere suggested potential follow-up questions that anyone could devise. *See* Ex. C at 1726–29. And because these questions are routinely disclosed, USCIS cannot plausibly assert that their disclosure here would risk circumvention of the law.

Privacy and First Amendment compliance information (Ex. C at 1878–1906, 1308–21).[7] Although USCIS has now removed some of the redactions in the presentation titled "Protecting The First Amendment in Social Media Research," it still has not met its burden as to the remaining withholdings. *See* Ex. C at 1888–1904. USCIS now states that the presentation content includes "non-public details of methods for screening" and "instructions regarding what media may or may not be searched." Defs.' Opp., ECF No. 126 at 20. Those new justifications ignore that the kind of legal and policy limits discussed in the presentation fall outside the scope of Exemption 7(E). *See* Pls.' Mot., ECF No. 108 at 18. Indeed, the Ninth Circuit in *ACLU* found non-exempt guidance far more detailed than what USCIS withheld here. *See* Ex. D. USCIS also wrongly focuses on whether the content is non-public rather than whether it is *exempt*.

Inconsistency in USCIS's redactions casts further doubt on the validity of its remaining withholdings. For instance, in reprocessing the presentation, USCIS redacted *additional* content that was previously unredacted. *Compare* ECF No. 109-3 at 1892 *to* Ex. C at 1892. The

---

[6] Because USCIS completely removed its redactions in the policy documents in Exhibit C at 443–44, 1954–55, 2031–32, those documents are no longer at issue.

[7] Following USCIS's reprocessing of program summaries and reviews in Exhibit C at 277–88, 293–300, 301–18, 331–34, 335–38, 1119–20, and 1541–42, those records are no longer at issue.

previously unredacted content simply posited a scenario involving a visa applicant who is a member of a rights group labeled "extremist," then questioned whether that information can be collected. *Id.* Nothing about that content suggests that it can validly be withheld under 7(E). Other still-redacted slides appear to include similar scenarios, with subsequent questions—but not answers—about the appropriateness of collecting the information. Ex. C at 1895–1905. Mere hypothetical scenarios illustrating USCIS's policy limitations are not exempt under 7(E).

Finally, USCIS has fallen short of its burden as to the privacy analysis of its operational use of social media. *See id.* at 1308–21. Here again, USCIS's removal of redactions not only demonstrates that its original withholdings were unjustifiable, but also undermines its remaining redactions. For instance, still-redacted content includes "examples of information that can be gathered through social media," *id.* at 1313–14—information that is neither secret nor a technique or procedure, and that USCIS has now disclosed in similar documents. *See, e.g.*, *id.* at 2261–64 (identifying specific information to be collected during social media reviews).

## II. Defendants Have Failed to Justify Withholdings Under Exemption 5.

### A. CBP Has Failed to Meet Its Exemption 5 Burden.

Privacy Threshold Analyses (Ex. A at 23–39, 48–57, 296–306, 337–48, 349–58). CBP has failed to rebut Plaintiffs' showing that content in these privacy analyses is not predecisional. Defendants argue that Plaintiffs "attempt to re-cast" the PTAs as "adjudications," Defs.' Opp., ECF No. 126 at 23, but the PTAs themselves conclude with "Privacy Threshold Adjudications." Ex. A at 37, 56, 305, 347, 356. Indeed, it is CBP's declarant who now attempts to recast the withheld content as "relate[d] to the CBP Privacy Office's recommendations to the DHS Privacy Office with respect to proposed privacy limitations on CBP's proposed activities." Suppl. Howard Decl., ECF No. 127 ¶ 13. But as their structure and context make clear, the PTAs document the outcome of the agency's privacy review and memorialize the DHS's position on the privacy issues identified therein. As such, they are not deliberative-process privileged—a conclusion that USCIS has now embraced by removing all Exemption 5 redactions from its own PTA. *See* Ex. C at 2258–69. Nor does CBP explain how a list of "privacy risk mitigation strategies" could fall within the deliberative process privilege. *See* Ex. A at 26.

Issue papers and summaries (Ex. A at 1–4, 8–12, 13–15, 16–17, 18–19, 20–22). CBP continues to withhold descriptive information from papers summarizing its social media surveillance activities—information that CBP has not established is deliberative or predecisional. CBP now states that the withheld content "involved assessments related to CBP's use of social media" or "recommended responses to questions about CBP's use of social media." Suppl. Howard Decl., ECF No. 127 ¶ 14. Neither establishes the content is either predecisional or "actually . . . related to the process by which policies are formulated." *See Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118–19 (9th Cir. 1988). CBP's new justification suggests the withheld content simply explains current policy. *See Habeas Corpus Res. Ctr. v. Dep't of Justice*, No. C 08–2649 CW, 2008 WL 5000224, at *1 (N.D. Cal. Nov. 1, 2008) (information "merely peripheral to actual policy formation" not deliberative-process privileged). Similarly, the headers on multiple issue papers suggest their contents are unmoored from any particular policymaking process. *See* Ex. A at 1, 16, 18 ("Action Required: Information Only; Time Constraint: None"). Nor does CBP explain how content under headings labeled "Background," "Current Social Media Use," and "Future Actions" is either predecisional or part of any decision-making process. Finally, CBP fails to demonstrate that questions and answers about CBP policies and practices are exempt. *See* Pls.' Mot., ECF No. 108 at 21.

**B.     ICE Has Failed to Meet Its Exemption 5 Burden.**

Contract-related language (Ex. B at 62–63). ICE still asserts a sweeping interpretation of the deliberative process privilege over contract language related to Giant Oak, a social media surveillance software vendor. That interpretation is untenable. First, Defendants fail to explain how this language does not simply reflect the implementation of a previous policy decision to purchase surveillance software. ICE's attempt to characterize contract-related language as a freestanding policy decision in itself is unavailing. *See ACLU of N. Cal. v. Fed. Bureau of Investigation*, 146 F. Supp. 3d 1161, 1170 (N.D. Cal. 2015) (rejecting deliberative process claim for draft language where agency had already "decided what to say, just not how to say it"). Second, ICE fails to establish this language remained internal to the government as "inter-agency or intra-agency" information, as Exemption 5 requires—in other words, that it was not shared

with a private vendor as part of the contract's formation. *See* 5 U.S.C. § 552(b)(5).

Vendor-related language for third party software (Ex. B. at 1012 (first paragraph), 1014). ICE has similarly failed to meet its burden as to a March 2018 set of emails that purportedly include explanations of the agency's current social media monitoring practices. ICE strains to characterize mere descriptions of how existing policies work in practice as a separate policy-making process. Defs.' Opp., ECF No. 126 at 25. But ICE has not shown how the withheld information—a response to the Deputy Director's request for "accurate information" about the "current use" of Facebook by ICE components—reflects the back and forth of policymaking rather than the rote recitation of "accurate" facts. *See* Ex. B at 1014. To establish the privilege applies, a document "must be prepared to assist an agency decision-maker in arriving at a *future particular decision*." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 981 (9th Cir. 2009) (emphasis added). Here, when the response was prepared, ICE's Deputy Director had already decided simply to request "accurate information," yet ICE's declarant suggests that this directive was up for debate, characterizing the withheld information as "relat[ed] to discussions regarding what information should be shared with the public regarding HSI's use of social media in HSI operations." Suppl. Pineiro Decl., ECF No. 128 ¶ 10. That explanation neither locates the content within a particular decision-making process nor establishes it as predecisional.

Performance Work Statement for Visa Lifestyle Vetting Initiative (Ex. B at 596–640). ICE has failed to meet its burden to justify the *full* withholding of multiple versions of this document. It is implausible that that the entire document falls within Exemption 5, especially because a publicly available version of the same type of document includes sections containing basic information about, for example, the general mission of DHS, agency components involved, and the period of performance. *See* Ex. B at 774–98. Separately, ICE's assertion that the existence of a DRAFT label on these documents will confuse the public about current policy is both nonsensical (after all, the label plainly communicates the government's view that the document is not final) and not an element of the deliberative process privilege. *See* Suppl. Pineiro Decl., ECF No. 128 ¶ 11; *Assembly of State of Cal. v. Dep't of Com.*, 968 F.2d 916, 923 (9th Cir. 1992) (concluding census data not subject to deliberative process privilege and rejecting

defendant's "public confusion" justification for secrecy).

### C. USCIS Has Failed to Meet Its Exemption 5 Burden.

<u>Email regarding First Amendment and USCIS authority</u> (Ex. C at 1571).[8] USCIS wrongly asserts the deliberative process privilege to withhold secret law: an interpretation of the substantive limits on its authority under the First Amendment. Defs.' Opp., ECF No. 126 at 27–28. Defendants' interpretation of the working law doctrine, moreover, is unduly narrow. The doctrine is not limited to an agency's understanding of individual "substantive rights and liabilities." *See id.* at 28. Rather, it "insures that the agency does not operate on the basis of secret law" or "hidden behind a veil of privilege because it is not designated as formal, binding, or final." *Assembly of Cal.*, 968 F.2d at 920 (cleaned up). For the email to explain "how the First Amendment may or may not restrict" three proposed policy choices, it must set forth what the agency believes the First Amendment requires or prohibits. *See* Supp. White Decl., ECF No. 129 ¶ 7. Put another way, USCIS's interpretation of the First Amendment is the agency's working law—it is an "interpretation[] which embod[ies] the agency's effective law and policy…." *Sears*, 421 U.S. at 153. This interpretation must be disclosed to the public, regardless of whether portions of the email applying the law are in draft form or need further agency clearance.

USCIS has also failed to establish that the attorney-client privilege applies to this email. For the privilege to apply, the communication's "primary purpose" must be to obtain legal advice, not policy advice. *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1128–29 (N.D. Cal. 2003). USCIS's new declaration fails this test. It states that the "guidance in the email focuses on specific legal questions related to restrictions that would apply to expanding the government's vetting of aliens in the United States, which related to three options being considered…." Supp. White Decl., ECF No. 129 ¶ 11. Because this guidance was designed to inform a choice among policy decisions, it is not privileged.

---

[8] USCIS is no longer asserting Exemption 5 as a basis for withholding content in several documents: Ex. C at 1267–78, 2258–69, and 2344–53. Supp. White Decl., ECF No. 129 ¶¶ 5, 6, 8. The Exemption 7 redactions in 1267–78 and 2344–53 remain contested, *see supra* Section I.C, whereas 2258–69 is no longer at issue.

Emails regarding DHS procurement of social media services (Ex. C at 1711–12). USCIS incorrectly asserts the deliberative process privilege over emails regarding a non-profit advocacy organization's letter to the agency.[9] The withheld emails respond to an email from the USCIS chief counsel's office sharing a link to the letter. Ex. C at 1712. USCIS cannot sustain its burden under Exemption 5 by vaguely alluding to a "decision that possibly may be made at some undisclosed time in the future." *Lahr*, 569 F.3d at 981. USCIS states that the remaining withheld information includes questions about the "potential procurement of social media services," "upcoming decisions" and "pending process decisions," but these vague descriptions could apply to any number of policy decisions before the agency. *See* Suppl. White Decl., ECF No. 129 ¶ 9; ECF 98-6 at 174. USCIS falls short of its burden to explain the specific policy decision at issue within the remaining withheld emails. *See Habeas Corpus*, 2008 WL 5000224, at *2 (document "summariz[ing] issues raised by outside groups" did not reflect policy deliberations).

Summary Paper: "Vetting of Aliens in the United States" (Ex. C at 1475–77). USCIS still cannot establish the essential elements of the attorney-client privilege as to this summary paper on vetting non-citizens inside the United States. In addition to other elements of the privilege, USCIS must demonstrate that it has maintained the paper in actual confidence. *See* Pls.' Opp., ECF No. 108 at 27–30. The privilege's core purpose is "protection of confidential facts," which cannot be "made known to persons other than those who need to know them," and an agency must demonstrate that the information circulated "no further than among those members of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980). Here, USCIS has failed to demonstrate that the paper was in fact kept confidential. The agency's new declaration states that the "the document has not been shared outside of the government." Suppl. White Decl., ECF No. 129 ¶ 10. But that does not remotely establish confidentiality. The executive branch of "the government" alone employs over two million people, the vast majority of whom have nothing to do with "vetting [noncitizens] in the

---

[9] Following Plaintiff's Cross-Motion, USCIS is no longer asserting attorney-client privilege under Exemption 5 for this email chain and has lifted multiple redactions. *See* Ex. C at 1711–12.

United States."[10] Moreover, the Department of Justice, which purportedly authored the document, failed to "submit[] evidence that substantiates its claim that the communications were confidential in fact," and such failure precludes reliance on the attorney-client privilege here. *See ACLU of N. Cal.*, 146 F. Supp. 3d at 1168 (content widely circulated within FBI not privileged).

### III.    ICE Has Failed to Demonstrate That it Conducted an Adequate Search.

ICE falls well short of its burden of demonstrating that it conducted a "search reasonably calculated to uncover all relevant documents." *Zemansky v. Env't Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985). First, ICE does not address or rebut Plaintiffs' showing that the searches by the Office of Acquisition Management and the Office of Policy were insufficient. *See* Pls.' Mot., ECF No. 108 at 35. Those offices' searches did not extend to systems and/or custodians likely to have responsive records and were therefore inadequate. *See id.*

The same is true of the search conducted by the Office of Enforcement and Removal Operations (ERO). In attempting to explain why ERO located so few records, ICE now states that "[t]he identification and arrest of aliens who present a danger to national security or are a risk to public safety, makes up only a portion of ERO responsibilities." Suppl. Pineiro Decl., ECF No. 128 ¶ 5. That explains nothing. Plaintiffs' FOIA request is not confined to records concerning danger to national security or risk to public safety. Indeed, the request encompasses records on social media surveillance of *any kind*, and it expressly *includes* "[r]ecords concerning any product or service capable of using social media content for immigration enforcement purposes." *See* Pineiro Decl., ECF No. 98-1 ¶ 5.

Nor is there any basis for ICE's statement that "Plaintiffs' FOIA request was limited in nature and did not request records relating to any programs or operations within the purview of ERO." Suppl. Pineiro Decl., ECF No. 128 ¶ 5. On its face, the request is broadly framed and plainly sought records within ERO's purview. Thus, ICE implausibly asserts that even though the few records ERO produced show that it spent hundreds of thousands of dollars on social media surveillance technology, ERO has no policies, guidance, procedures, directives, or

---

[10] Sizing Up the Executive Branch—Fiscal Year 2016, Office of Personnel Management at 4 (June 2017), https://rb.gy/8mzq14.

memoranda concerning the use of such technology, nor did it create any correspondence or communications regarding the products it acquired. *See* Pineiro Decl., ECF No. 98-1 ¶ 5.

Moreover, the records ERO produced barely hint at the scope of ERO's documented use of social media surveillance. Federal contracting records show that ERO has spent millions of dollars contracting with Thomson Reuters for access to its CLEAR database, which draws heavily on social media content.[11] The contracts for these products fall squarely within the scope of Plaintiffs' FOIA request, yet ICE's production contains no sign of any records related to them. They also raise questions about ICE's statement that "[a]t the time of the search, ERO did not have any systems or programs that incorporated the use of social media for 'targeting algorithms, machine learning processes, and/or data analytics.'" Suppl. Pineiro Decl., ECF No. 128 ¶ 5 (quoting Plaintiffs' FOIA request). Thomson Reuters openly advertises that CLEAR uses "web analytics to uncover facts hidden online," including "text and images" on "social networks."[12]

Thus, the manual search by a single officer within a subdivision of ERO of her paper files and her own email folders was plainly inadequate. It is beyond implausible that ERO conducted a search reasonably calculated to locate all responsive records.

## IV. The Court May Conduct *In Camera* Review if Warranted.

As explained above, Defendants have failed to meet their burden of establishing that the information they withheld is properly exempt. To the extent the Court is unable to adjudicate these motions on the available record, it may conduct *in camera* review to ensure compliance with FOIA. *See Hamdan*, 797 F.3d at 779; *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) (court has discretion to conduct *in camera* review on basis of "uneasiness" or "doubt").

### CONCLUSION

The Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment with respect to CBP, ICE, and USCIS.

---

[11] *See, e.g.*, Contract Summary, t.ly/9qHA ($9.8 million contract with Thomson Reuters for CLEAR, beginning in 2010); Contract Summary, t.ly/1Vlw ($5.6 million contract beginning in 2016); Contract Summary, t.ly/KscM ($2.1 million contract beginning in 2015).

[12] Thomson Reuters CLEAR, *The Smarter Way to Get Your Investigative Facts Straight* at 6 (2015), t.ly/WMP8.

Respectfully submitted,

DATED: June 10, 2021

*/s/ Hugh Handeyside*
Hugh Handeyside
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2500
hhandeyside@aclu.org

Matthew Cagle
American Civil Liberties Union Foundation of
    Northern California
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493
mcagle@aclunc.org

*Attorneys for Plaintiffs*

## APPENDIX: INDEX OF PLAINTIFFS' CHALLENGED WITHHOLDINGS

| CBP Records and Withholdings | | |
|---|---|---|
| **Document Bates No.** | **Document description** | **Exemption(s) at issue** |
| 1-4 | Information Issue Paper (Oct. 6,2016) | (b)(5), (b)(7)(E) |
| 5-7 | CBP Use of Social Media Paper (May 25, 2016) | (b)(7)(E) |
| 8-12 | CBP Use of Social Media Paper (Sept. 26, 2016) | (b)(5), (b)(7)(E) |
| 13-15 | Social Media Briefing Paper | (b)(5), (b)(7)(E) |
| 16-17 | Information Issue Paper (June 2,2016) | (b)(5), (b)(7)(E) |
| 18-19 | Information Issue Paper (Aug. 30, 2016) | (b)(5), (b)(7)(E) |
| 20-22 | Information Issue Paper (Apr. 20, 2017) | (b)(5), (b)(7)(E) |
| 23-39 | Privacy Threshold Analysis: Electronic Visa Update System (EVUS) | (b)(5), (b)(7)(E) |
| 48-57 | Privacy Threshold Analysis: Pilot Evaluation | (b)(5), (b)(7)(E) |
| 125-36 | Policy on Operational Use of Social Media | (b)(7)(E) |
| 149-60 | Privacy Threshold Analysis: Office of Intelligence and the Office of Professional Responsibility, July 2, 2018 | (b)(7)(E) |
| 161-69 | DHS Operational Use of Social Media: Office of Intelligence and Investigative Liaison | (b)(7)(E) |
| 170-77 | DHS Operational Use of Social Media: Office of Intelligence and Investigative Liaison | (b)(7)(E) |
| 178-91 | DHS Operational Use of Social Media: U.S. Border Patrol, November 27, 2017 | (b)(7)(E) |
| 197-212 | Contract Number HSHQDC-12-D-00013, Order Number 70B04C18F00001093 | (b)(7)(E) |
| 213-34 | Award Contract Number HSHQDC13D00027, Order Number 70B04C18F00001257 | (b)(7)(E) |
| 235-41 | Delivery Order 70B04C18F00000377 | (b)(7)(E) |
| 242-49 | Contract Number HSHQDC-13-D-00026, Order Number HSBP1017J000831 | (b)(7)(E) |
| 296-306 | Privacy Threshold Analysis: Office of Field Operations (July 8, 2016) | (b)(5), (b)(7)(E) |
| 337-48 | Privacy Threshold Analysis: Office of Field Operations, July 8, 2016 | (b)(5), (b)(7)(E) |
| 349-58 | Privacy Threshold Analysis: Office of Field Operations, January 5, 2018 | (b)(5), (b)(7)(E) |

| ICE Records and Withholdings | | |
|---|---|---|
| **Document Bates No.** | **Document description** | **Exemption(s) at issue** |
| 62-63 | Email titled "Social Locator for OST SOP" | (b)(5) |
| 432-48 | Homeland Security Investigations PowerPoint presentation | (b)(7)(E) |
| 596-640 957-1001 1264-1308 1356- 1400 1717-1760 1983-2027 | Document titled "Procurement Sensitive: Performance Work Statement Visa Lifecycle Vetting Initiative" | (b)(5) |
| 921 | Email titled "VLVI language" | (b)(7)(E) |
| 1008-20 | Email titled "TASKING REQUEST – HSI NSID USE OF FACEBOOK" | (b)(5) (at 1012 top), (b)(7)(E) (at 1017) |
| 1347-49 | Document titled "Extreme Vetting-Visa Security Program-PATRIOT" | (b)(7)(E) |
| 1680-81 | Document titled "Visa Lifecycle Initiative Summary" | (b)(7)(E) |
| 1812-13 | Document titled "Open Source/Social Media Exploitation" | (b)(7)(E) |
| 1818-26 | Document titled "Counterterrorism and Criminal Exploitation Unit Open Source/Social Media Exploitation" | (b)(7)(E) |

| USCIS Records and Withholdings | | |
|---|---|---|
| **Document No.** | **Document description** | **Exemption(s) at issue** |
| 1267-1278 | Draft Guidance for Use of Social Media in Field Operations Directorate Adjudications, dated October 27, 2017 | (b)(7)(E) |
| 1308-21 | DHS Operational Use of Social Media, Privacy Compliance memorandum, January 25, 2017 | (b)(7)(E) |
| 1475-77 | Memorandum titled "Impediments to Proposed Expanded Immigration Vetting of Aliens in the United States" | (b)(5) |
| 1571 | Email, FW: USCIS authority to collect/use social media information relating to the exercise of First Amendment protected activities (draft), dated June 22, 2016 | (b)(5) |
| 1711-1712 | Email, RE: DHS procurement of SM services in Enhanced Vetting initiative, dated April 9, 2018 | (b)(5) |
| 1878-1906 | PowerPoint training presentation, "Protect the First Amendment in Social Media Research," presented to USCIS's FDNS by the Office for Civil Rights and Civil Liberties | (b)(7)(E) |
| 2344-53 | USCIS's Refugee Affairs Division, Guidance for Use of Social Media in Syrian Refugee Adjudications, dated September 25, 2018 | (b)(7)(E) |