Pages 1 - 39

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

AMERICAN CIVIL LIBERTIES UNION )
FOUNDATION, et al.,            )
                               )
          Plaintiffs,          )
                               )
  VS.                          )     **NO. C 19-00290 EMC**
                               )
U.S. DEPARTMENT OF JUSTICE, et )
al.,                           )
                               )
          Defendants.          )
_____)

                    San Francisco, California
                    Friday, September 17, 2021

**SEALED TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Defendants:
                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division - Federal Programs Branch
                    P.O. Box 883 - Benjamin Franklin Street
                    Washington, D.C.  20044
               BY:  **VINITA ANDRAPALLIYAL, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

1 | **Friday - September 24, 2021**                    **10:29 a.m.**

2 | <u>P R O C E E D I N G S</u>

3 | ---oOo---

4 | (The following transcript was placed under seal by

5 | Order of the Court.)

6 | **THE CLERK:**  Court is now in session.  The Honorable

7 | Edward M. Chen is presiding.

8 | Calling civil action 19-290, American Civil Liberties

9 | Union Foundation, et al. versus Department of Justice, et al.

10 | This is a sealed ex parte in-camera hearing.

11 | Counsel, please state your appearance.

12 | **MS. ANDRAPALLIYAL:**  Good morning, Vinita Andrapalliyal

13 | from the U.S. Department of Justice on behalf of Defendants.

14 | **THE COURT:**  All right.  Thank you, Ms. Andrapalliyal.

15 | Actually, we are not all here.  Are we all here?

16 | Yeah, I guess we are all here since this is an ex parte

17 | proceeding.

18 | Okay.  I thought it would be helpful if we could go over

19 | the documents.  I think I have an understanding of the

20 | Exemption 7 documents, but the Exemption 5 is a -- sometimes a

21 | little bit more amorphous.

22 | I start with the premise that -- with an understanding

23 | that documents to be exempt are more than -- have to be

24 | pre-decisional.  It can't be final documents.

25 | And something that even if it is -- even if it is labeled

1   a draft, if it actually manifests the final version, it may not

2   be deemed, you know, an interim pre-final document.

3       And the other requirement, of course, is that there has to

4   be a document that's deliberative, which means that the

5   materials must bear on the formulation or exercise of agency's

6   policy according to judgment revealing either the formulation

7   or exercise of policy implicating judgment.

8       And that's the question that probably is where there is a

9   lot of gray area in some of these cases.  And so I wanted to

10  hear the Government's explanation about the documents in

11  question here and how you think it falls within -- meets those

12  two criteria.

13      So, in my minute order, the first set of documents are the

14  issue -- I guess, they are called issue papers.

15          **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

16          **THE COURT:**  And maybe you can give me a background of

17  what those are.  And then it is the -- there are so many

18  different colors here.  It's the blue -- the blue portions are

19  the -- and I forget which one is Exemption 7 and which one

20  Exemption 5; do you recall?

21          **MS. ANDRAPALLIYAL:**  Your Honor, I understand it

22  doesn't actually depend on the color of the box.

23      The color just means, you know, someone else went through

24  the document.

25      And so, I do have, you know, the redacted version as well

1   as my notes of which particular boxes were redacted under

2   (b)(5).

3          **THE COURT:**  Okay.  I had an understanding -- and maybe

4   I'm wrong -- that blue was for (b)(5) and red was for (7) or

5   vice verse is or something.  Are you saying that that's not

6   correct?

7          **MS. ANDRAPALLIYAL:**  Right, Your Honor, yeah, the color

8   of the boxes do not denote which exemption was applied.

9          **THE COURT:**  Oh, all right.

10     Do you -- I wonder, maybe if you have the documents, you

11  could put it up on screen-share; and then you could just walk

12  me through.

13         **MS. ANDRAPALLIYAL:**  Your Honor, I do apologize.  I

14  don't have the technology to do that.  I'm on an iPad, and our

15  office doesn't have the bandwidth to conduct these hearings on

16  desktop.

17     And so I don't have -- I have the hard copy, but I don't

18  have the soft copy up to share with you.

19         **THE COURT:**  Well, let me see.  Angie, do you know if

20  we have on OneDrive -- now, I'm trying to find OneDrive here.

21         **THE CLERK:**  I will check.

22                        (Pause in proceedings.)

23         **THE CLERK:**  The in-camera submission?

24         **THE COURT:**  Yeah, why am I not getting OneDrive?  Hold

25  on.

1                    (Pause in proceedings.)

2         **THE CLERK:**  Would you like for me to screen-share

3 that, the in-camera submission?

4         **THE COURT:**  Well, let me see if I can find it.  This

5 is under today.

6         **THE CLERK:**  It is under hearings for today.

7         **THE COURT:**  Yeah, I got it.  And you are looking at.

8         **THE CLERK:**  USCIS in-camera submission.  It is the

9 last thing.

10         **THE COURT:**  Oh, let me see if this is it.

11                  (Pause in proceedings.)

12         **THE CLERK:**  And there is also an in-camera review

13 chart.

14         **THE COURT:**  I think these are the -- this is not the

15 one I was -- it's --

16         **THE CLERK:**  There is a chart -- a couple of documents

17 above that one on One Drive.

18         **THE COURT:**  Okay.  Hold on for a second.

19                  (Pause in proceedings.)

20         **THE COURT:**  In-camera review chart.  I think that's

21 what was done internally; but the binder that has the couple

22 hundred pages, I don't see in here.  Let me look.

23                  (Pause in proceedings.)

24         **THE COURT:**  Yeah, it's just the chart.

25     Well, if you have it in front of you and I have it in

**SEALED PROCEEDINGS**

1    front of me, I guess maybe that's the best we can do.

2              **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

3        I do believe the soft copy, if you hover over the box, it

4    may pop up what the redaction was.

5        But I hope that that sort of went through when we

6    submitted the PDF version to the Court.

7              **THE COURT:**  Do you know -- do you know, by chance,

8    whether -- what the docket number of this submission was, the

9    binder?

10       There are lots of declarations, and it would take me

11   forever to try to figure out --

12             **MS. ANDRAPALLIYAL:**  Yeah, I believe, Your Honor, that

13   we did not submit it on the docket.  We submitted it to --

14             **THE COURT:**  Oh, okay.

15             **MS. ANDRAPALLIYAL:**  -- because it was --

16             **THE COURT:**  Okay.  Well, that makes sense.  It

17   wouldn't be docketed.

18             **THE CLERK:**  And Louise held that directly.

19             **THE COURT:**  So we never uploaded it, Angie?

20             **THE CLERK:**  No, not that I am aware of.

21             **THE COURT:**  All right.  Okay.

22       Well, let's -- why don't we talk about -- and maybe, you

23   know, I will look and you will look -- it is called information

24   issue papers.

25             **MS. ANDRAPALLIYAL:**  Right.

1      **THE COURT:**  Maybe -- and it goes on and it talks about

2 various aspects.  Maybe you can tell me why this is covered by

3 the deliberative process.  And those span through page, I

4 think, 22 --

5      **MS. ANDRAPALLIYAL:**  Right.

6      **THE COURT:**  -- of the CBP submission.

7      **MS. ANDRAPALLIYAL:**  That's right, Your Honor.

8 And I do want to point out at the outset that, you know,

9 most of the redactions in these issue papers were made under

10 (b)(7)(E).

11 And so I'm going to focus on (b)(5) --

12      **THE COURT:**  Yes, yes.

13      **MS. ANDRAPALLIYAL:**  -- redactions.

14      **THE COURT:**  All right.

15      **MS. ANDRAPALLIYAL:**  And so, you know, I guess just to

16 take a step back and talk about the issue papers as a whole,

17 you know, they were submitted to senior leadership at CBP at

18 leadership's request.

19 And, you know, each paper discusses a particular issue,

20 for example.  You know, the sort of common theme is ███████

21 ████████████████████████████████████████████████████████

22 ███████████████████████.

23 And so, you know, these were prepared for internal review.

24 We did release a lot of this sort of factual information that

25 we did determine could be severed from the, you know,

1  deliberative communications.

2      But in sort of isolated incidents, we did redact forward

3  looking -- forward looking thoughts and discussions of sort of

4  things in the works.

5      And so I can -- would it be helpful if I sort of walked

6  through each document?  Or -- yeah, I want to be as helpful as

7  possible.

8          THE COURT:  Yeah, well, let's take the issue papers.

9  In the first 22 pages, is that all from one -- that's one issue

10  paper, right, information issue paper?

11          MS. ANDRAPALLIYAL:  No, Your Honor, it's --

12          THE COURT:  It's not?

13          MS. ANDRAPALLIYAL:  Yeah, it should be -- I have the

14  number here -- seven -- there were seven different documents.

15  And they correspond to the way that you broke -- the Court

16  broke it out in a minute order in your 1 to 4 is one document,

17  4 to 8 --

18          THE COURT:  Oh, I see.

19          MS. ANDRAPALLIYAL:  -- and then 9 to 12 and then 13 --

20          THE COURT:  Okay, I see.  So these are separate papers

21  that came to staff from leadership.  Did they all -- well, why

22  don't you tell me, you know, when was it and what did it lead

23  to and why is it -- why is it deliberative?

24          MS. ANDRAPALLIYAL:  So, Your Honor, you know,

25  I believe that the documents were drafted between 2016 and

1  2017; and, you know, there were a number of different

2  initiatives that were being discussed.

3      You know, for example, on page 1, you know, CBP is talking

4  about ████████████████████ ████████████████,

5  ████████████████████████████ and ████████.

6      And so, you know, some of the issue papers talk about more

7  discrete issues.  You know, in this particular first document,

8  you know, the issue was outlining CBP's efforts to modify the

9  ESTA application and, you know, things that had happened and

10 things that this particular doctor expected to happen.

11     Other documents like, you know, the next two documents

12 talk about -- you know, I guess it is called the ████, which is

13 ██████████████████████.  That is, you know, an effort

14 that CBP undertook to ███████████████████████████

15 ████████████.

16     So, you know, sort of each document talks about something

17 different; but as a whole they were drafted, you know, during

18 this discrete time period to inform senior leadership as CBP

19 was considering ways to ███████████████████████████

20 ████████████.

21         **THE COURT:**  So for these issue papers, when was the

22 final policy or procedure enacted or formulated?

23         **MS. ANDRAPALLIYAL:**  Your Honor, I can't answer that.

24 Some of these initiatives, you know, were never finalized.  And

25 some of them were.

1       But, you know, the case law supports our position that,

2   you know, the agency is not required to identify a particular

3   specific policy decision made, you know, in the context of

4   these -- or -- made ultimately as a result of this information

5   paper.

6       You know, this is just reflecting the sort of give and

7   take of the deliberative process where staff level folks are

8   informing senior leadership and also suggesting, you know,

9   different approaches or ways to respond to follow-up questions.

10      **THE COURT:**  Are you saying that all of these are -- as

11  a matter of being self evident, that these are not final?

12      **MS. ANDRAPALLIYAL:**  Well, Your Honor, you know, I

13  think in some instances it appears that the documents are sort

14  of referencing factual sort of will happen scenarios.

15      I believe it is in one of the declarations; but I can sort

16  of confirm for you here that, you know, all of these documents

17  were staff level to senior leadership.

18      And they were not intended as sort of the final word from

19  the Agency on any of these issues that were subject to feedback

20  from senior leadership and, you know, sort of the rest of the

21  policymaking process.

22      **THE COURT:**  Can you identify for me then -- since I

23  guess I had a misunderstanding about the colors -- which of

24  these were Exemption 5 redactions?

25      If you look at the first -- let's just take the first one.

1   I think it's 1 through 4.  Are there any Exemption 5 redactions

2   there?

3          MS. ANDRAPALLIYAL:  Yes, Your Honor.  The first two

4   redactions -- I guess the first three redactions are (b)(5) and

5   redactions 2 and 3 also assert (b)(7)(E).

6       And then the first, second and fourth and fifth redactions

7   on page 2 are also (b)(5) redactions as well as (7)(E).

8          THE COURT:  When you say the second, I'm looking at

9   page 2.

10          MS. ANDRAPALLIYAL:  Page 2, yeah.

11          THE COURT:  Why don't you just tell me -- like, read

12   to me what it is, which one.  I don't know what you mean by

13   second, first.  There are so many blocks and some blocks are

14   just two words, and I don't know what you mean.

15       So just look at page 2, there is a little -- there is a

16   bullet item that says:  The social media working group drafted

17   blah, blah, blah.  Is that one?

18          MS. ANDRAPALLIYAL:  Yes, that's (b)(5) and (b)(7)(E).

19          THE COURT:  So let's just take that as an example.

20   Tell me why that falls within the deliberative process

21   privilege.

22          MS. ANDRAPALLIYAL:  Well, Your Honor, the bullet point

23   explains that, you know, there's a social media working group

24   that drafted a particular paper.  It's been reviewed but is

25   still under final review.

1      And -- you know, it proposes a draft strategy.  You know,

2  it proposes a way forward in draft form.

3      And so, that -- that is, you know, a non-final

4  recommendation or proposal that falls comfortably within the

5  deliberative process privilege as part of the give and take of

6  the consultative process.

7          THE COURT:  Well, and then when it says "future

8  actions," is the next line also a (b)(5) ██████████████

9  ████████████████████████████████████████████████?

10         MS. ANDRAPALLIYAL:  Yes, Your Honor.  That particular

11  line was redacted solely under (b)(5).  And, you know, it

12  reveals the Agency process, who we consulted with; and, you

13  know, who we didn't consult with.

14      And so that was protected because it shed light on the

15  sort of internal workings of the deliberative process.

16         THE COURT:  So it is your position that revealing who

17  participated in the discussion is part of the deliberative

18  process privilege?

19         MS. ANDRAPALLIYAL:  Yes, Your Honor.  It broadly

20  falls -- it falls within the broader, you know, description of

21  the privileges as something that protects the quality of the

22  Agency decision-making; protects, you know, intermediate level

23  folks who are involved in the decision from -- from public

24  scrutiny and allows all the stakeholders to provide sort of

25  frank and candid thoughts on, you know, a proposal.

1    **THE COURT:**  So that's answering the question.  Without

2    revealing what was said and who took what position and the back

3    and forth, just revealing who was in the room is a (b)(5)

4    exemption?

5        **MS. ANDRAPALLIYAL:**  Yes, Your Honor.  Here, you know,

6    the Department determined that this information would chill --

7    if released, would chill the Agency deliberation process.

8        And so it withheld that information for that reason.

9        **THE COURT:**  Is that the same reason why the bullet

10   item says:  Social media working group drafted a social media

11   strategy which has been reviewed and signed by -- and it lists

12   a bunch of initials there -- those are all agencies within or

13   subagencies or something within CBP or some branch of

14   government?

15       **MS. ANDRAPALLIYAL:**  Yes, they are all -- I believe

16   they are all federal agencies.  I'm not familiar with all of

17   these acronyms, but I think USBP stands for U.S. Border Patrol.

18   But I'm not sure about that, Your Honor.

19       **THE COURT:**  All right.  Do you happen to have at hand

20   what case law interpreting (b)(5) supports your position best

21   on the question of who -- not what was said but who

22   participated in some decision-making; that that is privilege

23   under (b)(5)?

24       **MS. ANDRAPALLIYAL:**  Your Honor, I refer the Court to

25   the D.C. Circuit's case *Coastal States* as well as the Ninth

1   Circuit's decision in *National Wildlife Federation*.

2        I can provide the cites for you if you like.

3        *National Wildlife Federation versus U.S. Forestry Service*,

4   861 F.2d 1114, it cites *Coastal States* extensively.

5        But, you know, the focus of the deliberative process

6   privilege inquiry is process oriented.  You know, what was the

7   sort of -- what was the role that this document played or its

8   underlying information played in the deliberative process.

9        And so even if a particular piece of information is, you

10  know, quote-unquote, factual, if that information would itself

11  reveal the inner workings of Agency decision-making or reflects

12  the personal opinions of, you know, the writer, that

13  information is properly protected.

14        **THE COURT:**  All right.  Well, do these cases actually

15  talk about the identification of the participants as being part

16  of that privilege or -- I know the general principle you are

17  articulating, but do these cases address the "who" question as

18  opposed to the "what was said" question?

19        **MS. ANDRAPALLIYAL:**  Your Honor, I'm not certain if

20  they address this exact factual scenario; but they do provide

21  the sort of guiding principles to make this analysis here.

22        **THE COURT:**  Okay.  So let's continue.  What is the

23  next (b)(5) exemption after the one I just mentioned?  The ███

24  ███████████████████████, is that a (7) or a (5)?

25        **MS. ANDRAPALLIYAL:**  That's (7), Your Honor.

1      The next redaction is in the paragraph starting with:

2   Subsequently CBP will continue the test and development

3   capabilities.

4      The next line, you know, in a deliberative and responsible

5   manner by -- and the rest of that information is redacted under

6   (b)(5) and (b)(7)(E).

7           **THE COURT:**  Okay.  Does -- that substantively explains

8   the methodology they are going to go through?

9           **MS. ANDRAPALLIYAL:**  Right.  Exactly, Your Honor.

10          **THE COURT:**  Okay.  And then is there another one on

11  this page?

12          **MS. ANDRAPALLIYAL:**  Yes.  It's -- the next redaction:

13  Prepared social media strategy and then ███████████████████

14  ███████████████████████████.

15          **THE COURT:**  Okay.  And then the other two redactions

16  about ██████████████, that is a (7)?

17          **MS. ANDRAPALLIYAL:**  That's a (7), yes, Your Honor.

18          **THE COURT:**  By the way, is that set forth somewhere

19  which redaction is -- I mean, which exemption applies to which

20  redaction because I --

21          **MS. ANDRAPALLIYAL:**  The redactions are identified in

22  the -- in the redacted filings that I believe Plaintiff put on

23  the docket.  So ECF 134-1 are sort of CBP withholdings.

24          **THE COURT:**  So that will show which redaction is

25  attributable to which exemption?

**SEALED PROCEEDINGS**

1     **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

2     **THE COURT:**  Okay.

3     **MS. ANDRAPALLIYAL:**  And I believe that if you do have

4     a soft copy of the in-camera submission, I believe, when you

5     hover a particular box, you should be able to see the

6     redaction.

7     I'm not completely sure that that capability sort of was

8     included in the final submission, but that was what we hoped

9     the Court would receive.

10     **THE COURT:**  All right.  Let's go to the PTAs privacy

11     threshold analysis.  Explain to me generally why that's

12     Exemption 5 or parts of that are Exemption 5.

13     **MS. ANDRAPALLIYAL:**  Okay, Your Honor, just a moment.

14     Let me just pull up the documents section.

15     (Pause in proceedings.)

16     **MS. ANDRAPALLIYAL:**  Okay.  Yes, Your Honor.  So these

17     privacy threshold adjudications -- I want to take a step back

18     and talk about DHS's privacy compliance process in general and

19     the role that the PTAs play within that process.

20     This information is publicly available, Your Honor,

21     I believe, on dhs.gov/compliance.

22     But the privacy threshold analysis is just the first step

23     in DHS's privacy compliance process.  DHS is required by

24     statute to make publicly available information about the PII

25     that it is collecting from individuals, the rationale for doing

1  so, and its privacy mitigation techniques.

2      And it does so in either a privacy impact assessment or in

3  a system of records notice.

4      And so the -- every three years, I believe, DHS reviews

5  particular information collection with the help of the -- you

6  know, the Agency component that is responsible for collecting

7  the information.

8      And, of course, agencies sometimes -- or Agency components

9  sometimes request authority to collect additional information.

10      And so those first level reviews are undertaken in these

11  privacy threshold analyses.

12      And you can see that at the end of the document, DHS

13  privacy weighs in on the -- on the -- you know, on what it

14  believes to be a way forward.

15      But, you know, that's not necessarily the end of the

16  process.  If DHS determines that a new privacy impact analysis

17  or assessment needs to be made or updated or a new systems of

18  record notice needs to be issued, that's another step in this

19  compliance process.

20      And so we -- again, Your Honor, a lot of these redactions

21  are under (7)(E), but I can tell you that we redacted the CBP

22  recommendations under (b)(5).  And we left in tact DHS's

23  privacy office comments with the exception of very limited

24  references to, you know, other policies in the works and so on.

25      So --

1          **THE COURT:**  Okay.  So, again, I don't know why my copy

2    is non-informative.  If we look at the first privacy PTA, that

3    starts at page 23.

4          **MS. ANDRAPALLIYAL:**  Right.

5          **THE COURT:**  Where is the first Exemption 5 redaction?

6          **MS. ANDRAPALLIYAL:**  So the first Exemption 5 redaction

7    is on page 26.  It's that block towards the middle of the -- of

8    the page, ████████████████████████████████████████████

9    ████████████  --

10         **THE COURT:**  Okay.  So explain to me -- yeah, maybe put

11   that in context for me, why this is a --

12         **MS. ANDRAPALLIYAL:**  Yes.  Your Honor, so, you know,

13   this is -- this particular analysis concerns the Electronic

14   Visa Update System --

15         **THE COURT:**  Yeah.

16         **MS. ANDRAPALLIYAL:**  -- EVUS.  And, you know, CBP is

17   requesting that -- you know, we are requesting to implement

18   EVUS in its operations as well and to collect social media.

19   I guess, here the update is to collect social media identifiers

20   within that EVUS process.

21         **THE COURT:**  Yeah.

22         **MS. ANDRAPALLIYAL:**  And so the block that was redacted

23   under (b)(5) sets forth CBP's proposals for how to, you know,

24   mitigate privacy risk.  And ultimately, you know, that's

25   subject to review from DHS privacy.

1     **THE COURT:**  Okay.  So, for instance, ████████

2    ████████████████████████████████████████

3    ████████████████████████     ████████████████

4    █████████████████████████████████████████

5    ███████████

6    Blah-blah, will ██████████████   ███████████████

7    █████████

8    So, is this something that's already been decided or is

9    this deliberative?  I guess that's my question.  Is this a

10   proposal?

11     **MS. ANDRAPALLIYAL:**  Right, Your Honor.  No, this has

12   not been decided yet.

13    This is CBP's proposal to DHS privacy.  It's explaining

14   what it wants to do and what risk mitigation measures it has

15   identified.  And as you -- as we sort of go along --

16     **THE COURT:**  Okay.

17     **MS. ANDRAPALLIYAL:**  -- you know, at the end there is,

18   you know, the ultimate component privacy output recommendation,

19   which was CBP's bottom line recommendation/proposal for DHS

20   privacy.  And that's on page 36, redacted under (b)(5).

21     **THE COURT:**  Page 36, and that's at the bottom.

22     **MS. ANDRAPALLIYAL:**  That's correct, Your Honor.  A

23   component privacy office recommendation.

24     **THE COURT:**  Okay.

25     **MS. ANDRAPALLIYAL:**  And I just want to point out in

1   this -- you know, in this block of text, CBP is ███████

2   ████████████████████████████████████████████

3   ██████████████████████████████████████████████

4   ███████████████████████████████████████████

5   ███████████████████████████████████████████████

6   ███████████████████████████████████████████████

7   ██████████████████████

8       And, you know, DHS privacy is -- ultimate adjudication is

9   unredacted on page 38.

10          THE COURT:  And so the only things that are redacted

11  are the two things -- there is one thing, it looks like, on

12  page 33.

13          MS. ANDRAPALLIYAL:  Yes.

14          THE COURT:  There is a line -- that is also a (b)(5)

15  redaction?

16          MS. ANDRAPALLIYAL:  That is a (b)(5) redaction,

17  Your Honor.  Let me just make sure that's the only other one.

18                  (Pause in proceedings.)

19          MS. ANDRAPALLIYAL:  Yeah, that should be the only

20  other one to go through in this particular document.

21          THE COURT:  And I take it, if I looked at this similar

22  PTAs on page 48, 57, it would be a similar -- well, let's

23  see --

24          MS. ANDRAPALLIYAL:  Yes, Your Honor.

25          THE COURT:  If I look at page 50, which redactions --

1  are there (b)(5) redactions on page 50?

2          MS. ANDRAPALLIYAL:   There is only one, Your Honor; and

3  that is the third line, you know, at the very end, it says:

4  This pilot will assess the -- and then that block is redacted

5  under (b)(5) and (7) regarding that particular tool and, you

6  know, what is -- what CBP is hoping to test in this pilot.

7          THE COURT:  You see -- this is on page 50?

8          MS. ANDRAPALLIYAL:  Yes, 50.

9          THE COURT:  And where is the sentence?

10         MS. ANDRAPALLIYAL:  So, it starts on line 4, but the

11 sentence itself begins at the very end of line 3 of box 1.

12 So --

13         THE COURT:  Oh, I see.  This pilot will assess

14 ███████████████

15         MS. ANDRAPALLIYAL:  Yes.

16         THE COURT:  Okay, because it explains what the plan

17 is, what they are going to do.  That's the idea.

18         MS. ANDRAPALLIYAL:  Exactly, yes.

19         THE COURT:  All right.  And then on the next page, on

20 page 51, is the -- because now it is sort of lining up.  I see

21 a red box around -- toward the bottom in box number 4, which

22 says, possibly may include -- and then it is redacted -- ██████

23 ████████████████████████████████████████████████

24 ████████   Is that a (b)(5) redaction?

25         MS. ANDRAPALLIYAL:  No, Your Honor, those are both

1  (7)(E) redactions.

2          **THE COURT:**  Oh, okay.  All right.  Well, is there

3  another (5) -- (b)(5) redaction in this document?

4          **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

5      On page 54, again, you have the component privacy office

6  recommendation.

7          **THE COURT:**  I see.

8          **MS. ANDRAPALLIYAL:**  That is withheld on (b)(5), and it

9  goes onto the next page as well.

10         **THE COURT:**  Okay.

11         **MS. ANDRAPALLIYAL:**  And, I believe, both of them are

12 actually also redacted -- I'm sorry.  This block is also

13 redacted under (7)(E).

14         **THE COURT:**  Okay.

15         **MS. ANDRAPALLIYAL:**  So, yeah.

16         **THE COURT:**  All right.  Okay.  All right.  So let's

17 go --

18         **MS. ANDRAPALLIYAL:**  For completeness, Your Honor --

19 sorry.

20         **THE COURT:**  Yeah.

21         **MS. ANDRAPALLIYAL:**  -- there is another block -- there

22 is -- the very last redaction on page 56 is also under (b)(5),

23 and that's --

24         **THE COURT:**  Which one is that?

25         **MS. ANDRAPALLIYAL:**  -- that's discussing -- sure,

1    it's -- so bottom of page 56 where you see "the system covered

2    by existing PIA," that --

3              THE COURT:  Yeah.

4              MS. ANDRAPALLIYAL:  -- that second sentence is

5    redacted under (b)(5) because it is discussing a potentially

6    forthcoming ███████████████████, which to my knowledge has

7    not been issued ███████████████████.

8              THE COURT:  Okay.  All right.  Let's go to the next

9    category, which is ICE contracts.  So I'm looking at page 62.

10             MS. ANDRAPALLIYAL:  Right.

11             THE COURT:  I can't really tell what this is.  Can you

12   explain that?

13             MS. ANDRAPALLIYAL:  Sure, Your Honor, just one moment.

14                       (Pause in proceedings.)

15             MS. ANDRAPALLIYAL:  I want to make sure I have the

16   right information here.

17                       (Pause in the proceedings.)

18             MS. ANDRAPALLIYAL:  So, yes, Your Honor.  This is sort

19   of one -- the two paragraphs that are redacted on page (b)(5)

20   on this page.

21        And, you know, this discussion is between HSI employees

22   and contractors who are in the process of developing standard

23   operating procedures and training manuals with respect to --

24   you know, there is -- there is a Ghost -- Giant Oak is a social

25   media surveillance company, I believe, that HSI contracted with

1    for this tool called Ghost.

2        And I believe we have released those contracts and

3    information about Ghost elsewhere in our production.

4        But, you know, in the middle of finalizing these standard

5    operating procedures and training manuals, we have an employee

6    providing some draft contract language to another employee.

7            THE COURT:  So this is all internal?

8            MS. ANDRAPALLIYAL:  Yes.

9            THE COURT:  This is internal to contract negotiations?

10           MS. ANDRAPALLIYAL:  Yes -- well, Your Honor, I --

11   yeah, CTR, I'm not sure.  I think it's between a -- an employee

12   and a contractor or multiple contractors.

13       But, yes, internal to the negotiations -- internal with

14   respect to how to move forward with contract negotiations

15   with --

16           THE COURT:  Right.  But this document -- this document

17   is not a communication from the Government to a contractor but

18   within the Government about how to negotiate with the

19   contractor; is that right?

20           MS. ANDRAPALLIYAL:  So, I believe that it is between

21   an employee and a contractor; but it is in -- it is -- the sort

22   of subject matter is how to negotiate with or what sort of

23   contract language ultimately to settle on with Giant Oak.

24           THE COURT:  Giant Oak being?

25           MS. ANDRAPALLIYAL:  A separate company, Your Honor,

1  that HSI contracted with to provide additional social media

2  monitoring.

3       THE COURT:  So, maybe I'm -- I'm a little confused.

4  This is a memo from -- I can't read it -- Rajewski to somebody

5  at CTR and to Michelle Anderson; right?

6       MS. ANDRAPALLIYAL:  Right, Your Honor.  I don't know

7  for certain if those two individuals are employees or if they

8  are contractors.

9       So, I'm not entirely sure about that.  But, yes, it's from

10  this person to Michelle, and it's providing draft contract

11  language.

12       THE COURT:  Well, so, negotiations or advice to an

13  outside contractor or back and forth, I'm not sure that

14  that's -- I thought (b)(5) is to cover sort of internal things,

15  you know, analogous to attorney-client discussions or

16  intra-agency policy discussions.

17       If this is sort of -- I don't know -- sort of negotiations

18  with the contractor, I'm not sure why that would be covered by

19  (b)(5).

20       MS. ANDRAPALLIYAL:  Your Honor, I apologize if I was

21  unclear.  This -- this language is not -- was not sent to Giant

22  Oak, which was the contractor -- which was the company with

23  whom HSI was hoping to finalize this particular Ghost contract.

24       THE COURT:  Yeah.

25       MS. ANDRAPALLIYAL:  But it's to another contractor as

1    CBP -- I'm sorry -- as ICE is preparing to, you know, get back

2    to Giant Oak.

3        And so, you know, I believe the consultant corollary would

4    apply here, Your Honor, where even if this particular -- either

5    of these particular individuals are not employees, they are,

6    you know, being consulted as part of this deliberative process.

7            THE COURT:  All right.  So they are almost like an

8    attorney hired by the Government?

9            MS. ANDRAPALLIYAL:  Similar, Your Honor, yes.

10           THE COURT:  Okay.  But instead of using an internal

11   consultant, they use an external consultant in negotiating the

12   contract is what you are saying.

13       And that they should be treated as if they were an

14   internal part of the Agency because they were -- they were a

15   vendor; but, I mean, presumably subject to the same NDA and

16   confidentiality clauses?

17           MS. ANDRAPALLIYAL:  Exactly, Your Honor, yes.

18           THE COURT:  Is that stated somewhere in your filings?

19           MS. ANDRAPALLIYAL:  Let me see.

20               (Pause in the proceedings.)

21           MS. ANDRAPALLIYAL:  I believe it is in ICE's index,

22   which is -- let me see.  If you can hold on for a minute.

23           THE COURT:  Sure.

24               (Pause in proceedings.)

25           MS. ANDRAPALLIYAL:  Okay.  This is document 98.2, ECF

1    Number 98.2, ICE's Vaughn index.

2              **THE COURT:**  Okay.

3              **MS. ANDRAPALLIYAL:**  Yes.  So this is on page 2 of that

4    Vaughn index, and ICE is explaining that this is protecting

5    internal discussions discussing draft contract language

6    regarding serial locator technology.

7              **THE COURT:**  All right.  Okay.  And the other -- the

8    other communication at pages 1012 through 1014 --

9              **MS. ANDRAPALLIYAL:**  Yes.

10             **THE COURT:**  -- seems like it is a similar one.  Okay.

11             **MS. ANDRAPALLIYAL:**  Yes.

12             **THE COURT:**  I understand that.

13             **MS. ANDRAPALLIYAL:**  Your Honor, this is actually -- if

14   I may?

15             **THE COURT:**  Yeah.

16             **MS. ANDRAPALLIYAL:**  Pages 1012 to 1014, they are

17   different.  This is actually involving, you know, a tasking

18   request.

19        It was, I believe, from the Deputy Director of ICE's

20   office down to staff level folks and sort of soliciting views

21   on what information to release about, you know, Homeland

22   Security's investigations use of Facebook for social media

23   monitoring purposes.

24        And so this information was a rough draft of the summary

25   that was going up to higher level folks, and senior leadership

1  would decide what information to ultimately provide to the

2  public.

3      And so this is a draft set of essentially talking points,

4  Your Honor; and that is protected under (b)(5) but for a

5  slightly different reason because it's a draft.  It reflects,

6  you know, these particular facts selected for inclusion by this

7  particular author, you know, that's that -- that employee's

8  personal view of what should be included in forward facing

9  communications.  And it's subject to final review.

10      **THE COURT:**  Well, that's an interesting question.  So

11  if what is being talked about is what should be disclosed, as

12  you put it, in forward facing communications with the public,

13  is that -- is that part of a process that exercises policy

14  implicating judgment?

15      I mean, it is not about forming the policy.  It is about

16  what should we disclose about the policy.

17      **MS. ANDRAPALLIYAL:**  Yes, Your Honor.  It does fall

18  within (b)(5) deliberative process privilege because, again,

19  it's a back-and-forth between folks within the Agency about

20  what to communicate to the public.

21      That is a policy decision because obviously, you know,

22  what can be publicly disclosed can impact sort of the efficacy

23  of these operational techniques as well as, you know, the

24  public's information about it.

25      So, yes, that is protected.  And I have a cite to *CREW*

 1 *versus DHS*, 648 F.Supp.2d, 152, out of the District of Columbia

 2 recognizing --

 3         THE COURT:  I'm sorry, 648 F.Supp; did you say?

 4         MS. ANDRAPALLIYAL:  Yes, F.Supp.2d 152, District of

 5 Columbia, protecting draft talking points.

 6     And I do, again, want to come back to *National Wildlife*

 7 *Federation* and *Coastal States*.  You know, again, the question

 8 is not whether this particular information is factual.

 9     The question is whether revealing this information would

10 thereby reveal the deliberative process and what someone thinks

11 about what should be included and what -- you know, in an

12 intermediate step before things are finalized and released to

13 the public.

14         THE COURT:  Well, in other words, the decision whether

15 to disclose and how much to disclose is itself a policy

16 decision that is subject to the (b)(5) analysis even though it

17 is not -- there are two policies.  One is a substantive policy.

18 Like, let's do X.

19         MS. ANDRAPALLIYAL:  Right.

20         THE COURT:  And the next question is:  How much do we

21 tell the public about X or --

22         MS. ANDRAPALLIYAL:  Right.

23         THE COURT:  -- what we did to get to X.  And you are

24 saying that *CREW* stands for the proposition that that itself --

25 talking points, for instance -- would be -- is there any

 1   other -- is there any contrary case law that distinguishes

 2   between sort of what to tell the press versus what do we decide

 3   to do substantively?

 4            MS. ANDRAPALLIYAL:  Your Honor, I'm not aware of any.

 5   I know that there is a distinction between what is factual and

 6   can be segregated out of otherwise -- you know, an otherwise

 7   deliberative communication and what is so interwoven or, you

 8   know, do particular facts themselves reveal information about

 9   the way the Agency was thinking about something or what -- you

10   know, what is appropriate for inclusion in a forward facing

11   document.  And so --

12            THE COURT:  Okay.

13            MS. ANDRAPALLIYAL:  So the question sort of turns on

14   whether this can be segregated out.  And here it can't.

15            THE COURT:  All right.  Let's go to the next thing,

16   Performance Work Statement Visa Lifecycle Vetting Initiative,

17   page 569.  Let's see.  Why don't I have that?

18            MS. ANDRAPALLIYAL:  Plaintiffs -- is it 596, Your

19   Honor?

20            THE COURT:  Oh, maybe 596.  Maybe it is a

21   transposition error.  It should be 596?

22            MS. ANDRAPALLIYAL:  It should be.

23            THE COURT:  Yeah, okay.  Tell me about this document.

24            MS. ANDRAPALLIYAL:  Yes, Your Honor.  This is a draft

25   document.  You know, the watermark makes that clear.  It is a

1    draft performance work statement regarding the Visa Lifecycle

2    Vetting Initiative.

3        To my knowledge this was never finalized and never went

4    out, and it's a draft.  And if you look through it, it is what

5    it sounds like.  As the Court said in *National Wildlife*

6    *Federation*, you know, it is non-final, subject to final review;

7    was never ultimately finalized.

8            **THE COURT:**  What was this supposed to be for?  What is

9    this a draft of?  This is like a procurement document?

10           **MS. ANDRAPALLIYAL:**  Well, just a second.  Let me see

11   if I can get more information about it.

12           **THE COURT:**  Because it talks about ████████████████

13   ██████████████    It sounds like something that would ultimately go

14   as a ████████████████████.  Is it an ████ or something.  Is that

15   what it is?

16           **MS. ANDRAPALLIYAL:**  Your Honor, my understanding is

17   that this is something that was drafted for -- ████████████████

18   ███████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████.

20           **THE COURT:**  Because in the very beginning, of course,

21   the page says is ██████████████████████.  I assume it is in the

22   ██████████████ -- part of the ██████████████████████.

23           **MS. ANDRAPALLIYAL:**  I think that's right, Your Honor.

24   I'm not totally familiar with that process.

25           **THE COURT:**  Okay.

1    **MS. ANDRAPALLIYAL:**  That sounds correct.  I do want to

2    refer this Court to paragraph 43 of the Pineiro declaration,

3    which was ICE's original declaration, explaining the

4    withholding of certain documents including this one.

5        And it does go into a little bit more detail about how

6    this is a draft and about how releasing this draft could, you

7    know, impair the decision-making process and also cause

8    confusion by, you know, by disseminating something non-final

9    about work responsibilities into the --

10       **THE COURT:**  Do you have the docket number for that

11   declaration by chance?

12       **MS. ANDRAPALLIYAL:**  Yes, Your Honor, just a moment.

13                   (Pause in proceedings.)

14       **MS. ANDRAPALLIYAL:**  So that's 98.1 --

15       **THE COURT:**  Okay.

16       **MS. ANDRAPALLIYAL:**  -- for the original declaration.

17   And then Docket Number 128 for the supplemental declaration.

18       And I just want to -- I have it up in front of me, but I

19   will just quote from paragraph 11, that supplemental

20   declaration.

21       "The draft document contains an unfinalized version of a

22   performance work statement which includes draft

23   responsibilities, draft scope and objectives, and various

24   personnel responsibilities."

25       So that was the content that was protected in this

1    particular --

2          **THE COURT:**  All right.  And what is sought is to

3    redact the entirety of this document?

4          **MS. ANDRAPALLIYAL:**  Yes, Your Honor, it was withheld

5    in full.

6          **THE COURT:**  All right.  Let's go to the USCIS, there

7    is an e-mail at 17 -- let's see, 1571.

8          **MS. ANDRAPALLIYAL:**  Yes.

9          **THE COURT:**  Maybe you can tell me the context of this

10   and who DEA is or what DEA is.

11         **MS. ANDRAPALLIYAL:**  Yes.  So, Your Honor, I'm not

12   entirely sure who DEA is.

13         I can tell you that this document was sent from USCIS's

14   Office of Chief Counsel; and it was, you know, in response to a

15   question it received from the operations side about whether

16   USCIS may collect publicly available information relating to,

17   you know, Petitioners' or Requester's exercise of First

18   Amendment protected activities.

19         And this was cleared by one level of review, but it went

20   on to another level of internal review at OCC.

21         And the Agency withheld this information under both the

22   deliberative process privilege and the attorney-client

23   privilege because these were Office of Chief Counsel

24   employees -- attorneys providing legal advice about what was

25   permissible to collect in this space.

1      **THE COURT:**  All right.  So, it is being held under

2  both the attorney-client and the deliberative process

3  privilege?

4          **MS. ANDRAPALLIYAL:**  That's correct, Your Honor.

5      **THE COURT:**  And this is a non --

6          **MS. ANDRAPALLIYAL:**  I do want to point out --

7      **THE COURT:**  It is a non-final document.

8          **MS. ANDRAPALLIYAL:**  Exactly.  It is a non-final

9  document.  And I refer this Court to paragraphs 7 and 11 of the

10  supplemental USCIS declaration.

11      I can get you a pin site for that.  That's ECF Number 129,

12  and it goes into the detail about the deliberative process and

13  the attorney-client privilege.

14          **THE COURT:**  What paragraph of -- what paragraph of

15  that declaration?

16          **MS. ANDRAPALLIYAL:**  So paragraph 7 of that declaration

17  explains in further detail the deliberative process privilege

18  withholding, and then paragraph 11 talks about the reason why

19  it withheld the information under DHS as well.

20          **THE COURT:**  Okay.  And do you know who Christina is?

21  "I plan to send to Christina in the morning."

22          **MS. ANDRAPALLIYAL:**  I don't, Your Honor; but I do want

23  to point out in paragraph 7 of the supplemental-wide

24  declaration, the e-mail -- I'm quoting here -- the e-mail

25  contains a sentence indicating that this draft version had been

1  cleared, but the subject indicates that it is a draft; and it

2  had only been cleared by one individual, which would be sent to

3  another individual -- which, I believe, you know, may be

4  Christina -- the Division Chief for the National Security and

5  Benefits Division of the USCIS for her review in the revision

6  prior to sending to USCIS leadership to review.

7       So this is, you know, sort of multiple steps removed from

8  being the final decision.

9       **THE COURT:**  All right.  Okay.  And then USCIS 11 --

10  1711 through 12 is an e-mail chain.

11       **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

12       **THE COURT:**  And my understanding is that the quote at

13  the top of 1712 from the Center of Democracy and Technology, is

14  a -- that quote is public.

15       **MS. ANDRAPALLIYAL:**  Yes, Your Honor.  My understanding

16  is that USCIS is in the middle of re-processing this document

17  and will release the underlying URL at the bottom of 1712 as

18  well as that particular block of text.

19       The other -- the other statements are sort of USCIS

20  employees' impressions of this particular lifecycle vetting

21  initiative and also opines on some of the technology's

22  limitations.

23       So, I do apologize for not having that ready for this

24  Court right now, but I understand that USCIS is working on it

25  and expect to --

1    **THE COURT:**  Okay, but you are still asserting the

2  privilege for an exemption with respect to the kind of comments

3  on that public document from the Center?

4    **MS. ANDRAPALLIYAL:**  Yes, Your Honor.

5    **THE COURT:**  And the theory is this is -- reveals

6  policy implicating sort of mode of the Agency?

7    **MS. ANDRAPALLIYAL:**  Well, Your Honor, I believe that

8  these e-mails were sent between employees that are part of a

9  social media monitoring working group.

10    And so, you know, this information was communicated to

11  members of that group; and they are opining on the -- on what

12  they think about this particular ICE initiative.

13    And, you know, I believe that they all -- let me see.  So,

14  these are e-mails between the USCIS Office of Chief Counsel

15  attorneys and the Fraud Detection and National Security Office.

16    And all of these employees are apparently part of USCIS's

17  social media working group, and they would meet periodically to

18  discuss sort of the current state of social media monitoring

19  and potential future initiatives.

20    **THE COURT:**  Did they have some role in the -- in this

21  DHS screening thing that -- this program, the RMA processes, to

22  generate, you know, investigations, et cetera, et cetera?  What

23  is their role in ICE -- over ICE?

24    **MS. ANDRAPALLIYAL:**  Your Honor, USCIS is a separate

25  Agency component.  But my understanding, from the supplemental

1  White declaration on paragraph 9, is that these statements

2  relate to upcoming decisions that the working group was

3  considering.  And, you know, it's a statement regarding a

4  specific technology request, employees' thoughts about pending

5  process decisions.

6      And so I'm not entirely certain the way all the pieces fit

7  together, Your Honor; but I do refer this Court to paragraph 5

8  of the supplemental White declaration for more information.

9          **THE COURT:**  Okay.  Again, what is the document number

10  for that declaration?

11          **MS. ANDRAPALLIYAL:**  Yes, that's ECF 129.

12          **THE COURT:**  ECF 129, and this one is paragraph --

13  which one?

14          **MS. ANDRAPALLIYAL:**  Paragraph 9.

15          **THE COURT:**  Nine, okay.  It is your understanding that

16  these folks were sort of commenting, somewhat snidely, are part

17  of a decision-making process that will affect the

18  implementation or not of this 10,000 investigative leads

19  program?

20          **MS. ANDRAPALLIYAL:**  So my understanding is that, yeah,

21  they are opining on, you know, this particular ICE technology

22  request.  But, you know, because DHS is one department, I

23  believe that -- my understanding is that the views of CNS are

24  relevant to sort of the ultimate decision-making process.

25      Again, I don't want to speak out of turn.  I do want to

1   refer this Court to page 9 of the supplemental White

2   declaration.

3        **THE COURT:**  That's helpful.  I understand that.  I am

4   reminded, however, that the burden of proof on establishing

5   exemption lies with the Government.

6        So, I will have to see -- it does -- my gut reaction is

7   that if these are folks that are part of the deliberative

8   process and will have some power over the implementation or not

9   or mode of implementation of this program that is talked about

10  in the CDT level -- letter, that at least makes for an argument

11  that that is part of the deliberative process.

12       If they are sort of outside the process and they are

13  poking fun or whatever, may not be part of the -- I will look

14  at the declaration.

15       **MS. ANDRAPALLIYAL:**  Yes, Your Honor.  And I will

16  submit the reprocessed document to this Court to see what

17  was -- what was --

18       **THE COURT:**  All right.  That will be helpful.  Is that

19  the only change, the only reprocess document?  Everything else

20  remains?

21       **MS. ANDRAPALLIYAL:**  Yes.

22       **THE COURT:**  Okay.  All right.  Well, this has been

23  helpful.  I was surprised.  I thought the blue and the red

24  meant something.

25       **MS. ANDRAPALLIYAL:**  I do apologize, Your Honor.  I

SEALED PROCEEDINGS

1  thought so initially as well.  It ultimately did not reflect

2  the category being applied.

3          **THE COURT:**  All right.  Okay.  I will get out a ruling

4  hopefully shortly on all of this.  Appreciate your help.

5          **MS. ANDRAPALLIYAL:**  Appreciate it.  Thank you,

6  Your Honor.

7          **THE COURT:**  All right.  Thank you.

8              (Proceedings adjourned at 11:28 a.m.)

9                      ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                 __CERTIFICATE OF REPORTER__

4          We certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Saturday, September 25, 2021

8

9

10

11   _____

12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25